ERIC G. YOUNG, ESQ. (SBN 190104)
**YOUNG LAW GROUP**
2544 Cleveland Avenue, Suite 210
Santa Rosa, California 95403
Tel.: 707.343.0556
Fax: 707.327.4360
Email: eyoung@younglawca.com
E-Service: service@younglawca.com

Attorneys for Plaintiff
RONALD CUPP

# UNITED STATES DISTRICT COURT

# NOTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| RONALD CUPP, an individual,<br><br>    Plaintiff,<br><br>    vs.<br><br>COUNTY OF SONOMA, a municipal corporation; TENNIS WICK, in his individual and official capacities; TYRA HARRINGTON, in her individual and official capacities; MARK FRANCESCHI, in his individual and official capacities; TODD HOFFMAN, in his individual and official capacities; JESSE CABLK, in his individual and official capacities; ANDREW SMITH, in his individual and official capacities; and DOES 1-50, inclusive.<br><br>    Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES**<br><br>**1) VIOLATION OF 42 U.S.C. § 1983 – VIOLATION OF FOURTH AMENDMENT**<br>**2) VIOLATION OF 42 U.S.C. § 1983 – VIOLATION OF FIFTH AMENDMENT**<br>**3) VIOLATION OF 42 U.S.C. § 1983 – VIOLATION OF FOURTEENTH AMENDMENT**<br>**4) VIOLATION OF 42 U.S.C. § 1983 - CONSPIRACY TO VIOLATE FOURTH AMENDMENT**<br>**5) VIOLATION OF 42 U.S.C. § 1983 – CONSPIRACY TO VIOLATE FOURTEENTH AMENDMENT**<br>**6) VIOLATION OF ART. I, § 7 OF THE CALIFORNIA CONSTITUTION**<br>**7) VIOLATION OF ART. I, § 13 OF THE CALIFORNIA CONSTITUTION**<br>**8) TRESPASS**<br>**9) INVASION OF PRIVACY**<br><br>**JURY TRIAL DEMANDED** |



*"The question we confront today is what limits are upon this power of technology to shrink the realm of guaranteed privacy."* -Kyllo v. United States

**COMES NOW,** Plaintiff RONALD CUPP ("Cupp") and hereby alleges against Defendants, and each of them, as follows:

## I.

## NATURE OF ACTION

1. This action is based upon, and seeks compensatory and injunctive relief to redress violations of the Civil Rights Act of 1872, 42 U.S.C. § 1983, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, caused by Defendants, and each of them, acting under color of law, acting to promote or enforce unconstitutional or unlawful practices, policies, procedures, ordinances, resolutions, patterns of conduct, customs and usage of regulations adopted, employed or ratified by policy-making supervisors in doing or causing the following to occur:

(A) Using unmanned aircraft systems (UAS) ("drones") to conduct warrantless searches of Cupp's real property located at 4640 Arlington Avenue, Santa Rosa, California ("the subject property") without Cupp's consent or exigent circumstances over a period of time and continuing;

(B) Submitting or causing the submission of a false or misleading affidavit of probable cause in support of an inspection warrant for the subject property to a judicial officer, giving Cupp neither notice nor an opportunity to be heard;

(C) Instituting abatement proceedings against Cupp, including recording or causing to be recorded an abatement lien against Cupp's title to the subject property based on warrantless searches of the subject property and/or based upon an inspection warrant issued only after completing warrantless searches of the subject property and/or upon a false or misleading affidavit designed to mislead a judicial officer;



(D) Taking, without any compensation, the subject property by disconnecting electricity and gas ("the power") to the residence located at the subject property, without just cause, arbitrarily and capriciously under the guise of local code enforcement and nuisance abatement, and then refusing to restore the power to the subject property until after this Court denied, in part, Defendant Andrew Smith's motion for summary judgment in *Cupp v. Smith,* Case No. 4:20-CV-03456-PJH;

(E) Taking, without any compensation, the subject property by enforcing local rules, ordinances, or regulations against Cupp and the subject property; namely, but not exclusively, by requiring Cupp to reduce the number of bedrooms in the residence at the subject property from 4 bedrooms to 1 bedroom to approve a permit for the septic system at the property which had already been approved many years prior; and

(F) Entering or causing another to enter upon the subject property through the use of drones, and other means, without Cupp's consent, invading Cupp's privacy with respect to the subject property, and intentionally causing Cupp to suffer severe emotional distress.

2. The foregoing conduct by Defendants, and each of them, has occurred, and continues to occur, as a result of unconstitutional policies, practices, procedures, or an ongoing pattern or course of conduct that is without just cause, arbitrary and capricious, malicious, oppressive, disregards Cupp's constitutional and state law rights, and arises from an improper motive on the part of Defendants, and each of them, amounting to a malevolent intent that is designed to, and has, vexed, harassed, annoyed, caused financial and pecuniary harm or damage to Cupp, made it unreasonably difficult or impossible for Cupp to complete actions to bring the subject property into compliance with rules, ordinances, or regulations imposed on Cupp by Defendants, and has resulted from an

improper purpose intended to cast a cloud on Cupp's title to the subject property, diminish the value of the subject property, interfere with Cupp's use of the subject property, devalue the subject property, and cause or require Cupp to unnecessarily expend large sums of money to comply with Defendants' demands as alleged herein.

## II.

## PARTIES, JURISDICTION & VENUE

4. At all times relevant herein, Cupp was an individual who either resided at the subject property; or was, and is, the owner of record of the subject property, and is entitled to the full panoply of rights, privileges, and protections of the United States Constitution, the California Constitution, California statutory law, and the common law.

5. Cupp is informed and believes, and thereon alleges, that Defendant TENNIS WICK ("Wick") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("the County"), and he was, and is, the Director of the Permit and Resources Management Department (also known and referred to herein as "PRMD" or "Permit Sonoma"), an official government agency within the County, and is, by reason of the authority vested in him by the Sonoma County Code of Ordinances, Chapter 7, Art. I, Sec. 7-2, "the Chief Building Official" for and on behalf of the County. Section 7-2 further provides:

> "The chief building official shall be the director of the permit and resource management department or his or her designee. The chief building official shall supervise and be responsible for all inspection work required for the proper enforcement of regulations imposed by this chapter except those duties specifically delegated herein to the county public health officer. The chief building official shall perform related duties as directed by the board of supervisors. The chief building official shall appoint such deputies and assistants as may be authorized by the board of supervisors."

(Ord. No. 5754 § 1 (b), 2007: Ord. No. 5399 § 1, 2003: Ord. No. 4906 § 3, 1995.) Wick is sued in his individual and official capacities.



6. Cupp is informed and believes, and thereon alleges, that Defendant TYRA HARRINGTON ("Harrington") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("County"), and that she was, and is, a Code Enforcement Manager, and is hereby sued in her individual and official capacities.

7. Cupp is informed and believes, and thereon alleges, that Defendant MARK FRANCESCHI ("Franceschi") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("County"), and that he was, and is, a Code Enforcement Supervisor, and is hereby sued in his individual and official capacities.

8. Cupp is informed and believes, and thereon alleges, that Defendant TODD HOFFMAN ("Hoffman") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("County"), and that he was, and is, a Code Enforcement Inspector II employed by County, and is hereby sued in his individual and official capacities.

9. Cupp is informed and believes, and thereon alleges, that Defendant JESSE CABLK ("Cablk") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("County"), and that he was, and is, a Senior Code Enforcement Inspector employed by County, and is hereby sued in his individual and official capacities.

10. Cupp is informed and believes, and thereon alleges, that Defendant ANDREW SMITH ("Smith") was, at all relevant times, a resident of Defendant COUNTY OF SONOMA ("County"), and that he was, and is, a Code Enforcement Inspector employed by County, and is hereby sued in his individual and his official capacities.

11. Cupp is informed and believes, and thereon alleges, that Defendant COUNTY OF SONOMA was, at all relevant times, a municipal corporation that acted jointly with the other Defendants named herein, including DOES 1-50, inclusive, directly and indirectly, by establishing the unconstitutional policies or procedures complained of



herein; or by instituting, approving, encouraging, or ratifying the patterns, practices, or courses of conduct engaged in by the other Defendants named herein, including DOES 1-50, inclusive, before, on and after February 15, 2019, as alleged herein.

12. Cupp sues each and all individual Defendants in their individual and personal capacities, but also in their official capacities by reason of the fact each Defendant, at all times alleged herein, was acting under color of law when engagin in, directing, ordering, approving, ratifying or undertaking the wrongdoing complained of herein.

13. Cupp does not know the true names and capacities of those defendants sued herein as DOES 1-50, inclusive, whether they be individuals, agents, representatives, corporations, associates, partners, departments, subdivisions, or other business or governmental entities, and therefore, Cupp sues these defendants by fictitious names. Cupp is informed and believes, and thereon alleges, that each of these fictitiously named defendants has harmed Cupp, or caused damage to Cupp, through varied intentional Constitutional violations and deprivations, or they have violated state or common law, in a manner that is equally reprehensible, outrageous, and vindictive as those Defendants named herein. Cupp will seek leave to amend this Complaint to set forth the true names and capacities of such defendants when the information is ascertained.

14. Cupp is informed and believes, and thereon alleges, that each of the Defendants named herein, including defendants sued herein as DOES 1-50, inclusive, in some legally recognizable manner acted in concert with, as the agent of, employee, representative, or assign of each of the other Defendants; or the conduct of the Defendants named herein, including defendants sued herein as DOES 1-50, inclusive, was done at the behest of the other Defendants, with their express or implied approval, encouragement, acquiescence, or was ratified by the other Defendants, and each of them, after the fact.



15. This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (deprivation of civil rights and conspiracies), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 1983 (civil rights violations actionable against states). This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

16. Venue in this Court is proper pursuant to 28 U.S.C. §1391b in that at least one Defendant resides in this District, and the events giving rise to Cupp's claims occurred in this District.

**III.**

**<u>COMPLIANCE WITH CAL. GOVT. TORT CLAIM PROCEDURES</u>**

17. Cupp submitted a formal claim to Defendants on July 15, 2022 pursuant to California Government Code section 910. The notice specifically references both the June 1, 2022 drone fly-over of the subject property as well as the March 27, 2020 drone flyover, and further alleged that both flyovers were conducted without warrants and constituted a "pattern or practice by County officials acting in concert to violate Claimant's private property interests and civil rights." Attached hereto as ***Exhibit A,*** and incorporated herein, is a true and correct copy of Cupp's July 15, 2022 claim.

18. On August 25, 2022, the County mailed notice of their rejection of Cupp's July 15, 2022 claim bearing the date August 25, 2022. In its notice rejecting Cupp's July 15, 2022 claim, the County referenced a prior claim Cupp had made dated August 4, 2020. Attached hereto as ***Exhibit B,*** and incorporated herein, is a true and correct copy of the County's August 25, 2022 rejection letter to Cupp.

19. Cupp's August 4, 2020 claim was filed as a result of the warrantless entry on July 30, 2020, and that claim specifically references July 30, 2020 as the Date of Incident



on the County's claim form. Cupp's August 4, 2020 claim makes no mention of drones whatsoever, nor does it allege a "pattern and practice" of unconstitutional misconduct by Defendants.

20. On August 29, 2022, realizing that the County had evidently misapprehended the scope of Cupp's July 15, 2022 claim, Cupp submitted a clearly marked "Amended Claim" – still well-within the 6-month time requirement – referencing the drone flyovers, and alleging:

> "...[S]uch conduct evidences and is indicative and representative of a pattern, practice, or repeated course of conduct approved, authorized, or ratified by County and other named officials acting in concert..."

Cupp also added a claim under the California constitution, Article I, Secs. 7 & 13 and removed a claim made pursuant to Civil Code section 1708.8. Attached hereto as ***Exhibit C,*** and incorporated herein, is a true and correct copy of Cupp's amended claim to the County.

21. Both the July 15, 2022 claim and the August 29, 2022 amended claim were personally delivered and stamped received by the County. Cupp's amended claim contained different and additional allegations requiring a further response from the County. The County had forty-five (45) days from August 29, 2022 to respond, which would have been up to and including October 13, 2022. No agreement to extend that date was made. To date, the County has not replied or otherwise even acknowledged Cupp's amended claim. Thus, the amended claim was deemed rejected on October 14, 2022.

22. As a result, the County has waived any defense to untimeliness of Cupp's amended claim. (Cal. Govt. Code §§ 911.3(b), 913). In addition, Cupp's statute of limitations on his state law claims is thereby extended by two (2) years from the date of accrual as stated in the amended claim, which was June 1, 2022, giving Cupp until June 1,



2024 to file suit on his state law claims. (Cal. Govt. Code, § 945.6.) Thus, Cupp brings suit for violation of his state constitutional, statutory and common law rights arising from the County's warrantless use of drones, and other unconstitutional methods, to search his property within the statutorily prescribed time pursuant to California Government Code.

23. The remainder of Cupp's counts as set forth herein arise under federal constitutional law and, thus, are not subject to California's Government Tort Claim procedures.

**IV.**

**<u>FACTS COMMON TO ALL CAUSES OF ACTION</u>**

**A. County Enacts Ordinance Authorizing "Code Enforcement Enhancement Program"**

24. On March 27, 2017, under the moniker "Code Enforcement Enhancement Program" ("CEEP"), County Counsel (at the time, Bruce Goldstein) and Defendant Wick presented Agenda Item 26 to the County Board of Supervisors, which was approved. Attached hereto as ***Exhibit D***, and incorporated herein, is a true and correct copy of Agenda Item 26.

25. It was asserted in Agenda Item 26 that CEEP was needed to address Permit Sonoma staffing reductions that had occurred in previous years, which had allegedly led to a decrease in revenue generated by Permit Sonoma for the County.

26. Rather than being a "program" to hire more Code Enforcement Inspectors to address the alleged backlog of cases and revenue shortfall, CEEP proposed hiring one Code Enforcement Manager, which ultimately turned out to be Defendant Harrington, who on information and belief is a former Deputy Sheriff with the Sonoma County Sheriff's Department.



27. According to CEEP, Defendant Harrington's mandate is "to oversee and coordinate violation remediation efforts to *both increase cost recovery and reduce case backlog*." (Exhibit D, "Recommended Actions," (A), page 1 of 8, emphasis added.) In other words, Defendant Harrington's job was, and is, to increase the revenue generated by Permit Sonoma for the County. Indeed, according to CEEP, *100%* of Defendant Harrington's salary, which on information and belief was or is at least $154,292 (as of 2018) or more in salary and benefits annually[1], was expected to be generated from increases in cost recovery. (Exhibit D, "Executive Summary," page 4 of 8; "Narrative Explanation of Fiscal Impacts," page 7 of 8, emphasis added.)

28. On information and belief, CEEP, which represents official County policy set into effect by the County Board of Supervisors, gave, and continues to give, a powerful incentive and motivation to Defendant Harrington to not only aggressively pursue "cost recovery" on behalf of the County herself, but to instigate, encourage, or mandate those working under her at PRMD, such as Defendants Franceschi, Hoffman, Smith, Cablk, and others, including DOES 1-50, to aggressively generate as much revenue as possible for the County. Indeed, the policy inasmuch encourages this by stating:

- "Aggressive code enforcement actions can also serve as an upstream investment..." (Exhibit D, "Executive Summary," page 1 of 8.)

- "...[T]his item recognizes the effectiveness of quick and aggressive litigation to resolve violations..." (Exhibit D, "Executive Summary, page 2 of 8.)

- "The decline in cases and corresponding decline in [cost] recovery is due to the elimination of the Division manager and reduction in staffing." (Exhibit D, "Discussion," page 3 of 8.)

- "The new manager position will facilitate the resolution of more complaints, as well as more Code Enforcement cases going to hearing, which together are expected to generate approximately $600,000 per year in additional

[1] https://calsalaries.com/tyra-harrington-4899625.



cost recovery ($12,000 per hearing with an additional 50 cases going to hearing." (Exhibit D, "Discussion," page 4 of 8.)

29. Additionally, CEEP proposed what it called "a number of minor policy modifications and delegations" and "policy modifications to increase effectiveness." (Exhibit D, "Executive Summary, page 2 of 8; "Discussion," page 5 of 8.) What this innocuous sounding phrase means is that the County Board of Supervisors delegated their authority to "bypass the administrative process" and file a lawsuit to abate any violations. This delegation of authority gave Defendant Wick, together with County Counsel, the unfettered authority to declare property uses as constituting "an immediate threat to public health and/or safety" with no guidance on to how they were to define these terms.

30. Furthermore, CEEP proposed to "streamline" the administrative hearing process" by creating an "Administrative Citation Program." In effect, this proposal, which was also approved as official policy by the County's Board of Supervisors, allowed Permit Sonoma to simply bypass certain procedural steps the department had previously taken when dealing with property owners, and instead, encouraged Permit Sonoma to immediately cite property owners with violations and assess penalties of one kind or another. Stated differently, this Administrative Citation Program conferred a virtually unfettered right on the part of Defendants Wick and Harrington to speed up the cost recovery process, and increase "citation fee revenue" while running roughshod over the constitutional due process rights of property owners within the jurisdiction of the County.

31. On information and belief, CEEP was not fully implemented by the County until late in 2018. In the interim, on the night of October 8, 2017, a historic wind event led to one of the worst firestorms in Sonoma County history, followed by almost three weeks of fire. In total, the Nuns, Tubbs, and Pocket Fires (together comprising the Sonoma Complex Fire) burned over 110,700 acres in Sonoma and Napa counties. 24 lives were lost



as a result of the fires.  6,997 structures were destroyed, resulting in direct losses exceeding $7.8 billion according to the California Insurance Commissioner. 25% of the destruction occurred on protected or open land in Sonoma County.[2] The cost to the County itself totaled at least $18.1 million.[3] On information and belief, a significant portion of the County's Code Enforcement efforts were either eased or diverted as a result of the Sonoma Complex Fires, or at least explains, in part, why CEEP's implementation was delayed until late in 2018.

**B. Defendant Smith Conducts Warrantless Search of the Subject Property on February 15, 2019**

32. On February 15, 2019, amidst and pursuant to the enactment and implementation of these unconstitutional policies and procedures which had, and continue to have, the effect of encouraging overly aggressive and intrusive inspection and Code Enforcement actions on the part of officials working for Permit Sonoma, Defendant Smith - a subordinate Code Enforcement officer who was a trainee at the time, only on the job for a few months, and was working under the direct supervision of Defendants Harrington and Franceschi, entered onto the subject property without an inspection warrant based on a confidential complaint of unpermitted construction occurring at the subject property.

33. Defendant Smith entered the subject property despite, admittedly, not having Cupp's consent or exigent circumstances, nor did Defendant Smith have the consent of

---

[2] "2017 Sonoma Complex Fires." https://sonomavegmap.org/firestory/index.html, accessed March 6, 2023.
[3] Varian, Ethan & Callahan, Mary. "Initial wildfire costs reach $18.1 million for Sonoma County." Press-Democrat: August 22, 2020. https://www.pressdemocrat.com/article/news/live-updates-walbridge-fire-continues-to-grow-overnight/, accessed March 6, 2023.



the entity he mistakenly thought owned the subject property at the time, Federal National Mortgage Association or "Fannie Mae."

34. Defendant Smith questioned a workman on the subject property at the time and learned the owner was not present on the property. Rather than leave at that time, Defendant Smith proceeded to wander about the subject property, searching it, and taking photographs.

35. As a result of this warrantless search, Smith issued two Notices and Orders against Cupp for various violations of the Sonoma County Code, including unpermitted construction, junkyard conditions, and occupancy violations ("the 2019 Citations"). Attached hereto as **_Exhibit E,_** and incorporated herein, are true and correct copies of the 2019 Citations that resulted from Defendant Smith's warrantless search of the subject property. The 2019 Citations refer to Violation Nos. VCM19-0123, VPL19-0130, VBU19-0076, VBU19-0077, and VBU19-0078.

36. This warrantless search by Smith is the subject of the related matter, *Cupp v. Smith,* Case No. 4:20-CV-03456-PJH, and the citations that followed, were executed pursuant to the unconstitutional policies and procedures promulgated by the County through Agenda Item 26 and as applied as the County's custom, practice and procedure.

**C. County Initiates Abatement Proceedings Based on Smith's Warrantless Search**

37. On April 19, 2019, Defendant Smith sent two letters to Cupp entitled "Civil Penalties Due and Payable." According to these two letters, as of April 19, 2019, Cupp owed a total of $22,680 in civil penalties, which accrue at the rate of $90/day per violation. From these letters, it appears that Violation Nos. VBU19-0076, 0077, and 0078 are considered one violation; whereas, Violation No. VPL19-0130 is considered a second violation, meaning that Cupp was incurring per diem civil penalties of $180 as a result of



the 2019 Citations. Attached hereto as ***Exhibit F,*** and incorporated herein, are true and correct copies of these letters. These letters refer back to the violation numbers listed on the 2019 Citations.

38. On May 13, 2019, *nearly one month later and prior to notice of an Abatement Hearing*, the County recorded two Notices of Abatement Proceedings against the subject property with the Sonoma County Assessor-Recorder's Office – Document No. 2019039697 and 2019039721 ("the Abatement Proceedings Notices"). The Abatement Proceedings Notices continue to encumber the subject property to the present day, casting a cloud on Cupp's title to the subject property. Attached hereto as ***Exhibit G,*** and incorporated herein, are true and correct copies of the Abatement Proceedings Notices.

39. On August 28, 2019, *over two, additional months later*, the County mailed Cupp a Notice of Abatement Hearing ("the Hearing Notice"). Attached hereto as ***Exhibit H,*** and incorporated herein, is a true and correct copy of the Hearing Notice. In the Hearing Notice, the County advised Cupp that he would be given the opportunity to have a hearing, call witnesses, and present evidence.

40. The Abatement Hearing did not commence until December 11, 2020, in part due to COVID-19 restrictions. Meanwhile, Cupp continued to incur civil penalties of at least $180/per diem.

**D. Permit Sonoma Comes Under Fire From Local Press for Over-Promising and Under-Delivering Through CEEP**

41. On August 9, 2019, a local reporter, Tyler Silvy, authored an unflattering article in the Sonoma County Press-Democrat, accusing Defendant Wick as head of Permit Sonoma with over-promising and under-delivering through what started as the CEEP policy. Attached hereto as ***Exhibit I,*** and incorporated herein, is a true and correct copy of Silvy's article downloaded from the Sonoma County Press-Democrat website.



42. According to the article, the program had been implemented for approximately one year, and only 2 administrative citations had been issued; yet, according to Silvy, the program had cost the County thousands of dollars. On information and belief, pressure from bad press such as Silvy's article also prompted Defendants and the County to step up their Code Enforcement activities, at whatever cost to the constitutional rights of property owners in the County.

**E. County Promulgates Standard Operating Procedures on the Use of Unmanned Aircraft Systems (UAS) (a.k.a. "Drones")**

43. Shortly afterwards, on or about September 10, 2019, the County, acting through Permit Sonoma, promulgated a five-page policy and procedure document entitled "7.0 Standard Operating Procedures on the Use of Unmanned Aircraft Systems (UAS) (i.e., "drones") ("the drone policy"). Attached hereto as ***Exhibit J,*** and incorporated herein, is a true and correct copy of the drone policy.

44. "UAS," or "Unmanned Aircraft Systems," is an acronym that is often associated with vehicles more commonly described as "drones." UAS refers to "an aircraft and its associated elements which are operated with no pilot on board."[4] "Drones" are also frequently referred to as UAVs, or "Unmanned Aerial Vehicles."[5] For simplicity and consistency herein, Cupp will continue to refer herein to such vehicles and systems primarily as "drones."

45. According to the United States Department of Defense, "drones" are categorized as follows[6]:

---

[4] Nagel, Lauren. "Types of Drones and UAVs (2023)." January 19, 2023. https://www.tytorobotics.com/blogs/articles/types-of-drones.
[5] *Ibid.*
[6] Wikipedia. "Unmanned aerial vehicle." Footnotes 21, 22. https://en.wikipedia.org/wiki/Unmanned_aerial_vehicle#cite_note-uavclassificationA-21, accessed March 6, 2023.



| Group: | Group 1 | Group 2 | Group 3 | Group 4 | Group 5 |
|---|---|---|---|---|---|
| **Size** | Small | Medium | Large | Larger | Largest |
| **Max take-off wt** | < 20 lb (9.1 kg) | > 20 & < 55 | > 55 & < 1320 | >1,320 lb (600 kg) | >1,320 lb (600 kg) |
| **Operating altitude** | < 1,200 ft (370 m) | < 3,500 ft (1,100 m) | < 18,000 ft (5,500 m) | < 18,000 ft (5,500 m) | > 18,000 ft (5,500 m) |
| **Speed** | < 100 kn (190 km/h) | < 250 kn (460 km/h) | < 250 kn (460 km/h) | Any speed | Any speed |

46. Drones can also be classified based on range and endurance, size, weight, altitude, and degree of autonomy. Some drones are remotely piloted aircraft, some offer intermediate degrees of autonomy, and some are fully autonomous.[7] At this time, it is not known what category of drones the County has acquired for Permit Sonoma; only that it has acquired one or more drones, nor is it known specifically what capabilities these drones have. On information and belief, however, Permit Sonoma's drones are remotely controlled but may have some features that are semi-autonomous. On further information and belief, Permit Sonoma's drones have the ability to fly at altitudes that are above 400 feet and below 400 feet, take high-resolution digital photographs, and record high-resolution video footage. In all respects, Permit Sonoma's drones, when used to conduct inspection searches of private property, enhance the senses of Code Enforcement officers such as the Defendants beyond what an ordinary human is capable of, and as such, require a warrant prior to their use to inspect and search private property. (Florida v. Jardines, 569 U.S. 1, 133 S. Ct. 1409 (2013); Kyllo v. United States, 533 U.S. 27 (2001).)

47. The County's drone policy was authored, at least primarily, by Defendant Harrington, and Defendant Harrington also reviewed the drone policy. The drone policy

---

[7] Wikipedia. "Unmanned Aerial vehicle." Footnote 24. https://en.wikipedia.org/wiki/Unmanned_aerial_vehicle#cite_note-uavclassificationA-21, accessed March 6, 2023.

was reviewed by County Counsel's office acting through Holly Rickett, who is not named as a Defendant herein. Most importantly, however, the drone policy was approved by Defendant Wick acting in his capacity as Permit Sonoma Director, evidencing Defendant Wick's role as the policy-making official for the County's Permit & Resources Management Department as further alleged herein.

48. The County operates one or more websites available to the public which discuss a variety of topics related to the County's many activities and departments, including the policies and procedures that apply to the operations of Permit Sonoma. Significantly, however, the County did not publish its drone policy on the "Internet." Instead, the drone policy was published solely on the "Intranet." Cupp alleges on information and belief that the use of the word "Intranet" on page 4 of 5 of Exhibit F refers to the County's private Intranet. An Intranet is a local, restricted communications network built using World Wide Web software, which is available to limited numbers of individuals (typically a work group or similar closed group) and not to members of the general public.[8]

49. On information and belief, Cupp alleges the County and Defendants Wick and Harrington deliberately chose not to publish its new drone policy on the Internet in order to keep the drone policy, and Permit Sonoma's use of drones to conduct warrantless searches of private property based on the drone policy, secret from the people of the County of Sonoma.

50. On information and belief, at or about the same time, Permit Sonoma executed a contract with a private drone operator to conduct aerial surveillance over private properties in the County of Sonoma through the use of drones. Attached hereto as

---

[8]Berry, Louise. "Intranet v. internet: what's the difference, and why does it matter? Interact: November 13, 2019. https://bit.ly/3WgoTbi, accessed December 15, 2022.



***Exhibit K,*** and incorporated herein, is a true and correct copy of an exhibit to that contract, entitled "Exhibit A: Scope of Work – Services to be Provided." On information and belief, this contract was awarded to an individual named Anthony Cinquini ("Cinquini"). At this time, it is not known whether Mr. Cinquini ever operated a drone to search the subject property; thus, he is not named as a defendant herein. Cupp reserves the right to amend this Complaint, however, should discovery reveal Cinquini was involved in such activities, as Cupp may have additional rights and remedies against Cinquini.

51. On information and belief, this contract for a drone operator was not opened for public bidding because, once again, Defendants desired to keep the drone-related activities of Permit Sonoma, including the contract referencing the Scope of Work, secret from the people of the County of Sonoma.

52. The County's drone policy and Scope of Work were promulgated prior to a warrantless drone search of the subject property that occurred on March 27, 2020, which is alleged in further detail below. Thus, the warrantless drone search of the subject property in March 2020 occurred pursuant to and was guided by the County's drone policy. On information and belief, the March 27, 2020 warrantless use of a drone to search the subject property was conducted by Defendants Hoffman and Cablk, acting pursuant to the County's drone policy, which was, itself, promulgated as part of Agenda Item 26 approved by the County's Board of Supervisors, and Defendants Hoffman and Cablk were acting at the direction and under the supervision of the remaining Defendants, and each of them, or these Defendants ratified Defendants Hoffman and Cablk's unconstitutional actions after they were committed.

53. Under its terms, on pages 1-2 of 5, the County's drone policy provides, in pertinent part:

> "Approved Use: Approved Permit Sonoma uses of a UAS include investigations of complaints received about alleged violations of the Sonoma County Code. These inspections of unpermitted and/or illegal land uses include, but are not limited to violations of zoning regulations, such as cannabis cultivation non-operative motor vehicle storage yards, and junkyard conditions. A UAS may also be employed for complaints and/or investigations alleging unpermitted construction, grading, and drainage improvements/obstructions....
>
> Prohibited Use: The UAS video surveillance equipment shall not be used: to conduct surveillance or inspection activity without a reasonable suspicion of unpermitted or illegal actions; to target people; to harass, intimidate, or discriminate against any individual or group; or to conduct personal business of any type....
>
> GENERAL
>
> Small unmanned aircraft systems (UAS) may be utilized for inspections of private property to detect violations of the Sonoma County Code when other means and resources are not available or are less effective. Permit Sonoma shall make every attempt to respect and observe existing privacy rights on private property. Permit Sonoma shall only conduct UAS take-offs and landings from public property or public right of way...
>
> Permit Sonoma's use of UAS shall focus primarily on expanses of land (e.g., "open fields") in which private property owners have knowingly exposed unpermitted structures and uses to aerial vantage points. While a Permit Sonoma UAS pilot is operating a UAS they will take steps necessary to protect privacy and private property rights by (1) turning on photographic equipment only when the UAS is positioned close to the suspected violation or unpermitted use; (2) launch UAS as close to the suspected unpermitted property and/or property use as possible to limit potential exposure to other properties; (3) ensure all UAS recording devices are focused on the areas necessary to support the mission and to minimize the inadvertent collection of data about persons or uninvolved places. Any inadvertently collected data will be immediately destroyed upon review by the Code Enforcement Manager or Supervisor.
>
> Permit Sonoma will conduct UAS aided inspections on properties where Permit Sonoma staff has reason to believe unpermitted building or illegal land use violations are occurring. Reasonable suspicion will be based on citizen complaints and/or staff observations coupled with any other facts that suggest violation of the Sonoma County Code.
> Data Retention and Processing



All UAS recorded data shall be reviewed and evaluated for evidentiary value by the Code Enforcement Manager or Supervisor. Data of identifiable individuals not intended to be used as evidence shall not be retained. All retained data shall be maintained or destroyed pursuant to County retention policies....

All UAS flights must be pre-approved by the Code Enforcement Manager or Supervisor and will be reviewed by the Code Enforcement Manager or Supervisor to ensure that they are conducted in accordance with Permit Sonoma policy, FAA regulations, state and federal law, and with due regard for public privacy."

54. On information and belief, at all relevant times, the Code Enforcement Manager referred to in the County's drone policy was, and is, Defendant Harrington, and the Supervisor referred to in the County's drone policy was, and is, Defendant Franceschi.

55. Additionally, the Scope of Work states, in pertinent part:

"Contractor shall only gather aerial data upon receipt of written authorization from either a Senior Code Enforcement Inspector, the Code Enforcement Supervisor or the Code Enforcement Manager of Permit Sonoma....

Contractor shall accompany a written summary for each request that includes the name and contact information of the employee that collected the data ,the date the data was collected, clearly outlined parcel and address information as well as detailed GPS coordinates and any other information for the County to understand the data location and scope....

Contractor shall comply with all laws, statutes, ordinances and regulations as they may be amended from time to time..."

56. Whether by the drone policy or private contract, the County does not have the authority to promulgate policies and procedures authorizing nonconsensual inspections of private property absent an administrative warrant. (Marshall v. Barlow's, Inc., 436 U.S. 307, 324 (1978) [striking down OSHA's warrantless inspection scheme finding it "unconstitutional insofar as it purports to authorize inspections without warrant."].)

57. As alleged in greater detail herein, neither the drone policy nor the Scope of Work represent adequate substitutes for the constitutional safeguards afforded by the



Fourth Amendment to protect the civil rights of property owners in the County, including Cupp. Taken together, these documents – which represent official County policy applied and put into official action - delegate the manner, method and operation of the use of drones to search private property to the unfettered discretion of those County officials engaged in the warrantless search. (See <u>De La Cruz v. Quackenbush</u>, 80 Cal.App.4th 775, 789-790 (2000) ["the regulatory scheme at issue does not provide an adequate substitute for a warrant because it has neither a 'properly defined scope' nor a 'limit on the discretion of the officers.'"])

58. What is most noticeable, however, is not so much what <u>is</u> stated in these documents; rather, it is what is <u>not</u> stated. Nowhere in either the County's drone policy or the Scope of Work is the word "warrant" even mentioned, much less are there any directives (or even encouragements) for Permit Sonoma officials to obtain a warrant before using drones to conduct nonconsensual, non-exigent searches of private property.

59. In short, these documents, at best, impose only the vaguest limitations on the discretion of County officials when conducting drone searches of private property resulting in the proverbial "fox guarding the hen house." The net result is the violation of the constitutional rights of Cupp and other property owners within the County's jurisdiction.

**F. On March 27, 2020, Defendants Cablk and Hoffman Fly a Drone Over the Subject Property Without a Warrant, and Without Cupp's Consent or Exigent Circumstances**

60. On information and belief, on March 27, 2020, *over one year after Defendant Smith conducted his warrantless search of the subject property*, Defendants Cablk and Hoffman, acting pursuant to and in accordance with the County's drone policy and the other documents referred to herein, flew a drone over the subject property, conducting a



search of the subject property, without first seeking an inspection warrant, and did so in their official capacities acting under color of law.

61. At the time Defendants Cablk and Hoffman engaged in this warrantless search of the subject property, neither individual had Cupp's consent to conduct the search. In addition, they lacked exigent circumstances or any substantial legal justification whatsoever for conducting the drone flyover other than simply to snoop and spy on the subject property.

**G.** ***Cupp v. Smith*, Case No. 4:20-cv-03456 PJH**

62. On May 21, 2020, Cupp filed suit in *Cupp v. Smith,* Case No. 4:20-cv-03456 PJH, which is a related case.

**F. On July 20, 2020, the Sonoma Superior Court Issues an Inspection Warrant Based on a False Affidavit of Probable Cause Executed by Defendant Hoffman**

63. For unknown reasons, on July 20, 2020, <u>*one year and six months after*</u> Defendant Smith conducted his warrantless search of the subject property, and <u>*nearly four months after*</u> Defendants Cablk and Hoffman conducted the warrantless drone flyover, Defendants finally sought the issuance of an inspection warrant from the Sonoma Superior Court that, if it had been valid, would legally allow Defendants to search the subject property.

64. The fact Defendants waited so long to seek an inspection warrant demonstrates a lack of exigency to justify their warrantless searches of the subject property in the first place. Moreover, throughout all this delay, Cupp continued to accrue per diem penalties on the 2019 Citations of at least $180.

65. To support the application for an inspection warrant for the subject property, Defendant Hoffman submitted a Declaration of Todd Hoffman in Support of Ex Parte



Application for Inspection Warrant ("Declaration") in his official capacity as an employee of the County and, specifically, Permit Sonoma. Attached hereto as ***Exhibit L***, and incorporated herein, is a true and correct copy of Defendant Hoffman's Declaration.

66. After a recitation of his qualifications, Defendant Hoffman states, "I possess first-hand knowledge of the matters stated herein and if called to testify as a witness, I could and would testify competently thereto." (Exhibit K, Declaration, ¶ 15.)

67. However, Defendant Hoffman's Declaration describes Defendant Smith's efforts to inspect the subject property in 2019, stating:

> "Code Inspector A. Smith attempted to access the property in response to a complaint regarding multiple violations. Inspector Smith was prevented from accessing the property by the fence and gate. From the right of way, he observed numerous violations…"

(Exhibit L, page 6 of 12, par. 19.)

68. This statement by Hoffman was false. Yet, it was submitted in support of the application for an inspection warrant under penalty of perjury. Defendant Hoffman was not present when Defendant Smith attempted to access the subject property, so there is no way he could have first-hand knowledge of what did or did not happen, or what Defendant Smith could or could not have observed when Smith went to the subject property on February 15, 2019. Throughout the disputes between the County and Cupp over the subject property, particularly in the *Cupp v. Smith* matter, Defendants have accused Cupp of erecting a 9-foot fence around the subject property. This is the very fence that blocked Defendant Smith from accessing the property. The alleged 9-foot fence is a solid, wooden fence, a fact left out of Defendant Hoffman's Declaration. Yet, somehow, Defendant Hoffman claimed he had first-hand knowledge that Defendant Smith was able to observe violations occurring on the property through this solid, wooden fence.

Defendant Smith would have needed x-ray vision, and Hoffman would have needed psychic powers, for this sworn statement to be true.

69. Most striking of all, however, is the omission of any mention to the Superior Court Judge that, in fact, Defendant Smith _had already accessed_ the subject property without an inspection warrant at the time the warrant was sought, which is how he was able to observe any condition of the subject property. This fact is not reasonably in dispute in the _Cupp v. Smith_ matter.

70. Defendant Hoffman also discussed "an analysis of available chronological satellite imagery," which he avers informed him that several structures had been altered in various ways. (Exhibit K, Declaration, page 8 of 12, par. 20.) In the very next paragraph of the Declaration, Defendant Hoffman refers to "aerial imagery obtained on March 27, 2020," which Defendant Hoffman refers to as being "Exhibits E1 & E2" to his Declaration. This imagery, Hoffman declares, indicated to him not only that unpermitted construction was occurring on the subject property, but also that the subject property was being used as an illicit cannabis grow operation. Attached hereto as **_Exhibit M,_** and incorporated herein, are true and correct copies of Exhibits E1 & E2 to Defendant Hoffman's Declaration.

71. At no point does Defendant Hoffman explain to the Court where he obtained any of these photos, only stating they were from "aerial imagery" immediately after referring to photos he obtained from "satellite imagery." The implication of this omission is that all the photos attached to the Declaration were obtained from imagery supplied by a publicly available source such as Google Earth, etc., which would not require a warrant; when in fact, the photos in Exhibit M represent photos obtained from the warrantless



drone search of the subject property conducted on March 27, 2020, a search Cupp contends did require a warrant that Defendants did not possess at that time.

72. Based on Defendant Hoffman's false and misleading Declaration, Superior Court Judge Shelley Averill issued an inspection warrant on July 20, 2022 without notice to Cupp that allowed for forcible entry onto the subject property in the company of law enforcement. Attached hereto as ***Exhibit N***, and incorporated herein, is a true and correct copy of the inspection warrant issued by Judge Averill pursuant to Defendant Hoffman's perjurious and misleading Declaration.

73. The case – Sonoma Superior Court Case No. SCV-266746 – was, thereafter, immediately closed, giving Cupp no reasonable means or opportunity to appear and challenge the issuance of the warrant or any of the detrimental effects that resulted from it.

**G. On July 30, 2020, Defendants Harrington, Hoffman, Smith, and Five Other County Officers, Including Law Enforcement, Enter Onto the Subject Property Pursuant to the Inspection Warrant**

74. Despite Defendant Hoffman's concern that the subject property was being used as an illicit cannabis grow operation, and despite his assertions of property owners being able to rapidly remove evidence of a grow operation – all facts that were intended to cause Judge Averill to issue an inspection warrant executable without notice to Cupp, allowing forcible entry, and in the company of law enforcement – Defendants still waited *an additional ten days* before taking any action to enter the subject property to abate any alleged Code violations.

75. On July 30, 2020, Defendants Harrington, Hoffman, Smith, and on information and belief, at least five, additional County officers, some of whom on information and belief were employed by the Sonoma County Sheriff's Department and



other County agencies, acting pursuant to the inspection warrant issued on July 20, 2022, entered upon the subject property. The operation was led by Defendant Harrington as the senior Code Enforcement officer acting in her official capacity. Once upon the subject property, Defendants and others broke down doors, entered the structures on the subject property, and inflicted other physical damages to the subject property, all acting under color of law.

76. Based on the July 30, 2020 inspection - or more accurately, raid - of the subject property, Defendants issued seven, separate Notices and Orders. Of those seven Notices and Orders, four generally allege "construction without permits," two were for "unlawful uses," and one was for "a dangerous building," which pertained to a barn on the subject property. The remainder were violations related to the alleged presence of hemp at the subject property.

**H. On July 31, 2020, in *Cupp v. Smith*, the Court Ordered Defendants Not to Shut Off PG&E Services to the Subject Property Until After Resolution of Cupp's Application for TRO**

77. In *Cupp v. Smith*, Cupp sought a TRO to preserve the status quo of the dispute involving the subject property. The Court set a briefing schedule and ordered Defendants not to remove PG&E services (i.e., electricity and gas) from the subject property until after the Court had resolved Cupp's application for a TRO.

78. Although Defendants technically complied with the Court's order, the day after the Court denied Cupp's application for a TRO, Defendants removed two electrical and one gas meter from the subject property. One electrical meter supplied electricity to the barn on the subject property. The other two meters supplied power to the residence on the subject property, which was located at least 50 yards from the barn and had not been deemed a "dangerous building" as a result of the July 30, 2022 raid. Defendants had no



reasonable basis for removing the meters from the residence, and in fact, did so on information and belief as a form of punishment because Cupp had sought a TRO in *Cupp v. Smith*.

79. The subject property was left without PG&E services for nineteen (19) months thereafter. PG&E services were not restored until the day after the Court denied Defendant Smith's motion for summary judgment in *Cupp v. Smith*. On information and belief, Deputy County Counsel Michael King, who represents Smith in the *Cupp v. Smith* matter, personally telephoned PG&E and instructed the utility to restore power at the subject property the day after Smith's motion for summary judgment was denied. This is based on the fact that a PG&E official contacted Cupp, confused, and asking who King was and why he called PG&E. However, because of Defendants' actions or inactions, gas services were still not restored at the subject property.

80. Consequently, for many months, the residence at the subject property was rendered uninhabitable, causing significant harm and damage to Cupp personally and financially.

**I. On December 11, 2020 and January 18 & 22, 2021, the County Proceeds With the Administrative Abatement Hearing Against Cupp**

81. Finally, over a year after it was first noticed, the County proceeded with the Abatement Hearing against Cupp. With regard to the 2019 Citations, the County argued that Cupp never timely appealed those citations, so they were conclusive evidence of the penalties against him. However, County Counsel Michael King had argued in the County's 12(b)(6) motion to dismiss in *Cupp v. Smith*, which the Court relied on, in part, in dismissing Cupp's due process claim as moot and granting Defendant Smith's motion in that case:



> "Defendant's filed their further reply...[and] In it, they stated they would provide plaintiff [Cupp] an administrative hearing to challenge the citations issued on February 19, 2019."

The Court went on to state regarding Cupp's claim for deprivation of due process:

> "In any event, because Sonoma County has agreed to provide plaintiff an administrative hearing to challenge the underlying February 19...citations...any claim premised on the denial of such a claim [of deprivation of due process] appears moot.

(Order Granting Motion to Dismiss and Denying Motion to Disqualify Counsel," p. 16, fn 4.)

82. In other words, the County said one thing to the Court to obtain a favorable ruling on their Motion to Dismiss in *Cupp v. Smith*, but then attempted to do the exact opposite when the time came for Cupp's administrative hearing. This is further proof of the County's punitive stance with respect to Cupp, and the extent of their arbitrary and capricious behavior.

83. In addition, at the administrative hearing, the County's <u>*only evidence*</u> against Cupp on <u>*either the 2019 or 2020 Citations*</u> pertained to evidence gathered during Defendant Smith's warrantless search on February 15, 2019 or the July 30, 2020 raid of the subject property, which Cupp contends was executed based on a false and misleading Declaration signed and submitted to the Superior Court by Defendant Hoffman pursuant to the County's official policies, practices and procedures as further alleged herein.

**J. On June 1, 2022, Defendants Cablk and Hoffman Fly a Drone Over the Subject Property, Again Without a Warrant, Cupp's Consent, or Exigent Circumstances, and After Fact Discovery Had Closed in *Cupp v. Smith***

84. On May 25, 2022, the parties in the *Cupp v. Smith* matter participated in a Magistrate Settlement Conference with the Hon. Mag. Judge Kandis Westmore. Mag. Judge Westmore adjourned the May 25, 2022 conference and ordered the parties to reconvene on August 5, 2022.



85. Fact discovery in *Cupp v. Smith* closed on January 24, 2022 pursuant to the Court's Scheduling Order. No agreement to extend this date was made, nor was the date extended by the Court.

86. On June 1, 2022, and on information and belief, Defendants Cablk and Hoffman, again, flew a drone over the subject property, once again without a warrant, without Cupp's consent, and without exigent circumstances, all while acting pursuant to the County's official policies, practices, customs and procedures, in their official capacities, acting under color of law.

**K. Pursuant to the County's Drone Policy, Defendants Routinely Fly Drones Over Private Properties, Conducting Searches, Without Ever First Obtaining Warrants, and in Violation of FAA Regulations**

### *(1) The FAA Regulates the County's Use of Drones*

87. The Federal Aviation Administration has promulgated regulations for the community and recreational use of drones, which apply to the County's use of drones as alleged herein. These regulations can be found at 14 C.F.R. Part 107 and are collectively referred to as the "Part 107" rules.

88. Among other restrictions and requirements, including but not limited to testing, certification, and reporting requirements, as an operator of drones that presumably would be categorized as "small unmanned aircraft" (meaning they weigh less than 55 pounds), the County is prohibited from flying a drone higher than 400 feet above the ground unless operating in the vicinity of an airport in which case the height requirements differ (but are not relevant at this time for purposes of this lawsuit). 14 C.F.R. § 107.51(b).

89. In addition, the County is prohibited from operating a drone over any human being unless (a) "the operation is within or over a closed- or restricted-access site and all human beings located within the closed- or restricted-access site must be on notice that a



COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF AND DAMAGES - 29

small unmanned aircraft may fly over them;" or (b) the small aircraft does not maintain sustained flight over any human being unless the human being is "directly participating in the operation of the small unmanned aircraft;" or the human being is "located under a covered structure or inside a stationary vehicle that can provide reasonable protection from a falling small unmanned aircraft." 14 C.F.R. § 107.125.

90. Despite these regulations (and others which on information and belief, the County does not follow), and in addition to its policies as alleged herein, the County – through Permit Sonoma and the individual Defendants, including DOES 1-50, maintain a custom, practice and procedure of routinely using drones to inspect and search private property of the residents of the County, without obtaining a warrant beforehand, and in disregard of the FAA regulations.

91. Specifically, the County routinely takes the official position publicly in cases brought by residents against the County, or by the County against its residents, in Superior Court filings, that the County or its Permit Sonoma officials do not need a warrant to inspect private property because they operate their drones in "navigable airspace," relying on California v. Ciraolo, 476 U.S. 207 (1986). Not only does Ciraolo not involve the use of drones, but the County's public position admits it routinely violates FAA regulations in its use of drones to inspect private property.

92. According to FAA regulations, "navigable airspace" is defined as "airspace at and above the *minimum flight altitudes* prescribed by or under this chapter, including airspace needed for safe takeoff and landing."14 C.F.R. § 1.1. For airplanes, the minimum flight altitude while flying over congested areas or open air assemblies of persons is 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet. 14 C.F.R. § 91.119(b). If the County's public position in its state court filings is true and not misleading the judicial



officers of the County, then the County, Permit Sonoma, and these Defendants have a policy, custom, practice or procedure of operating drones as high as 1,000 fee above the ground, which would not require a warrant. However, as alleged above, drones are not permitted to fly that high without violating FAA regulations.

93. In truth, the County's stated position appears to depend on the issues at stake. Where the issue is one alleging the lack of a warrant to conduct an inspection, the County asserts its Permit Sonoma officials fly their drones in navigable airspace; no warrant is needed. When other issues are raised, the County takes the position that its actions comply with federal regulations. Respectfully, the County cannot have it both ways.

### (2) The Unconstitutional Wrongs Committed Against Cupp by Defendants are not Part of Some Isolated Case

94. Cupp has obtained sworn statements from six (6) residents of the County of Sonoma attesting to the County's use of drones *without warrants* to search their property, *in a manner prohibited by one or more FAA regulations*. Attached hereto as **Exhibits O(A).1-(A)6** are true and correct copies of Declarations obtained by Cupp.

95. In addition, Cupp has interviewed through his counsel at least three (3), additional individuals who have been subjected to similar drone-related behavior, warrantless searches of their private property, due process violations, and other violations of federal and state statutory and constitutional protections by the County. These individuals have identified or can identify as many as twenty (20) more individuals with the same or similar experiences as alleged herein, involving warrantless searches of their private property and the use of drones to conduct aerial surveillance of their property. In the coming weeks, Cupp will come forward with additional proof of these allegations in the form of Declarations and additional actions, and respectfully requests the Court grant leave at an appropriate time to supplement these allegations and conduct discovery to bear them

out. In many instances, residents of the County have expressed sincere fear of reprisal by the County as well as these individuals Defendants, specifically.

96. In at least one instance, a resident of the County recounted how the resident was threatened with additional, punitive and more expensive Code violations by Defendant Hoffman when the resident confronted Defendant Hoffman on the resident's private property, which Defenant Hoffman (who at the time had a shaved head and visible tatoos, leading the resident to believe he was an intruder) had entered the resident's property without a warrant and conducted a search without consent or exigent circumstances.

97. When the resident ordered Defendant Hoffman off the property, Defendant Hoffman threatened her, "Well, now, I am just getting started with violating you." That resident has now been on the receiving end of some tens of thousands of dollars in alleged Code violations and penalties by the County and, specifically, these Defendants, and is in danger of losing her property outright as a result of Defendants' actions, which have been undertaken in furtherance of unconstitutional policies and constitute an arbitrary and capricious, punitive pattern of behavior, custom and practices.

98. Understandably, individuals confronting this situation are fearful of the repercussions they may experience by coming forward. Some will overcome this fear; some will not. However, in all but one situation interviewed thus far, the prohibited and unconstitutional conduct involves the same cast of characters – the Defendants that are named in this lawsuit, always acting under color of law of their public offices or employment with the County, and pursuant to the County's unconstitutional policies, practices, customs and procedures as alleged herein and as will be subject to supplementation and amendment as further investigation and discovery is conducted, at the Court's discretion.

99. Indeed, it appears nearly impossible to determine precisely how many instances exist where the County, Permit Sonoma, and these Defendants have conducted inspections of private property without a warrant, conducted aerial surveillance of private property without a warrant, applied for inspection warrants after the fact using the same or similar false allegations like those used against Cupp as alleged herein, and generally deprived residents of their constitutional rights to enjoy private property free from the government's prying eyes.

100. On June 24, 2022, through his counsel, Cupp issued a California Public Records Act ("PRA") request to the County seeking a number of documents and records pertaining to this question, including but not limited to warrantless searches of private property in the County, the use of drones to accomplish aerial surveillance, and other similar documents and records. To date, the County has only partially complied with Cupp's request, with County Counsel's office complaining the County cannot comply because their records are not kept in the manner requested. However, the County has done nothing to identify or assist Cupp in properly wording a request for the records, which is expressly required by the PRA.

101. In addition, despite an exhaustive search of the Sonoma County Superior Court's online case records, no court records of applications for inspection warrants can be identified without first knowing a case number, property address or defendant's identity. In other words, one cannot look up such cases by reference to the County of Sonoma, Permit Sonoma, or Permit Resources Management Department as the party applying for an inspection warrant.

102. Thus, at this time, it is not known how many times the County has applied for inspection warrants, whether the application was before or after a warrantless search had



already been conducted, or to review what evidentiary support was submitted in support of the issuance of the inspection warrants. On information and belief, based on representations made by County Counsel, there must be many such instances. When asked to produce this information as part of Cupp's PRA Request, the County indicated that this request would require thousands of hours of personnel research and cost Cupp a tremendous amount of money because, again and allegedly, the County does not keep track of their inspection warrants by case number or property address. Yet, to date, the County has not identified how it keeps its records, whether it keeps records, how many hours would be required to locate the records, or how much Cupp would be charged for this information.

103. One of the individuals interviewed by Cupp's counsel thus far had a Declaration submitted to the Court by Defendant Hoffman that was nearly identical to the one used against Cupp, particularly with reference to the use of "aerial imagery" as alleged herein, and which was, itself, a "cut and paste" job bearing the wrong name of the defendant, evidencing that the Declaration used by Hoffman is recycled again and again, case-by-case. Thus, on information and belief, Cupp's situation as alleged herein is not an isolated one; rather, it is activity undertaken under color of law pursuant to an unconstitutional policy, a policy that (while facially constitutional) was adopted for an improper motive; i.e., to the County's Code Enforcement regime as a money-making venture for the County; and/or it is activity undertaken as part of an unconstitutional practice, custom or procedure.

104. The smokescreen thrown up by the County is but one more example of the County's efforts to conceal the unconstitutional policies and their wrongful and unconstitutional, practices, customs and procedures as alleged herein. Other instances of the same or similar activity engaged in by these Defendants, acting under color of law on behalf of the County, are relevant proof of an unconstitutional practice, custom or procedure



sufficient for a finding of liability under <u>Monell v. Dept. of Soc. Sv'cs.</u>, 436 U.S. 658 (1978). *See, e.g.,* <u>Price v. Sery</u>, 513 F.3d 962 (9th Cir. 2008) [facially constitutional policy did not exonerate public entity from Monell liability where actual practice was unconstitutional use of excessive force]; Gregory<u> v. City of Louisville</u>, 444 F.3d 725 (6th Cir. 2006); <u>Cash v. Hamilton County Dept. of Adult Probation</u>, 388 F.3d 539 (6th Cir. 2004).

**V.**

**<u>COUNT ONE</u>**

**(42 U.S.C. § 1983 – VIOLATION OF FOURTH AMENDMENT)**

**(Against All Defendants)**

105. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count One of this Complaint.

106. The Fourth Amendment to the U.S. Constituion provides:

> *"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated; and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."*

107. By doing the acts complained of herein, Defendants, and each of them, acting under color of law, county ordinances, regulations, official policies or procedures, or customs and practices, in violation of 42 U.S.C. § 1983, have deprived Cupp, and continue to deprive Cupp, of the right against unreasonable searches of the subject property as guaranteed by the Fourth Amendment.

108. Defendants violated Cupp's right to be free from unreasonable searches under the Fourth Amendment by, among other things:



(A) Conducting a search of the subject property using a drone on or about March 27, 2020, without an inspection warrant, and without Cupp's consent and without exigent circumstances;

(B) Conducting another search of the subject property using a drone on or about June 1, 2022, again without a warrant, and without Cupp's consent and without exigent circumstances;

109. At the time Defendants undertook the above-referenced conduct, their acts and omissions as alleged herein are indicative and representative of unconstitutional policies promulgated by the County and/or a repeated course of conduct by Defendants, and each of them, in unconstitutionally enforcing the County's policies, which is tantamount to a custom, practice or procedure of the County and its agency, Permit Sonoma, of condoning and encouraging the disregard of the constitutional rights of the residents of the County, as alleged herein.

110. As a direct and proximate result of Defendants' illegal conduct, Cupp has suffered actual injuries and damages to his person, including general damages, as well as financial and pecuniary damages to the subject property in an amount according to proof at trial.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

<u>**COUNT TWO**</u>

**(VIOLATION OF 42 U.S.C. § 1983 – VIOLATION OF FIFTH AMENDMENT)**

**(Against All Defendants)**

111. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Two of this Complaint.

112. The Fifth Amendment to the U.S. Constitution provides, in part:



> *"No person shall be... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."*

112. In doing the acts complained of herein, including but not limited to removing electricity and gas meters to the residence located at the subject property, Defendants, and each of them, did engage in a taking of the subject property without just compensation in violation of the Fifth Amendment, which is a violation of 42 U.S.C. Section 1983, rendering the subject property of less value and uninhabitable.

113. In addition, at various times since July 30, 2022, Defendants, and each of them, have wrongfully insisted and required Cupp to reduce the residence from a 4-bedroom house to a 1-bedroom house in order to obtain Defendant's approval for a septic system that had already been approved by the County many years ago.

114. At the time Defendants undertook the above-referenced conduct, their acts and omissions as alleged herein are indicative and representative of unconstitutional policies promulgated by the County and/or a repeated course of conduct by Defendants, and each of them, in unconstitutionally enforcing the County's policies, which is tantamount to a custom, practice or procedure of the County and its agency, Permit Sonoma, of condoning and encouraging the disregard of the constitutional rights of the residents of the County, as alleged herein.

115. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.



**WHEREFORE, Cupp prays for Judgment as set forth below.**

## COUNT THREE

### (VIOLATION OF 42 U.S.C. § 1983 – VIOLATION OF FOURTEENTH AMENDMENT)

### (Against All Defendants)

116. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Three of this Complaint.

117. The Fourteenth Amendment to the U.S. Constitution provides, in part:

> "…*No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law…*"

118. By entering the subject property without advance notice or an opportunity for a hearing, and doing the other acts as complained of herein, Defendants violated the Fourteenth Amendment to the U.S. Constitution, which is also a violation of 42 U.S.C. Section 1983.

119. As a direct and proximate result of Defendants' illegal conduct, Cupp has suffered actual injuries and damages to his person, including general damages, as well as financial and pecuniary damages to the subject property in an amount according to proof at trial.

120. At the time Defendants undertook the above-referenced conduct, their acts and omissions as alleged herein are indicative and representative of unconstitutional policies promulgated by the County and/or a repeated course of conduct by Defendants, and each of them, in unconstitutionally enforcing the County's policies, which is tantamount to a custom, practice or procedure of the County and its agency, Permit



Sonoma, of condoning and encouraging the disregard of the constitutional rights of the residents of the County, as alleged herein.

121. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

**COUNT FOUR**

**(VIOLATION OF 42 U.S.C. § 1983 - CONSPIRACY TO VIOLATE FOURTH AMENDMENT)**

**(Against All Defendants)**

122. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Four of this Complaint.

123. Defendants, and each of them, conspired with each other to violate Cupp's civil rights, in particular, the Fourth Amendment's requirement that a warrant be obtained before conducting searches of private property, which the U.S. Supreme Court has held applicable to inspections by officials such as Defendants, and each of them, which is also a violation of 42 U.S.C. Section 1983.

124. In particular, Defendant Hoffman, acting in his official capacity, filed or caused to be filed a Declaration in support of an inspection warrant on July 20, 2022 in the Superior Court of the State of California that was false and intended to mislead a judicial officer; or did, in fact, mislead a judicial officer, as alleged herein. At all times, Defendant Hoffman knew his Declaration was false and misleading, and that Defendant

Smith had already accessed the subject property on February 15, 2019 without a warrant and that one or more individuals acting on behalf of the County, including but not limited to Defendants Hoffman and Cablk, had used a drone on March 27, 2020 to conduct aerial surveillance of the subject property without a warrant an in violation of FAA regulations.

125. On information and belief, Defendants Hoffman, Smith and Cablk were acting at the express direction of, under the supervision of, under the control of, or with the express or implied approval of the remaining Defendants, and each of them, to do the acts complained of herein.

126. By conspiring to enter the subject property of Cupp without a warrant, without a properly issued warrant, without consent, and without exigent circumstances, Defendants, and each of them, were acting according to express policies enacted by the County; or they were acting pursuant to an unconstitutional and illegal pattern or course of conduct designed to deprive the residents of the County of their constitutional right to be free from government intrusion upon their private property.

127. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

**WHEREFORE, Cupp prays for Judgment as set forth below.**



# COUNT FIVE

## (VIOLATION OF 42 U.S.C. § 1983 – CONSPIRACY TO VIOLATE FOURTEENTH AMENDMENT)

### (Against All Defendants)

128. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Five of this Complaint.

129. In doing the acts complained of herein, Defendants, and each of them, conspired with each other to violate Cupp's civil rights, in particular, the Fourteenth Amendment right to due process of law, which is also a violation of 42 U.S.C. Section 1983.

130. In doing these acts, Defendants, and each of them, were acting according to express policies enacted by the County; or they were acting pursuant to an unconstitutional and illegal pattern or course of conduct designed to deprive the residents of the County of their constitutional right to due process of law.

131. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

# COUNT SIX

## (VIOLATION OF ART. I, § 7 OF THE CALIFORNIA CONSTITUTION)

## (Against All Defendants)

132. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Six of this Complaint.

133. Article I, Section 7 of the California Constitution prohibits the deprivation of property without advance notice and the opportunity for a hearing.

134. By entering the subject property, without a warrant issued upon notice or with a warrant that was based on a false and misleading Declaration by Defendant Hoffman, and destroying or damaging the subject property, without advance notice to Cupp, and then immediately causing the state court inspection warrant case to be closed so that Cupp had not meaningful opportunity to contest the issuance of an inspection warrant, Defendants violated Article I, Section 7 of the California Constitution.

135. By taking and removing electric and gas meters from the subject property, particularly the residence located on the subject property, by insisting or requiring that Cupp reduce the number of bedrooms of the residence from four (4) to one (1) to obtain Defendants' approval on an already-approved septic permit, and by recording or causing to be recorded an abatement lien on the subject property clouding Cupp's title, Defendants violated Article I, Section 7 of the California Constitution.

136. In doing these acts, Defendants, and each of them, were acting according to express policies enacted by the County; or they were acting pursuant to an unconstitutional and illegal pattern or course of conduct designed to deprive the residents of the County of their constitutional right to due process of law.

137. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

138. Under California Government Code section 820(a), the individual Defendants are liable for damages for their own misconduct.

139. Under California Government Code section 815.2(a), the County is vicariously liable for the conduct of the individual Defendants that was performed within the course and scope of their employment.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

## <u>COUNT SEVEN</u>

### **(VIOLATION OF ART. I, § 13 OF THE CALIFORNIA CONSTITUTION)**

### **(Against All Defendants)**

140. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Seven of this Complaint.

141. California Constitution, Article I, Section 13 provides:

> *The California Constitution provides that "the right of the people to be secure in their persons, houses, papers and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."*

142. In doing the acts complained of herein, Defendants violated California's Constitution, Article I, Section 13.



143. In doing these acts, Defendants, and each of them, were acting according to express policies enacted by the County; or they were acting pursuant to an unconstitutional and illegal pattern or course of conduct designed to deprive the residents of the County of their constitutional right to due process of law.

144. These actions, and the others by Defendants were undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has directly and proximately caused Cupp to sustain actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

145. Under California Government Code section 820(a), the individual Defendants are liable for damages for their own misconduct.

146. Under California Government Code section 815.2(a), the County is vicariously liable for the conduct of the individual Defendants that was performed within the course and scope of their employment.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

## <u>COUNT EIGHT</u>

### (TRESPASS)

### (Against All Defendants)

147. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Eight of this Complaint.

148. At all times alleged herein, Cupp legally possessed the subject property and had a reasonable expectation of privacy over the subject property.



149. At all time alleged herein, Defendants' entry onto the subject property was not authorized by a warrant, or a properly issued warrant, was without Cupp's consent, and without any privilege on the part of Defendants to enter upon the subject property.

150. As a direct and proximate result, Cupp has sustained actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

151. These actions, and the others by the individual Defendants were done intentionally, knowingly, maliciously and with an evil or improper motive amounting to malice; or with a knowing and conscious disregard for Cupp's rights; in a manner and according to methods that no civilized society should be required to tolerate. As such, the individual Defendants may, and should be, held liable for punitive or exemplary damages in order to deter such conduct in the future. undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has

152. Under California Government Code section 820(a), the individual Defendants are liable for damages for their own misconduct.

153. Under California Government Code section 815.2(a), the County is vicariously liable for the conduct of the individual Defendants that was performed within the course and scope of their employment, though not for any award of punitive damages and no such award is sought against the County; however, the County may be required to indemnify the individual Defendants for some or all of the damages alleged herein.

**WHEREFORE, Cupp prays for Judgment as set forth below.**



# COUNT NINE

## (INVASION OF PRIVACY)

### (Against All Defendants)

154. Cupp realleges each and every allegation contained in this Complaint and incorporates them as if set forth in full in Count Nine of this Complaint.

155. At all times alleged herein, Cupp legally possessed the subject property and had a reasonable expectation of privacy over the subject property.

156. At all time alleged herein, Defendants' entered upon the subject property either physically or through the use of electronic surveillance, videography or photography, which was not authorized by a warrant, or a properly issued warrant, was without Cupp's consent, and without any privilege on the part of Defendants to enter upon the subject property.

157. As a direct and proximate result, Cupp has sustained actual injuries and damages to his person as well as his financial and pecuniary interest in the subject property, which has had its value substantially reduced as a result of Defendants' actions, in an amount according to proof at trial.

158. These actions, and the others by the individual Defendants were done intentionally, knowingly, maliciously and with an evil or improper motive amounting to malice; or with a knowing and conscious disregard for Cupp's rights; in a manner and according to methods that no civilized society should be required to tolerate. As such, the individual Defendants may, and should be, held liable for punitive or exemplary damages in order to deter such conduct in the future. undertaken arbitrarily, capriciously, punitively, and in furtherance of illegal conduct that violated Cupp's constitutional rights and has



159. Under California Government Code section 820(a), the individual Defendants are liable for damages for their own misconduct.

160. Under California Government Code section 815.2(a), the County is vicariously liable for the conduct of the individual Defendants that was performed within the course and scope of their employment, though not for any award of punitive damages and no such award is sought against the County; however, the County may be required to indemnify the individual Defendants for some or all of the damages alleged herein.

**WHEREFORE, Cupp prays for Judgment as set forth below.**

**VI.**

**RELIEF SOUGHT**

**WHEREFORE,** Plaintiff RONALD CUPP, seeks the following relief on behalf of himself and others similarly situated:

1. A declaration that the actions of Defendants', and each of them, were and are unlawful and unconstitutional;

2. A temporary restraining order and preliminary and permanent injunction enjoining Defendants, and each of them, their agents and employees, from entering the private property of the residents of the County of Sonoma without first securing a warrant; unless Defendants, and each of them, their agents and employees have the consent of the person in lawful possession of the property, unless the property presents exigent circumstances, unless the property is "open field, or unless the search is conducted from a public vantage point;

3. A temporary restraining order and preliminary and permanent injunction enjoining Defendants, and each of them, their agents and employees, from using drones to conduct inspections or searches of the private property of the residents of the County of



Sonoma without a warrant; unless Defendants, and each of them, their agents and employees have the consent of the person in lawful possession of the property, unless the property presents exigent circumstances, or unless the property is "open field;

4. A temporary restraining order and preliminary and permanent injunction enjoining Defendants, and each of them, their agents and employees, from using drones to conduct inspections or searches of the private property at a height greater than 400 feet above the ground;

5. For damages and punitive damages, according to proof at trial;

6. For costs and attorney's fees incurred in this action; and

7. For such other and further relief as this Court deems is just and proper.

Respectfully submitted,

Dated: March 6, 2023          **YOUNG LAW GROUP**

By: */s/Eric G. Young, Esq.*
ERIC G. YOUNG, ESQ., Attorneys for
Plaintiff RONALD CUPP

**VII.**

**DEMAND FOR JURY TRIAL**

Plaintiff RONALD CUPP hereby demands a trial by jury on all counts and upon all relief sought herein that are so triable.

Dated: March 6, 2023          **YOUNG LAW GROUP**

By: */s/Eric G. Young, Esq.*
ERIC G. YOUNG, ESQ., Attorneys for
Plaintiff RONALD CUPP

