ROBERT H. PITTMAN #172154
County Counsel
MICHAEL A. KING #77014
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403
Telephone: (707) 565-2421
Facsimile: (707) 565-2624
E-mail: michael.king@sonoma-county.org

Attorneys for Defendant
COUNTY OF SONOMA
TENNIS WICK, TYRA HARRINGTON,
MARK FRANCESCHI, TODD HOFFMAN,
JESSE CABLK and ANDREW SMITH

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD CUPP, an individual | **Case No. 4:23-cv-01007** |
| Plaintiff, | |
| vs. | **DEFENDANTS TENNIS WICK, TYRA HARRINGTON, MARK FRANCESCHI, TODD HOFFMAN, JESSE CABLK AND ANDREW SMITH'S REQUEST TO TAKE JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS** |
| COUNTY OF SONOMA, a municipal corporation; et al. | |
| Defendants. | Date: 08/17/23 |
| | Time: 2:00 p.m. |
| | Courtroom: 6, 2nd Floor |
| | Judge: Jon S. Tigar |

_____ /

This Request for Judicial Notice is brought by Defendants TENNIS WICK, TYRA

HARRINGTON, MARK FRANCESCHI, TODD HOFFMAN, JESSE CABLK AND ANDREW

SMITH, ("Defendants") in connection with their Motion to Dismiss Complaint, being filed

concurrently herewith, which is noticed for hearing on August 17, 2023. In this request,

Defendants ask the Court to take judicial notice of the facts and documents identified below

pursuant to Federal Rule of Evidence 201, as such facts are not subject to reasonable dispute

herein and are capable of accurate and ready determination by resorting to sources whose accuracy cannot reasonably be questioned.

When considering a motion to dismiss brought under Rule 12(b)(6), a Court may consider undisputed matters of public record through a request for judicial notice, including state court records. (*United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc*., 971 F.2d 244, (9th Cir. 1992); *Busch v. Torres,* 905 F. Supp. 766, 769, fn. 1 and 2 (C.D. Cal. 1995).) In the present case, Defendants are requesting judicial notice of documents that are part of this court's records in prior cases, and state court records.

Pursuant to these authorities, County Defendants seek judicial notice of the following categories of public records, as described below.

1. Complaint in United States District Court, Northern District, Case No. 4:20-cv-03456, filed on May 21, 2020;

2. Order Denying Application for TRO and Motion for Preliminary Injunction in Northern District, Case No. 4:20-cv-03456, filed on August 5, 2020;

3. Order Granting Motion to Dismiss in Northern District, Case No. 4:20-cv-03456, filed on September 9, 2020;

4. First Amended Complaint in Northern District, Case No. 4:20-cv-03456, filed on October 7, 2020;

5. Order Granting Motion to Dismiss in Northern District, Case No. 4:20-cv-03456, filed on February 17, 2021;

6. Order Denying and Granting in part, Defendant's Motion for Summary Judgment, Case No. 4:20-cv-03456, filed on February 23, 2022;

7. Dismissal and Judgment in Northern District, Case No. 4:20-cv-03456;

8. Complaint in United States District Court, Northern District, Case No. 4:22-cv-4307, filed on July 25, 2022;

9. Voluntary Dismissal in Northern District, Case No. 22-cv-04307-TSH, filed on August 26, 2022;

10. Decision of Administrative Hearing Officer on February 11, 2021.

WHEREFORE, County Defendants request judicial notice of these documents, and certain information contained therein, for consideration in connection with their Motion to Dismiss Complaint and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: May 15, 2023                    ROBERT H. PITTMAN, County Counsel

By:   /s/ *Michael A. King*
                    Michael A. King
                    Deputy County Counsel
                    Attorneys for Tennis Wick, Tyra
                    Harrington, Mark,Franceschi, Todd
                    Hoffman, Jesse Cablk, and Andrew
                    Smith

EXHIBIT 1

1  | Ronald Cupp
2  | 150 Raley Town Center Ste 2512
   | Rohnert Park, California [94928]
3  | Telephone: (707) 318-9929
   | Plaintiff in Pro Se

**FILED**

MAY 21 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA**

**JCS**

10

**CV20**  CASE NO:  **3456**

11 | Ronald Cupp

12 |     Plaintiff,

13 |  vs.

14 | ANDREW SMITH, Individually;
15 | MARGARET WILLETT, Individually;
   | TYRA HARRINGTON, Individually;
16 | MARK FRANCESCHI, Individually;
   | TENNIS WICK, Individually;
17 | COUNTY OF SONOMA;
18 | DOES 1-10

19 |     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**VERIFIED COMPLAINT FOR DAMAGES**
**CIVIL RIGHTS VIOLATIONS**
1. U.S.C. TITLE 42 §1983, Unlawful search
2. U.S.C. TITLE 42 §1983, Due Process
3. U.S.C. TITLE 42 §1985, Conspiracy
4. U.S.C. TITLE 42 §1986, Neglect to Prevent
5. TRESSPASS
6. LAND PATENT INFRINGEMENT
7. SLANDER OF TITLE
8. EXCESSIVE FINES

DEMAND FOR TRIAL BY JURY

26          **INTRODUCTION AND OPENING STATEMENT**

27

28          Plaintiff Ronald Cupp, in this Court of Record, complains as follows:

1  This is an action brought by Plaintiff against State Officials acting under the color of Law

2  for civil rights violations involving unlawful search, violation of due process, trespass,

3  conspiracy, land patent infringement and slander of title. At the conclusion Cupp requires

4  declaratory and injunctive relief.

5  At all times relevant herein the Defendants or their agents working in concert, and

6  outside the scope of their jurisdiction and authority, willfully caused Plaintiff a damage and

7  financial injury, and in so doing, violated clearly established law, as those laws apply to

8  Plaintiff's rights protected under the Constitution.

### I.  JURISDICTION AND VENUE

1.  Plaintiff brings this action pursuant to, and jurisdiction of this Court arises under
Title 42 USC sections §1983, §1985, §1986 and §1988, and the Civil Rights Act of 1870;  and
invokes the jurisdiction of this court pursuant to Title 28 USC Section §1343 (A)(3)(4), Section
§1331 (Federal Question), and supplemental jurisdiction exists for the state law claims pursuant
to 28 USC  §1367 , Jurisdiction arises under Cal. Civ. Pro. §410.10.

2.  Venue is proper pursuant to 28 U.S.C. §1391b and Cal. Civ. Pro. §395(a). Venue
in this District is proper in that the Plaintiff resides here, the Defendants are employed and
transact business here, and the conduct complained of occurred here.

### II.  PARTIES

3.  Plaintiff Ronald Cupp, herein after "CUPP" or "PLAINITFF", at all times
relevant herein, lived at 4640 Arlington Avenue, Santa Rosa, Sonoma County, California; and
has lived in Sonoma County since 1987. Mailing address is 150 Raley Town Center, Suite 2512,
Rohnert Park, CA 94928.

COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS, AND STATE LAW VIOLATIONS        2

4.      Defendant Andrew Smith, Sonoma County Code Enforcement Inspector II, herein after "SMITH", at all times relevant to this compliant was the Code Inspector employed by the County of Sonoma, California. SMITH is being sued individually and in his official capacity.

5.      Defendant Margaret Willett, Sonoma County Code Enforcement, herein after "WILLETT", at all times relevant to this compliant was the Code Inspector employed by the County of Sonoma, California; and is being sued individually and in her official capacity.

6.      Defendant Tyra Harrington, Sonoma County Code Enforcement Manager, herein after "HARRINGTON", at all times relevant to this compliant was the Code Enforcement Manager employed by the County of Sonoma, California; and is being sued individually and in her official capacity.

7.      Defendant Mark Franceschi, Sonoma County Code Enforcement Supervisor, herein after "FRANCESCHI", at all times relevant to this compliant was the Code Enforcement Supervisor employed by the County of Sonoma, California. FRANCESCHI is being sued individually and in his official capacity.

8.      Defendant Tennis Wick, Sonoma County Permit & Resource Management Director, herein after "WICK", at all times relevant to this compliant was the Permit & Resource Management Director employed by the County of Sonoma, California; and is being sued individually and in his official capacity.

9.      Defendant County of Sonoma California, herein after COUNTY, is a quasi-judicial corporation within the State of California, located at 575 Administration Drive, Santa Rosa, CA 95403. The County is being sued as a person.

10.     At all times relevant hereto, defendants "DOES 1-10" are unknown persons who have either created policy or custom and managed, ordered, controlled, or neglected to restrain or

correct the Defendants herein from committing said civil rights violations complained herein. These Defendants will be identified as their names and addresses become known to the CUPP.

11.     At all times relevant to this complaint Defendant COUNTY either directly or indirectly trained, controlled, made policy for, employed, supervised, compensated, enriched, or rewarded and ratified some or all of the other defendants for their actions on February 15, 2019 and thereafter.

12.     At all times relevant hereto Defendants SMITH, WILLETT, HARRINGTON, FRANCESCHI, WICK and DOES 1-10 were compensated, enriched, and rewarded as Government Officers by the quasi-judicial corporation or municipality of COUNTY.

13.     At all relevant times Defendants were acting in such capacity as the agent, servant, and employee of Defendant COUNTY. These Defendants work out of 2550 Ventura Avenue, Santa Rosa, CA 95403 and are believed to be a resident of Sonoma County, California.

14.     At all times relevant hereto and in all their actions described herein Defendants SMITH, WILLETT, HARRINGTON, FRANCESCHI, WICK, COUNTY, and DOES 1-10 were acting under color of law and pursuant to their authority as Permit and Resource Management personnel or government actors and public officials or agents of other Defendants at the time they violated CUPPs federal constitutional protections. .

### III.     PLAIN SIMPLE STATEMENT OF FACTS

15.     CUPP Purchased the land in 1989, via Grant Deed.

16.     CUPP is sovereign, one of the people of California.

17.     The subject land is protected under US land patent.

18.     In 2009 CUPP posted No Trespassing signs and in 2012 Posted Certified Copy of BLM Land Patent, Notices and CUPPs Affidavit of Status; claiming CUPPs rights under law.

19.     On April 18, 2013 CUPP notified (COUNTY) Sonoma County Board of Supervisors, Sonoma County Sheriff, and others of CUPPs claim of Land Patent rights and demanded a timely response. CUPP never received any response.

20.     On February 15, 2019, SMITH of the Sonoma County code enforcement trespassed on CUPPs land, without consent.

21.     On February 15, 2019 SMITH of the Sonoma County code enforcement searched CUPPs land and houses; without a warrant, exigent circumstances or probable cause.

22.     On February 15, 2019 SMITH of the Sonoma County code enforcement violated California Health and Safety Code 17972 by entering land and property without written order.

23.     SMITH issued citations and left.

24.     The last paragraph on the citations stated "If you do not timely appeal this notice and order, you will lose your rights to an administrative hearing and adjudication of this matter."

25.     On February 20, 2019 CUPP timely responded with correspondence and asked for a hearing and an appeal of his citations.

26.     CUPP has continually attempted (thru the filing of this suit) to have a hearing and/or appeal to his citation as part of CUPPs due process rights.

27.     On April 19, 2019 a NOTICE "CIVIL PENALTIES DUE AND PAYABLE" from Defendant SMITH to CUPP demanding $17,010.00 plus $90.00 per day for one citation and $5,670.00 plus $90.00 per day for the second citation.

28.     Thereby ***DAMAGES IN THIS SUIT*** are calculated by Defendants demanding $22,680.00 and $180.00 per day thereafter from April 20, 2019; thru May 15, 2020 is 391 days totaling **$93,060.00.**

29.     This is excessive fines in violation of CUPPs Eighth Amendment protection.

30.     On June 13, 2019 a NOTICE OF ABATEMENT PROCEEDINGS was filed against CUPPs title and his land; and recorded in Sonoma County Recorder's Office Doc# 2019039697 by WILLETT for HARRINGTON, including her boss's FRANCESCHI, WICK and their superiors COUNTY.

31.     Defendant's actions amount to and constitute a taking without compensation in violation of CUPPs constitutional protections.

32.     Defendant's actions damaged and reduced CUPP's land value by $93, 060.00.

33.     Defendants, and all of them, worked in concert by having WILLETT and HARRINGTON file documents in Recorders Office without CUPP having a hearing or appeal.

34.     CUPP has exhausted his administrative remedies, to the best of his abilities, to no avail; and is forced to file this suit for his remedy and attempt to undue defendant's actions.

35.     CUPP timely filed a governmental tort claim with COUNTY.

36.     CUPP's damage was caused by Defendants filing the Notice of Abatement on June 13, 2019; CUPP filed his CLAIM AGAINST COUNTY OF SONOMA on October 23, 2019.

37.     Defendants, and all of them, work in the same office, are copied on all CUPPs correspondence, Notices and Postings, and in the normal course of business discuss this and other similar cases on a daily basis.

38.     Defendants, and all of them, take direction from Superiors for their daily and weekly actions, schedules and to notifying and reporting back to the Superiors above them in the chain of command of what did or did not happen in the field based on the directives from Supervisors. CUPP has noticed each and every defendant except WILLETT who takes direction from HARRINGTON, FRANCESCHI and WICK.

39.     Defendants, and all of them, have consulted with each other, worked together in the same office.

40.     Defendants are each aware that CUPP has demanded Appeal of and Hearing on the citations, and all have ignored or denied a hearing violating due process owing to CUPP.

41.     CUPP has not received substantive or procedural due process from all Defendants in violation of CUPPs constitutional protections.

42.     Defendants all watched, assisted or acted in concert in Defendants refusal to assist CUPP with his due process protections.

43.     Violation of the Equal Protection and due process were willful and intentional.

44.     Defendants acted without authority, in excess of their jurisdiction, and beyond the scope of their powers, and in concert to deprive CUPP of his protections.

45.     Further Defendants continued to violate CUPPs constitutional protections and violating his protections of his land patent; filing slanderous documents against CUPP extorting money and funds.

46.     All Defendants were ignoring their oaths to CUPPs rights to appeal and hearings.

47.     COUNTY, by and thru its employees, working in concert and against land and home owners, are charging land owners with such large erroneous and exorbitant fines in an attempt to burden or take land owners property or extort excessive fines for punitive and income producing reasons.

48.     This is in violation of the Eighth Amendment of our Constitution.

49.     SMITH is the person who directly is responsible for the unlawful search, violation of due process, trespass, violation of CUPPs equal protection and Health and Safety Code 17972.

50.     SMITH, WILLETT for HARRINGTON under FRANCESCHI are the persons who directly are responsible for violating CUPPs due process by filing slanderous documents on his land and denying CUPP his appeal and hearing.

51.     COUNTY is ultimately responsible due to custom and policy of its Officers, agents and employees; whom they train and supervise.

52.     Defendant COUNTY as a policy or custom neglected to train, supervise, control, correct the abuse of authority, or discourage the unlawful use of authority of the Defendant Permit and Resource Management officers and agents.

53.     The failure to train Defendant Officers included the failure to instruct them in applicable provisions of the United States Constitution and applicable California statutes and law dealing in use of unlawful trespass, unlawful search and seizure, due process, equal protection of citizens, California Health and Safety Code 17972, resulting in the use of County Permit and Resource Management Department officers to attack land and home owners with civil process.

54.     Defendant County has created a policy and custom and promotes a policy or custom to act in concert with the other Defendants herein to violate CUPPs rights; and Defendant Permit and Resource Management officers acted with total disregard for CUPPs rights under clearly established law.

55.     CUPP had reasonable expectation that defendants would not violate his 4th amendment protection and search his land and houses; would not violate his 8th amendment protection and charge excessive fines; would not violate due process and slander his title.

56.     Defendant WICK, second highest policy maker, has not admonished or reprimanded Defendants SMITH, WILLETT, HARRINGTON OR FRANCESCHI for their actions; thereby ratifying their behavior and creating a custom and practice of their behavior.

57. Defendant COUNTY, the policy maker, has not admonished or reprimanded Defendants WICK, SMITH, WILLETT, HARRINGTON OR FRANCESCHI for their actions; thereby ratifying their behavior and creating a custom and practice of their behavior.

## IV. FEDERAL AND STATE CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF TITLE 42 § 1983-UNLAWFUL SEARCH
### VIOLATION OF CIVIL RIGHTS
### AS TO DEFENDANT SMITH

58. Cupp re-alleges and incorporates by reference the facts and allegations contained in the Paragraphs above as though fully set forth herein.

59. SMITH is a state actor acting under color of law, and has sworn an oath of office to support and defend the Constitution of the United States and the State of California.

60. Article 4 of the Bill of Rights states there will be so search without a warrant unless based upon probable cause supported by oath or affirmation.

61. SMITH violated California Health and Safety Code 17972 by entering land and property without written order.

62. SMITH violated his oath when he unlawfully searched CUPPs land and houses without consent, a search warrant or exigent circumstances.

63. SMITH knew or should have known he was violating CUPPs constitutional protections that he swore his oath to protect and defend.

64. SMITHs actions were willful and intentional, he acted in bad faith, wantonly, recklessly, maliciously, and "in concert" with additional state officers and agents showing a deliberate indifference towards CUPP and CUPP s rights protected, and guaranteed by the Constitution, with the direct intent and sole purpose of injuring, humiliating, vexing, oppressing,

1  and causing mental anguish to Cupp, by the reason of which Cupp is entitled to an award of

2  punitive damages.

### SECOND CAUSE OF ACTION
### VIOLATION OF TITLE 42 § 1983-VIOLATION OF DUE PROCESS
### VIOLATION OF CIVIL RIGHTS
### AS TO DEFENDANTS SMITH, WILLETT, HARRINGTON, FRANCESCHI, WICK

65.    Cupp re-alleges and incorporates by reference the facts and allegations contained
in the Paragraphs above as though fully set forth herein.

66.    SMITH, WILLETT, HARRINGTON, FRANCESCHI, and WICK are state
actors acting under color of law, and has sworn an oath of office to support and defend the
Constitution of the United States and the State of California.

67.    SMITH, WILLETT, HARRINGTON, FRANCESCHI, and WICK knew of
CUPPs request for an appeal or his hearing for due process regarding the citations SMITH
caused, and denied CUPP.

68.    Article 5 and 14 of the Bill of Rights states there are procedural and substantive
due process as Constitutional protections.

69.    SMITH, WILLETT, HARRINGTON, FRANCESCHI, and WICK violated their
oath when they denied CUPP his appeal and/or hearing and filed slanderous documents against
CUPPs land and title.

70.    The slanderous documents filed against CUPP are a damage to CUPP of $93,060.

71.    SMITH, WILLETT, HARRINGTON, FRANCESCHI, and WICK knew or
should have known they were violating CUPPs constitutional protections that they swore an oath
to protect and defend.

72.    SMITH, WILLETT, HARRINGTON, FRANCESCHI, and WICKs actions were
willful and intentional, they acted in bad faith, wantonly, recklessly, maliciously, and "in

concert" with additional state officers and agents showing a deliberate indifference towards

CUPP and CUPP s rights protected, and guaranteed by the Constitution, with the direct intent

and sole purpose of injuring, humiliating, vexing, oppressing, and causing mental anguish to

Cupp, by the reason of which Cupp is entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
### VIOLATION OF TITLE 42 § 1985
### CONSPIRACY
### AS TO ALL DEFENDANTS

73.     CUPP re-alleges and incorporates by reference the facts and allegations contained

in the Paragraphs above as though fully set forth herein.

74.     CUPP being denied his appeal and hearing deprived him of equal protection and

procedural and substantive due process, the final act in furtherance of conspiracy, and injury

constituting deprivation of rights resulting therefrom.

75.     All of the Defendants, at all times herein relevant, acted in bad faith, wantonly,

recklessly, willfully, maliciously, and "in concert" with additional state officers showing a

deliberate indifference towards CUPP and CUPPs rights protected, and guaranteed by the

Constitution, with the direct intent and sole purpose of injuring, humiliating, vexing, oppressing,

and causing mental anguish to CUPP, by the reason for which CUPP is entitled to an award of

punitive damages.

76.     As a proximate and direct result of the actions of the Defendants herein, CUPPs

rights were knowingly violated in direct violation of clearly established Federal law.

77.     CUPP further alleges that Defendants, and all of them, knew or should have

known that CUPP had protected due process and hearing rights by filing the responses and

requests for appeal and hearing, yet ALL Defendants intentionally and willfully failed to reveal

this fact.

78.     Each Defendant was aware of the actions of all Defendants and working in concert conspired against CUPP. CUPP is entitled to judgment damages for conspiracy and damages caused by all defendants.

79.     All the Defendant's conduct and actions were done in concert with each Defendant, knowingly, willfully, and with malicious intent, and CUPP is entitled to punitive damages.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF TITLE 42 § 1986**
**NEGLECT TO PREVENT DAMAGE**
**AS TO ALL DEFENDANTS**

80.     CUPP re-alleges and incorporates by reference the facts and allegations contained in the Paragraphs above as though fully set forth herein.

81.     CUPP further alleges that ALL Defendants knew or should have known that CUPP had protected due process and hearing rights by filing, corresponding, and noticing the request for appeal and hearing, yet ALL Defendants intentionally, knowingly and willfully failed to acknowledge this fact.

82.     CUPP further alleges that ALL Defendants knew or should have known that CUPP had protected due process rights and neglected to prevent damage to CUPP.

83.     CUPP further alleges that ALL Defendants knew or should have known that SMITH, WILLETT and HARRINGTON under the direction of FRANCESCHI were going to file the Abatement against CUPPs land and title, thereby slandering it, and they each had a duty and obligation to stop it. All Defendants neglected to prevent damage to CUPP.

84.     Section §1986 allows a cause of action against a party who had knowledge of §1985 conspiracy, had power to prevent it, and then failed to do so.

85.     During the course of the proceedings, All Defendants had the knowledge and power to stop the actions of the conspiracy or other parties acting in concert.

86.     Each Defendant had a duty and obligation to stop the wrongdoings of all the other Defendants, and failed to do so.

87.     Each Defendant (except FRANCESCHI) took an oath to support and defend the US Constitution and the California Constitution, which they perjured their oaths.

88.     All the Defendant's conduct and actions were done in concert with each Defendant, knowingly, willfully, intentionally and with malicious intent, and CUPP is entitled to general damages and punitive damages.

## FIFTH CAUSE OF ACTION
### TRESPASS
### AS TO DEFENDANTS SMITH, WILLETT, HARRINGTON, FANCESCHI

89.     CUPP re-alleges and incorporates by reference the facts and allegations contained in the Paragraphs above as though fully set forth herein.

90.     CUPP has owned the land since 1989.

91.     SMITH knowingly, willfully and intentionally, entered thru the posted No Trespassing fences with signs, searched the property and house without consent or a warrant.

92.     SMITH violated California Health and Safety Code 17972 by entering land and property without written order.

93.     All Defendants knew or should have known Defendants SMITH, WILLETT and HARRINGTON, under direction of FRANCESCHI were going to file the Notice of Abatement, and they proceeded knowingly, willfully and intentionally, as a matter of normal practice in their everyday extortion scheme.

94.     CUPP was harmed by SMITH, WILLETT, HARRINGTON, FRANCESCHI's actions and deeds, and all Defendants were a part of the process.

### SIXTH CAUSE OF ACTION
### LAND PATENT INFRINGEMENT
### AS TO ALL DEFENDANTS

95.     CUPP re-alleges and incorporates by reference the facts and allegations contained in the Paragraphs above as though fully set forth herein.

96.     CUPPs land is protected by highest form of title, US Land Patent. CUPP has given COUNTY certified copies of CUPPs BLM patent. CUPP has posted it for years. CUPP has claimed this with the COUNTY since 2012, and has noticed COUNTY several times since.

97.     NO COUNTY, CITY NOR MUNICIPALITIES HAVE JURISDICTION OVER PRIVATE PROPERTY UNDER TREATY OR LAND PATENT. Defendant COUNTY and all Defendants have no lawful right or jurisdiction to infringe or trespass on CUPPs property rights.

98.     Land Patent laws and treaties are part of our founding fathers and in the Constitution itself, thereby each and every Defendant who violates this perjures his Oath and is committing treason against the Constitution.

### SEVENTH CAUSE OF ACTION
### SLANDER OF TITLE
### AS TO ALL DEFENDANTS

99.     CUPP re-alleges and incorporates by reference the facts and allegations contained in the Paragraphs above as though fully set forth herein.

100.    Defendants SMITH, WILLETT, HARRINGTON, FRANCESCHI under direction of WICK, filed the Notice of Abatement Proceedings in the county recorder's office for all the public to see.

101.    The document was and is untrue and to this day CUPP has not had his hearing.

102.   Defendants SMITH, WILLETT, HARRINGTON, and FRANCESCHI under

direction of WICK, knew or should have known the statement was untrue.

103.   The Notice of Abatement Proceedings filing is of a disparaging nature that could

foreseeably impair the value of the property in the estimation of others.

104.   CUPP has suffered and continues to suffer damages because of this in the amount

of $93,060.00 and is continuing to increase as time goes on.

### EIGHTH CAUSE OF ACTION
### EXCESSIVE FINES
### AS TO ALL DEFENDANTS

105.   CUPP re-alleges and incorporates by reference the facts and allegations contained

in the Paragraphs above as though fully set forth herein.

106.   As a pattern and practice the COUNTY and all Defendants regularly and

consistently bully property owners, as in CUPPs case unlawful search, trespass and refuse to

respond with due process, and charge a ridiculous amount of funds for fines, which is income for

the COUNTY to pay is own employees. This is done as a form of penal purposes and is punitive;

and financial intercourse against CUPP is a source of revenue for COUNTY.  Such 'fines'

undermine our liberty. The Eighth Amendment protects against excessive fines.

### JURY TRIAL

107.   Jury trial by jury of my peers demanded.

1

## V.    PRAYER FOR RELIEF

2      **WHEREFORE,** CUPP prays that this Court enter a judgment in his favor and against

3   Defendants, jointly and severally, and award:

4      1.  General damages for civil rights violations, each count, each defendant;

5      2.  Compensatory damages in the amount of $93,060.00 each count, each defendant;

6

7      3.  Punitive damages to be determined at trial, all defendant's, except COUNTY;

8      4.  For cost of suit;

9      5.  For Attorney's fees per §1988;

10     6.  The right to amend this suit as facts permit or as needed;

11
12     7.  Such other relief as the Court deems just and proper;

13     8.  For Injunctive relief for any further actions or damages by Defendants from engaging

14         in conduct from activities described herein.

15

16   Dated:  May 18, 2020                                      Respectfully;

17

18

19

20                                                             Ronald Cupp
                                                               Plaintiff Pro Se

21

22

23

24

25

26

27

28

1

## **VERIFICATION**

2    Declaration of Ronald Cupp

3    I, Ronald Cupp, declare on personal knowledge, the following facts:

4    1.  I have read the foregoing pleading and know the facts therein stated to be true and correct.

5
6    I declare, under penalty of perjury pursuant to the laws of the State of California and these

7    United States of America, that the foregoing is true and correct to the best of my knowledge,

8    information and belief.

9    Date: May 18, 2020

10

11

12                                        Ronald Cupp, Plaintiff Pro Se

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
RONALD CUPP

**DEFENDANTS** AMBER PANTI, MARGARET WILLETT, TYRA HARRINGTON, MARK FRANCESCHI, TENNIS WICK, COUNTY OF SONOMA, DOES 1-10

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

SONOMA

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)* SONOMA

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

PRO SE

Attorneys *(If Known)*

UNKNOWN

C 20 -3456 J CS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| 1 | U.S. Government Plaintiff | ✕ 3  Federal Question *(U.S. Government Not a Party)* |
| 2 | U.S. Government Defendant | 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | | | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 790 Other Labor Litigation | **SOCIAL SECURITY** | 480 Consumer Credit |
| | 360 Other Personal Injury | 385 Property Damage Product Liability | 791 Employee Retirement Income Security Act | 861 HIA (1395ff) | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | | **IMMIGRATION** | 862 Black Lung (923) | 490 Cable/Sat TV |
| 190 Other Contract | | | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 864 SSID Title XVI | 890 Other Statutory Actions |
| 196 Franchise | ✕ 440 Other Civil Rights | **HABEAS CORPUS** | | 865 RSI (405(g)) | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | **FEDERAL TAX SUITS** | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | 870 Taxes (U.S. Plaintiff or Defendant) | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 871 IRS–Third Party 26 USC § 7609 | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ✕ 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from Another District *(specify)* | 6 Multidistrict Litigation–Transfer | 8 Multidistrict Litigation–Direct File | |

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
TITLE 42, 1983, 1985, 1986, 1988 CIVIL RIGHTS & STATE CLAIMS
Brief description of cause:
CIVIL RIGHTS AND CONCURRENT STATE CLAIMS

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $** 93060+

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ✕ Yes  No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*
JUDGE

DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)
*(Place an "X" in One Box Only)*  ✕ SAN FRANCISCO/OAKLAND

SAN JOSE

EUREKA-MCKINLEYVILLE

DATE  5-18-20

SIGNATURE OF ATTORNEY OF RECORD

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.  a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1)  <u>United States plaintiff.</u> Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2)  <u>United States defendant.</u> When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3)  <u>Federal question.</u> This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4)  <u>Diversity of citizenship.</u> This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.  **Origin.** Place an "X" in one of the six boxes.

   (1)  <u>Original Proceedings.</u> Cases originating in the United States district courts.

   (2)  <u>Removed from State Court.</u> Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3)  <u>Remanded from Appellate Court.</u> Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4)  <u>Reinstated or Reopened.</u> Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5)  <u>Transferred from Another District.</u> For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6)  <u>Multidistrict Litigation Transfer.</u> Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8)  <u>Multidistrict Litigation Direct File.</u> Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   <u>Please note that there is no Origin Code 7.</u> Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** <u>Example:</u> U.S. Civil Statute: 47 USC § 553. <u>Brief Description:</u> Unauthorized reception of cable service.

VII.  **Requested in Complaint.** <u>Class Action.</u> Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   <u>Demand.</u> In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   <u>Jury Demand.</u> Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.  **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

DUPLICATE

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611149066
Cashier ID: sprinka
Transaction Date: 05/21/2020
Payer Name: bizgistics llc
------------------------------------
CIVIL FILING FEE
 For: RONALD CUPP
 Case/Party: D-CAN-3-20-CV-034560-001
 Amount:        $400.00

PAPER CHECK CONVERSION
 Check/Money Order Num: 1156
 Amt Tendered:  $400.00
------------------------------------
Total Due:       $400.00
Total Tendered: $400.00
Change Amt:      $0.00

jcs


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.

EXHIBIT 2

1

2

3

4                     UNITED STATES DISTRICT COURT

5                    NORTHERN DISTRICT OF CALIFORNIA

6

7    RONALD CUPP,

8                 Plaintiff,                    Case No.  20-cv-03456-PJH

9         v.
                                                **ORDER DENYING APPLICATION FOR
10   ANDREW SMITH, et al.,                      A TEMPORARY RESTRAINING
                                                ORDER AND MOTION FOR
11                Defendants.                   PRELIMINARY INJUNCTION**

12                                              Re: Dkt. No. 20

13        Before the court is plaintiff Ronald Cupp's ("plaintiff") ex parte application for a

14   temporary restraining order and motion for a preliminary injunction.  Dkt. 20.  Having read

15   the parties' papers and carefully considered their argument and the relevant legal

16   authority, and good cause appearing, the court hereby **DENIES** plaintiff's requests.

17                                **BACKGROUND**

18   **A.    The Underlying Claims**

19        On May 21, 2020, plaintiff filed the instant civil rights action against defendant

20   County of Sonoma ("Sonoma County"), Andrew Smith ("Smith"), Tyra Harrington

21   ("Harrington") ("defendants"), as well as other individuals not relevant to the instant

22   motion.  Dkt. 1 (Compl.).  In it, plaintiff alleges that defendants violated his Fourth

23   Amendment, Fifth Amendment, and certain due process rights in connection with their

24   alleged February 15, 2019 "trespass" and "search" of plaintiff's property at 4640 Arlington

25   Avenue, Santa Rosa, California.  Compl. ¶¶ 20-22.  Plaintiff's property comprises 4.33

26   acres of land and is "completely fenced in" with a "solid wood" fence.  Dkt. 20-2 ¶¶ 3, 8.

27        Plaintiff's due process deprivation claim stems from defendants maliciously

28   denying plaintiff his request for an appeal of the citations issued by Sonoma County

1   following their February 15, 2019 visit.  Id. ¶¶ 65-72.  Plaintiff adds ancillary state law

2   claims for trespass, land patent infringement, slander of title, as well as excessive fines,

3   all of which arise from the February 15, 2019 visit.  Id. ¶¶ 89-106.

4   **B.      The July 30, 2020 Search**

5            On July 20, 2020, an unspecified judge of the Sonoma County Superior Court

6   signed and issued an inspection warrant of plaintiff's property pursuant to California Code

7   of Civil Procedure § 1822.50, *et. seq.*  Dkt. 20-1 at 8.  The warrant authorized Sonoma

8   County to search the "interior and exterior" of the premises and "all items on and

9   associated to" the property, including "the surrounding grounds . . . garages . . . [and] any

10  vehicles, trailers, or motor-homes present on the property."  Id. at 10.  The warrant added

11  various endorsements authorizing the use of reasonable force for entry, id. at 13, its

12  execution in the absence of the owner or occupant, id. at 14, and shortened notice to

13  Cupp and other occupants, id.[1]

14           Ten days later, Smith, Harrington, and Todd Hoffman (an inspector with Sonoma

15  County, Dkt. 25-1 at ¶ 7) arrived at plaintiff's property and "passed thru" [sic] his "solid

16  wood" fence.  Dkt. 20-2 ¶ 8.  Smith used "some sort of metal ram to bust in the doors and

17  bust the locks and door jambs."  Id. ¶ 9.  Following the entry, Smith posted on plaintiff's

18  property various citations concerning certain "construction(s) without permit," Dkt. 20-1 at

19  1-2, 4, 7, "unlawful use/zoning violation(s)," id. at 3, "unlawful commercial cannabis use,"

20  id. at 5, and "dangerous building(s)," id. at 6.  By a phone call from Harrington, plaintiff

21  learned about the search immediately before it occurred but was not present when Smith,

22  Hoffman, and Harrington conducted it.  Dkt. 20-2 at ¶ 8. During the search, Smith stated

23  to someone living in a trailer on the property that he or she needed to leave and that

24  defendants "were going to get the PG&E power shut off."  Dkt. 20 at 7.

25

26  _____

27  [1] Shortly after filing their opposition, defendants filed an errata indicating that it is unclear
    whether the judge who signed the July 20, 2020 warrant was Assistant Presiding Judge
    Shelly Averill or the judge to whom defendants presented the inspection warrant,

28  Presiding Judge Bradford DeMeo.  Dkt. 28.  This court cannot tell from the signature
    which judge signed it.  To simplify, the court will not refer to the issuing judge by name.

2

On July 31, 2020, the day after the search, Hoffman filed a return of inspection with the Sonoma County Superior Court.  Dkt. 25-5.  In his supporting declaration, Hoffman details the various violations observed.  Id. ¶ 4.  Those violations include the cultivation of over 450 cannabis plants, id. ¶ 4(B)(6), hazardous electrical work to plaintiff's barn, id. ¶ 4(C)(2), and a water heater powered by propane added to plaintiff's garage, id. ¶ 4(C)(7).  That same day, Smith returned outside plaintiff's property and posted another citation. Dkt. 26.[2]  The court details other evidence proffered by the parties as necessary in its analysis below.

## C.    The Instant Motion

On July 31, 2020, plaintiff filed the instant motion on an ex parte basis.  In it, he seeks "protection and status quo" until the court can decide this action on the merits.  Id. at 7-8.  Plaintiff expressly asked this court to order defendants not to direct PG&E to terminate his power. Id. at 8.

Within hours, the court issued its order denying plaintiff's request to proceed on an ex parte basis and setting a briefing schedule.  Dkt. 21.  The court also ordered defendants to refrain from issuing any direction to third-party PG&E to terminate plaintiff's electricity until it resolves the instant motion.  Id. at 3.  They complied.  Dkt. 25 ¶ 12.

### DISCUSSION

## A.    Legal Standard

Federal Rule of Civil Procedure 65 provides federal courts with the authority to issue temporary restraining orders and preliminary injunctions.  Fed. R. Civ. P. 65(a)-(b).  Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction

---

[2] The court did not allow plaintiff leave to file a reply and warns him against making such unauthorized filings in the future.  In any event, the court has considered plaintiff's reply and will detail it as necessary.

1   hearing may be held, <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck</u>

2   <u>Drivers</u>, 415 U.S. 423, 439 (1974)).  Requests for temporary restraining orders are

3   governed by the same legal standards that govern the issuance of a preliminary

4   injunction.  <u>Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.</u>, 240 F.3d 832, 839

5   n.7 (9th Cir. 2001).

6        An injunction is a matter of equitable discretion and is "an extraordinary remedy

7   that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

8   <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008); <u>Munaf v. Geren</u>, 553

9   U.S. 674, 689-90 (2008).  A preliminary injunction "should not be granted unless the

10  movant, by a clear showing, carries the burden of persuasion."  <u>Mazurek v. Armstrong</u>,

11  520 U.S. 968, 972 (1997) (per curiam).

12       "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to

13  succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of

14  preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an

15  injunction is in the public interest."  <u>Winter</u>, 555 U.S. at 20.  Alternatively, "'serious

16  questions going to the merits' and a hardship balance that tips sharply toward the plaintiff

17  can support issuance of an injunction, assuming the other two elements of the <u>Winter</u> test

18  are also met."  <u>All. for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011).

19  Stated differently, "'serious questions going to the merits' and a balance of hardships that

20  tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long

21  as the plaintiff also shows that there is a likelihood of irreparable injury and that the

22  injunction is in the public interest."  <u>Id.</u> at 1135; <u>Disney Enterprises, Inc. v. VidAngel, Inc.</u>,

23  869 F.3d 848, 856 (9th Cir. 2017).

24  **B.    Analysis**

25       The court concludes that plaintiff failed to show that he is entitled to preliminary

26  injunctive relief.  As analyzed below, plaintiff's request fails under every <u>Winters</u> factor.

27       **1.    Plaintiff Failed to Show a Likelihood of Success on the Merits**

28       To substantiate this factor, plaintiff analyzes the likelihood that he will succeed on

4

only (1) his Fourth Amendment claim for unlawful search premised upon the alleged

February 15, 2019 entry; and (2) his claim for deprivation of due process concerning his

denied request to appeal the citations issued after that visit.  Dkt. 20 at 4-5.  Below, the

court analyzes plaintiff's likelihood of success on each claim in turn.

a.    **The Claim for Unlawful Entry**

Plaintiff failed to show that he is likely to succeed on the merits of his claim for

unlawful entry.  As an initial matter, plaintiff did not present any evidence to support

finding that Smith, in fact, entered his property on February 15, 2019.  To the contrary,

defendants proffered affirmative evidence showing that Smith did not do so.  In his

declaration in support of the July 30, 2020 warrant, Hoffman states that in January 2019,

Smith "observed" from plaintiff's property's "right of way" numerous violations, including

"unpermitted construction/remodel of the primary residence, a barn, and a garage. . . .

[and] at least one of the structures [] being converted into an unpermitted dwelling unit."

Dkt. 25-2 at 7-8.  For context, Hoffman explains that Smith then ran a permit history

search of the property and "posted the notices to the property in February 2019."  Id. at 8.

The court finds Hoffman's statement credible.  Based on an aerial photo of

plaintiff's property attached to Hoffman's declaration in support of the July 20, 2020

warrant, Dkt. 25-2 at 26, it appears that Smith could have easily viewed the unauthorized

structures behind plaintiff's wooden fence from alongside the road.  Given the above, the

court concludes that plaintiff failed to show that he is likely to succeed on the merits of his

claim for unlawful entry.

b.    **The Claim for Deprivation of Due Process**

Plaintiff also failed to show that he is likely to succeed on the merits of his claim for

deprivation of due process.  In a prior request for judicial notice, defendant proffered

evidence showing that plaintiff did receive the opportunity for a hearing for the notice of

abatement proceedings initiated against him in connection with the February 15, 2019

visit.  Dkt. 10-3 at 2-4.  On September 4, 2019, plaintiff sent a letter to Sonoma County's

Code Enforcement Supervisor, Mark Franceschi, expressly stating that "I am in receipt of

your letter dated August 28, 2019 titled **Notice of Abatement Hearing**.”  Dkt. 10-4 at 2.

In that letter, plaintiff goes on to explain that he is “not available at the end of this month

[September 2019] . . . Please reschedule for last part of October 2019.”  Id.  This letter

directly undermines plaintiff's allegation that defendants “knew of [his] request for an

appeal . . . regarding the citations Smith caused and denied Cupp.”  Compl. ¶ 67.

While ten months to reschedule an administrative hearing is a long time,

defendants cite the October 2019 Kincade fires in the county, this litigation, and the

ongoing pandemic as exceptional circumstances that have prevented rescheduling that

hearing.  Dkt. 26 at 5.  Counsel for defendants represents to this court that the subject

hearing is “in queue to be scheduled.”  Id.  If that representation is true, such hearing

would provide plaintiff the process requested and, thus, moot this claim.  Given the

above, the court concludes that plaintiff failed to show that he is likely to succeed on the

merits of his claim for deprivation of due process.

**2.      Plaintiff Failed to Show Irreparable Injury in the Absence of the
Preliminary Relief Requested**

Plaintiff suggests that, in the absence of preliminary relief, he will suffer irreparable

injury in three ways.

First, plaintiff argues that defendants will retaliate against him by future

“unconstitutional search and harassment without warrants or prior notice.” Dkt. 20 at 7.

Plaintiff appears to base this argument on the July 30, 2020 search.  Id.  This reason is

undermined by the evidence proffered: a judge authorized such entry without 24-hour

notice by warrant.  Dkt. 20-1 at 9-14.

In his reply, plaintiff states that he “continues to claim there was no warrant” until

he “may challenge the affidavit of probable cause.”  Dkt. 26 at 2.  Despite having that

affidavit, Dkt. 25-2, plaintiff failed to contest its sufficiency or accuracy.  In any event,

based on review of that affidavit, the court finds it implausible that he could overcome its

presumed validity.  Franks v. Delaware, 438 U.S. 154, 171 (1978).  Accordingly, the court

has no basis to conclude that defendants will unlawfully retaliate against plaintiff.

1

2      Second, plaintiff suggests that the defendants' actions will harm the "forever

3  benefits" of his property's "land patent."  Dkt. 20 at 7.  Plaintiff fails to explain how, absent

4  preliminary relief, defendants would disrupt any such perpetual benefits of his real

property.  The court cannot discern one.  Given that, it need not consider any such harm.

5      Third, while not neatly articulated, plaintiff argues that defendants will direct PG&E

6  to terminate his power.  This argument potentially carries more weight.  Plainly, the

7  absence of utilities may harm plaintiff.  However, he fails to explain how or why any such

8  harm would be irreparable.  In any event, any cognizable harm that plaintiff could cite as

9  a result of having his electricity terminated appears self-imposed.  As defendants "hope"

10 for in their opposition, plaintiff could "abate the public nuisance and . . . work with the

11 County . . . to deal with the violations."  Dkt. 25 at 7.  Accordingly, the court concludes

12 that plaintiff failed to clearly show that he will likely suffer irreparable harm in the absence

13 of preliminary relief.

14     **3.      Defendants Showed that the Remaining <u>Winters</u> Factors Cut Against**

15          **Ordering the Preliminary Relief Requested**

16     In his opening brief, plaintiff did not present any evidence or make any arguments

17 establishing that the balance of equities tips in his favor or that the requested relief is in

18 the public interest.  On these omissions alone, plaintiff failed to satisfy the remaining

19 <u>Winters</u> factors.

20     That failure aside, defendants proffered evidence showing that the public interest

21 favors denying any preliminary relief that would prevent it from pursuing abatement

22 proceedings against plaintiff or terminating his utilities.  Significantly, in his declaration to

23 this court, Hoffman states the following:

24          "the unpermitted and illegal electrical wiring and gas piping
             systems in the cannabis barn, presented an immediate and
25          serious danger to the public, as well as the residents on the
             property.  The open electrical wiring ran through water and in a
26          different room, wiring was present with the unpermitted gas
             piping.  A major fire or explosion could occur at any time,
27          thereby endangering the surrounding neighbors and
             community.  It is imperative that the entire electrical system be
28          shut down until the problems are abated and legally permitted."

United States District Court
Northern District of California

7

Dkt. 25-1 ¶ 10.

Attached to his return of warrant, Hoffman provides two pictures from inside plaintiff's barn that appear consistent with this determination.  Dkt. 25-5 at 11-12.  Both show rows of cannabis under exposed ceilings with hanging wires and lights as well as uncovered air vents.  Id.  Aside from his conclusory assertions that there are "no immediate dangers to person or property," Dkt. 26 at 4; Dkt. 27 at 2, plaintiff fails to proffer any evidence contradicting Hoffman's determination.  Given the apparent fire risk that the conditions of the barn poses, the court concludes that the public interest cuts in favor of denying the preliminary relief requested.

Lastly, given the abundant evidence proffered by defendants that plaintiff has been engaged in unlawful activity, Dkt. 25-5 at ¶ 4 (B)-(C) (listing 16 different sorts of violations), the court further concludes that the balance of equities also favors denying that relief.

**CONCLUSION**

For the above reasons, the court **DENIES** plaintiff's application for a temporary restraining order and motion for preliminary injunction.  The court acknowledges that Sonoma County alternatively argues that the court should dismiss the claims against it under the Younger abstention doctrine.  Sonoma County raises that issue in its pending motion to dismiss, which is the proper procedural vehicle for the court to address it.

**IT IS SO ORDERED.**

Dated: August 5, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

8

EXHIBIT 3

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

          Plaintiff,

    v.

ANDREW SMITH, et al.,

          Defendants.

Case No.  20-cv-03456-PJH

**ORDER GRANTING MOTION TO DISMISS AND DENYING MOTION TO DISQUALIFY COUNSEL**

Re: Dkt. No. 9, 14

Before the court is County of Sonoma's ("Sonoma County"), Andrew Smith's ("Smith"), Margarett Willet's ("Willett"), Tyra Harrington's ("Harrington"), Mark Franceschi's ("Franceschi"), and Tennis Wick's ("Wick") (collectively, the "Individual Defendants" and jointly with Sonoma County, "defendants") motion to dismiss.  Dkt. 9. Also before the court is plaintiff Ronald Cupp's ("plaintiff") motion to disqualify counsel. Dkt. 14.  Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **GRANTS** defendants' motion to dismiss and **DENIES** plaintiff's motion to disqualify.

<div align="center">BACKGROUND</div>

**A.**    **Factual Background**

Plaintiff owns certain real property ("the property") located in the County of Sonoma.  Dkt. 1 ("Compl.") ¶ 3.  The Individual Defendants are employees of Sonoma County's Code Enforcement and Permit & Resource Management divisions.  Id. ¶¶ 4-8. Plaintiff alleges various federal civil rights claims and state law torts against defendants. He requests both monetary and injunctive relief.  Id. Prayers for Relief ¶¶ 1-5, 8. To the extent discernable, plaintiff's claims include or are brought under the following:

- Title 42 U.S.C. § 1983 against Smith for unlawful search in violation of the Fourth Amendment and California Health and Safety Code § 17972.  Id. ¶¶ 58-64.

- Title 42 U.S.C. § 1983 against the Individual Defendants for violation of plaintiff's due process rights under the United States Constitution.  Id. ¶¶ 65-72.

- Title 42 U.S.C. § 1983 against all defendants for levying "excessive fines" against plaintiff for the property's violations of the county building code.  Id. ¶¶ 105-06.

- Title 42 U.S.C. § 1985 against all defendants for conspiracy to deprive plaintiff of his right to a hearing and appeal.  Id. ¶¶ 73-79.

- Title 42 U.S.C. § 1986 against all defendants for failing to prevent harmful slander against the property.  Id. ¶¶ 80-88.

- Trespass against Smith, Willet, Harrington, and Franceschi.  Id. ¶¶ 89-94.

- "Land patent infringement" against all defendants.  Id.  ¶¶ 95-98.

- "Slander" of the property's title against all defendants.  Id. ¶¶ 99-104.

Each claim arises out of a supposed "trespass" by Smith, a Sonoma County Code inspector, on the property on February 15, 2019.  Id. ¶¶ 4, 20-22.   Shortly after that, on February 19, 2019, Sonoma County issued plaintiff two citations for unlawful land use and construction without a permit.  Id. ¶ 23; Dkt. 10-1.[1]  Between February 2019 and November 2019, plaintiff, Smith, and Franceschi (Smith's supervisor) exchanged various letters.  Those letters concern the following:

- The property's code violations.  Compl. ¶ 25; Dkt. 30-3 at 2-6.

- The possibility of an administrative hearing allowing plaintiff the opportunity to challenge such violations. Compl. ¶¶ 25- 26; Dkt. 30-3 at 8-17.

- A notice of abatement proceeding instituted against the property. Compl. ¶ 30; Dkt. 30-3 at 19-31.

- A government tort claim premised on Smith's purported February 15, 2019 entry

---

[1] The court **GRANTS** Sonoma County's request for judicial notice of the documents filed at Dkt. 10 and cited in this order.  Plaintiff failed to oppose this request.  Further, the cited documents are either matters of public record or are referred to and relied on in the complaint.

1    onto the property. Compl. ¶ 35; Dkt. 30-3 at 33-36, 41.

2        Relying on these communications, plaintiff alleges that he "has continually

3    attempted . . . to have a hearing and/or appeal" of the citations issued on February 19,

4    2019.  Compl. ¶¶ 25-26, 35-37.  According to plaintiff, defendants have acted in concert

5    to ignore and deny him such a hearing.  Id. ¶¶ 40, 42.  The precise wording of these

6    communications is critical, so the court will detail their contents in its analysis below.

7        On June 13, 2019, Sonoma County filed a notice of abatement proceedings

8    concerning the property's violations with the county recorder's office.  Id. ¶ 30.  As of May

9    15, 2020, Sonoma County has assessed plaintiff approximately $93,000 for his property's

10   then-outstanding violations.  Id. ¶ 28.  That amount reflects the sum of $90 per day for

11   each violation since February 15, 2019.  Id. ¶ 27; Dkt. 30-3 at 8-9.

12   **B.    Procedural History**

13       On October 23, 2019, plaintiff filed a California Government Code § 910 claim

14   against Sonoma County.  Compl. ¶¶ 35-36; Dkt. 10-5.  According to plaintiff, on

15   November 6, 2019, Sonoma County sent plaintiff a "notice of return of untimely claim,"

16   Dkt. 30-3 at 41, apparently rejecting plaintiff's § 910 claim as untimely.  On November 13,

17   2019, plaintiff responded, arguing the timeliness of his claim.  Id.  Six months later, in late

18   May, plaintiff initiated this action.  Dkt. 1.  The record is silent on what, if anything,

19   transpired between the parties during that period.  Defendants filed their motion to

20   dismiss on June 29, 2020.  Dkt. 9.  Plaintiff filed his motion to disqualify Sonoma County

21   counsel from representing the Individual Defendants shortly after.  Dkt. 14.

22       On July 30, 2020, while those motions were pending, Sonoma County conducted

23   an inspection of the property pursuant to a warrant authorized by a Sonoma County

24   Superior Court judge under California Code of Civil Procedure § 1822.50, *et. seq.*  Dkt.

25   25-4.  Sonoma County identified numerous additional code violations during the

26   inspection.  Dkt. 25-6. On July 31, 2020, in response to that inspection, plaintiff filed a

27   motion for a temporary restraining order and preliminary injunction asking the court to

28   maintain the "status quo" until finally adjudicating this action.  Dkt.  20 at 8.  The court

United States District Court
Northern District of California

3

1   denied that motion on August 5, 2020.  Dkt. 29.  Following that denial, plaintiff requested

2   that the court permit him to file a supplemental declaration (Dkt. 30-2) and its underlying

3   exhibits (Dkt. 30-3) in support of his opposition to the motion to dismiss.  Dkt. 30.  The

4   supplemental declaration outlines additional facts related to some of plaintiff's claims.

5   Dkt. 30-2.  The court granted that request and permitted defendants an opportunity to

6   respond.  Dkt. 34.  Defendants filed their further reply on August 17, 2020.  Dkt. 35.  In it,

7   they stated that they would provide plaintiff an administrative hearing to challenge the

8   citations issued on February 19, 2019.  Id. at 4.

9                                              **DISCUSSION**

10  **A.     Legal Standards**

11         **1.        Motion to Dismiss under Rule 12(b)(6)**

12         A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims

13  alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8

14  requires that a complaint include a "short and plain statement of the claim showing that

15  the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is

16  proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege

17  sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953,

18  959 (9th Cir. 2013). While the court is to accept as true all the factual allegations in the

19  complaint, legally conclusory statements, not supported by actual factual allegations,

20  need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint

21  must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell

22  Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

23         As a general matter, the court should limit its Rule 12(b)(6) analysis to the

24  contents of the complaint, although it may consider documents "whose contents are

25  alleged in a complaint and whose authenticity no party questions, but which are not

26  physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th

27  Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a

28  document on which the complaint relies if the document is central to the plaintiff's claim,

United States District Court
Northern District of California

United States District Court
Northern District of California

and no party questions the authenticity of the document"). The court may also consider matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

Lastly, a district court "should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations," however, dismissal without such leave "is proper if it is clear that the complaint could not be saved by amendment." Somers, 729 F.3d at 960.

### 2.   Motion to Disqualify Counsel

Matters of disqualification generally are governed by state law. In re County of Los Angeles, 223 F.3d 990, 995 (9th Cir.2000).  Under California law, "the propriety of disqualification depends on the circumstances of the particular case in light of competing interests." Oaks Mgmt. Corp. v. Superior Court, 145 Cal. App. 4th 453, 464 (2006). Accordingly, a court considering a motion to disqualify must "weigh the combined effect of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest."  Id. at 465.

"The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers."  Visa U.S.A., Inc. v. First Data Corp., 241 F. Supp. 2d 1100, 1103 (N.D. Cal. 2003).  Because motions to disqualify are "often tactically motivated," they are subject to "particularly strict judicial scrutiny" and "[t]he party seeking disqualification bears a heavy burden." Dimenco v. Serv. Employees Int'l Union, 2011 WL 89999, at *3 (N.D. Cal. Jan. 10, 2011).  When considering disqualification, courts

1  must make "'a reasoned judgment,'" may "resolve disputed factual issues," and should

2  support their findings by substantial evidence.  Id.

3  **B.    Motion to Dismiss Analysis**

4      In their motion, defendants advance two categories of arguments.  First, they

5  argue that plaintiff's claims are non-justiciable.  Second, they challenge plaintiff's

6  allegations as insufficient to state a claim.  The court considers each category in turn.

7      **1.    Justiciability Challenges[2]**

8      Defendants advance two sorts of justiciability arguments: (1) plaintiff's claims are

9  barred by the abstention doctrine set forth in Younger v. Harris, 401 U.S. 37 (1971); and

10  (2) plaintiff's claims are barred by the sovereign immunity doctrine.

11      **a.    Younger Bars Any Request for Injunctive Relief**

12      As a starting point, "federal courts are obliged to decide cases within the scope of

13  federal jurisdiction. Abstention is not in order simply because a pending state-court

14  proceeding involves the same subject matter."  Sprint Commc'ns, Inc. v. Jacobs, 571

15  U.S. 69, 72 (2013).  The Supreme Court has recognized, however, that "certain instances

16  in which the prospect of undue interference with state proceedings counsels against

17  federal relief."  Id.  Although "exceptional," id. at 73, such proceedings include the

18  following "three categories of cases: (1) parallel, pending state criminal proceedings, (2)

19  state civil proceedings that are akin to criminal prosecutions, and (3) state civil

20  proceedings that implicate a State's interest in enforcing the orders and judgments of its

21  courts." Herrera v. City of Palmdale, 918 F.3d 1037, 1043 (9th Cir. 2019).  Articulated by

22  the Supreme Court in New Orleans Public Service, Inc. v. Council of New Orleans, 491

23  U.S. 350 (1989) ("NOPSI"), "[t]hese three categories are known as the NOPSI

24

25  ──────────────

26  [2]  In their notice of motion, defendants claim to bring their motion pursuant to both Rule
   12(b)(1) and Rule 12(b)(6).  In their opening brief, however, they fail to provide any
   indication that their justiciability challenges are properly analyzed for lack of subject
27  matter jurisdiction as opposed to failure to state an actionable claim.  Consistent with
   other courts considering similar issues, the court will analyze these challenges under
28  Rule 12(b)(6).  Dignity Health v. Dep't of Indus. Relations, 445 F. Supp. 3d 491, 496-501
   (N.D. Cal. 2020).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    categories." Herrera, 918 F.3d at 1044.

2         To warrant abstention, the subject state action must first "fall into one of the

3    NOPSI categories" and, second, "satisfy a three-part inquiry: the state proceeding must

4    be (1) 'ongoing,' (2) 'implicate important state interests,' and (3) provide 'an adequate

5    opportunity . . . to raise constitutional challenges.'" Id. citing Middlesex Cty. Ethics Comm.

6    v. Garden State Bar Ass'n, 457 U.S. 423, 432 (1982) (the "Middlesex factors").  Finally,

7    "[i]f the state proceeding falls into one of the NOPSI categories and meets the three

8    Middlesex factors, a federal court may abstain under Younger so long as 'the federal

9    action would have the practical effect of enjoining the state proceedings.'" Herrera, 918

10   F.3d at 1044 (9th Cir. 2019) (internal citation omitted).  With respect to Younger's final

11   condition, the Ninth Circuit has clarified that a request for monetary relief, as much as a

12   request for equitable relief, may have such an effect. Gilbertson v. Albright, 381 F.3d

13   965, 979 (9th Cir. 2004) ("Younger principles may apply to claims for damages under §

14   1983. Damages suits that turn on a constitutional challenge to pending state proceedings

15   implicate the reasons for Younger abstention as much as equitable or declaratory relief

16   actions because to determine whether the federal plaintiff is entitled to damages . . . the

17   district court must first decide whether a constitutional violation has occurred.").

18        Still, a plaintiff's request for monetary relief in federal court for alleged misconduct

19   that arises from the state proceeding does not necessarily satisfy that final condition.

20   Herrera, 918 F.3d at 1048-49.  In Herrera, the Ninth Circuit considered whether the

21   district court properly abstained from deciding plaintiffs' requests for monetary relief with

22   respect to their § 1983 claims against certain local government defendants for allegedly

23   violating their First, Fourth, Fifth, and Fourteenth Amendment rights. Id.  Those claims

24   derived from the government defendants' inspection of plaintiffs' hotel for code violations

25   and their subsequent initiation of a nuisance action against plaintiffs in state court. Id. at

26   1041-42.  The Ninth Circuit affirmed the district court's decision to stay its adjudication of

27   plaintiff's requests for monetary relief with respect to the alleged violations of their First,

28   Fifth, and Fourteenth Amendment rights. Id. at 1050.  However, it reversed the district

7

court's stay decision with respect to the alleged Fourth Amendment violations.  Id.  It

reasoned that "[t]he Fourth Amendment claims arise from the defendants' search of the

motel and subsequent entry onto the property to enforce the abatement proceedings,

rather than from a challenge to the state proceeding as a whole or the state's allegedly

discriminatory motivation in initiating such action. A ruling in favor of [plaintiffs] on such

claims would presumably not invalidate the basis for the code-violation enforcement

proceedings, and the Fourth Amendment claims themselves are not at issue in such

proceedings." Id. at 1049.  Citing Ninth Circuit precedent, the panel reiterated that "a

mere potential for conflict" between the state proceeding and federal court action is

insufficient to support abstention.  Id.

For the reasons set forth below, the court concludes that abstention is proper with

respect to only plaintiff's request for injunctive relief.

### i.    The State Proceedings Qualify under NOPSI

Sonoma County has initiated proceedings in state court against the property.  Dkt.

25-4 (Inspection Warrant re 4640 Arlington Ave., Santa Rosa, California).  As shown by

the above-cited warrant, Sonoma County seeks to investigate "violations of the Sonoma

County Code for unpermitted buildings and illegal cannabis cultivation."  Dkt. 25-4 at 3.

This investigation serves as a qualifying civil enforcement action within the scope of

Younger.  Herrera, 918 F.3d at1045 ("The City, a state actor, obtained and executed an

inspection warrant, and identified more than four hundred violations of State and local

laws on the motel property. Such investigation by the City is characteristic of the state

actions that warrant Younger abstention under Sprint.").

The procedural fact that Sonoma County has agreed to hold an administrative

hearing concerning the citations issued on February 19, 2019 (Dkt. 35 at 4), as opposed

to immediately going forward with a nuisance action in the Sonoma County Superior

Court, does not change this conclusion.  There is no indication that Sonoma County has

dismissed the state court action that it initiated to obtain the July 20, 2020 inspection

warrant.  In fact, the return to the inspection warrant (Dkt. 25-5), which details various

United States District Court
Northern District of California

8

1    additional violations by plaintiff's property, suggests the exact opposite.  At most, then,

2    Sonoma County's decision to provide plaintiff an administrative hearing changes the

3    forum for the proceedings.  It does not terminate them.  Accordingly, however labeled,

4    the state proceedings against the property falls within an applicable NOPSI category.

##                 ii.          The State Proceedings Satisfy the Middlesex Factors

6          The state proceedings also satisfy the Middlesex factors.  First, as indicated

7    immediately above, those proceeding remain ongoing.  Second, Sonoma County has

8    important governmental interests in deterring and abating violations of its building code.

9    Herrera, 918 F.3d at 1045 ("The state action sought to enforce health and safety

10   provisions, and to abate public nuisances. . . . We have previously held that such

11   nuisance actions implicate important state interests.").  Third, despite the opportunity in

12   both his opposition and supplemental declaration, plaintiff failed to even attempt to show

13   that "state procedural law barred presentation of" his federal constitutional claims in the

14   state proceedings.  Id. at 1046.

15         Even if he had, the Sonoma County Code, through its severability provision,

16   contemplates constitutional challenges at its administrative hearings.  See Son. Cty.

17   Code § 1-6 ("if any . . . section of this code shall be declared unconstitutional or invalid by

18   the valid judgment or decree of a court of competent jurisdiction, such unconstitutionality

19   or invalidity shall not affect any of the remaining . . . sections of this code").  In any event,

20   plaintiff may file a writ of administrative mandamus with the Sonoma County Superior

21   Court requesting it to review any final administrative action.  Cal. Civ. Pro. § 1094.5.  As a

22   court of general jurisdiction, the superior court may consider a federal constitutional

23   challenge.  Bos. Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 321 n.3 (1977) ("We

24   agree . . . that state courts of general jurisdiction have the power to decide cases

25   involving federal constitutional rights where, as here, neither the Constitution nor statute

26   withdraws such jurisdiction.").  Given the above,[3]  the court is satisfied that plaintiff may

27   _____

28   [3] Sonoma County has also acknowledged that plaintiff may raise these challenges in the
     state proceedings.  Dkt. 9 at 16 ("If the administrative procedure moves forward, Ronald

1    raise any applicable constitutional challenge in the state proceedings.

2              iii.      **Plaintiff's Request for Injunctive Relief Would Practically**

3                        **Enjoin the Enforcement Proceeding**

4           The remaining question, then, is whether the relief sought by plaintiff in this action

5    would "have the practical effect of enjoining the state proceedings.'" Herrera, 918 F.3d at

6    1044.  The court has no trouble concluding that plaintiff's request for injunctive relief

7    satisfies this final condition.  Indeed, based on his prior motion for a temporary restraining

8    order, plaintiff contends that such relief should extend to any search of his property or

9    limitations imposed on its utilities for failure to comply with the county code.  Dkt. 20.

10   Such relief is indistinguishable from that at issue in Herrera.  Herrera, 918 F.3d at 1048

11   ("Certainly [plaintiffs'] request that the court enjoin the City from closing the motel and

12   evicting [plaintiffs] from their personal residence would enjoin directly the state action.").

13   Accordingly, the court will abstain from adjudicating any request for injunctive relief

14   against defendants' enforcement of the property's code violations and, thus, dismisses all

15   such claims from this action.

16          Plaintiff's requests for monetary relief are "not so straightforward." Herrera, 918

17   F.3d at 1048.  As illustrated by Herrera, not all requests for monetary damages arising

18   out of different alleged constitutional violations in connection with the same state

19   proceeding warrant abstention under Younger.  Id. at 1048-50.  That said, the court need

20   not parse through this issue.  Despite multiple opportunities in their briefing, Dkt. 9 at 16;

21   Dkt. 25 at 5-7; Dkt. 35 at 4, defendants omitted any argument showing that plaintiff's

22   requests for monetary relief would practically enjoin the state proceedings.  Independent

23   of that omission, even if the court were to find that plaintiff is entitled to damages for the

24   alleged violations, it is not clear that any such finding would practically enjoin the state

25   proceedings.  Given the above, and that issues pertaining to Younger abstention need

26

27   Cupp will have the opportunity to challenge the penalties that he alleges are improper");
     Dkt. 35 at 4 ("Mr. Cupp will have rights to bring a writ of mandate pursuant to the

28   California Code of Civil Procedure in the event he is not satisfied with the outcome of the
     appeal hearing.").

not be decided sua sponte, <u>Herrera</u>, 918 F.3d at 1049 n.3 (acknowledging that plaintiffs "waived on appeal" their argument that the bad-faith exception to <u>Younger</u> abstention applied), the court concludes that plaintiff's requests for monetary relief are not barred by <u>Younger</u>.  Thus, unless those requests are barred by the sovereign immunity doctrine, the court will analyze their viability in this order.

**b.    Sovereign Immunity Doctrine Does Not Apply**

The Eleventh Amendment generally immunizes states against lawsuits by their own citizens.  <u>Edelman v. Jordan</u>, 415 U.S. 651, 662-63 (1974).  Such immunity extends to state agencies and state officers when the lawsuits against them are "in fact against the sovereign if the decree would operate against the latter." <u>Pennhurst State School & Hosp. v. Halderman</u>, 465 U.S. 89, 101 (1984).

Defendants quote plaintiff's allegation that the Individual Defendants are "state actors," to support their suggestion that they are immune under the Eleventh Amendment.  Dkt. 9 at 11.  Perhaps understanding that that suggestion is meritless, defendants fail to advance any substantive argument that they qualify for such status within the meaning of the Eleventh Amendment.  <u>Beentjes v. Placer Cty. Air Pollution Control Dist.</u>, 397 F.3d 775, 777 (9th Cir. 2005) ("The [United States Supreme] Court, however, has 'consistently refused to construe the Amendment to afford protection to political subdivisions ***such as counties*** and municipalities, even though such entities exercise a slice of state power.'") (emphasis added). Thus, the sovereign immunity doctrine does not apply.  Given its decisions on defendants' justiciability arguments, the court will now analyze plaintiff's claims as they pertain to his request for money damages.

**2.    Remaining Failure to State a Claim Challenges**

**b.    Alleged Violations of Federal Law**

Plaintiff alleges five claims premised on a violation of federal law.  The first three arise under Title 42 U.S.C. § 1983 and the remaining two arise under § 1985 and § 1986, respectively.  The court analyzes each in turn.

1
2

### i.    Plaintiff Failed to Allege a § 1983 Claim for Unreasonable Search

3    Title 42 U.S.C. § 1983 "provides a cause of action for the deprivation of any rights,

4  privileges, or immunities secured by the Constitution and laws of the United States."

5  Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 (1990). To state a claim under § 1983,

6  a plaintiff must allege the following: (1) he suffered a violation of a right conferred by the

7  Constitution or laws of the United States; and (2) such violation was committed by a

8  person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988).

9    "To prevail on a section 1983 claim based on the Fourth Amendment, a plaintiff

10  must show that the state actor's conduct was an unreasonable search or seizure."

11  Mendez v. Cty. of Los Angeles, 897 F.3d 1067, 1074-75 (9th Cir. 2018).  "A Fourth

12  Amendment 'search' occurs when a government agent 'obtains information by physically

13  intruding on a constitutionally protected area' . . . or infringes upon a 'reasonable

14  expectation of privacy'" Whalen v. McMullen, 907 F.3d 1139, 1146 (9th Cir. 2018)

15  (internal citations omitted).  The Ninth Circuit has explained that, after United States v.

16  Jones, 565 U.S. 400 (2012), "when the government physically occupies private property

17  for the purpose of obtaining information, a Fourth Amendment search occurs, regardless

18  whether the intrusion violated any reasonable expectation of privacy.  Only where the

19  search did not involve a physical trespass do courts need to consult Katz's reasonable-

20  expectation-of-privacy test." Whalen, 907 F.3d at 1147 (italics in the original).

21    "Searches and seizures inside a home without a warrant are presumptively

22  unreasonable."  United States v. Perea-Rey, 680 F.3d 1179, 1184 (9th Cir. 2012).

23  "Because the curtilage is part of the home, searches and seizures in the curtilage without

24  a warrant are also presumptively unreasonable."  Id.  The Supreme Court has noted that,

25  "for most homes, the boundaries of the curtilage will be clearly marked; and the

26  conception defining the curtilage—as the area around the home to which the activity of

27  home life extends—is a familiar one easily understood from our daily experience."  Oliver

28  v. United States, 466 U.S. 170, 182 n.12 (1984).  Lastly, "[i]t is clear that the warrant

United States District Court
Northern District of California

1  requirement of the fourth amendment applies to entries onto private land to search for

2  and abate suspected nuisances." <u>Conner v. City of Santa Ana</u>, 897 F.2d 1487, 1490 (9th

3  Cir. 1990).

4          Here, plaintiff failed to state a claim for the unreasonable search of the property.

5  In relevant part, plaintiff alleges that Smith "trespassed," Compl. ¶¶ 20, "searched," <u>id.</u> ¶¶

6  21, 49, 55, 62, and "entered," <u>id.</u> ¶¶22, 91-92, his property on February 15, 2019.

7  Plaintiff adds only that Smith did so without his consent, a warrant, or exigent

8  circumstances, <u>id.</u>, ¶¶ 20-22, and that, subsequent to the entry, Smith "issued citations

9  and left." <u>Id.</u> ¶ 23.  These allegations are conclusory and amount to nothing more than

10  formulaic recitation of the elements necessary to substantiate this claim.

11          That said, the court cannot conclude that permitting plaintiff leave to amend this

12  claim would be futile.  In his supplemental declaration in support of his opposition, plaintiff

13  sets forth various additional details concerning the circumstances of Smith's purported

14  February 15, 2019 entry.  Dkt. 30-2.  Among them, plaintiff states that Smith "entered

15  through a posted, no trespassing fence and gate that fronts the boundary of [his] property

16  . . . The fence is 9' tall, constructed of solid wood without gaps, and makes any view of

17  my property from the private road that leads to my property impossible without a person

18  entering upon the property itself."  <u>Id.</u> ¶ 1.  Plaintiff adds that Smith then "wandered" his

19  4.33 acres of land, "looked into" certain windows and doors, and "walked through" a barn.

20  <u>Id.</u> ¶ 2.  Plaintiff further states that Smith "approached" and spoke with a third-party hired

21  by plaintiff to paint his property, Daniel St. Clair ("St. Clair").  <u>Id.</u>  While these additional

22  details still overlook the predicate question of **how** Smith entered (e.g., opening the

23  fence's unlocked gate, breaking through the fence's locked gate, or walking through the

24  fence's opened gate), they would cure some of this claim's other factual deficiencies.

25          Given the above, the court will permit plaintiff one opportunity to include these

26  details in his complaint and address any other deficiencies pertaining to this claim.  Since

27  plaintiff failed to state a prima facie claim premised on Smith's allegedly unlawful search

28  and the factual allegations underlying such purported conduct are unclear at this time, the

United States District Court
Northern District of California

United States District Court
Northern District of California

1 court finds that its resolution of Smith's alternative argument that he is entitled to qualified

2 immunity is premature.  If plaintiff files an amended complaint, Smith may raise that

3 defense once more in an answer or second motion to dismiss.  Lastly, while plaintiff does

4 not formally allege a claim for this purported violation against Sonoma County in his

5 complaint, Compl. ¶¶ 58-64, it appears, based on his opposition (Dkt. 11 at 6-9) and

6 suggestions in his complaint (Compl. ¶¶ 47, 51-57), that he intends to bring such a claim

7 under <u>Monell</u>.  If so, the court will also permit plaintiff one opportunity to clarify such a

8 claim in any amended pleading.

9    **ii.    Plaintiff Failed to Allege a § 1983 Claim for Deprivation of**

10    **Due Process**

11    "We have emphasized time and again that 'the touchstone of due process is

12 protection of the individual against arbitrary action of government' . . . whether the fault

13 lies in a denial of fundamental procedural fairness . . . or in the exercise of power without

14 any reasonable justification in the service of a legitimate governmental objective." <u>Cty. of</u>

15 <u>Sacramento v. Lewis</u>, 523 U.S. 833, 845-46 (1998) (internal citations omitted).  The Ninth

16 Circuit has remarked that "[t]he fundamental requirements of procedural due process are

17 notice and an opportunity to be heard before the government may deprive a person of a

18 protected liberty or property interest." <u>Conner</u>, 897 F.2d at 1492.

19    Here, plaintiff failed to state a claim for deprivation of due process.  As an initial

20 matter, as shown in the documents attached to defendants' unopposed request for

21 judicial notice, there is no question that Sonoma County provided plaintiff the opportunity

22 to request a hearing.  Both citations included provisions in bold indicating plaintiff's right

23 to appeal their issuance.  Dkt. 10-1 at 2-3.

24    Plaintiff, however, never timely requested a hearing to challenge those citations.

25 To the contrary, as detailed in the communications attached to plaintiff's own declaration,

26 plaintiff made various representations to defendants suggesting that, at least until

27 September 4, 2019, he wished ***not*** to proceed in any administrative process.

28    First, in his February 20, 2019 letter to defendants, plaintiff states the following:

14

"First of all I do not agree that I have committed any violations of any ordinances, building or zoning code(s), or laws. **_Before I agree to proceed with anything further_**, I need you to provide my proof of any valid executed complaint filed . . . I **_then will request_** an administrative hearing on the matter." Dkt. 30-3 at 2 (emphasis added).

Later in that letter, plaintiff goes on to say that "[t]his is my timely notice of any appeal rights we may have **_ONLY after resolution_** of the civil and criminal trespass and violations of our constitutional protections." Id. at 4 (capitalization in the original) (bold added).

Second, in his April 26, 2019 letter responding to Smith's April 19, 2019 letter, plaintiff states that "[y]ou state in your letters that no appeal has been lodged, I respectfully disagree . . . I have again attached a copy of my [February 20, 2019 letter]." Dkt. 30-3 at 15. Plaintiff then goes on to reiterate the same condition attached to his February 20, 2019 letter, stating "[t]his is my second timely notice of any appeal rights we may have **_ONLY after resolution_** of the civil and criminal trespass and violations of our constitutional protections." Id. at 16 (capitalization in the original) (bold added).

Third, in his June 14, 2019 letter to Smith, plaintiff again attempts to attach the same condition to any hearing. Id. at 22 ("This is my third timely notice of any appeal rights we may have **_ONLY after resolution_** of the civil and criminal trespass and violations of our constitutional protections.") (capitalization in the original) (bold added).

Lastly, in his September 4, 2019 letter to Franceschi, plaintiff declines a September 27, 2019 hearing on the pending notice of abatement proceeding. Id. at 28. Instead, he requests a hearing for the "last part of October 2019" and then asks for seven categories of information pertaining to the hearing. Id. Plaintiff further requires that defendants "submit the above at least 30 days prior so I may prepare for the hearing." Id.

Plaintiff attached the above communications to his own supplemental declaration. Given that, he cannot contest the accuracy of their contents. Such content is inconsistent with an essential allegation to plaintiff's theory of procedural deprivation—namely, that he requested a hearing in the time allowed. Plaintiff did not. Instead, he conditioned any hearing on "the resolution" of an unspecified proceeding, Dkt. 30-3 at 4, 16, 22, and his

United States District Court
Northern District of California

1  receipt of information for which he showed no legal entitlement, id. at 28.  Given that no

2  allegation can alter these prior representations concerning his request (or lack thereof)

3  for an administrative hearing, the court finds that any opportunity to amend this claim

4  would be futile.  Accordingly, the court dismisses this claim with prejudice.[4]

5          iii.        **Plaintiff Failed to Allege a § 1983 Claim for Excessive**

6                      **Fines**

7          "The Supreme Court has held that a fine is unconstitutionally excessive under the

8  Eighth Amendment if its amount 'is grossly disproportional to the gravity of the

9  defendant's offense.'"  Pimentel v. City of Los Angeles, 966 F.3d 934, 938 (9th Cir. 2020)

10 citing United States v. Bajakajian, 524 U.S. 321, 336-37 (1998). "To determine whether a

11 fine is grossly disproportional to the underlying offense, four factors are considered: (1)

12 the nature and extent of the underlying offense; (2) whether the underlying offense

13 related to other illegal activities; (3) whether other penalties may be imposed for the

14 offense; and (4) the extent of the harm caused by the offense."  Pimentel, 966 F.3d at

15 938 citing United States v. $100,348 in U.S. Currency, 354 F.3d 1110, 1122 (9th Cir.

16 2004) (setting forth the "Bajakajian factors"). "While these factors have been adopted and

17 refined by subsequent case law in this circuit, Bajakajian itself 'does not mandate the

18 consideration of any rigid set of factors.'"  Id. citing United States v. Mackby, 339 F.3d

19 1013, 1016 (9th Cir. 2003).  The Ninth Circuit has "extend[ed] Bajakajian's four-factor

20 analysis to govern municipal fines."  Id.

21         Here, plaintiff failed to state a claim for excessive fines.  As an initial matter,

22 plaintiff failed to proffer any authority supporting the application of the Eighth Amendment

23 to county government civil fines.  Regardless, even if this court were to recognize that

24 Pimentel extends to such fines, plaintiff fails to make any attempt to allege or otherwise

25 argue that the approximately $90,000 in fines imposed by Sonoma County for his

26

27 _____

28 [4] In any event, because Sonoma County has agreed to provide plaintiff an administrative
hearing to challenge the underlying February 19, 2019 citations, Dkt. 35 at 4, any claim
premised on the denial of such a hearing appears moot.

1   property's purported building code violations are excessive under <u>Bajakian</u>'s four factor

2   analysis.  Instead, in his complaint, plaintiff summarily alleges that the subject fines are

3   "in violation of [his] Eighth Amendment protection," Compl. ¶ 29, issued for "penal

4   purposes," <u>id.</u> ¶ 106, and "punitive," <u>id.</u>  Such conclusory allegations fall far short of

5   showing any of the four factors set forth in <u>Bajakian</u>.

6          In any event, the fines imposed do not appear grossly disproportional to the

7   underlying offense.  The subject violations concern physical structures, which, the court

8   may reasonably infer, could be dangerous.  While $90 per day is not insignificant, neither

9   is the seriousness of those violations.  Moreover, the total fine reflects a balance that has

10  accumulated over the course of a year.  That plaintiff has chosen to allow that amount to

11  compound is his decision and, thus, not relevant to this court's determination under the

12  <u>Bajakian</u> factors.  Given that plaintiff failed to proffer any meaningful argument in support

13  of his Eighth Amendment claim in his opposition or any additional facts in his

14  supplemental declaration, the court finds that any amendment of this claim would be

15  futile.  Accordingly, the court dismisses this claim with prejudice.[5]

16                   **iv.      Plaintiff Failed to Allege § 1985 and § 1986 Claims**

17         Title 42 U.S.C. § 1985 "proscribes conspiracies to interfere with certain civil rights.

18  A claim under this section must allege facts to support the allegation that defendants

19  conspired together. A mere allegation of conspiracy without factual specificity is

20  insufficient."  <u>Karim-Panahi v. Los Angeles Police Dep't</u>, 839 F.2d 621, 626 (9th Cir.

21  1988).  Title 42 U.S.C. § 1986 "imposes liability on every person who knows of an

22  impending violation of section 1985 but neglects or refuses to prevent the violation. A

23  claim can be stated under section 1986 only if the complaint contains a valid claim under

24  section 1985."  <u>Id.</u>

25         Here, plaintiff failed to state a claim under § 1985 for conspiracy to violate his civil

26

27  ──────────────

[5] To the extent plaintiff alternatively claims that this fine qualifies as an unconstitutional
28  "taking," Compl. ¶¶ 31-32, the court dismisses such claim with prejudice.  Plaintiff failed
    to proffer any authority in his complaint, opposition, or supplemental declaration to
    support the theory that relief from a fine is properly analyzed under the Takings Clause.

United States District Court
Northern District of California

rights.  As an initial matter, plaintiff failed to proffer any non-conclusory allegations in support of this claim.  Rather, he summarily alleges that defendants, who "work in the same office" and "consult with each other," acted "in bad faith" and "in concert" to deny "his appeal and hearing" and file "slanderous documents" against him.  Compl. ¶¶ 33, 37-40, 42, 44, 74-75, 77-79.  As detailed above, however, plaintiff never timely requested a hearing to challenge the February 15, 2019 citations.  As detailed in Section B.2.b.iii. below, plaintiff also failed to state a claim for slander of title.  Thus, plaintiff cannot allege that defendant conspired against him to deprive him of any right.  Since plaintiff failed to state a predicate § 1985 claim, he also failed to state a § 1986 claim.  Given that plaintiff failed to proffer any meaningful argument in support of these claims in his opposition or any additional facts in his supplemental declaration, the court finds that their amendment would be futile.  Thus, the court dismisses these claims with prejudice.

### c.    Alleged Violations of State Law

Plaintiff alleges three claims under California law.  The court analyzes each in turn.

### i.    Plaintiff Failed to Allege a Claim for Trespass

The Individual Defendants primarily contend that plaintiff's claim for trespass is untimely under the California Government Code § 911.2.  Dkt. 9 at 17.  That contention is misplaced.  In relevant part, § 911.2 provides the following:

> "A claim relating to a cause of action for death or for injury to person or to personal property or growing crops shall be presented as provided in Article 2 (commencing with Section 915) not later than six months after the accrual of the cause of action. A claim relating to any other cause of action shall be presented as provided in Article 2 (commencing with Section 915) not later than one year after the accrual of the cause of action." Cal. Gov't Code § 911.2(a).

The court disagrees with the Individual Defendants' assumption that a trespass claim rests on an injury to "person" or "personal property."  Under California law, a claim for trespass rests on injury to real property.  Cal. Civ. Pro. § 338(b) (three-year statute of limitations applies to "an action for trespass upon or *injury to real property*"); Elton v. Anheuser-Busch Beverage Grp., Inc., 50 Cal. App. 4th 1301, 1305 (1996), as modified

United States District Court
Northern District of California

1    (Dec. 11, 1996) ("The common law drew a distinction between two types of actions *for*

2    *injuries to real property*. If the injury was an immediate and direct result of the act

3    complained of, then *an action for trespass* was the appropriate remedy.") (emphases

4    added).  Thus, § 911.2(a)'s one-year period applies to the trespass claim.

5         In their opening brief, defendants acknowledged that plaintiff "presented his Tort

6    Claim in person to the County Board of Supervisors on October 23, 2019. . . . His claim

7    expressly refers to the 'Date of Incident' was 02/15/2019." Dkt. 9 at 17.  Given that

8    acknowledgement, plaintiff timely presented his trespass claim.

9         Still, for the same reasons set forth above with respect to plaintiff's § 1983 claim

10   for an unreasonable search, plaintiff failed to allege adequate facts to state a claim for

11   trespass.  Given the additional facts set forth in plaintiff's supplemental declaration

12   concerning the circumstances of Smith's purported February 15, 2019 entry to the

13   property, the court will permit plaintiff one opportunity to amend this claim as it pertains to

14   Smith.  Because plaintiff's supplemental declaration fails to provide any indication that

15   Willett, Harrington, or Franceschi participated in the unauthorized entry at issue, the court

16   dismisses this claim with prejudice as it pertains to them.  Again, since plaintiff failed to

17   state a prima facie claim for trespass and the factual allegations underlying such claim

18   are presently unclear, the court finds that its resolution of Smith's alternative argument

19   that he is entitled to statutory immunity under California Government Code § 820.2 for

20   discretionary policy decisions is premature.  If plaintiff files an amended complaint, Smith

21   may raise that defense once more in an answer or second motion to dismiss.

22             ii.        **Plaintiff Failed to Allege a Claim for Land Patent**

23                        **Infringement**

24        Plaintiff alleges that his "land is protected by the highest form of title, US land

25   patent," Compl. ¶ 96, and that defendants "have no lawful right or jurisdiction to infringe

26   or trespass on [his] property rights," id. ¶ 97.

27        Again, plaintiff failed to state a claim on this basis.  Critically, he does not proffer

28   any authority recognizing the viability of a claim for "land patent infringement."  It appears

that he confuses a "land patent" with a "patent" right.  As a legal matter, such terms are not synonymous.  As defined at Title 35, a "patent" must concern "a new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35 U.S.C. § 101.  Plainly, these requirements relate to an invention, not real property.  Because the court does not see any legal basis to support the subject claim, the court finds that its further amendment would be futile and dismisses it with prejudice.

### iii.     Plaintiff Failed to Allege a Claim for Slander of Title

"Slander or disparagement of title occurs when a person, without a privilege to do so, publishes a false statement that disparages title to property and causes the owner thereof some special pecuniary loss or damage. . . . The elements of the tort are (1) a publication, (2) without privilege or justification, (3) falsity, and (4) direct pecuniary loss." Sumner Hill Homeowners' Assn., Inc. v. Rio Mesa Holdings, LLC, 205 Cal. App. 4th 999, 1030 (2012), as modified on denial of reh'g (May 30, 2012) (internal citations omitted).

Plaintiff premises this claim on the notice of abatement filed by defendants with the county recorder's office.  Compl. ¶ 100.  In relevant part, that notice provides that Sonoma County "has commenced a proceeding to abate land use violations located at 4640 Arlington Avenue, Santa Rosa . . . owned by Ronald Cupp."  Dkt. 30-3 at 38.  The notice further provides that "[t]he land use violations are described in the Notice and Order dated March 11, 2019 . . . The owner of record of the property has been notified of the described conditions by service of the Notice and Order in accordance with law."  Id. Plaintiff summarily contends that the notice is "untrue."  Compl. ¶¶ 101-02.

Plaintiff failed to allege a claim for slander of the property's title.  First, plaintiff failed to identify any false statement in the notice.  While the court acknowledges that the notice's reference to "March 11, 2019" appears mistaken (the underlying citations were issued on February 19, 2019), plaintiff fails to proffer any authority that such a ministerial mistake may form the basis for a slander claim.

Separately, based on the communications between the parties prior to the notice's

United States District Court
Northern District of California

entry, Sonoma County was justified to enter the notice of abatement proceedings.  The

February 19, 2019 citations stated that "a Notice of Abatement Proceedings also may be

recorded against the Property in the Official Records of Sonoma County."  Dkt. 10-1 at 2-

3.  As detailed above, plaintiff did not timely request a hearing to challenge the February

19, 2019 citations.  Given that inaction and plaintiff's failure to abate the violations,

Sonoma County was entitled to file the subject notice (as warned) and initiate abatement

proceedings.  In light of this justification, the court finds that further amendment of this

claim would be futile.  Accordingly, the court dismisses it with prejudice.

## C.    Motion to Disqualify Analysis

Plaintiff primarily requests that the court disqualify Sonoma County Counsel

("Counsel") from representing both Sonoma County and the Individual Defendants.  Dkt.

14 at 1-2.  Plaintiff asserts that there is a "potential conflict of interest" between each set

of defendants because Counsel is an employee of Sonoma County.  Id. at 3.  Plaintiff

appears to base that potential conflict on the possibility that, to avoid liability, Sonoma

County has an interest in showing that the Individual Defendants acted outside the scope

of their official duties.  Id. at 3-4.  Conversely, plaintiff posits, the Individual Defendants

have an interest in showing that they acted within the scope of such duties.  Id.

To support this position, plaintiff relies heavily on the Second Circuit's decision in

Dunton v. Suffolk County, 729 F.2d 903 (2d Cir.), amended, 748 F.2d 69 (2d Cir. 1984).

In that case, plaintiff sued a police officer defendant for battery after plaintiff purportedly

made improper advances toward the officer's wife.  Id. at 905-06.  At trial, the officer was

represented by county counsel, who argued in his opening statement that the officer

"acted as a husband, not even as an officer."  Id. at 906.  Counsel adopted that theory

throughout trial and repeated this thesis in his closing statement.  Id.  The Second Circuit

observed that since Monell, "the interests of a municipality and its employee as

defendants in a section 1983 action are in conflict."  Id. at 907. It reasoned that:

> "A municipality may avoid liability by showing that the employee
> was not acting within the scope of his official duties, because
> his unofficial actions would not be pursuant to municipal policy.

1

2

> The employee, by contrast, may partially or completely avoid liability by showing that he was acting within the scope of his official duties." Id.

3

4        The Second Circuit held that the subject conflict between the officer and county

5    "surfaced when the County Attorney stated that [the officer] was not acting under color of

6    state law but rather as an 'irate husband.'" Id. In a footnote, the court clarified that "[it]

7    need not create here a per se rule that disqualification is automatic in conflicts of this

8    nature, although considering the overall responsibility of the court to supervise the ethical

9    conduct of the Bar . . . such a rule might indeed be appropriate." Id. at 908 n. 4.

10       In its opposition, Sonoma County proffers three counterarguments. First, plaintiff's

11   motion relies on inapplicable law. Dkt. 23 at 1-4. Second, courts disfavor motions to

     disqualify. Id. at 4. Third, plaintiff fails to identify any potential conflict. Id. at 4-5.

12       Here, the court denies plaintiff's request to disqualify counsel. As a predicate

13   matter, plaintiff failed to show how or why he maintains Article III standing to seek the

14   requested disqualification in the first instance. Courts recognize that disqualification of

15   counsel on the basis of a conflict of interest generally is proper only if requested by a

16   former client. Canatella v. Stovitz, 2004 WL 2648284, at *2 (N.D. Cal. Sept. 13, 2004).

17   As the party seeking the requested disqualification, plaintiff bears the burden of showing

18   that he would suffer an injury in fact that is causally related to defendants' joint

19   representation. Id. at 1. Plaintiff fails to make any such constitutionally required showing.

20       Even if he had, plaintiff's motion fails for other reasons. First, California law

21   controls the instant motion. Plaintiff's request relies almost exclusively on out of circuit

22   authority that appears not to apply California law. Dkt. 14 at 4-6. Under the traditional

23   disqualification factors considered by California courts, including, for example, the

24   financial burden that Smith would incur if he had to replace Counsel, Oaks Mgmt.Corp.,

25   145 Cal. App. 4th at 465, there is good reason to deny the disqualification request.

26       Second, despite Dunton's sweeping language, courts—including the Second

27   Circuit—have clarified that there is no per se rule mandating disqualification where, as

28   here, government counsel represents both the government and an employee in a civil

United States District Court
Northern District of California

1  rights challenge.  Restivo v. Hessemann, 846 F.3d 547, 580 (2d Cir. 2017) (distinguishing

2  Dunton on the grounds that county defendant "was not a party at trial facing a Monell

3  claim," the county had previously taken the position that it would indemnify its co-

4  defendant police officer, and counsel proffered "a unified theory of defense benefitting the

5  officer and county.") cert denied, 138 S.Ct. 644 (2018)  While it appears the Ninth Circuit

6  has not weighed-in on that question, the Tenth Circuit and Seventh Circuit agree in

7  principle and have limited Dunton to its facts.  Johnson v. Bd. of Cty. Comm'rs for Cty. of

8  Fremont, 85 F.3d 489, 493 (10th Cir. 1996) ("While some courts have held separate

9  representation is required in the face of the potential conflict [citing two district courts] . . .

10  we decline to adopt a per se rule. We hold that when a potential conflict exists because of

11  the different defenses available to a government official sued in his official and individual

12  capacities, it is permissible, but not required, for the official to have separate counsel for

13  his two capacities."), cert denied, 117 S. Ct., 611 (1996); Coleman v. Smith, 814 F.2d

14  1142, 1147-48 (7th Cir. 1987) ("We are troubled by the Second Circuit's broad holding

15  that after Monell an automatic conflict results when a governmental entity and one of its

16  employees are sued jointly under section 1983. We believe that that holding must be

17  read in context with the factual situation present in Dunton.").

18         Critically, plaintiff failed to identify any peculiarity in this action, or Counsel's

19  representation in it, that is remotely analogous to the lawyer's missteps in Dunton.

20  Rather, plaintiff vaguely asserts that "[t]here is a possibility that there will be differing

21  theories of liability applied to each defendant."  Dkt. 14 at 3.  Perhaps.  However, the

22  court has not made any decision on whether Smith would be entitled to qualified

23  immunity or Sonoma County may be held liable under Monell.  At this juncture, it sees no

24  reason to suggest that either defendants' incentives on litigating those issues are

25  misaligned.  Until that reason becomes evident, the court concludes that disqualifying

26  Counsel from representing Smith is simply premature.

27         Third, at most, this action amounts to a suit for money damages for trespass and a

28  § 1983 claim premised on an unreasonable search.  As referenced above, plaintiff does

not actually allege either claim against Sonoma County.  Compl. ¶¶ 58-64, 89-94.  Thus, Sonoma County would gain nothing from advancing a theory that Smith acted outside his official capacities on February 15, 2019.  Indeed, in its opposition, Sonoma County took the exact opposite position, acknowledging that "[w]hile [p]laintiff . . . may argue that he is suing [d]efendants, both individually and in their official capacity . . . all of the allegations of improper conduct ***arise out of the employment of each individual defendant***."  Dkt. 23 at 3 (emphasis added).  This acknowledgement undermines any suggestion that Counsel has or will litigate this case in a way detrimental to Smith.

## CONCLUSION

For the foregoing reasons, the court **GRANTS** defendants' motion to dismiss and **DENIES** plaintiff's motion to disqualify.  To be abundantly clear, the court orders the following with respect to the motion to dismiss:

- Any request for injunctive relief is **DISMISSED WITH PREJUDICE**.
- The § 1983 claim for violation of plaintiff's due process rights is **DISMISSED WITH PREJUDICE**.
- The § 1983 claim for "excessive fines" is **DISMISSED WITH PREJUDICE**.
- The § 1985 claim for conspiracy is **DISMISSED WITH PREJUDICE**.
- The § 1986 claim for neglect is **DISMISSED WITH PREJUDICE**.
- The "land patent infringement" claim is **DISMISSED WITH PREJUDICE**.
- The slander of property title claim is **DISMISSED WITH PREJUDICE**.
- The trespass claim against Willett, Harrington, and Franceschi is **DISMISSED WITH PREJUDICE**.
- The § 1983 claim against Smith for unlawful search is **DISMISSED WITHOUT PREJUDICE**.
- The trespass claim against Smith is **DISMISSED WITHOUT PREJUDICE**.

Going forward, plaintiff may ***not*** seek to litigate any claims dismissed with prejudice.  Plaintiff may amend his complaint with respect to only the two claims against Smith dismissed without prejudice (bulleted immediately above) and as specified in this

United States District Court
Northern District of California

1     order.  To the extent plaintiff intends to allege a <u>Monell</u> claim against Sonoma County

2     premised on the allegedly unlawful search by Smith on February 15, 2019, plaintiff may

3     also do so.  Otherwise, unless plaintiff obtains leave of court or consent from both Smith

4     and Sonoma County, plaintiff may ***not*** add any new claims or parties to this action.  The

5     court will permit plaintiff **28 days** from the date of this order to file any amended pleading.

6         **IT IS SO ORDERED.**

7     Dated: September 9, 2020

8                       /s/ Phyllis J. Hamilton

9                       PHYLLIS J. HAMILTON
                          United States District Judge

United States District Court
Northern District of California

EXHIBIT 4

1    RONALD CUPP
2    150 Raley Town Center, Ste 2512
     Rohnert Park, California [94928]
3    Telephone: (707) 318-9929

     Plaintiff *Pro Se*

4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                   **NORTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| RONALD CUPP, | ) CASE NO: 20-cv-03456-PJH |
| | ) |
| Plaintiff, | ) |
| | ) **VERIFIED FIRST AMENDED** |
| vs. | ) **COMPLAINT FOR DAMAGES** |
| | ) |
| ANDREW SMITH, an individual and in his | ) 1. Violation of 42 U.S.C. § 1983 |
| official capacity; TENNIS WICK, an | ) (4th Amendment Violation - Unlawful Search) |
| individual and in his official capacity; | ) 2. Trespass |
| COUNTY OF SONOMA; and DOES 1-10, | ) 3. Agency Liability (Monell) |
| inclusive, | ) |
| | ) **DEMAND FOR TRIAL BY JURY** |
| Defendants. | ) |

19        Plaintiff, RONALD CUPP (hereinafter "Plaintiff"), hereby alleges against Defendants,

20   and each of them, as follows:

21                          **I.  INTRODUCTION**

22
23        1.       This case arises under 42 U.S.C. § 1983 to redress deprivations under color of law

24   of Plaintiff's rights, privileges, and immunities secured by the Fourth Amendment to the

25   Constitution of the United States.  Plaintiff also seeks to remedy an illegal trespass by Defendants

26   under California law.

27
28

2.      Plaintiff was subjected to an unlawful search and trespass by Defendant ANDREW SMITH (hereinafter Defendant SMITH), acting in his official capacity and under color of law as an employee of, on behalf of, or at the behest or direction of Defendant COUNTY OF SONOMA (hereinafter Defendant COUNTY) and its managing or supervisorial agent, Defendant TENNIS WICK (hereinafter Defendant WICK).

3.      Plaintiff's claims arise out of a course of conduct involving officials of Defendant COUNTY and the Sonoma County Permit and Resource Management Department (PRMD) in the State of California and within this judicial district.

4.      Plaintiff seeks money damages for trespass and to redress and remedy the deprivation of his Constitutional rights.

## II.  JURISDICTION AND VENUE

5.      This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 28 U.S.C. § 2201 (declaratory relief), and 42 U.S.C. § 1983.  This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue in this Court is proper pursuant to 28 U.S.C. §1391b in that Defendants reside in this District and/or conduct or transact business in this District, and the conduct complained of herein occurred in this District.

## III.  PARTIES

7.      At all times relevant herein, Plaintiff was an individual residing at 4640 Arlington Avenue, Santa Rosa, Sonoma County, California (hereinafter the "subject land"); and was and is the owner of record of the subject land, entitled to the rights, privileges, and protections of the Fourth Amendment to the United State Constitution and of California law.

8.       At all relevant times herein, Defendant SMITH was a Code Inspector employed by Defendant COUNTY and was personally involved in the violations alleged herein.  SMITH is being sued individually and in his official capacity.

9.       Defendant COUNTY is a political subdivision of the State of California, with its principal offices located at 575 Administration Drive, Santa Rosa, CA 95403.

10.       At all relevant times herein, Defendant WICK was employed by, and in a supervisorial capacity with, Defendant COUNTY, acting as the Director of the PRMD, which is the top land use official for Defendant COUNTY, and thus was directly involved in, participated in, directed, approved of, encouraged, or ratified the violations alleged herein and/or oversaw, supervised, planned, trained, made policy for, or rewarded the wrongful action of the individual Defendant SMITH, as alleged herein.

11.       At all times relevant herein, Defendants "DOES 1-10" are unknown persons who have either created policy or custom, managed, ordered, controlled, trained or neglected to train, supervised, rewarded, disciplined or failed to discipline, or ratified the conduct of Defendants named herein, and each of them, in committing the violations alleged herein, or are in some manner liable to Plaintiff for deprivation of his civil rights and rights under California law. These Defendants will be identified as their names and addresses become known to the Plaintiff.

12.       Each individually named Defendant and each DOE defendant acted under color of law and within the scope of his or her agency and employment with Defendant COUNTY and the PRMD.  All acts and omissions of the individual Defendants were malicious and intentional, with either the intent to deprive Plaintiff of his constitutional and statutory rights, or in reckless disregard of those rights.

VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES

# IV.  STATEMENT OF FACTS

13.    Plaintiff purchased the subject land in 1989 via Grant Deed.  The subject land is a large parcel in a rural part of the Sonoma County, measuring approximately 4.33 acres in size.  A private road borders the western edge of the subject land.  The subject land is protected under a US land patent.  Plaintiff is sovereign, one of the people of California.  Attached hereto as ***Exhibit "A,"*** and incorporated herein, is an aerial view of the subject land.

14.    In 2009, Plaintiff posted "No Trespassing" signs at the subject land.  Then, in 2012, Plaintiff posted a certified copy of his US Land Patent containing "No Trespassing" language.

15.    In 2013, Plaintiff posted clearly visible signs at all three entrances to the subject land stating – "No Trespassing" – and, further, that entry was permitted only with an inspection warrant required by California Code of Civil Procedure section 1822, *et seq.*  These signs were posted on a solid wooden fence running the entire length of the western edge of the subject land.

16.    On April 18, 2013, Plaintiff notified Defendant COUNTY by certified mail of his US Land Patent, Notices and Plaintiff's Affidavit of Status to Defendant COUNTY asserting his rights under law.  Plaintiff notified the Sonoma County Board of Supervisors, the Sonoma County Sheriff, as well as other COUNTY officials, and demanded a timely response.  Attached hereto as ***Exhibit "B,"*** and incorporated herein, are true and correct copies of the documents Plaintiff mailed to Defendant COUNTY.

17.    On May 7, 2013, Defendant COUNTY's Risk Management Department mistakenly treated Plaintiff's submissions as a government tort claim (which they were not) and sent Plaintiff a Notice of Insufficient Claim.  Then, on June 11, 2013, Defendant COUNTY's Rick Management Department again mistakenly treated Plaintiff's submissions as a government tort claim and sent Plaintiff a Notice of Rejection of Claim.  Attached hereto as ***Exhibit "C,"*** and

incorporated herein, are true and correct copies of the documents Defendant COUNTY sent to Plaintiff, which while mistaken as to the nature of Plaintiff's communications with Defendant COUNTY, evidence that Defendant COUNTY was on notice regarding Plaintiff's US Land Patent, and that there was to be no trespassing on the subject land.

18.   Plaintiff contacted Defendant COUNTY by telephone on May 7, 2013 and then by confirming letter dated June 23, 2013, informing Defendant COUNTY that Plaintiff was not making a claim against Defendant COUNTY, but instead, was providing "notice of my claim of forever benefit of land patient [sic]."  Attached hereto as *Exhibit "D,"* and incorporated herein, is a true and correct copy of Plaintiff's June 23, 2013 letter.

19.   Therefore, at all times relevant herein, Defendants, and each of them, had actual notice that Plaintiff did not consent to entry upon the subject land, did not permit trespassing on the subject land, required an inspection warrant before entry would be permitted upon the subject land, and that the subject land was protected by a US Land Patent that also forbade trespass.

20.   In December 2018, Plaintiff erected a 9 feet-tall, solid, wooden fence running along the entire western edge of the property parallel to the road leading to the subject land, and which is the only way to approach the subject land without intruding on other persons' private property that border the subject land to the north, south, and east.

21.   On February 15, 2019, Defendant SMITH came to the subject land acting in his official capacity as a Code Enforcement Inspector for Defendant COUNTY.  On that date, the "No Trespassing" signs that also stated an inspection warrant was required to enter upon the subject land were posted and clearly visible on the solid, wooden fence next to an entry gate.  Attached hereto as *Exhibit "E,"* and incorporated herein, are true and correct of photographs showing the signage that existed at the subject land on February 15, 2019.

22.     On February 15, 2019, Defendant SMITH ignored the posted signage, opened the closed gate, and entered upon the subject land without having a valid warrant of any kind.  He did not knock to announce himself or his purpose before entering upon the subject land.  At the time, and at all times thereafter, Defendant SMITH also lacked Plaintiff's consent to enter upon the subject land, did not have probable cause, and lacked exigent circumstances that might have otherwise justified his warrantless entry.

23.     In entering upon the subject land on February 15, 2019, Defendant SMITH knew or reasonably should have known (because a reasonable Code Enforcement Inspector would have known) that, at and after that moment, he was violating, and had violated, Plaintiff's clearly established private property rights pursuant to the Fourth Amendment to the US Constitution, that he lacked a properly issued inspection warrant pursuant to Code of Civil Procedure section 1822, *et seq.,* and that he lacked a properly issued order from a judge having jurisdiction pursuant to Health & Safety Code section 17972.  Defendant SMITH knew or reasonably should have known that his actions constituted a trespass.

24.     On February 15, 2019, after entering the subject land, Defendant SMITH encountered Daniel St. Clair, who was painting the inside of a building located on the front portion of the subject land.  Defendant SMITH, having now fully and wrongfully entered upon the subject land, then entered the building St. Clair was painting by crossing the threshold and looked inside the building.  At that time, Defendant SMITH identified himself as being a Sonoma County Building Inspector.

25.     Defendant SMITH then wandered the entirety of the 4.33 acres of the subject land, walked all around Plaintiff's private residence, peeped inside the windows, and looked into doorways.  Defendant SMITH walked through a barn located on the subject land.  He then returned back to the building where St. Clair was located.

- 6 -

26.   Throughout the time Defendant SMITH was upon the subject land conducting the unlawful search, he also took photographs of the subject land, again without permission, consent, or justifiable cause.

27.   Defendant SMITH then left the subject land, but he soon returned.  Upon returning, Defendant SMITH again re-entered the subject land through the posted "No Trespassing" fence and gate and, once again, crossed the threshold of the building where St. Clair was located, entering the interior of the building.  He handed St. Clair his card and told St. Clair to have the owner contact him.

29.   Defendant SMITH then stapled notices of violations onto the building.  Attached hereto as *Exhibit "F,"* are true and correct copies of the notices that Defendant SMITH stapled to the building.

30.   St. Clair contacted Plaintiff who immediately came to the subject land.  Plaintiff arrived with Tracy Schmidtman.  St. Clair explained what Defendant SMITH had done to Plaintiff and Schmidtman.

31.   On April 19, 2019, a notice entitled "CIVIL PENALTIES DUE AND PAYABLE" was sent by Defendant SMITH to Plaintiff on behalf of Defendant COUNTY demanding $17,010.00 plus $90.00 per day for one citation and $5,670.00 plus $90.00 per day for the second citation.  Attached hereto as *Exhibit "G,"* and incorporated herein, is a true and correct copy of the Notice Plaintiff received.

32.   Based on the Notice received from Defendant SMITH on behalf of Defendant COUNTY, calculated at $22,680.00 and $180.00 per diem thereafter from April 20, 2019 to October 7, 2020 (170 days) totals $53,280.00, and continuing by reason of the per diem penalties.

33.   On June 13, 2019, Defendant COUNTY filed a Notice of Abatement against the subject land based on the alleged violations and resulting civil penalties, all of which were the

fruits of Defendant SMITH's unlawful search of, and trespass on, the subject land, and

deprivation of Plaintiff's constitutional and statutory rights.

34.    On October 23, 2019, Plaintiff timely filed a governmental tort claim with

Defendant COUNTY with respect to the state law claims made herein.

35.    Plaintiff has exhausted his administrative remedies to the best of his abilities, but

to no avail; and is now forced to file this suit in an attempt to remedy Defendants' wrongful

actions.

## FIRST CAUSE OF ACTION

### VIOLATION OF 42 U.S.C. § 1983- UNLAWFUL SEARCH
### IN VIOLATION OF FOURTH AMENDMENT

### (Against Defendant SMITH)

36.    Plaintiff re-alleges and incorporates by reference the facts and allegations

contained in Paragraphs 1 through 35, above, as though fully set forth in this First Cause of

Action.

37.    As shown above, on February 15, 2019, Defendant SMITH entered upon the

subject land without a warrant, lawful authority, or the benefit of justification, in violation of

Plaintiff's Fourth Amendment right to be free from warrantless invasions and searches, including

warrantless administrative searches.

38.    Defendant SMITH's entry was conducted without Plaintiff's consent.

39.    As a direct and proximate result of Defendant SMITH's actions, Plaintiff has

incurred, and continues to incur, general and special damages in an amount to be proven at trial.

40.    At all relevant times herein, Defendant SMITH's actions, as complained of herein,

were committed maliciously, oppressively, and in reckless disregard of Plaintiff's constitutional

rights; were done willfully, in bad faith, wantonly, and with an evil motive or purpose designed to

vex, injure, or annoy; were done in concert with other Defendants, including Defendant WICK

and DOES 1-10, demonstrating a deliberate indifference to Plaintiff's constitutional and statutory rights, sufficient for an award of punitive/exemplary damages against Defendants, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION

### TRESPASS

### (Against Defendants SMITH, WICK, and DOES 1-10)

41.     Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1-40, above, as though fully set forth in this Second Cause of Action.

42.     Plaintiff has owned the land since 1989.

43.     Defendant SMITH intentionally entered upon the subject land belonging to Plaintiff by disregarding posted "No Trespassing" signs, disregarding warrant requirements; entering through a fence and gate and searching the subject land and house without a warrant, consent, probable cause, or exigent circumstances in violation of Health and Safety Code section 17972 and Code Civil Procedure 1822 *et seq*.

44.     Plaintiff is informed and believes, and based thereon alleges, that at all relevant times herein, Defendant SMITH was acting at the direction, behest, or encouragement of Defendant WICK, his supervisor employed by Defendant COUNTY, and DOES 1-10, who caused Defendant SMITH to enter upon the subject land without a warrant, consent, probable cause, or exigent circumstances in violation of Health and Safety Code section 17972 and Code Civil Procedure 1822 *et seq*.

44.     As a direct and proximate result of Defendants' actions, Plaintiff was actually harmed, has incurred, and continues to incur general and special damages in an amount to be proven at trial.

45.    At all relevant times herein, Defendant SMITH's actions, as complained of herein, were committed maliciously, oppressively, and in reckless disregard of Plaintiff's constitutional rights; were done willfully, in bad faith, wantonly, and with an evil motive or purpose designed to vex, injure, or annoy; were done in concert with other Defendants, including Defendant WICK and DOES 1-10, demonstrating a deliberate indifference to Plaintiff's constitutional and statutory rights, sufficient for an award of punitive/exemplary damages against Defendants, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION

### AGENCY LIABILITY – UNCONSTITUTIONAL OFFICIAL OR DE FACTO POLICY, PRACTICE, OR CUSTOM IN VIOLATION OF 42 U.S.C. § 1983 (MONELL)

### (Against Defendant COUNTY)

46.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1-45, above, as though fully set forth in this Third Cause of Action.

47.    Plaintiff is informed and believes that Defendant COUNTY exercises de facto policies that are contrary to its constitutional requirements.  Defendant COUNTY is ultimately responsible due to customs, policies, and practices of its officers, agents, and employees; whom they employ, train, supervise, oversee, discipline, reward, or ratify.

48.    At all times relevant herein, Plaintiff had a reasonable expectation that Defendants would not violate his Fourth Amendment protections and search the subject land without a warrant or other legal justification.

49.    Plaintiff is informed and believes and thereon alleges that, at all times mentioned herein, Defendant COUNTY, with deliberate indifference, and in conscious disregard of the security and constitutional rights of Plaintiff and others, including the right to be free from warrantless searches under the Fourth Amendment, maintained, enforced, tolerated, ratified,

permitted, acquiesced in, and/or applied, among others, the following customs, policies, and

practices:

     a.  Failing to adequately train, supervise, and discipline its Code Inspectors, including Defendant SMITH;

     b.  Failing to discourage, or actively encouraging, the unlawful use of authority of the PRMD, its officers, and its agents, including the named Defendants herein and DOES 1-10;

     c.  Failing to admonish, reprimand, discipline, or even investigate constitutional or statutory rights violations by its Code Inspectors, including the named Defendants herein and DOES 1-10;

     d.  Ratifying the violations of clearly established constitutional protections, including those conferred by the Fourth Amendment, by directing, encouraging, or rewarding Code Inspectors and others, including the named Defendants herein and DOES 1-10, in conducting warrantless searches of private property, including but not limited to the subject land;

     e.  Failing to implement proper procedures for obtaining inspection warrants, keeping track of when inspection warrants are sought, executing such warrants; and applying to judicial officers for orders regarding inspection warrants, including the falsification of court records and other documents to justify the otherwise unlawful and unconstitutional behavior of its Code Inspectors, officers, and other agents, including the named Defendants herein and DOES 1-10;

     f.  Maintaining a custom, policy, or practice of routinely violating, or encouraging the violation of, the Fourth Amendment rights of landowners in Defendant COUNTY by searching their private property without warrants or other legal justification in a scheme to illicitly raise revenue for Defendant COUNTY and, thus, unfairly penalize landowners in Defendant COUNTY.

50.    At all relevant times herein, all individual Defendants named herein as well as DOES 1-10 were acting pursuant to the customs, policies, and practices of Defendant COUNTY and its agency, PRMD.

51.    As a direct and proximate result of the acts and omissions complained of herein, Plaintiff has sustained, and continues to sustain, general and special damages in an amount to be proven at trial.

## REQUEST FOR DECLARATORY RELIEF

52.    Plaintiff re-alleges and incorporates by reference the allegations contained in Paragraphs 1-51, above, as though fully set forth herein.

53.     An actual case or controversy has arisen and now exists between Plaintiff and Defendants, and each of them, concerning their respective rights and duties in that Plaintiff contends that his Fourth Amendment rights under the U.S. Constitution, as well as statutory and common law rights, have been violated.

54.     Plaintiff desires a judicial determination of those rights and his duties with respect to Defendants, and each of them.

55.     A judicial declaration is necessary and proper at this time under the circumstances alleged herein in order that Plaintiff may know his rights and duties with respect to the civil penalties assessed by Defendant COUNTY, which now burden Plaintiff and the subject land.

56.     Monetary damages will not suffice to provide Plaintiff with an adequate remedy because Defendant COUNTY is assessing per diem penalties against Plaintiff and the subject land, which arose out of an unlawful search in violation of the Fourth Amendment, trespass, and the subsequent actions by Defendant COUNTY as alleged herein.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that this Court enter a judgment in his favor and against Defendants, jointly and severally, as follows:

1.      For a declaration that the civil penalties assessed by Defendant COUNTY arose from an unconstitutional search of the subject land, and as such, are fruit of unlawful actions by Defendant COUNTY, its employees, officers, and agents; accordingly, any civil penalties arising therefrom are null and void;

2.      General and compensatory damages in an amount according to proof;

3.      Special damages in an amount according to proof;

4.      Punitive damages against each individual and DOE Defendant, but not against Defendant COUNTY, in an amount according to proof;

5.      Costs of suit, including attorneys' fees, under 42 U.S.C. § 1988; and

6.      Such other and further relief as the Court may deem is just and proper.

1

## **DEMAND FOR TRIAL BY JURY**

2

Plaintiff hereby demands a trial by a jury of his peers on all Causes of Action so triable.

3

Dated:  October 7, 2020                          Respectfully;

4

5

6

_____/s/_____

RONALD CUPP

7

Plaintiff *Pro Se*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*EXHIBIT "A"*



*EXHIBIT "B"*

# NOTICE OF POSTING

## OF FOURTEEN (14) *DIFFERENT* "DO NOT TRESPASS" POSTINGS ON THE SUBJECT PRIVATE LAND (COPIES ATTACHED) WITH TIMELY DEMAND TO COMPLY

**April 18, 2013**

Board of Supervisors & Successors
County of Sonoma
575 Administration Drive
Santa Rosa, CA 95403
Certified 7012 1010 0002 7428 4562

Sheriff Steve Freitas & Successors
Sonoma County Sheriff's Office
2796 Ventura Avenue
Santa Rosa, CA 95403
Certified 7012 1010 0002 7428 4579

Chief Tom Schwedhelm & Successors
City of Santa Rosa Police Department
965 Sonoma Avenue
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5545

Caroline Fowler, City Attorney
Office of City Attorney & Successor
100 Santa Rosa Avenue, Room 10
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5552

Office of Mayor & City Council
100 Santa Rosa Avenue, Room 10
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5569

**RE: NOTICE OF ACTION – Private Land commonly identified as: 4640 Arlington Avenue, Santa Rosa, California Republic located in the original, underlying California republic, pursuant to the Supremacy Clause of the Constitution for the United States of America.**

To All Above Named Parties:

I, the undersigned, Ronald Vernon Cupp, one of the Sovereign People of the State of California hereby states as follows:

The attached fourteen (14) "POSTED – DUE PROCESS - PUBLIC NOTICE – DO NOT TRESPASS" notices are now POSTED on the subject PRIVATE land as of this date. DEMAND is hereby made for these DUE PROCESS – POSTED NOTICES to be presented to any Judge, Judge Pro Tem, Temporary Judge, Retired Judge, Court Commissioner, Court Referee, or Court Hearing Officer that you may involve so that he or she can be forewarned of their liability without immunity standing.

Executed by the voluntary act of My own hand in the old, underlying, original Santa Rosa Township, in the underlying, original California Republic, and is dated this Eighteenth day of the fourth month, in the year two thousand and thirteen, Anno Domini, in the two-hundred and thirty-sixth year of the Independence of America.

Ronald Vernon Cupp

# 1st POSTED

## DUE PROCESS - PUBLIC NOTICE

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

### THIS PRIVATE LAND IS PROTECTED BY THE STILL VALID ORIGINAL UNITED STATES LAND PATENT as Historically Recorded at the UNITED STATES NATIONAL ARCHIVES.

All <u>Original</u> Sovereign Allodial Land Ownership Rights, Title, Interest, Use, Control, Immunities, and Appurtenances of whatsoever Nature are Claimed Under The *ORIGINAL* United States Land Patent.

**WARNING TO ALL GOVERNMENTAL OFFICERS, AGENTS, AND EMPLOYEES.**
THE PRIVATE LAND BEHIND THESE POSTED NOTICES IS HEREBY DECLARED TO BE NOT UNDER YOUR JURISDICTIONAL POWERS AND AUTHORITY. IT IS "DECLARED" TO BE SOVEREIGN LAND, DIRT, SOIL, EARTH, AND GROUND, UNDER THE AMERICAN "LAW OF THE LAND," AND ITS "COMMON-LAW." IT IS NOT IN ANY WAY TO EVER BE CONSIDERED AS REAL ESTATE, REAL PROPERTY, PROPERTY, A PARCEL, OR PREMISES UNDER THE "LAW OF THE SEA," AND ITS "ROMAN, CIVIL, EQUITY, ADMINISTRATIVE-LAW." ITS SOVEREIGN STATUS STEMS FROM KING OF SPAIN, THE MEXICAN GENERAL ASSEMBLY, AND THE SUPREMACY CLAUSE OF THE CONSTITUTION FOR THE UNITED STATES OF AMERICA, AS WELL AS THE RELATED 1848 A.D. INTERNATIONAL TREATY OF GUADALUPE HIDALGO, AND THE UNITED STATES LAND PATENT LAWS THAT QUIT-CLAIM TRANSFERRED THE SOVEREIGN RIGHTS, TITLE, INTEREST, USE, AND CONTROL DIRECTLY FROM THE UNITED STATES [GOVERNMENT] TO THE PRIVATE SECTOR, WITHOUT ANY SUCH RIGHTS, TITLE, INTEREST, USE, OR CONTROL BEING TRANSFERRED TO ANY TOWN, CITY, COUNTY, PARISH, OR STATE.

Willful Trespass or Failure to Obtain Exclusive Written Permission from Private Land Patent Assign (Owner) Prior to Entry Shall Result in Civil and/or Criminal Prosecution and Shall Result in a Five-thousand Dollar Face Value Silver or Gold Coin, Per Trespass, Land-Use Fee,

Damages May Also be Prosecuted Under Federal, and State Civil or Criminal R.I.C.O. Penalties,

**WARNING:** Unauthorized Entry or Trespass Shall Result in Fines & Prosecution Pursuant to this Contractual Legal Notice. Trespassers Shall be Enjoined, Treated as Intruders, and Peacefully Prosecuted in the UNITED STATES DISTRICT COURT,

**WARNING:** If You Do Not Understand this NOTICE, or Do Not Understand What Procedures are Lawfully Required of You, Immediately Contact your Attorney AND the County District Attorney AND the Land Patent Assignee (Land Holder).

**DISCLAIMER:** Use of Federal Law is for Your Protection and Not for the Benefit of Assign. Lack of Lawful Applicability of any Part of this Contractual Legal Notice Shall in No Way Invalidate the Remainder of this Contractual Legal Notice,

**THIS CLAIM and NOTICE** is Retroactive, nunc pro tunc, as of the Date of the issuance of the *Original* UNITED STATES LAND PATENT, which was signed by the President of the United States of America.

**CLAIMED BY** a Living Principal, Assign, or Owner <u>from without</u> the 'UNITED STATES', Not an Accommodation, All Rights Reserved.

### LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

## DO NOT TRESPASS – KEEP OFF

BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

# 2nd POSTED

## DUE PROCESS - PUBLIC NOTICE

---

### NEW – SUBJECT MATTER
### JURISDICTIONAL CHALLENGE

---

#### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

#### STILL PROTECTED BY THE ORIGINAL, STILL VALID, UNITED STATES LAND PATENT THAT WAS SIGNED BY THE PRESIDENT OF THE UNITED STATES OF AMERICA AND ISSUED BY THE UNITED STATES GENERAL LAND OFFICE.

NOTE: Today's governments and courts are extremely upset about what their predecessors accomplished for themselves, their heirs, assigns, and the other Sovereign American People in the past that *FOREVER* precluded today's Public Servant's (a valid title they hate) from accomplishing today's desired management, control, and taxation of the *private land* and the Sovereign American People located on the land, within America today – a country which was historically known as a nation of Sovereigns with no Subjects," and a place where "a man's house was his castle."

#### CAVEAT

As stated above, this is a valid *and new SUBJECT MATTER JURISDICTIONAL CHALLENGE*, which its posting is not an unlawful nor rebellious act presents a well-settled procedure for responding to such timely made *SUBJECT MATTER JURISDICTIONAL CHALLENGE*. It is designed to present, under the American laws of Presentment, DUE PROCESS NOTICE of fatal jurisdictional defects, so any and all governmental officers, agents, and employees are *pre-warned* about the real possibility of becoming a party in a new CIVIL R.I.C.O, United States District Court - Color of State Law, action against them personally, and *"in their individual capacity"*, for their overt actions committed in *"the clear, total, and complete absence of all competent Subject Matter Jurisdiction,"* which, inter alia, produces a personal liability with absolutely NO IMMUNITY.

#### REGARDING THIS POSTED PRIVATE LAND

THIS above identified *private land* is *totally and completely* outside of the Subject Matter Jurisdiction of the federal, corporate, STATE OF CALIFORNIA, a.k.a. CA., and all of its Political Subdivisions, i.e. courts, counties, and cities, etc. This lack of competent Subject Matter Jurisdiction over this private land can be compared with the same lack of jurisdiction over Federal Indian Reservations, Federal Military Installations, National Forests, National Parks, National Monuments, and National Wildlife Refuges, that might also be located within the above mentioned governmental borders.

#### HOW?

After the signing and implementation of the **1848 INTERNATIONAL TREATY OF GUADALUPE HIDALGO, AND ITS PROTOCOL OF QUERETARO**, the UNITED STATES [government] thereby obtained ALL *sub-surface* SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL to ALL of the land which would become most of the seven western states. The UNITED STATES [government] also obtained ALL *surface* SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE AND CONTROL to the same land, WITH THE SPECIFIC EXCEPTION OF the previously settled Spanish and Mexican Land Grants, wherein those foreign governments, granted their own SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL to their respective grantees to encourage settlement in the area first known as New Spain and then later known as ALTA CALIFORNIA.

The above mentioned PROTOCOL OF QUERETARO, mandated that the UNITED STATES [government] honor and respect ALL of those Spanish and Mexican Land Grants as a preemptive agreement. It should be noted that the new 1849 State of California owned and controlled absolutely no dry or wet-lands located within its original borders at the time of its

# DO NOT TRESPASS – KEEP OFF

### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

founding, as it was the UNITED STATES [government] that owned and controlled it all as a United States Possession, through the above mentioned international treaty.

Regarding the Spanish and Mexican Land Grants in California, when the UNITED STATES [government] issued its UNITED STATES LAND PATENT, pursuant to the mandates of the **1848 INTERNATIONAL TREATY OF GUADALUPE HIDALGO, AND ITS PROTOCOL OF QUERETARO**, it then released to the grantee its own sub-surface, SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL, that it had received from the Mexican government, as it was stated in court cases that sub-surface SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL was not an incident of American government Sovereignty. This lawful act thereby provided the subject grantees with a higher form of ownership with the UNITED STATES LAND PATENT, than they possessed with their original Spanish or Mexican Land Grant. They then possessed the exclusive SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL to the center of the earth as a MATTER OF LAW.

### THE UNITED STATES PUBLIC DOMAIN LANDS

ALL land located *outside* of those recognized and confirmed preemptive Spanish and Mexican Land Grants were known as the UNITED STATES PUBLIC DOMAIN LAND. The new State of California still did not own or control any dry or wet-lands until it was admitted into the Union of States, known as the United States of America, on September 9, 1850. At that time the new State of California was granted only a small amount of land from out of the UNITED STATES PUBLIC DOMAIN LAND, which land became known as the California Pubic Trust Easement. The California Public Trust Easement, encompassed all of the states navigable rivers and lakes from the mean high-water mark on one side to the mean high-water mark on the other side, and all of the coastal waters, from the mean high-tide mark to a point three English Miles into the ocean.

After the 1849 State of California was admitted into the Union of States pursuant to the September 9, 1850 **ACT FOR ADMISSION OF CALIFORNIA INTO THE UNION**, and its stated prohibitions, the United States Treasury, through its General Land Office (GLO) was charged with the disposition of the UNITED STATES PUBLIC DOMAIN LAND that it held in trust for the Sovereign American People that were located within the exterior borders of the new State of California. It accomplished that responsibility through six methods - United States Homestead Grants, United States Cash Entry Grants, United States Desert Entry Grants, Mining Claim Grants, Military Warrant Grants, and Railroad Grants.

Only after those grants were perfected and confirmed by the mandated occupation and the specified improvements, the coveted UNITED STATES LAND PATENT was issued, wherein the UNITED STATES [government] *quit-claim transferred* ALL of its SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE and CONTROL to the private sector, keeping none for itself, or for any city, county, parish, or state government.

AS A MATTER OF LAW, *at the time* when a UNITED STATES LAND PATENT was *FOREVER* issued, the case law clearly stated that any rights not *specifically reserved and noted* on the actual UNITED STATES LAND PATENT, could *NEVER* be made later. It should also be noted that absolutely no rights could ever be noted on a UNITED STATES LAND PATENT that *recognized and conformed* a Spanish or Mexican Land Grant, due to the *FACT* that the UNITED STATES [government] never had any *surface* SOVEREIGN ALLODIAL OWNERSHIP RIGHTS, TITLE, INTEREST, USE or CONTROL in the subject land and therefore could not reserve any to itself, *nor to any city, county, parish, or state.*

From the remaining UNITED STATES PUBLIC DOMAIN LANDS, the UNITED STATES [government] originally reserved to itself only, the right to maybe, possibly, someday come back onto the land and install ditches and canals This right was *not provided to any city, county, parish, or state.* IT IS A FACT OF LAW, that absolutely no SOVEREIGN ALLODIAL LAND OWNERSHIP RIGHTS, TITLE, INTEREST, USE or CONTROL were EVER "reserved," to any state, county, parish, city, town, or village government on *any* UNITED STATES LAND PATENT.

### MANDATED RESPONSE DEMANDED

DEMAND IS HERBY MADE, for any governmental officer, agent, or employee who has documented information to the contrary, to present it to the Sovereign Land Holder, as proof of competent Subject Matter Jurisdiction over the subject private land, OR **YOUR DEFAULT WILL BE TAKEN AS YOUR TACIT ACCEPTANCE, TOTAL, AND COMPLETE APPROVAL OF THE ABOVE-PRESENTED INFORMATION.**

## LAND USE FEE IS  5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL** SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

# DO NOT TRESPASS – KEEP OFF

### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

# 3rd POSTED

## DUE PROCESS - PUBLIC NOTICE

| NEW – SUBJECT MATTER JURISDICTIONAL CHALLENGE |
|:---:|

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

## PRIMARY AND BASIC SUBJECT MATTER JURISDICTIONAL CHALLENGE PRESENTMENT

### NEW FEDERAL QUESTION

### SUBJECT MATTER JURISDICTIONAL CHALLENGE DEMAND

The Sovereign Inhabitant on the land, hereby timely challenges, ON THE RECORD, the jurisdictional competency of this County, with this long and extremely detailed:

### FORMAL SUBJECT MATTER JURISDICTIONAL CHALLENGE

DEMAND is hereby made for any Prosecution, any Court, and any City and County to IDENTIFY the Constitutional Article, Section, Sub-section, Paragraph, Sub-paragraph, Clause, Sentence, or Amendment - State or Federal, or Constitutionally promulgated State Statute, or Federal Statute-at-Large, or Revised Statute, along with its date of enactment, and Implementing Regulation, and effective date that granted or delegated any type of "judicial," "regulatory," or "taxing" jurisdiction, powers, or authority" to the STATE OF California, or to any of its political subdivision – courts, counties, or cities, over private land located within its borders, land that was *FOREVER* recognized as a British, Russian, French, Spanish, or Mexican Land Grant, OR it was Quit-Claim transferred out of the United States Public Domain to the private sector by a Homestead Grant, Mining Claim Grant, Military Warrant Grant, Cash Entry Grant, Desert Entry Grant, or Railroad Grant that was *FOREVER* "confirmed" by the UNITED STATES [government] via its own UNITED STATES LAND PATENT procedure which was lawfully administered by the UNITED STATES GENERAL LAND OFFICE (GLO) under the UNITED STATES DEPARTMENT OF THE TREASURY, and thereafter signed by the PRESIDENT OF THE UNITED STATES OF AMERICA, and is now on permanent file in the UNITED STATES NATIONAL ARCHIVES in Washington DC, with copies available today from the UNITED STATES DEPARTMENT OF THE INTERIOR'S BUREAU OF LAND MANAGEMENT, a.k.a. the B.L.M., with the superior FOREVER protections of the SUPREMACY CLAUSE of the CONSTITUTION FOR THE UNITED STATES OF AMERICA."

## SUBJECT MATTER JURISDICTIONAL CHALLENGE CASES:

# DO NOT TRESPASS – KEEP OFF

### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

"Once jurisdiction is challenged, the agency/court cannot proceed."
Melo v. US, 505 F2d 1026,
Joyce v. US, 474 Fed 215

"The burden of proof shifting to government."
Rosemont v. Lambert, 469 F2d 416

"The burden of proof being upon the person asserting the jurisdiction."
Mc Nutt v. GMAC, 298 US 178,
Thomas v. Gaskeil, 83 Led 111,
Basso v. UP, 495 F2d 906

"Government must produce on the record all jurisdictional facts."
Lantana v. Harper, 102 F2d 118,
New York v. US, 337 F Supp 150; 344 F Supp 929

"Jurisdiction must appear as proved on the face of the record."
Baer v. USA, 503, F2d 393

"A court has a duty to see to it that its processes are not being used
improperly, for improper purposes, or fraud, etc."
Pueblo De Taos v. Archuleta, 64 F2d 807, 813.

"The burden of proving all jurisdictional facts rests upon the plaintiff or
person claiming jurisdiction."
Town of Lantana v. Hooper, 102 F2d 118

"Jurisdiction once challenged cannot be assumed to exist."
Hagans v. Lavine, 415 US 533 n. 5
Monell v. NY, 436 US 633,
US v. More, 3 Cr. 159, 172

"Jurisdiction can be challenged at any time."
Brady v. Richardson, 18 Ind. 1
Bialac v. Harsh, 436 F2d 1185, cert. den. 93 S Ct. 558, 34 L Ed 2d 512
Crater Lake v. Oregon, 26 F.Supp. 363
Beauty Col. V. Huse, 195 W 160, 80 P2d 403.

### MANDATED RESPONSE DEMANDED
DEMAND IS HERBY MADE, for any governmental officer,
agent, or employee who has documented information to the contrary,
to present it to the Sovereign Land Holder, as proof of competent
jurisdiction to be on the subject land, OR **YOUR DEFAULT WILL
BE TAKEN AS YOUR TACIT ACCEPTANCE, TOTAL, AND
COMPLETE APPROVAL OF THE ABOVE-PRESENTED
INFORMATION.**

### LAND USE FEE IS  5,000 United States lawful,
### money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL** SOVEREIGN, ALLODIAL LAND
OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 4th POSTED

## DUE PROCESS - PUBLIC NOTICE

> ### NEW – SUBJECT MATTER
> ### JURISDICTIONAL CHALLENGE

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE
### SOVEREIGN LAND

*ONLY* THE COUNTY SHERIFF MAY ENTER THIS PRIVATE LAND TO EXECUTE A VALID 1789 A.D. *LAW OF THE LAND* COMMON-LAW FELONY, FOURTH AMENDMENT "SEARCH WARRANT" AND/OR "SEIZURE WARRANT." A *LAW OF THE SEA* ARREST WARRANT, WARRANT OF ARREST, OR BENCH WARRANT DOES NOT, AND WILL NOT QUALIFY.

THIS PRIVATE LAND IS SOVEREIGN LAND *FOREVER* PROTECTED BY THE SUPREMACY CLAUSE OF THE CONSTITUTION FOR THE UNITED STATES OF AMERICA, AND ITS RELATED UNITED STATES LAND PATENT LAWS, TO THE CENTER OF THE EARTH.

## CAVEAT

THE LEGAL PHRASE *"DEFECTIVE ON ITS FACE"* WILL FATALLY DESTROY ANY PRECEIVED PERSONAL IMMUNITY YOU MAY THINK YOU HAVE WHEN PROVEN IN A COURT OF LAW. ANY PAPERS YOU MAY RELY UPON MUST BE SCRUPULOUSLY RENDERED PURSUANT TO THE *California RULES OF COURT* AND ALSO BE IN CLEAR, TOTAL, AND COMPLETE COMPLIANCE WITH THE 1789 A.D. FOURTH AMENDMENT PROHIBITIONS WHICH WERE MADE APPLICABLE TO THE STATE OF *California* AND ALL OF ITS POLITICAL SUBDIVISIONS IN 1961 PURSUANT TO *MONROE V. PAPE*, 365 U.S. 167, 81 S.Ct. 473, 81 S.Ct. 473, 5 L.Ed.2d 492, AND *MAPP V. OHIO*, 367 U.S. 643, 81 S.Ct. 3012, 6 L.Ed.2d 1.

"The right of the [Sovereign] people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no Warrants* (repeat – NO WARRANTS) shall issue, but upon probable cause, (a Common-Law Felony exclusively in 1789 A.D.) supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added)

## DO NOT TRESPASS – KEEP OFF

### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

YOU WOULD BE WELL ADVISED TO NOTE THAT THE WORD "ARREST" AND "ARREST WARRANT" IS NOT MENTIONED IN THE HEREINBEFORE PRESENTED AMENDMENT. A *LAW OF THE LAND* "SEARCH WARRANT" AND/OR A *LAW OF THE LAND* "SEIZURE WARRANT" IS CONSTITUTIONALLY MANDATED, AND IT MUST BE SUPPORTED BY 1789 A.D. *LAW OF THE LAND* "PROBABLE CAUSE" AND ALSO BE SUPPORTED BY OATH OR AFFFIRMATION <u>PARTICULARLY DESCRIBING THE PLACE TO BE "SEARCHED" AND THE PERSONS OR THINGS TO BE "SEIZED,"</u> [WITH NO ANONYMOUS ACCUSERS.]

IT SHOULD ALSO BE PARTICULARLY NOTED THAT IN THE YEAR OF 1789 A.D. <u>AT THE TIME</u> WHEN THE SUBJECT AMENDMENT WAS DRAFTED AND PRESENTED TO THE SEVERAL, FREELY ASSOCIATED, COMPACT, UNION STATES FOR RATIFYING, THE TERM "*PROBABLE CAUSE*" WAS *ONLY* THE DESCRIPTION OF A "MENS RAE" (BAD IN ITSELF – COMMON-LAW FELONY) CRIME, SUCH AS MURDER, RAPE, ARSON, MATHEM, KIDNAPPING, AND TREASON. IT SHOULD ALSO BE PARTICULARLY NOTED THAT PROHIBITIVE "MENS PROHIBITA" QUASI-CRIMES HAD NOT YET BEEN PASSED AS *STATUTES AT LARGE* SINCE THE TWO LEGISLATIVE HOUSES OF THE UNITED STATES OF AMERICA HAD NOT YET MET IN CONGRESS ASSEMBLED TO PASS SUCH LESSOR LAWS. IT IS THE INTENT OF THE <u>ORIGINAL</u> 1789 A.D. LAW MAKERS THAT ARE MANDATED.

UNLESS AND UNTIL *YOU* PRODUCE A CONSTITUTIONALLY VALID, FOURTH AMENDMENT, 1789 A.D. *LAW OF THE LAND* "SEARCH WARRANT" AND/OR "SEIZURE WARRANT" EXECUTED BY PROPER <u>California</u>, JUDICIAL DEPARTMENT "COURT OF RECORD," COURT OF COMMON-LAW AUTHORITY, *YOU* ARE NOT WELCOME HERE. IF YOU TRESPASS ONTO THIS PRIVATE SOVEREIGN LAND, *YOU*, AND YOUR SUPERIORS, IN YOUR "INDIVIDUAL CAPACITY," *WILL* ANSWER TO A PERSONAL DAMAGE ACTION IN <u>THE UNITED STATES DISTRICT COURT</u>. <u>YOU CAN COUNT ON IT</u>.

## <u>LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY</u>.

Present inhabitant on this private land is the holder of <u>ALL</u> SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 5th POSTED

## DUE PROCESS - PUBLIC NOTICE

> ### NEW – SUBJECT MATTER
> ### JURISDICTIONAL CHALLENGE

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

### STILL PROTECTED BY THE ORIGINAL, STILL VALID,
### UNITED STATES LAND PATENT

DEMAND IS HEREBY MADE FOR A CERTIFIED COPY OF ANY DOCUMENT SHOWING TOTAL COMPLIANCE WITH ALL PROCEDURAL MANDATES OF 5 U.S.C. Section 552, 553, 554, 555, AND 556, BY THE OVERLAPPING, FEDERAL, CORPORATE, STATE, AND ITS COUNTIES, TO BE PRESENTED INTO THE RECORD AND TO THE SOVEREIGN LAND HOLDER.

DEMAND IS ALSO HEREBY MADE FOR A CERTIFIED COPY OF ANY ALLEGED "CONSTITUTIONALLY VALID CONTRACT," BETWEEN ALL OF THE PARTIES, THAT REMOVED THE BELOW-NAMED OWNER OF THE SUBJECT PRIVATE LAND, AND THE SUBJECT PRIVATE LAND, FROM THE PROTECTIONS OF "CONSTITUTIONAL LAW JURISDICTION," AND PLACE THEM UNDER THE MANDATES OF THE "ADMINISTRATIVE LAW JURISDICTION," OF THE OVERLAPPING, FEDERAL, CORPORATE, STATE, ITS COUNTIES, AND CITIES, A CONTRACT THAT WAS KNOWINGLY, WILLINGLY, INTENTIONALLY, VOLUNARILY, AND FREELY ENTERED INTO BY THE SUBJECT PRIVATE LAND HOLDER, AND THEN ONLY AFTER FULL DISCLOSURE OF ALL OBLIGATIONS, DUTIES, AND RESPONSIBILITIES ASSICIATED WITH SUCH A "CONSTITUTIONALLY VALID CONTRACT," WITH AT LEAST ONE SILVER DOLLAR TENDERED AS MINIMUM AMOUNT OF "VALUABLE CONSIDERATION," FOR SUCH CONTRACT, PURSUANT TO WELL SETTLED AMERICAN LAW.

## DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

"Fifty years ago this Court pointed out the essential relationship between rights and remedies. "Nothing can be more material to the obligation [of a contract with government] than the means of enforcement. Without the remedy the contract may, indeed, in the sense of the law, be said not to exist, and its obligation to fall within the class of those moral and social duties which depend for their fulfillment wholly upon the will of the individual. The ideas of [constitutional] validity [of the law] and remedy are inseparable, and both are parts of the obligation, which is guaranteed by the Constitution against invasion. The obligation of a [governmental] contract 'is the law which binds [both of] the parties to perform their agreement." Von Hoffman v. City of Quincy, 4 Wall. 535, 552. Red Cross Line vs. Atlantic Fruit Company. No. 112. SUPREME COURT OF THE UNITED STATES 264 U.S. 109, 68 L. Ed. 582, 44 S. Ct. 274 Decided February 18, 1924. (Emphasis added)

DEMAND IS ALSO HEREBY MADE FOR THE SUBJECT OVERLAPPING, FEDERAL, CORPRATE, STATE, AND ITS COUNTY, AND CITY CODES TO BE "CERTIFIED AS CONSTITUTIONAL" BY THE ATTORNEY GENERAL AND THE STATE SUPREME COURT AS PROVIDED BY LAW.

**NOTE:** IF DEEMED NECESSARY IN THE FUTURE, THE California ATTORNEY GENERAL **WILL BE SUBPOENAED** INTO THE COURTROOM TO TESTIFY TO THE CERTIFICATION AND THE CONSTITUTIONALITY OF THE OVERLAPPING, FEDERAL, CORPORATE, STATE AND ITS COUNTY AND CITY CODE(S) ALLEGED TO BE VIOLATED.

## LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL** SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

# DO NOT TRESPASS – KEEP OFF
BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates All Rights Reserved

# 6th POSTED

## DUE PROCESS - PUBLIC NOTICE

| NEW – SUBJECT MATTER JURISDICTIONAL CHALLENGE |
| :---: |

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

### STILL PROTECTED BY THE ORIGINAL, STILL VALID, UNITED STATES LAND PATENT

IT IS HEREBY DECLARED, UNDER THE AMERICAN LAWS OF DECLARATIONS, THAT THE BELOW NAMED OWNER AND HOLDER OF ALL SOVEREIGN ALLODIAL LAND OWNERSHIP RIGHTS, TITLE, INTEREST, USE AND CONTROL, OBTAINED DIRECTLY FROM THE UNITED STATES [GOVERNMENT] REGARDING THE ABOVE IDENTIFIED, SUBJECT PRIVATE LAND, IS ONE OF THE SOVEREIGN PEOPLE OF THE STATE, AND HAS ADMISSIBLE EVIDENCE THAT OFFICERS, AGENTS, AND EMPLOYEES OF THE OVERLAPPING, FEDERAL, CORPORATE, STATE, AND ITS POLITICAL SUBDIVISION, COUNTIES, AND CITIES, ARE ATTEMPTING TO INFLICT FEDERAL, CORPORATE, STATE, COUNTY, AND CITY ADMINISTRATIVE-LAWS, i.e. ORDINANCES, CODES, TITLES, MANUALS, RESOLUTIONS, RULES, AND REGULATIONS, AGAINST THE SUBJECT PRIVATE LAND OWNER AND THE SUBJECT PRIVATE LAND IN DEGRADATION OF THE SUPREMACY CLAUSE OF THE CONSTITUTION FOR THE UNITED STATES OF AMERICA AS ALSO MENTIONED IN THE CONSTITUTION FOR THIS STATE.

IT IS ALSO HEREBY DECLARED, UNDER THE AMERICAN LAWS OF DECLARATIONS, THAT THE LAND HOLDER OF ALL SOVEREIGN ALLODIAL LAND OWNERSHIP RIGHTS, TITLE, INTEREST, USE, AND CONTROL, OBTAINED DIRECTLY FROM THE UNITED STATES

## DO NOT TRESPASS – KEEP OFF

BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

[GOVERNMENT] REGARDING THIS PRIVATE LAND, IS ONE OF THE SOVEREIGN PEOPLE OF THE STATE, WHO HAS ADMISSIBLE EVIDENCE THAT OFFICERS, AGENTS, AND EMPLOYEES OF THE OVERLAPPING, FEDERAL, CORPORATE, STATE, AND ITS POLITICAL SUBDIVISION, THE COUNTIES, AND CITIES, ARE ATTEMPTING TO INFLICT FEDERAL, CORPORATE, STATE, COUNTY, AND CITY ADMINISTRATIVE-LAWS, i.e. ORDINANCES, CODES, TITLES, MANUALS, RESOLUTIONS, RULES, AND REGULATIONS AGAINST THE SUBJECT PRIVATE LAND HOLDER AND THE SUBJECT PRIVATE LAND, IN VIOLATION OF, AND WITHOUT FIRST COMPLYING WITH 5 U.S.C. SECTIONS 553, 554, 555, 556, AND 557. See also CHRYSLER CORP. v. BROWN, SECRETARY OF DEFENSE, ET AL. 441 U.S. 281; 60 L. Ed. 2d 208; 1979.

IT IS ALSO HEREBY DECLARED, UNDER THE AMERICAN LAWS OF DECLARATIONS, THAT THE UNDER-NAMED OWNER AND HOLDER OF ALL SOVEREIGN ALLODIAL LAND OWNERSHIP RIGHTS, TITLE, INTEREST, USE, AND CONTROL, OBTAINED DIRECTLY FROM THE UNITED STATES [GOVERNMENT] REGARDING THE ABOVE IDENTIFIED, SUBJECT PRIVATE LAND, IS ONE OF THE SOVEREIGN PEOPLE OF THE STATE, WHO HAS ADMISSIBLE EVIDENCE THAT OFFICERS, AGENTS, AND EMPLOYEES OF THE OVERLAPPING, FEDERAL, CORPORATE, STATE, AND ITS POLITICAL SUBDIVISION, COUNTIES, AND CITIES, ARE ATTEMPTING TO INFLICT FEDERAL, CORPORATE, STATE, COUNTY, AND CITY ADMINISTRATIVE-LAWS, i.e. ORDINANCES, CODES, TITLES, MANUALS, RESOLUTIONS, RULES, AND REGULATIONS AGAINST THE SUBJECT PRIVATE LAND HOLDER AND THE SUBJECT PRIVATE LAND IN DEGRADATION OF THE 1787 A.D., CONSTITUTION FOR THE UNITED STATES OF AMERICA, ITS FOURTH AMENDMENT, AND ITS UNITED STATES LAND PUBLIC DOMAIN, UNITED STATES PATENT QUIT-CLAIM LAND TRANSFER LAWS.

**LAND USE FEE IS  5,000 United States lawful,
money of account dollars, PER PERSON - PER DAY.**

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND
OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF

BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

# 7ᵗʰ POSTED

## DUE PROCESS - PUBLIC NOTICE

### NEW - JURISDICTIONAL CHALLENGE

**THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND**

**STILL PROTECTED BY THE ORIGINAL, STILL VALID, UNITED STATES LAND PATENT**

**WITH ALL RELATED OBLIGATIONS, DUTIES, AND RESPONSIBILITIES ASSOCIATED THEREWITH.**

The Sovereign Land Holder, hereby DECLARES, and AVERS, that he or she has been financially involved in a Due Diligent, Basic American Land Law Research Study that commenced, in the Spring of 1978 A.D., and that the subject Basic American Land Law Research Study failed to discover ANY constitutionally valid law that would indicate that ANY private land in America was held under ANY form of a SUBSERVIENT FUEDAL LAND OWNERSHIP, and a related SUBSERVIANT regulatory control of ANY town, Township, city, City, CITY, county, County, COUNTY, parish, Parish, PARISH, state, State, STATE, United States of America [government], or UNITED STATES [government], and that ALL private land in America was and is thus still held in the strict form of a SOVEREIGN ALLODIAL LAND OWNERSHIP, and its Rights, Title, Interest, Use, and Control, by the private sector, who were originally known as the Sovereign Founding Fathers, along with their Sovereign posterity, and now held by the Sovereign American People and their legal entities, such as this private land holder, who claims to be one of the Sovereign People of America, and of this state.

The Sovereign Land Holder, thus hereby DECLARES, and AVERS, that there is absolutely no constitutionally valid law that shows the subject private land is held in ANY form of a SUBSERVIENT FUEDAL LAND OWNERSHIP, with a related SUBSERVIENT regulatory control of ANY town, Township, city, City, CITY, county, County, COUNTY, parish, Parish, PARISH, state, State, STATE, the United States of America [government], or the UNITED STATES [government], and that the subject private land is truly held in a strict form of a SOVEREIGN ALLODIAL LAND OWNERSHIP, and its related Sovereign ALLODIAL Rights, Title, Interest, Use, and Control.

DEMAND is herby made for anyone claiming ANY constitutionally valid law to the contrary, to present it to the Sovereign Land Holder, and into the record, within a reasonable ten (10) days from receiving this NOTICE, or the above stated DECLARATION and AVERMENT will be deemed to be tacitly accepted as stated above.

**LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.**

Present inhabitant on this private land is the holder of **ALL** SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

## DO NOT TRESPASS – KEEP OFF

BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

# 8th POSTED

## DUE PROCESS - PUBLIC NOTICE

<div style="border: 1px solid black;">

### NEW – SUBJECT MATTER
### JURISDICTIONAL CHALLENGE

</div>

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND
#### PROTECTED BY THE ORIGINAL, FOREVER VALID, UNITED STATES LAND PATENT

THIS POSTED NOTICE IS A SUBJECT MATTER JURISDICTIONAL CHALLENGE,
A TYPE OF JURISDICTION WHICH CANNOT EVER BE WAIVED THROUGH MISTAKE,
INADVERTANCE OR ERROR, AND CAN BE CHALLENGED AT ANY TIME.

The Subject Matter Sovereignty of the subject private land, historically stems directly from a specific United States Land Patent that was signed by the President of the United States of America, and thereafter placed on permanent file with the United States National Archives. A certified copy is available from the United States Department of the Interior's, Bureau of Land Management. (BLM) THIS CONSTITUTIONAL AND HISTORICALLY VALID PROCEDURE IS A VERIFIABLE MATTER OF FACT.

Historically, United States Land Patents either [1] treaty-recognized a former Sovereign governments earlier FOREVER, quit-claim transfer of ALL of its Sovereign allodial land ownership rights, title, interest, use, and control to its own settlers and soldiers, with its own original Land Grant, OR [2] it actually FOREVER quit-claim transferred ALL of the UNITED STATES [governments] own Sovereign allodial land ownership rights, title, interest, use, and control, to its own Public Domain land grantees, land that it was "holding in trust," for the Sovereign American People. This was commenced with constitutionally valid "laws of the United States," that were created for Homestead Grants, Cash Entry Grants, Desert Entry Grants, Military Warrant Grants, Mining Claim Grants, or Railroad Grants. Then, ONLY AFTER the required development and occupation, mandated in the above-mentioned constitutionally valid laws, the final FOREVER quit-claim release of ALL of its Sovereign allodial land ownership rights, title, interest, use, and control, which was transferred with the final issuance of the coveted United States Land Patent. THAT'S IT. Those are the constitutionally valid powers of the only two types of United States Land Patents.

More than 200 years of high court case law clearly indicates that the above-mentioned quit-claim transfer was FOREVER, and a possible reservation of ANY stated rights, title, interest, use, or control, that MAY have been mentioned on the actual United States Land Patent, was for the UNITED STATES [government] exclusively, and historically they NEVER mentioned any reservation of rights for any state, county, city, or town government. Thus, there is *absolutely* no constitutionally valid law that grants, or delegates, or transfer's ANY regulatory or taxing rights, title, interest, use or control to any state, county, city, or town governments. This Historic FACT presents a valid Subject Matter Jurisdictional problem for such governments, which is a type of jurisdiction that CANNOT be waived through fraud, deceit, misrepresentation, coercion, or through mistake, inadvertence, or error. This leaves any possible governmental jurisdictional contract or quasi-contract that was obtained without Full Disclosure of all obligations, duties, and responsibilities associated with any governmental related privilege, in the form of a license, pass, permit, or franchise, not only voidable, but void ab initio (from the beginning) and nunc pro tunc (now for then).

## DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates All Rights Reserved

A Subject Matter Jurisdictional Challenge, is hereby Declared NOT to be an unlawful, illegal, or rebellious act, and it shifts the burden of specific proof of Subject Matter Jurisdiction to the governmental legal entity claiming such Subject Matter Jurisdiction. Jurisdictional power and authority to regulate and tax United States Land Patented private land, is hereby challenged.

The private Land Holder, herein alleges that a good faith Subject Matter Jurisdictional Challenge is neither a rebellious, "unlawful," or "illegal" procedure. It is designed to discover who has competent Subject Matter Jurisdiction, AND WHO DOES NOT. Pursuant to the below cited United States Supreme Court case, to wit:

**"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays   within the bounds of their authority. . . . and this is so even though as here, the agent himself may have been unaware of the limitations upon their authority."** Federal Crop Insurance Corporation v Merrill (1947) 332 U.S. 380 at 384.

United States Land Patented private land was and still is FOREVER protected by a specific United States Land Patent that is STILL under the constitutionally valid protections and powers of the original Supremacy Clause of the 1787 A.D. Constitution for the United States of America, at Article VI paragraph 2, to wit:

**"This [federal] Constitution, and the [constitutionally valid] Laws of the United States which shall be made in Pursuance thereof; [i.e. the United States Land Patent Laws] and all Treaties [i.e. the 1848 A.D. International Treaty of Guadalupe Hidalgo, and its Protocol of Queretaro] made, or which shall be made, under the authority of the United States, shall be the Supreme Law of the Land [with its related Common-Law]; and the judges in every state [including, but not limited to, the federal, corporate STATE, and its Superior Courts] shall be bound thereby, any thing in the Constitution or laws of any state [including, but not limited to, the federal, corporate STATE, and its political subdivisions i.e. COUNTIES and the CITIES] to the contrary notwithstanding."** (Emphasis added)

All of the above is constitutionally coupled with such constitutions Bill of Rights, especially considering the specific "intent," of the original 1791 A.D. lawmakers:

*"On every question of construction let us carry ourselves back to the time when the Constitution was adopted, recollect the spirit manifested in the debates, [intent of the original law makers] and instead of trying to determine what meaning can be squeezed out of the text, or invented against it, conform to the probable one in which it was passed." Thomas Jefferson.*

### FOURTH AMENDMENT
**"The *right of the [sovereign] people* to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, *shall not be violated*, and *no warrants* shall issue, but upon [1791 A.D. mens rae] *probable cause*, supported by oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized. Proposed September 25, 1789: ratified December 15, 1791.** (Emphasis added)

It should be noted that in the year 1791 A.D., the term "probable cause," specifically referenced a "mens rae," (bad in itself) common-law felony, as absolutely no "mens prohibita" Administrative-Law, quasi-crimes, had yet been either constitutionally "passed," one at a time, or Administratively "adopted," in bulk.

## <u>LAND USE FEE IS  5,000 United States lawful, money of account dollars, PER PERSON - PER DAY</u>.

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF
## BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 9th POSTED

## DUE PROCESS - PUBLIC NOTICE

> ### NEW – SUBJECT MATTER
> ### JURISDICTIONAL CHALLENGE

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

#### DECLARATION OF INDEPENDENT SOVEREIGNTY

The above described private land, dirt, soil, earth, and ground, AND all private chattels, AND all native, human, inhabitant, sovereign people located thereon, hold the status of being sovereign, with lawful land ownership title held in allodium, and thus with absolutely no higher earthly power or authority above them, including the COUNTY, and CITY

The above mentioned native, human, inhabitant, sovereign people, located thereon, hereby claim each and every one of their many, unnumbered, Unalienable (un-lienable) Rights, among them the right to life, liberty, and the pursuit of happiness, as endowed to them by their Creator, and as guaranteed and secured to them by the original, founding, 1776 A.D., Unanimous Declaration of Independence, drafted and signed, and Presented by the American Founding Fathers.

The material, and specific, above-mentioned sovereign status and allodial standings directly stem from the earlier British Common-Law, and the British 1215 A.D. Great Charter, known as the Magna Carta, and its Trial BY a Jury of Peers, as they both relate to the well-settled foundations of the American Law of the Land, and its Common-Law.

The above-mentioned private land, dirt, soil, earth, and ground, are thus never, under any circumstances, to be considered, or referred to, as real estate, real property, property, premises, or a parcel, under the international Law of the Sea, and its Roman, Civil, Equity, Administrative-Laws - a legal distinction being specifically made, and justifiably relied upon.

The above-mentioned sovereign status and standing stem from:

1. The original, founding, 1787 A.D. Constitution for the United States of America, and its first 10 Amendments, also known as, the Bill of Rights. And,

2. Its original Supremacy Clause, as clearly presented at Article VI, paragraph 2. And,

3. The original United States Congressional Township Survey laws. And,

4. The original United States Land Patent laws, as they relate to the FOREVER, quitclaim transfer of all United States sovereign, allodial land ownership rights, title, and interest, to the private sector, pursuant to original United States Homestead Grants, United States Desert Entry Grants, United States

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

Cash Entry Grants, United States Mining Claim Grants, United States Military Grants, and United States Railroad Grants. And,

5. The original 1848 A.D. International Treaty of Guadalupe Hidalgo, and its Protocol of Queretaro. And,

6. In California, the original related Act of May 3, 1851 A.D., entitled An Act to Ascertain and Settle the Mexican Land Claims in California. And,

7. In all states, the original United States Land Patent laws, as they relate to the mandated, above-mentioned international *treaty recognition* of ALL former English, Russian, French, Spanish, and Mexican foreign governments FOREVER, quitclaim transfer of ALL of their original conquest obtained sovereign, allodial, land ownership, rights, title, interest, use, and control to their settlers and soldiers.

The above-mentioned native, human, inhabitant, sovereign people, located on the subject private land, dirt, soil, earth, and ground, hereby claim that the above-mentioned 1787 A.D. Constitution for the United States of America, and ALL constitutionally valid laws made pursuant thereto, and ALL constitutionally valid Treaties of the United States of America, as a matter of law and fact, *supercede and trump* the provisions of ALL State constitutions, along with ALL state, county, city, and town, Law of the Sea, Roman, Civil, Equity Administrative-Laws, including, but not limited to, ALL state and local ordinances, codes, titles, manuals, resolutions, rules, and regulations, without an implementing, constitutionally valid, Full Disclosure contract.

It is also hereby noted and claimed, that ALL officers, agents, and employees, of the subsequent, overlapping, federal, corporate, COUNTY, have failed, refused, or neglected to do their due diligent research, and correctly determine that the *current non-conforming use and condition* of the subject private land, *predates* the applicable ordinances and codes, *by many years*, making their unconstitutional and overt actions *in violation* of their own Non-Conforming (grandfathered) Use laws.

## A TIMELY 10 DAY RESPONSE IS HEREBY DEMANDED

DEMAND IS HERBY MADE, for any governmental Legislative, Executive, or Judicial Department officer, agent, or employee, who has or can obtain documented admissible contrary evidence or information, to, within 10 days, place it into the record, and present such information to the under-named, as proof of competent Subject Matter Jurisdiction, and its related Immunities, for local governmentally privileged "Persons," to come onto, and or, to regulate the current use and condition of the subject private land, OR **A DEFAULT WILL BE TAKEN AS A TACIT ACCEPTANCE, AND A TOTAL AND COMPLETE UNCONDITIONAL APPROVAL OF THE ABOVE-PRESENTED FACTS.**

## LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates   All Rights Reserved

# 10th POSTED

# DUE PROCESS - PUBLIC NOTICE

## NEW – SUBJECT MATTER JURISDICTIONAL CHALLENGE

### THIS PRIVATE LAND HAS BEEN DECLARED TO BE SOVEREIGN LAND

#### A NEW SUBJECT MATTER JURISDICTIONAL CHALLENGE

Any governmental officer, agent, or employee from any STATE Legislative, Executive, or Judicial Department or Branch who may trespass on this private land WILL BE committing and charged with a BREACH OF OATH to uphold and defend the Constitutions for the State, and the United States of America.

The private Land Holder, as a lawful Purchaser/Assignee in the Chain of Title of the subject private land, hereby, Declare my good-faith Claim to ALL Sovereign Allodial land ownership, rights, title, interest, use, and control that was *originally* constitutionally held by the UNITED STATES [government] which was subsequently *quit-claim transferred* to the private sector with a United States Land Patent, which is a United States Land Patent that DID NOT thereon *reserve* any such *original* Sovereign Allodial land ownership, rights, title, interest, use, or control to any Legislative, Executive, or Judicial Departments or Branches of the STATE, which renders such governmental entities or federal, corporate, quasi-governmental entities outside of the scope of any jurisdictionally competent power or authority regarding the subject private land. Reliance on this paragraph is based upon the Supremacy Clause of the original 1787 A.D. Constitution for the United States of America, at Article VI, paragraph 2, to wit:

"This [1] [1787 A.D. federal] constitution, and [2] the [constitutionally valid] laws of the United States which shall be made in pursuance thereof; and [3] all [constitutionally valid] treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; *and the judges in every state* shall be

## DO NOT TRESPASS – KEEP OFF

BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding." (Emphasis added).

The private Land Holder, thus hereby Declare that I have justifiably relied upon the above-mentioned constitutional paragraph as it lawfully relates to the superior 1848 A.D. International Treaty of Guadalupe Hidalgo, and its Protocol of Queretaro, and the related Act of May 3, 1851 entitled: An Act to Ascertain and Settle the Mexican Land Claims in California, and the related United States Land Patent FOREVER transfer and recognition laws, and the Congressional Township Survey Laws, which all together, constitutionally supersede any and all, sub-servant, lower State Constitutions, and all State political subdivisions, or departments, – counties, parishes, cities, towns, and township Administrative Laws or quasi-laws, i.e. Statutes, Ordinances, Codes, Titles, Manuals, Resolutions, Rules, and Regulations, as well as all State Legislative, Executive, and Judicial Departments or Branches. (See above paragraph)

## A TIMELY, 10 (TEN) DAY RESPONSE IS HEREBY DEMANDED

DEMAND IS HERBY MADE, for any governmental Legislative, Executive, OR JUDICIAL Department or Branch officer, agent, or employee, who has or can obtain documented admissible contrary evidence or information to, within 10 days, place it into the record, and present such information to the Sovereign Land Holder, as proof of competent Subject Matter Jurisdiction, and its related Immunities, for local governmentally privileged "Persons," to come onto, and or, to regulate the current use and/or condition of the subject private land, OR **A DEFAULT WILL BE TAKEN AS A TACIT ACCEPTANCE, AND A CLEAR, TOTAL AND COMPLETE UNCONDITIONAL APPROVAL OF THE ABOVE-PRESENTED FACTS.**

## LAND USE FEE IS  5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 11ᵗʰ POSTED

## DUE PROCESS PUBLIC NOTICE
### AND "LAW OF THE LAND" - DECLARATION
### THIS PRIVATE LAND IS HEREBY DECLARED TO BE SOVEREIGN LAND

Historically, a DECLARATION, presented under the international "Law of the Land," placed a burden on the receiver or reader, to either tacitly except all Declared Facts as presented therein, or in the alternative, timely and specifically respond to *each* of the perceived erroneous Facts with a COUNTER-DECLARATION, *supported by court admissible evidence*, to prove the contrary. This DUE PROCESS – PUBLIC NOTICE is such a "Law of the Land" - DECLARATION.

The Owner of this Posted land, hereby and with this Posting, Declares, that historically, in America, *the original* "non-taxable, Sovereign, Allodial, land ownership, rights, title, interest, use, and control," of the land was held by the original, Sovereign, native, tribal, First Americans who lived on the subject land. They held what was known as an Aboriginal Allodial Title, or a Title held in Allodium with no superior. In time, through discovery, conquest, purchase, treaty, trade, adverse possession, or agreement, the original "non-taxable, Aboriginal Allodial land ownership, rights, title, interest, use, and control," was transferred from the original, Sovereign native, tribal, First American inhabitants, to the leaders of a tribe, or to a county, parish, state, or national government, which was thereafter governed by a chief, president, or governor, with *such a transfer rendering a taxable and controllable Feudal Title to those still living on the land*. ALL original "non-taxable Sovereign Allodial land ownership, rights, title, interest, use, and control," WAS eventually *transferred back to other Sovereign American inhabitants* through Homestead Grants, Desert Entry Grants, Cash Entry Grants, Military Warrant Grants, and Railroad Grants.

Later, for a valid transfer of all "non-taxable Sovereign, Allodial, land ownership, rights, title, interest, use, and control," to be transferred back to a governmental entity from the Sovereign American People, such as a sub-divider, such transfer was required to be associated with some type of *contract*, that was entered into knowingly, willfully, intentionally, voluntarily, and freely, and ONLY AFTER Full Disclosure of ALL obligations, duties, and responsibilities associated with such a contract, PLUS such contract, to be valid and binding was *required* to have a "Lawful Consideration," of at least one American Dollar in silver coin, or a paper Note redeemable in one American Dollar, as specifically defined in the federal COINAGE ACT OF APRIL 2, 1792.

Without a lawful, and constitutionally valid and binding contract, *in the record*, showing such a transfer, the "non-taxable Sovereign, Allodial, land ownership, rights, title, interest, use, and control," of the subject land remained with the Sovereign native inhabitants, as happened here.

Today there are many governmental statutory or juristic "persons," who function as officers, agents, or employees of local city, county, parish, state, and federal, Legislative, Executive, or Judicial governmental entities, who have absolutely no court admissible evidence, *in the record*, indicating any discovery, conquest, purchase, treaty, trade, or adverse possession activity, or a constitutionally valid contract, that would prove any possible claim to have captured or re-captured the "non-taxable Sovereign, Allodial, land ownership, rights, title, interest, use, and control," of ANY private land located within the exterior borders of their jurisdiction, and they regularly, unlawfully, and unconstitutionally, due to dumbed-down ignorance of the Sovereign American People, tax and trespass onto such private land, in an effort to enforce their own in-house "Law of the Sea," Administrative-Law - ordinances, codes, titles, manuals, resolutions, rules, and regulations that were originally designed, adopted, and implemented by the Sovereign American People, through their Representatives, to regulate and control, only governmentally owned public land, parks, buildings, freeways, turnpikes, highways, streets, roads, and bridges.

### LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

## DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 12th POSTED

## DUE PROCESS PUBLIC NOTICE

### THIS PRIVATE LAND IS HEREBY DECLARED TO BE SOVEREIGN LAND

**TO ALL OFFICERS OF THE COURT AND ADMINISTRATIVE-LAW TRIBUNALS REGARDING THE PRIVATE LAND BEHIND THIS POSTED NOTICE:**

You are ALL about to be sued in your non-official, individual capacity in this matter *as it can now be proven* with court admissible evidence that your grievous and/or overt and conspiratorial actions or inactions, have been committed, under the mere color of state law, while in the clear, total, and complete absence of all Subject Matter Jurisdiction, which as you know, or reasonably should know, CANNOT EVER be waived through mistake, error, or inadvertence. (From the book entitled: SUING JUDGES.) It is well-settled American Law and Jurisprudence that when there is fraud, deceit, misrepresentation, and related lack of Full Disclosure along with the lack and want of Subject Matter Jurisdiction, there can be absolutely NO In Personam Jurisdiction over the People, In Rem Jurisdiction over the thing or land, or Venue Jurisdiction regarding a specific land mass, and all actors are therefore subject to an Action for Damages with absolutely no Immunity against such an Action.

### ITS ALL ABOUT LAND OWNERSHIP AND TITLE

In the instant matter, CONSITUTIONALLY VALID DUE PROCESS NOTICE IS HEREBY PRESENTED that ALL of the *original* United States Sovereign Allodial Land Ownership rights, title, interest, estate, use, and control of the subject private land was constitutionally and lawfully quit-claim transferred directly from the United States of America's Public Domain, to the private sector, first through a United States Homestead Grant, Mining Claim Grant, Desert Entry Grant, Cash Entry Grant, Military Warrant Grant, or a Railroad Grant.

Then, in the case of a Homestead Grant, AFTER COMPLETION a specific and specified amount of land development, such as fencing, installing a well, building a home, barn, and out-buildings, planting a garden and crops, bringing in livestock, and foul, and other documented proof that the inhabitant was NOT a land speculator, the Grantee could then have a local magistrate, i.e. judge, marshal, sheriff, constable, mayor, notary public, etc. come out and Verify that the mandated work was done, and ONLY THEN could the Grantee send such Verification to the United States Treasury's General Land Office (GLO), and obtain the coveted, title-transfer - UNITED STATES LAND PATENT. It was

## DO NOT TRESPASS – KEEP OFF

### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

the subject UNITED STATES LAND PATENT document that would either FOREVER quit-claim transfer the Sovereign Allodial Land Ownership, rights, title, interest, estate, use, and control that was originally held by the government of the United States of America to the private sector, OR it would, pursuant to the laws of the United States as recognized by the Constitution for the United States of America and its Supremacy Clause, FOREVER "recognize and confirm," a former government, i.e. English, French, Russian, Spanish, or Mexican governments transfer of ITS own Sovereign Allodial Land Ownership, rights, title, interest, estate, use, and control to ITS soldier and settler Grantees, which happened YEARS BEFORE such title might have been obtained by the government of the United States of America through the Northwest Ordinance, the Louisiana Purchase, the International Treaty of Guadalupe Hidalgo, and its Protocol of Queretaro, the Gadsden Purchase, and the Alaskan Purchase.

### GOOD-FAITH "LACK OF IMMUNITY," - NOTICE AND CAVEAT

### TO ALL GOVERNMENTALLY CREATED LENDING INSTITUTIONS

### AND ALL OFFICERS OF THE COURT AND ADMINISTRATIVE-LAW TRIBUNALS

*ABSOLUTELY NO* Sovereign Allodial Land Ownership, right, title, interest, estate, use, or control was EVER "reserved or transferred," to ANY state or local government, or to its legislative, executive, OR JUDICIAL Branches or Departments for zoning, land use control, taxation, OR for judicial, or non-judicial foreclosure or eviction proceedings – EVER, as absolutely no such Sovereign Allodial Land Ownership, right, title, interest, estate, use, or control was EVER knowingly, willingly, intentionally, and contractually reserved or transferred within any lender documents to ANY lender, loan servicer, or trustee, during the life of ANY New-Money-creation loan. YOU HAVE BEEN WARNED.

### CONCLUSION

ANY contrary information to the above must be presented *into the record*, within a reasonable fifteen (15) days, or the Doctrine of Estopple by Acquiescence shall prevail, and a subsequent Default will be taken.

### LAND USE FEE IS  5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 13th POSTED

## DUE PROCESS PUBLIC NOTICE

### THIS PRIVATE LAND IS HEREBY DECLARED TO BE SOVEREIGN LAND

### DECLARATION AND CLAIM OF
### Ronald Vernon Cupp

I do hereby declare and claim that I go by the name of Ronald Vernon of the family, tribe, clan, and house of Cupp.

I also claim to be the "Authorized Representative," and "Copyright Holder," and UCC – 1 "Holder In Due Course," of the governmentally created strawman, at times known and identified as RONALD VERNON CUPP, and that *any unauthorized use* of the above listed ALL UPPERCASE NAMES, or any other combination thereof, is an infringement on my copyright, at a value of five-thousand American Dollars (5,000 United States, lawful, money of account dollars) in the MONEY OF ACCOUNT of the State of California, pursuant to *California Government Code* Section 6850, as it directly relates to the MONEY OF ACCOUNT of the United States of America, pursuant to the still valid, federal Coinage Act of April 2, 1792, Section 20, for each infringement.

As the reader knows, or reasonably should know, the above constitutionally valid laws are strictly related to the Supremacy Clause of the 1787 A.D. Constitution for the United States of America, found at Article VI, Paragraph 2, to wit:

"[1] **This** [federal] **constitution, and** [2] **the** [constitutionally valid] **laws of the United States which shall be made in pursuance thereof; and** [3] **all** [constitutionally valid] **treaties made, or which shall be made, under the authority of the United States, shall be** the **supreme law of the land; and the judges in EVERY state shall be bound thereby, any thing in the constitution or laws of any state to the contrary** notwithstanding." (Emphasis added).

### LAND USE FEE IS 5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of **ALL** SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

# 14th POSTED

## DUE PROCESS PUBLIC NOTICE

### THIS PRIVATE LAND IS HEREBY DECLARED TO BE SOVEREIGN LAND
### DECLARATION AND CLAIM OF
### Ronald Vernon Cupp

Ronald Vernon Cupp has recently discovered a major problem that is binding on the Everhome Mortgage Company that needs clarification.

It is hereby noted that Ronald Vernon Cupp is, at this time, making this **OFFER TO PAY** any and all constitutionally valid taxes, penalties, principal, interest, Administrative Citations, Inspection fees, and other charges that may be due and payable at this time, subject to an authorized officer of the Everhome Mortgage Company, squarely facing and addressing the above-cited material major problem just discovered.

Ronald Vernon Cupp has also been informed, and believe(s), and upon that information and belief herein Declare(s) that he/she has been made aware of the still-in-effect, original Federal **COINAGE ACT OF APRIL 2, 1792**, which appears to be the only Constitutionally valid American law that precisely defined and still defines the American Dollar, which appears to be what Everhome Mortgage Company may require as a tender of any **OFFER TO PAY** for any Amount Due and Payable at any time or place.

Ronald Vernon Cupp has also been informed, and believe(s), and upon that information and belief herein Declare(s) that the subject Constitutionally valid law, the Federal **COINAGE ACT OF APRIL 2, 1792**, at Section 20, clearly Declares the what the MONEY OF ACCOUNT *shall be* for the United States and all United States court proceedings.

Ronald Vernon Cupp has also been informed, and believe(s), and upon that information and belief herein Declare(s) that the subject Constitutionally valid law, the Federal **COINAGE ACT OF APRIL 2, 1792**, clearly defines the substance, and measurements of the American Dollar shortly before the above cited Section 20, and that anyone working at the United States Mint who may cheat on such measurements for his or her own personal gain, "SHALL SUFFER DEATH."

### SEVEN (7) GOOD-FAITH and MATERIAL QUESTIONS
### MATERIAL QUESTION No. 1.

What constitutionally valid American Law, has changed the above-cited constitutionally valid Federal **COINAGE ACT OF APRIL 2, 1792**, regarding the original MONEY OF ACCOUNT for the United States of America?
### MATERIAL QUESTION No. 2.

What was the Date of Enactment of the more recent law that changed the above-cited constitutionally valid Federal **COINAGE ACT OF APRIL 2, 1792**, regarding the original MONEY OF ACCOUNT for the United States of America?

# DO NOT TRESPASS – KEEP OFF
### BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER
© Copyright 2012 – by His Advocates  All Rights Reserved

**MATERIAL QUESTION No. 3.**

What was the Publishing Date of the more recent law that changed the above-cited constitutionally valid Federal COINAGE ACT OF APRIL 2, 1792, regarding the original MONEY OF ACCOUNT for the United States of America?

**MATERIAL QUESTION No. 4.**

What was the Effective Date of the more recent law that changed the above-cited constitutionally valid Federal **COINAGE ACT OF APRIL 2, 1792**, regarding the original **MONEY OF ACCOUNT** for the United States of America?

**MATERIAL QUESTION No. 5.**

Identify the Constitutionally valid law that allows Everhome Mortgage Company constitutionally valid authority to place a levy on Ronald Vernon Cupp , or his private land, or to place a hold on a state issued license, pass, permit, or franchise, WITHOUT a constitutionally valid Order or Judgment from a Constitutionally valid state or federal Court of Record, and thus convert the above-cited **MONEY OF ACCOUNT** into some substance or thing, other than that of the **MONEY OF ACCOUNT** of the UNITED STATES pursuant to the Federal **COINAGE ACT OF APRIL 2, 1792**.

**MATERIAL QUESTION No. 6.**

What is the name and address of the governmental location where Everhome Mortgage Company can Demand and obtain a Certified Copy of the Constitutionally valid contract, quasi-contract, adhesion contract, or document in the nature of a contract, that Everhome Mortgage Company considers as admissible evidence that owner(s), Ronald Vernon Cupp has/have, at some time in that past, and while of a legal age, knowingly, willingly, intentionally, voluntarily, and freely, and after Full Disclosure of all obligations, duties and responsibilities, and with a Lawful Consideration Paid, applied for and received a governmentally created privilege in the form of a taxable, regulatable, and auditable license, pass, permit, or franchise that would make him a governmentally recognized statutory or juristic "Person."

**MATERIAL QUESTION No. 7.**

Identify the Constitutionally valid law that allows Everhome Mortgage Company, constitutionally valid authority to copyright infringe on the UPPERCASE strawman names of Ronald Vernon Cupp    which has/have a Declared unauthorized use copyright infringement committing and accruing a penalty of **5,000 United States lawful, money of account dollars, per each infringement**, in the MONEY OF ACCOUNT of both the state and federal governments.

## LAND USE FEE IS  5,000 United States lawful, money of account dollars, PER PERSON - PER DAY.

Present inhabitant on this private land is the holder of
**ALL SOVEREIGN, ALLODIAL LAND OWNERSHIP, RIGHTS, TITLE, INTEREST, ESTATE, USE AND CONTROL.**

# DO NOT TRESPASS – KEEP OFF
BY ORDER OF THE SOVEREIGN ALLODIAL LAND TITLE HOLDER

© Copyright 2012 – by His Advocates  All Rights Reserved

# Ronald Vernon Cupp
## c/o 4640 Arlington Avenue
## Santa Rosa California 95407

April 18, 2013

Board of Supervisors & Successors
County of Sonoma
575 Administration Drive
Santa Rosa, CA 95403
Certified 7012 1010 0002 7428 4562

Chief Tom Schwedhelm & Successors
City of Santa Rosa Police Department
965 Sonoma Avenue
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5545

Sheriff Steve Freitas & Successors
Sonoma County Sheriff's Office
2796 Ventura Avenue
Santa Rosa, CA 95403
Certified 7012 1010 0002 7428 4579

Caroline Fowler, City Attorney
Office of City Attorney & Successor
100 Santa Rosa Avenue, Room 10
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5552

Office of Mayor & City Council
100 Santa Rosa Avenue, Room 10
Santa Rosa, CA 95404
Certified 7012 1010 0002 7428 5569

**RE:  NOTICE OF ACTION – Private Land commonly identified as: 4640 Arlington Avenue, Santa Rosa California located in the original, underlying California republic, pursuant to the Supremacy Clause of the Constitution for the United States of America found at Article VI, paragraph 2.**

To the above mentioned:

### NOTICE TO THE AGENTS IS NOTICE TO THE PRINCIPAL.
### NOTICE TO THE PRINCIPAL IS NOTICE TO THE AGENTS.

The undersigned has been financially involved in a 34-year study regarding the issues presented herein and justifiably relies on these findings.

It is sincerely believed that the information presented herein was known and understood by the Sovereign American People during the 1700's and the 1800's, but much has been forgotten since that time. The information has recently been rediscovered by historic researchers and found to be still valid and binding even though it flies in the face of some new regulatory codes, rules and regulations. Some people say that this is just very old law, but can't explain the fact that the very old law uses the eternal word "FOREVER"

1

throughout. The issues of BASIC LAND LAW and LAND PATENTS are addressed in two different areas of this document and while there are some similarities they look at the issue from a somewhat different perspective and they, therefore, are not redundant, but educational in nature.

It should be noted that this communication is designed to be an educational document that shows how all land within the boundaries of the United States of America, either came into the regulatory control and jurisdiction of those governmental entities and that some did not and never did.

It should also be noted that it is well-settled that not all land within specific jurisdictional boundaries is under the regulatory authority of that government. There is much land within California that is not under the regulatory control and jurisdiction of California as it is still under the Sovereign ownership, control and regulation of the United States government. These lands are National Forests, National Parks, National Monuments and Indian Reservations and others. Many of these same lands are also within the boundaries of many counties and cities and those counties and cities also have absolutely no regulatory control or jurisdiction within those specific United States governmental lands. It is also well know that there are many pieces of land that are under a county jurisdiction that are completely surrounded by land under a city's jurisdiction and many pieces of city jurisdiction land that are completely surrounded by land under a county jurisdiction. This jurisdictional fact has presented a real daily problem for some county and city police and sheriff departments.

## HISTORIC PERSPECTIVE

During the early years of the United States government and the several state governments, those new governments had not yet learned how to create spendable money from thin air with a vote. In order to financially survive they had to raise the real money they needed through indirect taxes, which were in the form of excises, imposts and duties. They also raised real money through the sale of their Public Domain Lands. Through financial necessity, those early governmental officers, agents and employees completed some official acts that their controlling counterparts of today despise, as it effects their ability to control and regulate as they desire.

Many of the original states had already sold or granted most if not all of their Public

2

Domain Lands by the time the United States government was created. Much of their Public Domain Land was granted by what was called "War Warrants" to the people who served in the military during the Revolutionary War and other conflicts. Some of the states that still had Public Domain Land released those lands to the United States government when it was

created and those lands became known as United States Public Domain Land. Much of that land was then surveyed and sold to raise money for the United States government by the United States Department of the Interior's General Land Office, also known as the G.L.O. Many years later, in 1947, the General Land Office was renamed the Bureau of Land Management, also known as the B.L.M. At the time, many congressmen challenged the change as it was their understanding that the original job of the General Land Office was to sell or disperse the United States Public Domain Land and not to control or manage it for the United States government.

## THE LAND PATENT

We now present the governmental jurisdiction problem of today that is evidenced by the governmental document known as a Land Patent. There appears to be only two basic types of Land Patents. Land Patents issued by the state governments and Land Patents issued by the United States government.

After the United States government was created and took control of all Public Domain Land, the United States government granted some of that land to the states as school grants. The state governments thereafter issued their own state land patents on the land they sold to the private sector. In other words, the United States government granted the states specific school grant lands from its vast United States Public Domain Lands and when the state governments sold that land it issued its state land patent which transferred all state rights, title and interest to the purchaser, in its own eternal word "FOREVER". In some cases the state land patents reserved rights to water, oil and minerals, but whatever was not specifically reserved in writing on the actual state land patent, was granted to the purchaser FOREVER. ALL state government land patents have the eternal word "FOREVER" somewhere on the actual land patent.

It appears that the United States Land Patents are of two completely different types. Some "recognize" and some "transfer ownership". Those United States Land Patents that "recognize" actually FOREVER "recognize" a former foreign governments Land Grant, and also recognize that the United States obtained absolutely no rights, title or interest in those lands.

3

Those United States Land Patents that "transfer ownership" first confirmed that the requirements of a United State Land Grant were accomplished and then FOREVER transferred all United States government ownership rights, title and interest in the land to the United States Land Patent holder.

When the United States Land Grant holder proved that he or she complied with the requirements of his or her Homestead, Cash Entry, Desert Entry, Mining Claim, or Railroad Grant, they were issued the coveted United States Land Patent. The United States Land Patent then FOREVER released and transferred all United States governmental rights, title and interest to the United States Land Patent holder. In some cases the United States Land Patent reserved rights to water, oil and minerals and to install ditches and canals at some time in the future. Whatever was not specifically reserved in writing on the actual United States Land Patent, was granted to the purchaser FOREVER. Like state land patents, all United States Land Patents have the eternal word "FOREVER" somewhere on the actual land patent.

Because the United States government never obtained any ownership and control rights, title or interest in the former foreign government Land Grant lands, those specific United States Land Patents only recognized the land grant and NEVER reserved any rights to oil, mineral or water or for rights to install ditches and canals at some time in the future.

After years of research it has been discovered that ALL private land, that is ALL land that is not under the direct ownership and control of any federal, state, county or city, was either recognized as a foreign land grant by a United States Land Patent, OR ALL ownership rights, title and interest in the private land was FOREVER transferred to the private sector by either a United States Land Patent or a state Land Patent with only a few reservations for water, oil and minerals and absolutely no reservations for any type of any future regulatory control to be granted to any federal, state, county or city government. In other words, ALL PRIVATE LAND IS OUTSIDE THE REGULATORY CONTROL OF ANY GOVERNMENT WITHOUT ATTEMPTING TO CEDE THAT LAND FROM THOSE
GOVERNMENTS.  This is a fact of law that was created by those governmental agencies themselves.

### COMPETENT JURISDICTION – AN HISTORIC THRESHOLD ISSUE.

Competent Jurisdiction has been defined as the power and authority constitutionally

4

delegated to certain, specific officers, agents or employees or governmental entities to achieve a desired constitutional goal. Any pretended authority that is implemented which is

not constitutionally delegated is merely usurped authority and unconstitutional and therefore cannot be an official governmental act. Any act that has been done with usurped unconstitutional authority, is done with absolutely no official immunity as against a personal injury action in a Court of Law.

## THE LAW OF THE LAND vs. THE LAW OF THE SEA

All Earthly laws are divided into two basic groups – The Law of The Land and The Law of the Sea. Historically the dividing line between the two Basic Laws was the High Tide Mark on the sea shores of the world.

The Law of the Land addressed only one type of law – The Common-Law. The Law of the Sea addresses ALL other types of law, including, but not limited to, Admiralty Law, under Maritime jurisdiction, Roman Civil Law, Equity Law, Cannon Law, Ecclesiastical Law, Administrative Law, and others.

The Law of the Land is also known as the Law of Peace, while the Law of the Sea is known as the Law of War.

Under the Law of the Sea, the Ships Captain is in total control to protect the all-important success of the voyage. There is absolutely no Due Process of Law nor a Trial by Jury under the Law of the Sea. The Ship's Captain can not only marry people, but he can burry people. Walking the Plank was designed to "send a message" to others that they SHALL OBEY the orders of the Ship's Captain or they will die. All military services are therefore under the Basic Law of the Sea in order to obtain maximum compliance from the one in charge. Even the Law of the Land has a provision to adopt the Law of the Sea type of total control in cases of national emergency and that provision is known as Marshal Law. What is known as Marshal Law Rule is simply a weaker form of Marshal Law.

All national governments of the world were originally formed under their own Basic Law of the Land and its Common-Law, and all national governments have a provision for adopting Marshal Law or Marshal Law Rule in case of a national emergency. Many nations have now adopted the Basic Law of the Sea in order to control their people. The Basic Law of the Land and its Common-Law are still in place as a safety net to catch everything that isn't available under the

5

Basic Law of the Sea. The original and more basic Law of the Land and its Common-law is complete in every way.  It is basically founded on reason, logic and

common sense, associated with local custom and usages. The common-law of one nation or area could be different than the common-law of another nation or area. It is always based on local custom and usage.

Under the Basic Law of the Land there could be absolutely no Cause of Action against a citizen, inhabitant or human unless there was some type of damage to someone's life, liberty or property. Under the Basic Law of the Sea, a government can *create* a Cause of Action such as an injunction or restraining order to restrain people from doing something that might, maybe, someday cause a damage. Under the Basic Law of the Sea, the government doesn't have to wait until a damages actually occurs before seeking some type of relief or remedy and it is also designed to "send a message" to those who might be targeted in the future.

History indicates that ten of the original colonies in America were founded on the Basic Law of the Land, while Louisiana, Alabama, and Florida were originally based under the Basic Law of the Sea's Roman Civil Law. The states of Alabama and Florida later adopted the Law of the Land and its Common-Law as their basic law and rejected Roman Civil Law under the Basic Law of the Sea. Louisiana has always maintained itself under Roman Civil Law.

The terms Law of the Land and Common-Law were and are used interchangeably. Such terms as "Law", "at Law", and "Lawful" are also Common-Law, Law of the Land terms. In modern contracts there is usually a clause that mentions such court actions as "at Law or Equity" which clearly identifies possible cases under the Law of the Land's Common-Law or the Law of the Sea's - Equity Law.

Even when the United States government was originally created its Constitution clearly stated that it was the Supreme Law of the Land, which simply a statement that it is under the Basic Law of the Land and not under the Basic Law of the Sea.

## REPUBLIC FORM OF GOVERNMENT

Under the Constitution for the United States of America ALL of the original states and the future states that would be admitted were constitutionally required to be Republic in their form. Democracies were considered as evil and were rejected. Therefore forty-nine of today's states were at one time Common-Law Republics with Louisiana being the only

6

Roman Civil Law Republic. The founding fathers of Louisiana had a right to place their state under the basic Law of the Sea and its Roman Civil Law and did so.

Thereafter, each state that was admitted into the Union of States, known as the United States of American, had a right to choose the type of basic law they would function under, so long as they were Republic in their form. They were constitutionally required to be Republic in their form to be admitted into the Union of states. History indicates that ALL new states that were later admitted into the Union of States came in as Common Law Republics under the Basic Law of the Land. There were absolutely no evil democracies and only one state under the Basic Law of the Sea.

## DELEGATION OF AUTHORITY

In America, all governments function on a Delegation of Authority basis. This authority to act is also known as Competent Jurisdiction and it was originally delegated from the Sovereign People who created those governments to serve them. Competent Jurisdiction must be in compliance to the various Constitutions in which those Sovereign People adopted to protect themselves from those governments they created. The Constitution adopted for each state is the Supreme Law of the Land of each state, while the Constitution for the United States of America is the Supreme Law of the Land for the United States government, its territories and possessions.

At the time of the War between the States, also known as "the Civil War" under Roman Civil Law, the United States government was constitutionally disbanded. President Abraham Lincoln made a gallant effort to keep the Union together, but it had already been disbanded when the Southern states walked out of Congress without formally adjourning as constitutionally mandated. When the United States government reorganized under what was called Reconstruction with the several Reconstruction Acts, it forced ALL states to adopt a new controlling Civil Law Constitution without first constitutionally repealing the original, founding, organic state constitutions. Therefore, ALL states that were in existence at the time have two constitutions – a Common Law Republic and a Civil Law Democracy. Louisiana, of course, now has a Civil Law Democracy as well as its original Civil Law Republic Constitution.

It was the original Common-Law Republic state Constitutions that made all of the original Union of States separate in their own right, but now they all have Civil Law Democracy constitutions forced upon them by the Reconstructed United States government that make them mere colonies of the United States government. In other words, the new state constitutions made the

7

new state governments mere territories or possessions of the United States government. While the original Common-Law Republic state constitutions are still valid, because they were never constitutionally repealed, they are not recognized by the new reconstructed United States government after the Reconstruction period. Today's new state governments are now under the Basic Law of the Sea and the Administrative Laws of the United States government such as were the District of Colombia and all of the other former territories and possessions of the United States government. This procedure was how the Reconstructed United States government made it possible to tax, control and regulate the newly freed slaves and other foreigners who elected to stay or be in the United States of America. The former slaves had been freed to leave, but if they were going to stay in the United States it was only as a matter of a governmentally created Privilege granted by the new United States government and that privilege was taxable controllable and regulatable. The Post Civil War Fourteenth Amendment identified them as "Persons" along with all other governmentally created and privileged legal entities.

It was only after the Post Civil War Reconstruction Period that so-called laws known as Codes, Rules, Regulations, Manuals, and Titles were adopted and promulgated. They were developed for the sole purpose of taxing, regulating and controlling all of those statutory and juristic "Persons" mentioned above. Therefore when the above-cited Administrative Laws are used they only tax, regulate and control such legal entities as governmentally privileged Persons. Note that those Administrative Laws also clearly identify those legal entities they were designed to tax, regulate and control and clearly identify them as "All Persons". It would have been very easy for those same so-called laws to identify its targets as "All People" instead of "All Persons", if it was truly the Sovereign People that were the target of those Administrative Laws. Now the reader can see for him or herself that a so-called law that commences with the words "All Persons . . . is a law created to control and regulate those who possess some type of governmentally created privilege, franchise or license.

## CONSTITUTIONAL LAW vs. ADMINISTRATIVE LAW

All Constitutions are merely a plan for the building and development of a state or federal government. The Constitutions, therefore, are not the actual government any more than a plan for building a home can be later considered as the home. There is a legal distinction between the plan and the entity that the plan built.

All American Constitutions divide the constitutional government it created into three

8

completely different and separate departments – the Legislative Department, the Executive Department and the Judicial Department. These are called Department and not branches, with the state Legislative Department being divided into two branches - the Senate and the Assembly.

All Executive Departments are divided into two branches, the Executive branch that constitutionally functions with the two other constitutional departments, and the Administrative branch, which administers its own in-house activities. Under Administrative Law, the Executive Department can not only legislate its own in-house codes, rules, regulations, manuals and titles, but it can then supervise those in-house functions and provide appellate remedies to those who are aggrieved by those functions. In other words, under Administrative Law, all three Departments are combined with absolutely no Separation of Powers Doctrine as there is under Constitutional Law. It should be noted that under Constitutional Law there are no provision for adopting or promulgating any such type of so- called lesser law as a Code, Rule, Regulation, Manual or Title. Those so-called laws can only be constitutionally adopted and promulgated under Administrative Law for in-house use. There is absolutely no constitutional provision for those so-called laws to be taken off the government property curb and out and into the community any more than IBM or the State Universities can.

There is only one way one can become under any type of Administrative Law, and that is through some type of Contract or document in the nature of a Contract relating to some type of governmentally created, taxable and regulated Privilege. Those types of so- called laws are, as stated above, only for "Persons" who function under such governmentally created Privilege. Those People who function outside of any contract with government, function under the protections of the Constitutional Laws and are protected by the Separation

of Powers Doctrine and its separate Constitutional Legislative Department, Executive Department and Judicial Department.

To be a valid and binding contract, the above-mentioned governmental contract, under the Law of Contract, must be entered into knowingly, willingly, intentionally and voluntarily, and only after what is known as "Full Disclosure" of all duties, obligations and responsibilities, and with some type of "Legal Consideration" paid. The Uniform Commercial Code, (U.C.C) makes it possible for such a contract to be assumed or presumed by the in-house Administrative Law governmental entities, but that assumption or presumption can be quashed by a challenge to the existence of such contract pursuant to the defects of Full Disclosure mentioned above and

9

under the Basic Law of Contracts. A demand to place such a taxable, regulatable and controlling contract into the record makes the original assumption or presumption of such contract unavailable. Such assumed or presumed contract, if not placed into the record, kills that possibility of an assumption or presumption.

## BASIC LAND LAW IN AMERICA

Originally ALL land in America was used by the Tribal American People – they never claimed ownership. Several different foreign governments made claims on the land through the International Law of Conquest. The original colonies were primarily claimed by England and France. While Columbus was credited with discovering America for Spain, he never saw America. Columbus really discovered what is today known as the British West Indies. Part of what is known as the Western United States today was originally claimed by Spain, Russia and England under the same International Law of Conquest. Spain's claim turned out to be superior to all others and the entire area became known as New Spain.

When the original 13 colonies became the original 13 states, those new state governments claimed all of the unclaimed land within their borders. Since those governments had no money in which to operate, they sold their Public Domain land to raise that money. They also granted soldiers part of their Public Domain land when they served in the state militias during the Revolutionary War and other conflicts. Those first 13 states issued a transfer of those lands to their military personnel through what they called Land Patents.

Later when the states united and formed the United States of America that new governmental entity was designed to provide security to the states and other services such as a national money, a national Post Office, a national Coast Guard, and a national Weights and Measures. All of those services were to be paid for with what was known as Indirect taxes such as Excises Taxes, Imposts and Duties collected for the privilege of using the Ports of Entry. It was those Excise Taxes, Imposts and Duties that paid for the functioning of the entire original United States government. There was a provision for a Direct Tax to be levied, but only if there was a national emergency and an enumeration (census) to determine how much each citizen would be equally taxed. A Direct Tax was otherwise unconstitutional.

The new, original United States government had absolutely no land of its own. The original Constitution for the United States of America made a provision for the several states to cede some

10

of their Public Domain land to the United States for Forts, Magazines, Dock Yards and other needful buildings. The original Constitution for the United States of American also made a provision for the new government to take ownership and control of a ten mile square area located in two states which would be the seat of the new government and named Washington D.C.

At one time, Washington D.C. was the only land owned by the United States government. Later it purchased and/or took control of land through such International Treaties as The Northwest Ordinance, the Louisiana Purchase, the Treaty of Guadalupe Hidalgo, The Gadsden Purchase and the Alaska Purchase. Guam, Puerto Rico, the Philippines, the Virgin Islands, the Mariana Islands, the Hawaiian Islands and the Panama Canal Zone also became possessions or territories of the United States government. At one time the United States government owned and controlled more land than all of the original states combined.

During the signing of the above cited treaties and purchases the United States government agreed to honor and respect the many Land Grants that had originated with the foreign governments that owned and controlled the land first. Thus, thereafter, the original English, French, Spanish and Mexican Land Grants were FOREVER recognized by what the United States government called its United States Land Patent.

Historic documents identify two quite different types of United States Land Patents – One "recognized" a former foreign government's Land grant and the other merely granted or transferred the United States government's rights, title and interest in the subject land to the United States Land Patent holder.

The first mentioned United States Land Patent is of the highest level as it recognized those original foreign Land Grants, pursuant to the mandates of those original purchases agreements and international treaties. Those Land Grant lands were FOREVER recognized as pre-dating the interest of the United States government and therefore were NEVER considered as part of the United States Public Domain land.

The other level of a United States Land Patent occurred when the United States government finally confirmed that all responsibilities, duties and obligations associated with one of their Land Grant programs was completed and only then was the coveted United States Land Patent issued which only then transferred all rights, title and interest the United States government had in the subject land to the original Land Patent holder.

When the United States government transferred their Public Domain rights, title and interest

11

to the United States Land Patent holder, it sometimes reserved some of those rights to itself, such as the right to come in at some time in the future and install ditches and cannels and/or the rights to subsurface minerals, oil and/or water. If there were no reservations stated on the United States Land Patent, then ALL rights, title and interest to the subject land was FOREVER transferred to the United States Land Patent holder. It is simply a case of "What is not stated is sometimes more eloquent than what is stated." It should be noted that absolutely no United States Land Patents that "recognized" a foreign government Land Grant, ever retained any rights, title or interest to ever install ditches or cannels or for subsurface mineral, oil or water rights. This is due to the fact that under international treaty law the United States government NEVER had ANY rights, title or interest in the subject land.

After the United States government made certain specific Educational Land Grants to the several state governments to help them finance their educational programs, a new type of Land Patent emerged – a State Land Patent. State Land Patents also transferred all state government rights, title and interest to the State Land Patent holder, except for those rights that might be retained and noted on the subject State Land Patent.   Again, ALL state

government rights, title and interest that were not specifically retained by the state by a reservation on the actual the State Land Patent, were FOREVER transferred to the State Land Patent holder.


## TODAY'S LAND OWNERSHIP AND CONTROL

Today, in America, land is only of two completely different types – government land and private land. Government land is either owned and controlled by some federal, state, county or city government, or it is considered still as United States Public Domain land. ALL other land is private land that was either:

1. Land FOREVER "Recognized" as a former government Land Grant by a United States Land Patent in which the United States government NEVER had any type of rights, title or interest. Or,

2. Land originally under the ownership and control of the United States government through some type of purchase or international treaty and in which all United States governmental rights, title and interest was "transferred" to the private sector by a United States Land Patent. Or,

3. Land originally under the ownership and control of the United States government, and

12

thereafter all rights, title and interest transferred to a state government as part of one of the several Educational Land Grants, and thereafter all state rights, title and interest was "transferred" to the private sector with a State Land Grant.

In any case mentioned above, if the actual United States Land Patent or State Land Patent did not reserve any type of interest to build ditches or cannels or for subsurface mineral, oil or water rights or for any type of future regulatory control IT COULD NEVER EXIST OR BE DEVELOPED IN THE FUTURE.

<div align="center">

### Regarding the Constitutional Authority over Today's
### PRIVATE LAND
### *and DEMAND FOR RESPONSE*

</div>

I, the undersigned, hereby present My Good faith definitions and questions regarding the threshold question of competent Subject Matter jurisdiction and authority over the three

(3) basic and completely different and distinct types of today's private, non-governmental land located within the boundaries of SONOMA COUNTY, and are as follows:

**Private Land Group 1.**

Private land that was once part of a Spanish or Mexican Land Grant BEFORE the 1848 international Treaty of Guadalupe Hidalgo, and thus NEVER considered by the United States government as part of the United States Public Domain.

**Private Land Group 2.**

Private land that was not part of a Spanish or Mexican Land Grant, but was part of the original United States Public Domain and thereafter transferred to the private sector via a UNITED STATES LAND PATENT with absolutely no regulatory reservations going to the California nor any of its offices, agencies, departments or political subdivisions.

**Private Land Group 3.**

Private land that was not part of a Spanish or Mexican Land Grant – but land that was originally part of the United States Public Domain as stated in Private Land Group 2 (supra) and later became a United States School Grant, a School Grant related State Selection (SS), or a Wet-land Grant – land that was granted from the United States Public Domain to the California.

NOTE: There appears to be NO OTHER known types of private, non- governmental land in America. In other words – if the land is "private" it is in one of the three (3) above-cited

<div align="center">13</div>

Private Land Groups and was FOREVER made private and non- governmental.

## DEFINITIONS

In this document the term **"Constitutional Authority"** shall mean ANY *"public law"* Constitutional, Article, Section, Sub-section, Paragraph, Sub-paragraph, clause, sentence or Amendment – State or Federal, OR Constitutionally promulgated State Statute, Revised State Statute, OR Federal Statute at Large and any mandated Implementing Regulation, along with the precise date of its enactment, and its "effective date".

The term **"Constitutional Authority"** shall EXCLUDE any and ALL lesser state, and county, in-house, *"private law"* – Rules, Regulations, Ordinances, Codes, Manuals, and Titles – those so-called laws that cannot be ***directly traced*** as a *"public law"* to a

constitutional provision (supra) lawfully established for the adopting and promulgating of such lesser law.

## PRIVATE LAND GROUP 1.

My Question regarding today's Private land that was once part of a Spanish or Mexican Land Grant BEFORE the 1848 international Treaty of Guadalupe Hidalgo and was thus NEVER considered by the United States government as part of the United States Public Domain.

## QUESTION

Should this case be brought before the UNITED STATES DISTRICT COURT YOU will personally be asked this good faith Jurisdictional question, to wit:

**"What Constitutional Authority" (supra) can YOU personally cite that YOU claim granted or delegated ANY type of "regulatory, taxable, eminent domain, administrative or judicial jurisdiction" to ANY State, County or City government over the private land located within its boundaries – land that had been *FOREVER* transferred to the private sector by a foreign government, YEARS *BEFORE* California or any of its political subdivisions, counties, cities and townships ever existed?"**

**NOTE:** This early type of land transfer includes ALL original Spanish and Mexican government Land Grant transfers that were *FOREVER* "recognized" by the United States government pursuant to the mandates of the 1848 international Treaty of Guadalupe Hidalgo and its Protocol of Queretero with absolutely NO "reservations" of any type shown on the related UNITED STATES LAND PATENT. This was a constitutional action that was made pursuant to the

14

UNITED STATES LAND PATENT procedure lawfully administered by the United States General Land Office (the GLO) under the United States Department of the Interior, and thereafter signed by the President of the United States and placed on permanent file in the National Archives.

**NOTE:** Evidence can be shown that this original Private Land Group is quite unique from the others in that the United States Government itself NEVER claimed any Rights, Title, Interest or Jurisdiction in the subject land.

It can also be shown that when the original 1848 Treaty of Guadalupe Hidalgo was offered to the United States Congress for ratification, they saw that Article X, of the subject international treaty, the Spanish and Mexican Rancho "recognition" provision, would be a

major problem for the future and rejected it completely. But the Mexican General Assembly, thereafter, would not ratify the subject treaty without the subject "recognition" provision incorporated therein. The subject treaty was basically dead and neither side wanted to budge. This is probably where the term "Mexican Standoff" originated. Finally, the United States government, wanting to move ahead and end the War with Mexico, signed the Treaty Addendum known as the Protocol of Queretero, which reinstituted the Spanish and Mexican Land Grant "recognition" provision and the signed treaty became the Supreme Law of the Land for the American government and superior to the COUNTY OF SAN BERNARDINO Codes.

Historic Documents indicate that the United States government still desired to reject the subject treaty provision and did everything in its power to kill the results of that provision.

First the United States government took more than two years to implement a law that would satisfy the Protocol of Queretaro and provide a mechanism for applying for the hated Spanish and Mexican Land Grant "recognition". That congressional law allowed only two years to apply for the "recognition" related UNITED STATES LAND PATENT. Approximately 750 grantees timely applied for such recognition from the United States General Land Office's special confirmation commission. The subject recognition was so despised by the United States government that only three of those original applications were approved at the administrative level.

The costly and time consuming procedure then went into the District Court of the United States where many UNITED STATES LAND PATENTs were finally confirmed. The United States government thereafter appealed many such decisions, but later failed to pursue those United States judicial department confirmation appeals. With additional appeals to the United States Supreme Court and to the Congress itself, more than 720 original Spanish and Mexican Land Grants

15

were finally confirmed with a UNITED STATES LAND PATENT. The United States government put up major obstacles, but eventually failed to kill 720 old original Spanish and Mexican Land Grant recognitions. The District Court of the United States confirmations, many times took ten to twenty years to complete – some more. Many times the original grantee had died or was forced to sell part of the grant in order to afford to continue the costly appeals. Some appeals took close to 30 years to become final. One UNITED STATES LAND PATENT issue regarding Rancho Castro was finalized in

1939 where the original RANCHO CASTRO LAND GRANT and related UNITED STATES LAND PATENT prevailed against the UNITED STATES NAVY over issues concerning MARE ISLAND NAVAL BASE. The UNITED STATES [government] fought those Spanish and Mexican Land Grants to the very end, but usually lost and the grantee's, their successors, assigns and heirs finally received the coved UNITED STATES LAND PATENT they desired and fought so hard for.

The major problem presented by those UNITED STATES LAND PATENTs that recognized the former Spanish and Mexican Land Grants was that even the United States government was forced to honor those Land Grants that were issued long before the California ever existed. The recognition UNITED STATES LAND PATENTs ALL used the eternal word "FOREVER" on each and every UNITED STATES LAND PATENT. They were truly nations unto themselves and were just as much outside the scope of any jurisdictional authority as any Spanish or Mexican Land Grant located within the boundaries of old Mexico itself.

As proof, many years later when the United States Surveyor General was surveying the United States Public Domain Land in the western states the survey teams were instructed to stay out of those Spanish and Mexican Land Grant recognition UNITED STATES LAND PATENTs. It can be shown that the Township lines, the Range lines and the Section lines and numbers are conspicuously missing from ALL of those Land Grant areas. There are also absolutely no Federal Indian Reservations, National Parks, National Monuments, or National Forests located within the boundaries of ANY Spanish or Mexican Ranchos that were finally confirmed with a UNITED STATES LAND PATENT.

The California Mexican Rancho, RANCHO SAN BERNARDINO is especially interesting to this study as Col Henry Washington, in 1851, while working for the United States Surveyor General, surveyed the "initial Point" for the entire Southern California Congressional Township Survey. He brought the Base Line down from Mt. SAN BERNARDINO and brought it West

16

through the SAN BERNARDINO Valley and beyond. That is where Base Line Road got it name. He and his team actually surveyed all of the Township lines, the Range lines and the Section lines and numbers throughout SAN BERNARDINO Valley. This all happened several years before the Lugo - Mexican Rancho SAN BERNARDINO was finally confirmed by a judicial determination and UNITED

STATES LAND PATENT No. 481 was issued. After the subject Land Patent was issued the United States Surveyor General abandoned the Township, Range and Sections lines and numbers within the boundaries of old RANCHO SAN BERNARDINO *because* even the United States government had absolutely no jurisdiction to do the subject survey within such a recognized Mexican Rancho. The United States government was bound by the Protocol of Queretaro and its recognition mandates. The United States government was forced under the provisions of the 1848 international Treaty of Hidalgo and its Protocol of Queretaro to remove its erroneous survey markers and thereafter stay out.

It can also be shown that there were never any type of reservations for underground water, oil, minerals, coal or for future Ditches and Cannels (D/C) within the boundaries of ANY confirmed Spanish or Mexican Rancho. The United States government simply had absolutely no jurisdiction in such an area. The United States government, therefore had absolutely no rights, title or interest in the subject treaty recognized land and, therefore, could NEVER grant any such jurisdiction to any California office, agency or political subdivision.

## PRIVATE LAND GROUP 2.

My questions regarding today's Private Land that was never a Spanish or Mexican Land Grant, but was part of the original United States Public Domain.

## QUESTION

What "Constitutional Authority" (supra) can YOU personally cite that YOU claim granted or delegated ANY type of "regulatory, taxable or eminent domain, administrative or judicial jurisdiction" to ANY State, County or City government over the private land located within its boundaries – land that had been granted to the private sector via a United States Homestead, Desert Entry, Cash Entry, Mining Claim, or Railroad Grant and thereafter **FOREVER** "released and

transferred" to the grantee, with a few rare "reservations" noted only for underground water, oil, coal and minerals and possible future ditches and canals, (D/C) via the UNITED STATES LAND PATENT procedure lawfully administered by the United States General Land Office (the GLO) under the United States Department of the Interior, and thereafter signed by the President of the United States and placed on permanent file in the National Archives?

## PRIVATE LAND GROUP 3.

My question regarding today's Private Land that was never a Spanish or Mexican Land Grant, originally part of the United States Public Domain and later transferred to California via a United States School Grant, School Grant related State Selection (SS) or a Wet-land Grant from all granted out of the United States Public Domain.

## QUESTION

What "Constitutional Authority" (supra) can YOU personally cite that YOU claim granted or delegated ANY type of "regulatory, taxable, eminent domain, administrative or judicial jurisdiction" to ANY State, County or City government over the private land located within its boundaries – land that had been granted to the private sector via a State School Grant, a School Grant related State Selection, (SS) or a State Wet-land Grant, and thereafter *FOREVER* "released and transferred" to the grantee, with a few rare "reservations" noted only for underground water, oil, coal and minerals, via the California State Land Patent procedure lawfully administered originally by the California Surveyor General and later by the California State Lands Commission, thereafter signed by the Governor of California and placed on permanent file in the California State Archives under the California Secretary of State?

The information presented hereinabove is actually very simple to know and understand and yet it is not taught to nor understood by today's governmental officers, agents or employees. In fact this information is usually despised by those people who are into controlling others and how others use their private land. This type of control attempt is more commonly known as "Social Engineering through Administrative or Judicial Activism" and is only successful against those People who are ignorant of the historic background of America's Basic Land Law.

The information presented herein is to be construed as a good faith NOTICE of the several Competent Jurisdictional Defects at issue and those who ignore this good faith NOTICE will be held personally accountable for knowing and understanding this very valid information. The old Common-Law Maxim, "Ignorance of the Law is no Excuse" will be used against them. This

information does not take advantage of "loop holes in the law". IT IS THE LAW.

## CAVEAT

The governmental receiver of this U.C.C. Presentment only has the three days or 72 the hours provided by the UNIFORM COMMERCIAL CODE to respond to and controvert this good faith PRESENTMENT, on the record, or the default will be taken and the Doctrine of Estopple by Acquiescence will be claimed.  TIME IS OF THE ESSENCE.


Executed by the voluntary act of My own hand in the old, underlying, original Santa Rosa Township, in the underlying, original California Republic, and is dated this twentieth day of the first month, in the year two thousand and thirteen, Anno Domini, in the two-hundred and thirty-sixth year of the Independence of America.

Ronald Vernon Cupp

*EXHIBIT "C"*

Opportunity. Diversity. Service.



COUNTY OF SONOMA
**HUMAN RESOURCES DEPARTMENT**

**WENDY G. MACY, HR Director**

Employment • Classification • Employee Relations • EEO • Training • Risk Management

May 7, 2013

Ronald Cupp
4640 Arlington Ave.
Santa Rosa, CA 95407

| | |
|---|---|
| **SUBJECT:** | **NOTICE OF INSUFFICIENT CLAIM** |
| **CLAIMANT:** | **Ronald Cupp vs. County of Sonoma** |
| **DATE OF LOSS:** | **4/22/2013** |
| **CLAIM NO:** | **GC022655** |

Dear Mr. Cupp:

The claim which you presented to the Sonoma County Board of Supervisors on April 22, 2013 has been referred to the Risk Manager pursuant to Board of Supervisors Resolution No. 66798 and California Government Code Section 935.4.

NOTICE IS HEREBY GIVEN that said claim failed to comply substantially with certain sections of the California Government Code. The claim is insufficient in that it fails to clearly state the date of the occurrence or transaction which gives rise to the claim, the persons who caused the injury alleged in the claim, and it fails to state the amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

For your information, consult sections 910, 910.2, 910.4 and 910.8, and other sections of the California Government Code pertaining to the filing of the claims against a public entity. Pursuant to California Government Code section 910.8, no action will be taken on this claim by the County of Sonoma for a period of 15 days after the date of this notice. Therefore, if you wish to file an amended claim correcting these deficiencies, you should do so within that time period.

This notice applies only to causes of action arising under California law for which a claim is mandated by the California Government Tort Claims Act, California Government Code sections 900 et. seq. Other causes of action, including those arising under federal law, may have shorter time limitations for filing.

If you would like to discuss your claim further, please call Janell Crane in Risk Management at (707) 565-3537.

Sincerely,

Marciá Chadbourne
Risk Manager

575 Administration Drive, Suite 116B • Santa Rosa, CA 95403 • Telephone (707) 565-2331 • Fax (707) 565-3770 • www.sonoma-county.org



(PROOF OF SERVICE BY MAIL-1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA

COUNTY OF SONOMA

I am employed in the County of Sonoma, California; I am over the age of 18 years and not a party to the within action; my business address is 575 Administration Drive, Suite 116C, Santa Rosa, CA 95403. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

On May 7, 2013, following ordinary business practice, I served the NOTICE OF REJECTION OF CLAIM FOR INSUFFICIENT INFORMATION on the parties in said cause, by placing on that date at my place of business, a true copy thereof, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business, addressed as follows:

**Ronald Cupp**
**4640 Arlington Ave.**
**Santa Rosa, CA 95407**

I certify (or declare), under penalty of perjury,*that the foregoing is true and correct.

Date: May 7, 2013

_____
(Signature)

*Proof of service by mail forms, being signed under penalty of perjury, do not require notarization.



Opportunity. Diversity. Service.

**COUNTY OF SONOMA**
**HUMAN RESOURCES DEPARTMENT**

**WENDY G. MACY, HR Director**

Employment • Classification • Employee Relations • EEO • Training • Risk Management

June 11, 2013

Ronald Cupp
4640 Arlington Ave.
Santa Rosa, CA 95407

| | |
|---|---|
| **SUBJECT:** | **NOTICE OF REJECTION OF CLAIM** |
| **CLAIMANT:** | **Ronald Cupp v. County of Sonoma** |
| **DATE OF LOSS:** | **4/22/2013** |
| **CLAIM NO:** | **GC022655** |

Dear Mr. Cupp:

The claim you presented to the Sonoma County Board of Supervisors on April 22, 2013 has been referred to the Risk Manager pursuant to Board of Supervisors Resolution No. 66798 and California Government Code Section 935.4.

NOTICE IS HEREBY GIVEN that said claim was rejected on June 11, 2013.

## WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. (See California Government Code Section 945.6.) You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

This notice applies only to causes of action arising under California law for which a claim is mandated by the California Government Tort Claims Act, California Government Code sections 900 et. seq. Other causes of action, including those arising under federal law, may have shorter time limitations for filing.

Sincerely,

Marciá Chadbourne
Risk Manager

MC/kc



575 Administration Drive, Suite 116B • Santa Rosa, CA 95403 • Telephone (707) 565-2331 • Fax (707) 565-3770 • www.sonoma-county.org

(PROOF OF SERVICE BY MAIL-1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA

COUNTY OF SONOMA

I am employed in the County of Sonoma, California; I am over the age of 18 years and not a party to the within action; my business address is 575 Administration Drive, Suite 116C, Santa Rosa, CA 95403. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

On June 11, 2013, following ordinary business practice, I served the NOTICE OF REJECTION OF CLAIM on the parties in said cause, by placing on that date at my place of business, a true copy thereof, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business, addressed as follows:

**Ronald Cupp**
**4640 Arlington Ave.**
**Santa Rosa, CA 95407**

I certify (or declare), under penalty of perjury,*that the foregoing is true and correct.

Date:  June 11, 2013

_____
(Signature)

*Proof of service by mail forms, being signed under penalty of perjury, do not require notarization.

*EXHIBIT "D"*

2013
June 23, 2012

PETITIONER:
Ronald Cupp
4640 Arlington Avenue
Santa Rosa, California
Certified Mail: 7012 1010 0002 7428 8331

RESPONDENT:
Marcia Chadbourne
HUMAN RESOURCES DEPARTMENT
COUNTY OF SONOMA
575 Administration drive, Suite 116B
Santa Rosa, CA 95403

| | |
|---|---|
| YOUR CLAIM NO: | GC022655 |
| SUBJECT: | Claim of Land Patient Forever Benefits |
| LAND: | 4640 Arlington Avenue, Santa Rosa, California Republic |

Dear Marcia;

I am in receipt of both of your letters, dated May 7, 2013 and June 11, 2013 respectively.
I called you on the phone after receiving the May 7, 2013 letter to advise you of the following:
I have not filed an active 'claim' against the Board of Supervisors, yet. It is Notice of my claim
of forever benefit of land patient.

Any encroachment from anybody or anything under the direction, control, training, et seq of the
Board of Supervisors of Sonoma County, including any agency or employee or independent
contractor will trigger a claim for which you and they are properly noticed. A claim for injury or
harm will be issued then.

<div align="center">NOTICE:</div>

A claim of conusance is now before you and Sonoma County by and through the Board of
Supervisors. I require this case be held at a court of record.

Respectfully:

Ronald Cupp

***EXHIBIT "E"***



## ATTN: COUNTY OFFICIALS

Pursuant to section 1822.56 of the Code of Civil Procedure an inspection may not be made in the absence of an owner or occupant of the particular place, dwelling, structure, premises, or vehicle unless specifically authorized by the judge upon showing that such authority is reasonably necessary to effectuate the purpose of the regulation being enforced. An inspection pursuant to a warrant shall not be made by means of forcible entry, except that the judge may expressly authorize a forcible entry where facts are shown sufficient to create a reasonable suspicion of a violation of a state or local law or regulation relating to building, fire, safety, plumbing, electrical, health, labor, or zoning which if such violation exists would be an immediate threat to health or safety, or where facts are shown enabling that reasonable attempts have been unsuccessful.

Where prior consent has been sought and refused, notice that a warrant has been issued must be given at least 24 hours before the warrant is executed, unless the judge finds that immediate execution is reasonably necessary in the circumstances shown.

FAILURE TO ADHEAR TO THIS CODE WILL RESULT IN PROSECUTION TO THE FULL EXTENT OF THE LAW.

## PRIVATE PROPERTY

Any persons entering this private property must hold contract with owner and/or tenant which grant ingress with indemnity.

NO TRESPASSING

INCLUDING ALL INDIVIDUALS, PUBLIC CORPORATE OFFICIALS, THEIR AGENTS, EMPLOYEES OR FRANCHISE

THERE OF:

This puts you on NOTICE that the owner tenant of this property requires that ALL PERSONS abide by provisions of the Supreme Law of the Land:

The Constitution of the United States of America

USC Title 18, Sec. 3109

USC Title 42, Sec. 1983

USC Title 18, Sec. 241 & 242

The owner of this property may use force to remove those who trespass. The Penalty for Trespass is a fine of not more than $10,000 or imprisonment for not more than ten years or both.



*EXHIBIT "F"*



County of Sonoma
**Permit & Resource Management Department**

## NOTICE & ORDER – UNLAWFUL USE/ZONING VIOLATION

Ownership Detail (Included in Certified Mail):

**To the Property Owner(s) / Tenant(s) of:**

Property Address: 4640 ARLINGTON AV  APN: 134-751-063  Inspection Date: 2/15/19
SANTA ROSA

The Code Enforcement Division of the Sonoma County Permit and Resource Management Department has determined that the following use(s) of the Property identified above are in violation of Sonoma County Code:

1. CHANGE OF OCCUPANCY - CONVERT GARAGE TO DWELLING UNIT

2. _____

**Sonoma County Code Section(s):** DA AL  26 05 010 , 020 030

Under Sonoma County Code ("SCC") section 26-92-200 (a), it is unlawful for any land, building or premises to be used, designated or intended to be used for any purpose or in any manner that is not permitted in the district in which the building, land or premises is located and/or which does not have all permits required for that use under SCC Chapter 26.

**You must stop the unlawful use(s) within thirty (30) days from the date of this Notice. Failure to comply could result in a lawsuit filed against you.**



...hedule a re-inspection to confirm that the illegal use has been ...equested and the violation has not been removed, a re-

**permit SONOMA**

Andrew Smith
Code Enforcement Inspector II
Building & Safety Division
Code Enforcement

...apter 26, are subject to mandatory civil penalties, the costs of

2550 Ventura Avenue
Santa Rosa, CA 95403-2809
www.PermitSonoma.org
Direct (707) 565-2123
Office (707) 565-1900
Fax (707) 565-3767
Andrew.Smith2@sonoma-county.org

...hirty days will result in the assessment of daily civil penalties. A ...corded against the Property in the Official Records of Sonoma County.

This cons... ...having record title, or legal interest in the premises, files an appeal from this determination in writing ... ten (10) days, as described in SCC Section 1-7.3. The appeal process includes the right to an appeal hearing with a hearing officer. If a hearing officer finds that a violation exists, you may be responsible for paying the County's administrative costs, including but not limited to administrative overhead, salaries, and expenses incurred for the hearing.

**If you do not timely appeal this notice and order, you will lose your rights to an administrative hearing and adjudication of this matter. You may also contact the Inspector that issued this Notice and request an extension of time to bring the Property into compliance, instead of an appeal hearing.**

_____
Code Enforcement Inspector

(707) 565- 2123
Phone

2/15/19
Date of Notice

VCM 19 0123
Violation # (If Applicable)

2550 ...  ...95403-2859 (707) 565-1900
...onoma.org

permit SONOMA   ...ertified Mail---Pink Copy Post to Property

County of Sonoma
Permit & Resource Management Department

permit
SONOMA

## NOTICE & ORDER - CONSTRUCTION WITHOUT PERMIT

Ownership Detail (Included in Certified Mail):

**To the Property Owner(s) / Tenant(s) of:**

Property Address: 4040 Arlington Av.    APN: 04 251 063   Inspection Date: 2/15/19
SANTA ROSA

The Code Enforcement Division of the Sonoma County Permit and Resource Management Department has determined that a building permit(s) has not been issued for construction work on the Property identified above (the "Property"). The specific construction for which a permit has not been issued includes the following:

1. CONST - REMODEL VACANT SFD AND BARN - NO PERMIT

2. CONST - GARAGE CONVERSION TO DWELLING UNIT - REMODEL

3. _____

Under Sonoma County Code ("SCC") Section 7-5, it is unlawful to erect, construct, enlarge, alter, repair, move, improve, convert or demolish any building or structure, or cause the same to be done without first obtaining a building permit. Permits are required for the construction described above. In the absence of proper permitting and inspection, the construction is unlawful and violates SCC Chapter 7 and the California Building Codes adopted in that chapter.

**These violation(s) must be corrected. You are required to immediately either: (a) remove the unlawful construction by obtaining a demolition permit, completing the demolition, and obtaining a verification inspection; or (b) legalize the unlawful construction by obtaining all required permits and obtaining a verification inspections.** Failure to abate noted violation(s) within thirty days from the date of this Notice will result in the assessment of daily penalties or, a penalty multiplier of normal permit fees will be assessed on permit(s) to legalize the violation.

Failure to comply could result in the filing of a lawsuit against you.

**Pursuant to SCC Sections 1-7 and 1-7.1, and Section 114 of the California Building Code, violations of SCC Chapter 7 are subject to mandatory civil penalties, abatement costs, and investigation fees.**

A "Notice of Abatement Proceedings" also may be recorded against the Property.

This constitutes final notice unless any person having record title or legal interest in the premises files an appeal from this determination in writing within ten (10) days from the date of this Notice and as described in SCC Section 1-7.3. **The appeal process includes the right to an appeal hearing. If a hearing officer finds that a violation exists, you may be responsible for paying the County's administrative costs including, but not limited to, administrative overhead, salaries, and expenses incurred as a result of the hearing. If you do not appeal this notice and order, you will lose your rights to an administrative hearing and adjudication of this matter.**

**You may also contact the Inspector that issued this Notice and request an extension of time to bring the Property into compliance instead of an appeal hearing.**

N R SMITH

Code Enforcement Inspector

(707) 565- 2123
Phone

2/15/19
Date

UCM 19 0121
Violation # (If Applicable)

permit
SONOMA

2550

95403-2859 (707) 565-1900
sonoma.org

Certified Mail---Pink Copy Post to Property

*EXHIBIT "G"*



County of Sonoma
Permit & Resource Management Department

# Civil Penalties Due and Payable

April 19, 2019

Ronald Cupp
150 Raley Town Center Drive, Suite 2512
Rohnert Park, CA 94928

**Re:   Civil penalties**
**At:   4640 Arlington Avenue, Santa Rosa**
**APN:  134-251-063**

On February 15, 2019 you were notified via a Notice of Violation or Notice & Order of the unpermitted construction that exists on the above referenced property in violation of Chapter 7 of the Sonoma County Code. You were advised that you were required to abate this unlawful work by submitting a complete building permit application package with plans (as needed) within thirty (30) days. **You were also informed that this determination of a violation would become final unless a timely appeal to a Hearing Officer was received in accordance with Sonoma County Code Chapter 1 Section 1-7.3.**

No appeal has been received and you have not applied for required permits to legalize of demolish the unlawful construction. This failure to bring your property into compliance subjects you to civil penalties and the assessment of the cost of abatement pursuant to Sonoma County Code Sections 1-7 and 1-7.1.

Please be advised that civil penalties in the amount of **$90 per day** have been assessed against your property. As of the date of this letter, these penalties total $17,010 and will continue to accrue at the rate of **$90 per day** until the violation is abated and verified by code enforcement staff.

Continued failure to resolve this violation may also result in the recordation of a Notice of Abatement Proceedings and/or a Partial Abatement Lien against the title of the property. In addition, a public hearing in accordance with Sonoma County Code Chapter 1 Section 1-7.3 may be scheduled to order abatement. This file may also be referred to the Office of the Sonoma County Counsel to pursue litigation in Superior Court to bring your property into compliance and collect accrued civil penalties. This matter demands your immediate attention.

Sincerely,

*A.R. SMITH*

Andrew Smith
Andrew.Smith2@Sonoma-County.org
Code Enforcement Section

File VBU19-0076, VBU19-0077, VBU19-0078
c: cm

2550 Ventura Avenue Santa Rosa CA  95403-2859 (707) 565-1900
www.PermitSonoma.org





permit
SONOMA

## Civil Penalties Due and Payable

April 19, 2019

Ronald Cupp
150 Raley Town Center Drive, Suite 2512
Rohnert Park, CA 94928

**Re:     Civil penalties**
**At:     4640 Arlington Avenue, Santa Rosa**
**APN:   134-251-063**

On February 15, 2019 you were notified via a Notice of Violation or Notice & Order of the unpermitted land use(s) that exist on the above referenced property in violation of Chapter 26 of the Sonoma County Code. You were advised that you were required to abate these unlawful land uses within thirty (30) days and contact this office to schedule a compliance inspection to verify abatement. **You were also informed that this determination of a violation would become final unless a timely appeal to a Hearing Officer was received in accordance with Sonoma County Code Chapter 1 Section 1-7.3.**

No appeal has been received and you have not requested a compliance inspection to verify that the violation(s) have been abated. This failure to bring your property into compliance subjects you to civil penalties and the assessment of the cost of abatement pursuant to Sonoma County Code Sections 1-7 and 1-7.1.

Please be advised that civil penalties in the amount of **$90 per day** have been assessed against your property. As of the date of this letter, these penalties total $5,670 and will continue to accrue at the rate of **$90 per day** until the violation is abated and verified by code enforcement staff.

Continued failure to resolve this violation may also result in the recordation of a Notice of Abatement Proceedings and/or a Partial Abatement Lien against the title of the property. In addition, a public hearing in accordance with Sonoma County Code Chapter 1 Section 1-7.3 may be scheduled to order abatement. This file may also be referred to the Office of the Sonoma County Counsel to pursue litigation in Superior Court to bring your property into compliance and collect accrued civil penalties. This matter demands your immediate attention.

Sincerely,

A.R. Smith

Andrew Smith
Andrew.Smith2@Sonoma-County.org
Code Enforcement Section

File VPL19-0130
c cm



2550 Ventura Avenue Santa Rosa CA 95403-2859 (707) 565-1900
www.PermitSonoma.org

1

<u>**VERIFICATION**</u>

2

I, RONALD CUPP, declare on personal knowledge, the following facts:

3

I am over the age of 18 years and am the Plaintiff in this action.  I have read the foregoing

4

document entitled:

5

6

**VERIFIED FIRST AMENDED COMPLAINT FOR DAMAGES**

7

and know the facts and allegations stated therein.  Those facts and allegations are true and correct

8

to the best of my knowledge, except for those facts and allegations which are stated on

9

information and belief.  As to those facts and allegations, I believe them to be true.

10

I declare under penalty of perjury pursuant to the laws of the United States of America,

11

that the foregoing is true and correct.

12

13

Date: October 6, 2020

14

_____/s/_____

15

RONALD CUPP, Plaintiff *Pro Se*

16

17

18

19

20

21

22

23

24

25

26

27

28

- 14 -

EXHIBIT 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

          Plaintiff,

   v.

ANDREW SMITH, et al.,

          Defendants.

Case No.  20-cv-03456-PJH

**ORDER GRANTING SONOMA COUNTY'S MOTION TO DISMISS, STRIKING REFERENCES TO WICK AS A DEFENDANT, AND GRANTING IN PART PLAINTIFF'S MOTION TO STRIKE SMITH'S AFFIRMATIVE DEFENSES**

Re: Dkt. Nos. 41, 47

Before the court is County of Sonoma's ("Sonoma County") and Tennis Wick's ("Wick") motion to dismiss.  Dkt. 41.  Also before the court is plaintiff Ronald Cupp's ("plaintiff") motion to strike certain affirmative defenses in defendant Andrew Smith's ("Smith") answer.  Dkt. 47.  Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **GRANTS** Sonoma County's motion to dismiss, **STRIKES** any references in the first amended complaint ("FAC") to Wick as a defendant, and **GRANTS IN PART** plaintiff's motion to strike Smith's affirmative defenses.

<div align="center"><strong>BACKGROUND</strong></div>

On May 21, 2020, plaintiff filed the instant action against Sonoma County and various county employees.  Dkt. 1.  In his complaint, plaintiff brought various claims under Title 42 U.S.C. § 1983 in connection with Smith's purportedly unlawful search of plaintiff's property in Sonoma County on February 15, 2019.  Id.

In its September 9, 2020 order, the court dismissed with prejudice all claims against all previously named defendants, except Smith and Sonoma County.  Dkt. 36 at

1   24-25.  The then-dismissed defendants included Wick, Margarett Willet ("Willett"), Tyra

2   Harrington ("Harrington"), and Mark Franceschi ("Franceschi").  Compare Id. at 2-3

3   (listing claims alleged against every defendant) with Id. at 24-25 (listing orders dismissing

4   each claim alleged).

5          The court permitted plaintiff leave to amend only his § 1983 claim against Smith

6   for unconstitutional search as well as his parallel state law claim for trespass.  Id.  The

7   court also observed that, although plaintiff did not formally allege a Monell claim against

8   Sonoma County for maintaining a policy of conducting unconstitutional searches of real

9   property, plaintiff suggested such a claim in his complaint and opposition brief.  Id. at 14.

10  Given those suggestions, the court permitted plaintiff "one opportunity to clarify such a

11  claim in any amended pleading."  Id.

12         On October 7, 2020, plaintiff filed his operative FAC.  Dkt. 38.  In it, plaintiff adds

13  allegations attempting to cure the factual deficiencies in his two remaining claims against

14  Smith.  Id. ¶¶ 13-35.  In particular, plaintiff details the physical barriers surrounding his

15  property and explains how Smith passed those barriers on February 15, 2019 when

16  entering the property.  Id. ¶¶ 20-25.  Separately, plaintiff added allegations in support of

17  his Monell claim against Sonoma County.  Id. ¶¶ 46-51.  Lastly, plaintiff also includes a

18  trespass claim against one of the previously dismissed defendants, Wick.  Id. ¶¶ 41-45.

19         On October 21, 2020, Sonoma County and Wick filed the instant motion to dismiss

20  the claims against them.  Dkt. 41; Dkt. 43 (errata correcting for defense counsel's

21  mistaken designation of moving defendants).  Sonoma County asks that the court

22  dismiss the single Monell claim against it.  Sonoma County and Wick ask that the court

23  dismiss the trespass claims against Wick.  The court will detail the allegations underlying

24  these claims below.

25         That same day, Smith filed an answer in response to the amended claims against

26  him.  Dkt. 42 ("Ans.").  In response, on November 12, 2020, plaintiff filed the instant

27  motion to strike 14 of Smith's 20 affirmative defenses.  Dkt. 47.  Only a handful of the

28  originally challenged defenses remain at issue.  The court will detail the defenses below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DISCUSSION**

**A.     Legal Standards**

    **1.     Motion to Dismiss**

        A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

        As a general matter, the court should limit its Rule 12(b)(6) analysis to the contents of the complaint, although it may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document"). The court may also consider matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

        Lastly, a district court "should grant the plaintiff leave to amend if the complaint

can possibly be cured by additional factual allegations," however, dismissal without such leave "is proper if it is clear that the complaint could not be saved by amendment." Somers, 729 F.3d at 960.

### 2.    Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that the court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010).

Motions to strike are not favored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Colaprico v. Sun Microsystem, Inc., 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). When a court considers a motion to strike, it "must view the pleadings in light most favorable to the pleading party." Uniloc v. Apple, Inc., 2018 WL 1640267, at *1 (N.D. Cal. Apr. 5, 2018).  A court must deny the motion to strike if there is any doubt whether the allegations in the pleadings might be at issue in the action. In re 2TheMart.com, Inc., Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000). However, a motion to strike is proper when a defense is insufficient as a matter of law. Chiron Corp. v. Abbot Labs., 156 F.R.D. 219, 220 (N.D. Cal. 1994). Ultimately, the decision "to grant a motion to strike lies within the sound discretion of the district court." Rees v. PNC Bank, N.A., 308 F.R.D. 266, 271 (N.D. Cal. 2015).

### B.    Motion to Dismiss Analysis

In its motion to dismiss, Sonoma County principally argues that plaintiff failed to allege sufficient facts to state a Monell claim against it.  Before analyzing that argument, the court will first address plaintiff's renaming of Wick in this action.

### 1.    Wick Is Not a Defendant in This Action

In its opening brief, Sonoma County takes the position that Wick "was not

4

expressly dismissed in the [September 9 Order] but believes that he should have been." Dkt. 41 at 9.  In his opposition, plaintiff asserts that the court has not and should not dismiss Wick from this action.  Dkt. 48 at 13-14.  Both Sonoma County and plaintiff mistakenly assert that the Wick remains a defendant in this action.  He does not.

In his complaint, plaintiff named Wick as a defendant on the following six claims:

(1)    Title 42 U.S.C. § 1983 for violation of due process rights.  Compl. ¶¶ 65-72.

(2)    Title 42 U.S.C. § 1985 for conspiracy.  Id. ¶¶ 73-79.

(3)    Title 42 U.S.C. § 1986 for neglect.  Id. ¶¶ 80-88.

(4)    Land patent infringement.  Id. ¶¶ 95-98.

(5)    Slander of title.  Id. ¶¶ 99-104.

(6)    Excessive fines. Id. ¶¶ 105-106.

Plaintiff alleged these same claims against various other defendants.  Id.  At the conclusion of its prior order, the court enumerated its decision on each of the claims alleged in the complaint.  Dkt. 36 at 24-25.  The court dismissed all claims in the complaint.  Id. at 24.  More specifically, the court dismissed all six of the above claims **with prejudice**.  Id.  The court permitted plaintiff leave to amend only the following three claims: (1) the Title 42 U.S.C. § 1983 against Smith premised on an unconstitutional search; (2) a state law trespass claim against Smith; and (3) a Monell claim against Sonoma County premised on Smith's search of the property.  Id. at 24-25.

The court does not see any reason for either side to conclude that Wick remains a party in this action.  When the court dismissed all six claims alleged against Wick with prejudice, it necessarily dismissed Wick from this action.  Moreover, plaintiff did not name Wick as a defendant to the trespass claim in the complaint.  Compl. ¶¶ 89-94.  Thus, it is unclear how or why plaintiff may, in the first instance, justify alleging that claim against Wick in the FAC.  FAC ¶¶ 41-45.  In any event, Wick is not a defendant in this action.

As the court directed in its September 9 order, plaintiff "may **not** add any new claims or parties to this action" absent "leave of court or consent from both Smith and Sonoma County."  Id. (emphasis in the original).  Plaintiff failed to satisfy either condition.

5

United States District Court
Northern District of California

Accordingly, the court strikes the FAC's references to Wick as a defendant.  Separate but relatedly, the court understands that Wick is not listed as a "terminated" defendant on the docket.  That omission was a ministerial oversight by the court.

### 2.    Plaintiff Failed to Allege a <u>Monell</u> Claim against Sonoma County

"To establish municipal liability under <u>Monell</u>, a plaintiff "must prove that (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [his or her] constitutional right; and (4) the policy was the moving force behind the constitutional violation."  <u>Lockett v. Cty. of Los Angeles</u>, 977 F.3d 737, 741 (9th Cir. 2020).  Local government liability under § 1983 may arise "for policies of inaction as well as policies of action." <u>Jackson v. Barnes</u>, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the government body itself violates someone's constitutional rights[] or instructs its employees to do so."  <u>Id.</u>  On the other hand, "a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'"   <u>Id.</u>

Stated simply, Sonoma County and plaintiff dispute the sufficiency of the FAC's allegations as they pertain to the <u>Monell</u> claim's policy and causation elements.  Dkt. 41 at 10-12; Dkt. 48 at 6-13.  The court analyzes the allegations and argument underlying each element in turn below.

### a.    Plaintiff Fails to Allege Sufficient Facts Showing that Sonoma County Maintains a Policy of Conducting Unlawful Searches

Plaintiff fails to allege the policy element of his <u>Monell</u> claim for at least two reasons.  First, the bulk of plaintiff's allegations that Sonoma County maintains an actionable policy of conducting unlawful searches rests on FAC paragraphs 47 and 49. Both paragraphs contain numerous pleading deficiencies.

At paragraph 47, plaintiff alleges that Sonoma County "exercises de facto policies" that are contrary to the Constitution and, ultimately, is responsible for the acts of its employees.  FAC ¶ 47.  This allegation is a legal conclusion.  It does not rest on predicate facts substantiating the unlawful nature of the policy alleged.

6

United States District Court
Northern District of California

At paragraph 49, plaintiff enumerates six theories to support his position that Sonoma County maintains a policy to conduct unlawful searches.  In particular, plaintiff alleges that Sonoma County engages in the following:

    a.    Failing to adequately train, supervise, and discipline its Code Inspectors . . .

    b.    Failing to discourage, or actively encouraging, the unlawful use of authority . . .

    c.    Failing to admonish, reprimand, discipline, or even investigate constitutional or statutory rights violations by its Code Inspectors . . .

    d.    Ratifying the violations of clearly established constitutional protections, including those conferred by the Fourth Amendment, by directing, encouraging, or rewarding Code Inspectors and others . . . . in conducting warrantless searches of private property . . .

    e.    Failing to implement proper procedures for obtaining inspection warrants, keeping track of when inspection warrants are sought, executing such warrants; and applying to judicial officers for orders regarding inspection warrants, including the falsification of court records and other documents to justify the otherwise unlawful and unconstitutional behavior of its Code Inspectors . . .

    f.    Maintaining a custom, policy, or practice of routinely violating, or encouraging the violation of, the Fourth Amendment rights of landowners in [Sonoma County] by searching their private property without warrants or other legal justification in a scheme to illicitly raise revenue for [Sonoma County] and, thus, unfairly penalize landowners in [Sonoma County].   FAC ¶ 49(a)-(f).

None of the above purported failures, ratifications, customs, policies, or practices rest on any particular fact.  Instead, plaintiff bases all six theories of Sonoma County's purported "customs, policies, and practices" on conclusory assertions.  When viewing these allegations in the context of paragraphs 46-51, the court finds it clear that the above six theories serve as nothing more than a formulaic recitation of the elements necessary to substantiate a Monell claim.

Second, independent of the above, plaintiff does not rest his municipal policy-related allegations on any reasonable investigation.  While plaintiff states in his FAC that he bases the above-referenced theories on his "information and belief," his signed

7

1   verification indicates that he actually bases these theories on what he "believes to be

2   true."  Dkt. 38 at 77 ("Those facts and allegations are true and correct to the best of my

3   knowledge, *except* for those facts and allegations which are stated on information and

4   belief. ***As to those facts and allegations, I believe them to be true***.") (emphasis

5   added).  Plaintiff's mere "belief," without more, falls short of the reasonable inquiry

6   required under Rule 11.  Fed. R. Civ. Pro. 11(b)(3) ("By presenting to the court a pleading

7   . . . an attorney or unrepresented party certifies that to the best of the person's

8   knowledge, information, and belief, ***formed after an inquiry reasonable under the***

9   ***circumstances***: . . . (3) the factual contentions have evidentiary support or, if specifically

10  so identified, will likely have evidentiary support after a reasonable opportunity for further

11  investigation or discovery.") (emphasis added).

12          The court acknowledges that "information and belief" allegations might be proper

13  in very limited circumstances where the evidence necessary to allege a fact is in the

14  exclusive possession of a defendant.  However, as plaintiff himself asserts in his

15  opposition, Sonoma County's purported policy of conducting unlawful searches is public

16  knowledge.  Dkt. 48 at 6-8.  Thus, even if plaintiff had engaged in a reasonable inquiry

17  into the alleged Sonoma County policies, his information and belief allegations are

18  improper here.  In light of the two pleading deficiencies identified above, plaintiff fails to

19  allege that Sonoma County maintains a policy of conducting unlawful searches.

20          Plaintiff's attempt to introduce new facts in his opposition does not alter that

21  conclusion.  For the first time in his opposition, plaintiff asserts that Smith's entry is not an

22  isolated incident by county employees.  Dkt. 48 at 6-7.  To substantiate that assertion,

23  plaintiff relies on (1) defendants' unspecified violation of his "private land rights" on July

24  30, 2020 and (2) "at least six" other instances where county employees conducted

25  unconstitutional searches of some unspecified third parties' private land.  Id. at 7-8.

26          Plaintiff's first ground is a non-starter.  The court is familiar with the events that

27  occurred at the property on July 30, 2020.  As detailed by the court in its August 5, 2020

28  order denying plaintiff's motion for a temporary restraining order, the county employees

1   visited the property on July 30, 2020 pursuant to an inspection warrant.  Dkt. 29 at 2.

2   Given that warrant (which the court reviewed), plaintiff is hard-pressed to allege in this

3   forum that the July 30, 2020 visit constitutes an actionable search.

4       Plaintiff's second ground does not fare any better.  Contrary to his representation,

5   plaintiff details only four instances when Sonoma County conducted unlawful searches of

6   others' real property.  Dkt. 48 at 7-8.  Looking beyond the obvious procedural deficiency

7   that plaintiff merely argues these facts, the court finds that the four other incidents

8   identified by plaintiff (taken as true) would not support the inference that Sonoma County

9   maintains a policy of conducting unlawful searches.

10      The first instance is a legal conclusion.  Dkt. 48 at 7 ("On one occasion, a Code

11  Enforcement Inspector with County entered upon an individual's private land without a

12  warrant just because he happened to be in the area.  In fact, he had an appointment to

13  inspect an entirely different parcel of land down the road from the affected landowner[]

14  but conducted an illegal search of the affected landowners property.").

15      The second instance does not refer to any search by county employees.  Id. ("On

16  another occasion, a landowner was assured by County's Code Enforcement Inspectors

17  that if the landowner took certain steps to cure discovered violations, County would either

18  not pursue the matter or pursue lesser civil penalties. Yet, the same County officials then

19  took back such assurances at a subsequent hearing, fully penalizing the landowner.").

20      The third instance rests on the mistaken assumption that Sonoma County was

21  constitutionally required to obtain a warrant before using an aerial drone to view land not

22  visible from the street.  Id. ("On yet another occasion, County's Code Enforcement

23  Inspectors flew a drone over the private land of another County resident, again without

24  first securing a warrant, to determine if the landowner was a 'grow operation.'").

25      The Supreme Court has recognized that the Fourth Amendment does not

26  automatically protect space that authorities may view only from the air.  Fla. v. Riley, 488

27  U.S. 445, 450 (1989) (holding that a landowner had no reasonable expectation of privacy

28  from aerial surveillance of the open space in his residential backyard); California v.

United States District Court
Northern District of California

1   Ciraolo, 476 U.S. 207, 215 (1986) ("The Fourth Amendment simply does not require the

2   police traveling in the public airways at [1,000 feet] to obtain a warrant in order to observe

3   what is visible to the naked eye.").  In any event, even if Sonoma County's purported use

4   of a drone to search open backyard spaces were legally actionable, such use qualifies as

5   a distinct policy from that at issue in this case.

6         The fourth instance rests on facially implausible accusations that Sonoma County

7   employees are taking bribes.  Dkt. 48 at 8 ("In addition, [county employees] have on more

8   than one occasion, offered to take bribes from private landowners. In exchange for

9   'looking the other way' on code violations discovered as a result of illegal searches,

10   [county employees] have requested payment of large sums of money. On at least one

11   occasion, a partial payment was made by a landowner.").  Further, given that plaintiff's

12   description of the above-reference incidents of bribery sound in fraud, Rule 9(b) would

13   apply.  Plaintiff's description falls short of the specificity demanded by that rule.

14         The court concludes that the Monell claim fails because plaintiff did not allege

15   sufficient facts showing that Sonoma County maintains a policy of conducting unlawful

16   searches.

17         **b.**     **Plaintiff Fails to Allege Sufficient Facts Showing that Any**

18               **Sonoma County Policy Caused the Purported Violation**

19         Independent of plaintiff's failure to allege that Sonoma County maintains an

20   actionable policy, plaintiff separately fails to show how or why such policy serves as the

21   proximate and legal cause of Smith's February 15, 2019 entry.  To substantiate the

22   Monell claim's causation element, plaintiff relies on only FAC paragraph 50 and 51.  In

23   those paragraphs, plaintiff summarily alleges that:

24             At all relevant times herein, all individual Defendants named
herein . . . were acting pursuant to the customs, policies, and
25             practices of [Sonoma County] . . .

26             As a direct and proximate result of the acts and omissions
complained of herein, Plaintiff has sustained, and continues to
27             sustain, general and special damages in an amount to be
proven at trial. FAC ¶¶ 50-51.

28

1   Neither of the above allegations purporting to link a Sonoma County policy to the

2   February 15, 2019 entry rest on any particular fact. Again, when viewed in the context of

3   paragraphs 46-51, the court finds that these two allegations serve as nothing more than a

4   formulaic recitation of the causation element necessary to substantiate a Monell claim.

5   The court understands that plaintiff also attempts to raise new causation-related

6   facts in his opposition. In particular, plaintiff argues that:

7   At the same time, Wick is the decisionmaker that animates all
    the other Code Enforcement Inspectors for County, including
8   Smith. Smith would not have committed the constitutional
    violations alleged in this matter without either the express
9   approval of Wick or the knowledge that Wick would "have his
    back" after the fact. Smith would not have trespassed unless
10  Wick told him to. Dkt. 48 at 14.

11  Again, putting aside the procedural deficiency that plaintiff fails to allege this fact

12  in his FAC, the court finds that, even if taken as true, this fact would not support the

13  inference that a Sonoma County policy caused the purported constitutional violation at

14  issue. First, plaintiff argues this fact in the conditional. He does not actually state that

15  Wick **did** tell Smith to enter plaintiff's property. Second, the contention that Smith would

16  violate a constitutional right only if Wick supported that violation is conclusory. Plaintiff

17  fails to identify any predicate facts about the relationship between Smith and Wick

18  substantiating that summary assertion. Third, even if plaintiff had proffered such facts, he

19  failed to proffer any authority, see Dkt. 48 at 11-14, showing that a single instance of a

20  county official instructing an employee to take a certain course of action qualifies as "the

21  actionable cause of [the] claimed injury." Bearchild, 947 F.3d at 1150. Indeed, plaintiff

22  omits any reference (in his FAC, opposition, or otherwise) to whether Wick's supposed

23  instruction qualifies as the legal cause or proximate cause (or both) of the entry.

24  The court concludes that the Monell claim separately fails because plaintiff did not

25  allege sufficient facts showing that a Sonoma County policy caused his purported

26  constitutional injury.

27  **3.     The Court Denies Plaintiff Further Leave to Amend**

28  In his opposition, plaintiff requests leave to amend in the event the court "is

1   inclined to grant the defense motion." Dkt. 48 at 8.  In support of that request, he states

2   that he "can provide further factual allegations" to substantiate his claim that Sonoma

3   County maintains a policy of conducting unlawful searches.  Id.  Plaintiff later adds that

4   his opposition "alleges facts" not formally alleged in his FAC.  Id. at 15.  Plaintiff further

5   requests leave to amend on that additional ground.  Id.

6       The court denies plaintiff leave to amend for two reasons.  First, the court has, in

7   effect, already permitted plaintiff two opportunities to amend his complaint.  Neither

8   altered the viability of his Monell claim.  On August 10, 2020, the court granted plaintiff's

9   request to file a supplemental declaration (Dkt. 30-2) in support of his original complaint

10   and in opposition to defendants' first motion to dismiss.  Dkt. 34.  Plaintiff filed that

11   declaration after briefing closed on that motion.  Compare Dkt. 18 (reply brief filed on July

12   20, 2020) with Dkt. 30 (request for notice of supplemental declaration filed on August 8,

13   2020).  Thus, as part of his supplemental declaration, plaintiff had the opportunity to

14   correct the deficiencies in the Monell claim that Sonoma County identified in its moving

15   papers.  Dkt. 9 at 14-15.  Indeed, to justify his request that the court permit him leave to

16   file the declaration, plaintiff explained that the additional facts proffered in it "go to the

17   crux of [his] allegations in this matter."  Dkt. 30 at 2.  The court considered this

18   declaration when ruling on the viability of the claims in the original complaint.  Dkt. 36 at

19   3-4.  Despite the opportunity to proffer additional facts, plaintiff failed to state a Monell

20   claim against Sonoma County.

21       Separately, as noted above, the court formally permitted plaintiff another

22   opportunity to allege a Monell claim against Sonoma County following its September 9

23   order.  Id. at 14.  Despite that subsequent opportunity, plaintiff failed.

24       Second, and in any event, the court finds that further leave to amend the Monell

25   claim would be futile.  As detailed above, the court considered the purported "facts"

26   identified by plaintiff in his opposition that were not included in his FAC.  Those facts

27   (even if taken as true) would not compel the inference that Sonoma County maintains a

28   policy of conducting unlawful searches.  They also would not show a causal connection

United States District Court
Northern District of California

1   between any Sonoma County policy (sufficiently alleged or not) and plaintiff's claimed

2   constitutional deprivation.

3        The court has expended significant resources on this matter.  When accounting for

4   the present order, it has decided a motion for a temporary restraining (Dkt. 20), a motion

5   to disqualify (Dkt. 14), two motions to dismiss (Dkt. 9 and Dkt. 41), and a motion to strike

6   (Dkt. 47).  This action is almost a year old.  The parties must now enter discovery.

7   **C.   Motion to Strike Analysis**

8        In his opening brief, plaintiff challenges 14 of Smith's defenses on three distinct

9   grounds.  Dkt. 47 at 2.  As part of Smith's opposition, Michael King, counsel for Smith

10  ("counsel King"), filed a declaration indicating that he contacted plaintiff concerning the

11  motion to strike.  Dkt. 53-1.  In his declaration, counsel King states that he "agreed to

12  drop certain defenses" and "amend other defenses."  Id. ¶ 3.  As attachments to his

13  declaration, Counsel King filed three communications with plaintiff purportedly indicating

14  Smith's intent to modify his answer.  Id. ¶ 5.  Plaintiff did not formally accept Smith's

15  proposal.  Id. ¶ 3.

16       In his opposition brief, Smith asserts that, after accounting for the defenses that

17  he agreed to withdraw or amend, only three affirmative defenses remain at issue.  Dkt. 53

18  at 2.  Those defenses include the following:

19  •   Assumption of risk by plaintiff.  Ans. at 7 ¶ 7 (seventh defense).

20  •   Absolute immunity.  Id. at 8 ¶ 14 (fourteenth defense).

21  •   Reservation of the right to allege additional, unstated affirmative defenses.

22      Id. at 9 ¶ 20 (twentieth defense).

23       Plaintiff failed to file a reply in support of his motion.  Given that failure, the court

24  finds that plaintiff abandoned his motion's original challenges to Smith's second through

25  sixth defenses, eighth defense, ninth through twelfth defenses, fifteenth defense, and

26  nineteenth defense.  The court will consider the remaining three defenses in turn below.

27           **a.   Assumption of Risk Defense**

28       As his seventh defense, Smith alleges that plaintiff had "full knowledge" of some

United States District Court
Northern District of California

1   unspecified "risks, dangers, and hazards" but nevertheless "voluntarily and with full

2   appreciation of the amount of danger involved in his action . . . assumed the risk of injury

3   and damages to himself."  Ans. at 7 ¶ 7.

4       In his opening brief, plaintiff challenges this defense on two grounds.  First, plaintiff

5   argues that Smith fails to allege a sufficient factual basis for this defense.  Dkt. 47 at 6.

6   Second, plaintiff argues that this defense fails as a matter of law because the Ninth

7   Circuit "has long recognized that contributory negligence is a defense only to actions

8   grounded on negligence."  Dkt. 47 at 6.  Plaintiff adds that the Supreme Court "has held

9   that comparative/contributory fault is no bar to intentional wrongdoing."  Id.  In his

10  opposition, Smith explains that, given the claims against him, "there is a possibility that

11  unintentional (negligent) conduct may be at issue in this case."  Dkt. 53 at 5.

12      As this court recently explained, "when analyzing the factual sufficiency of an

13  alleged affirmative defense, courts in this district apply the pleading standard set forth in

14  Twombly and Iqbal."  Cisco Systems, Inc., et. al., v. Chung, et. al., 2021 WL 427293, at

15  *8 (N.D. Cal. Feb. 8, 2021) (citing Perez v. Gordon & Wong Law Grp., P.C., 2012 WL

16  1029425, at *7-8 (N.D. Cal. Mar. 26, 2012) (collecting cases)).

17      Plaintiff is correct that Smith's assumption of risk defense fails that standard.

18  Smith provides only vague allegations about plaintiff's knowledge and appreciation of

19  risks in the events underlying this action.  Smith fails to tie such knowledge and

20  appreciation to any specific event at issue.  He also fails to explain how or why plaintiff, in

21  fact, assumed such risk.  Thus, on the basis of plaintiff's first argument, the court strikes

22  the assumption of risk defense.  Given that plaintiff failed to contest Smith's assertion that

23  this defense might be relevant to the claims against him, the court need not consider

24  plaintiff's second argument.

25          **b.    Absolute Immunity Defense**

26      As his fourteenth defense, Smith alleges that he "acted within the scope of his

27  discretion, in good faith, with due care, and pursuant to applicable rules, regulations and

28  practices, which were reasonably and in good faith believed to be in accordance within

United States District Court
Northern District of California

1   the Constitution and laws of the United States, and that Defendant is therefore immune

2   from liability."  Ans. at 8 ¶ 14.

3       In his opening brief, plaintiff argues that this defense is "insufficient and

4   superfluous."  Dkt. 47 at 2.  Plaintiff explains that it is unclear which applicable law Smith

5   references.  Id. at 7.  Plaintiff further asserts that, absent additional information, this

6   defense is also "redundant of" Smith's thirteenth defense (qualified immunity) and

7   eighteenth defense (statutory immunity under the California Government Torts Act)."  Id.

8       In his opposition, Smith argues only that plaintiff "is well aware that the basis for

9   [this defense, among others] is his conduct for failure to obtain permits and abate the

10  nuisances that existed and still exist," which Sonoma County previously communicated to

11  plaintiff.  Dkt. 53 at 3-4.

12      The court finds that Smith fails to adequately allege the basis of this defense.

13  First, Smith fails to identify any authority supporting his proffered "absolute immunity"

14  defense.  He also fails to describe how such defense differs from his qualified immunity

15  or statutory immunity defenses.  Second, even if he had proffered such authority or

16  description, Smith fails to explain how or why **his** conduct falls within the scope of an

17  absolute immunity defense.  Lastly, Smith fails to specify the purported "rules,

18  regulations, or practices" referenced in that defense.  Accordingly, the court strikes the

19  absolute immunity defense without prejudice.

20              c.       **Reservation of Rights Defense**

21      As his twentieth affirmative defense, Smith alleges that he "reserves the right to

22  assert additional defenses in the event that discovery indicates it would be appropriate."

23  Ans. at 9 ¶ 20.

24      As plaintiff correctly points out, Dkt. 47 at 7, "[a]n attempt to reserve affirmative

25  defenses for a future date is not a proper affirmative defense in itself."  Solis v. Zenith

26  Capital, LLC, 2009 WL 1324051, at *7 (N.D. Cal. May 8, 2009).  Smith effectively

27  acknowledges the same.  Dkt. 53 at 4 ("[The twentieth defense] is not technically a

28  defense, and Defendant will need to move to amend in any event, if proof changes the

United States District Court
Northern District of California

1 | pleading."). Accordingly, the court strikes this defense with prejudice. To the extent
2 | Smith later seeks to add an affirmative defense, he must move for leave to do so.

3 | <div align="center">**d.    Smith Must File an Amended Answer**</div>

4 | Rule 8's pleading requirements, as construed by <u>Twombly</u>, <u>Iqbal</u>, and their Ninth
5 | Circuit progeny, apply to a defendant's answer. These requirements are black letter law.
6 | Thus, the court need not describe them here.

7 | The court permits Smith a single opportunity to amend his defenses for
8 | assumption of risk and absolute immunity to meet these requirements. Smith must
9 | correct all pleading deficiencies in each such defense, including without limitation those
10 | identified above. If Smith fails to do so, the court will strike both defenses with prejudice.

11 | Separately, in his opposition, Smith represents to the court that he has "agreed to
12 | amend" his defenses for failure to exhaust administrative remedies, failure to mitigate
13 | damages, violation of law by plaintiff, unclean hands, contribution of risks by plaintiff, and
14 | proper exercise of police powers. Dkt. 53 at 5 ("Defense counsel agreed to amend
15 | affirmative defenses 2, 4, 6, 8, 9, and 15, to some degree; primarily to spell out what Mr.
16 | Cupp already knows from his Complaint and attachments."). Given that representation,
17 | the court orders Smith to file an amended answer correcting all factual deficiencies in
18 | each of the above defenses. Again, when doing so, Smith must comply with the pleading
19 | requirements set forth in <u>Twombly</u> and <u>Iqbal</u>.

20 | Lastly, Smith also represents that he has agreed to strike his res judicata, consent,
21 | and privilege defenses. Dkt. 53 at 5 ("Nevertheless, defense counsel agreed to drop
22 | defenses numbers 3, 10, and 11, for the present, without prejudice to raising those
23 | defenses in the future."). Given that representation, the court orders Smith to remove
24 | these defenses from his amended pleading.

25 | <div align="center">**CONCLUSION**</div>

26 | For the above reasons, the court **GRANTS** Sonoma County's motion to dismiss
27 | the <u>Monell</u> claim against it **WITH PREJUDICE**. Dkt. 41. The court also **STRIKES** the
28 | FAC's references to Tennis Wick as a defendant. Such references include FAC

<div align="center">16</div>

1   paragraphs 2, 10, 44, and 45.  As of the date of this order, Sonoma County is also **no**
2   **longer** a defendant in this action.  Thus, the only remaining defendant is Andrew Smith.

3        The court **GRANTS** plaintiff's motion to strike Smith's defenses for assumption of
4   risk and absolute immunity.  **Within 21 days of this order**, Smith may file an amended
5   answer accounting for all pleading deficiencies in these two defenses.  In any event,
6   Smith must timely file an amended answer accounting for all such deficiencies in the six
7   defenses that he voluntarily agreed to amend.  In that same answer, Smith must remove
8   his defenses for res judicata, consent, privilege, and reservation of rights.  Absent leave
9   of court or plaintiff's consent, Smith may not otherwise amend his answer.  When filing
10  his amended answer, Smith must provide a redline clearly showing each amendment
11  made to his original answer.  The subject redline must be filed as a separate attachment.

12       The court will set this matter for a case management conference after the
13  pleadings are settled.
14       **IT IS SO ORDERED.**
15  Dated: February 17, 2021

16                                    /s/ Phyllis J. Hamilton
17                                    PHYLLIS J. HAMILTON
                                      United States District Judge
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 6

1

2

3

4                            UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    RONALD CUPP,

8                    Plaintiff,                    Case No.  20-cv-03456-PJH

9           v.
                                                   **ORDER DENYING, IN PART, AND**
10   ANDREW SMITH,                                 **GRANTING, IN PART, DEFENDANT'S**
                                                   **MOTION FOR SUMMARY JUDGMENT**
11                   Defendant.
                                                   Re: Dkt. No. 78
12

13

14          Defendant's motion for summary judgment, or partial summary judgment, came on

15   for hearing before this court on February 3, 2022.  Plaintiff appeared through his counsel,

16   Eric Young.  Defendant appeared through his counsel, Michael King.  Having read the

17   papers filed in conjunction with the motion and carefully considered the arguments and

18   the relevant legal authority, and good cause appearing, the court hereby rules as follows.

19                                        **BACKGROUND**

20   **I.      Factual History**

21          This case concerns the February 15, 2019 warrantless search of plaintiff Ronald

22   Cupp's property by Sonoma County Code Inspector Andrew Smith ("defendant").  Plaintiff

23   purchased the property located at 4640 Arlington Ave, Santa Rosa, California ("Arlington

24   property") on August 18, 1989.  Smith Decl. ISO Mot. for Summ. J., Ex. 6 (Dkt. 78-9 at 2).

25   Between April 4, 2013 and January 24, 2019, plaintiff underwent foreclosure proceedings

26   and negotiated ownership terms over the property with Federal National Mortgage

27   Association ("Fannie Mae").  Cupp Decl. ISO Opp'n to Mot. for Summ. J. (Dkt. 81-1 at 2).

28   Plaintiff testified that he reoccupied the Arlington property around January 10, 2019.  Dkt.

78-15 at 4.  On January 24, 2019, Fannie Mae granted plaintiff a quitclaim deed to the property but the deed was not recorded.  Dkt. 81-1 at 14.  The quitclaim deed was redrawn on February 20, 2019 and recorded shortly thereafter.  Dkt. 78-8 at 2.

According to plaintiff, the Arlington property is a 4.33-acre parcel of land.  Dkt. 81-1 at 2.  The property is only accessible by a private road, and is landlocked on three sides (northern, southern, and eastern).  Id. at 2–3.  The property has a two-story single family home residence, along with a garage located twenty-five feet from the southwest corner of the residence.  Id. at 3.  Plaintiff declared that the residence and garage are enclosed by fences and/or gates.  Id. at 4.  The garage is accessible through two doors, none of which face the street.  Id. at 3.  The only way to approach the garage is by entering the Arlington property through an eight-foot gap in a ninety-three inch tall wooden fence on the western edge of the property.  Id. at 5.  According to plaintiff, neither the public nor delivery persons access the Arlington property through this gap.  Id.

According to defendant's violation complaint form, an unidentified individual complained about the Arlington property on January 28, 2019, alleging unpermitted construction.  Dkt. 78-6 at 2.  On January 29, 2019, defendant sent Fannie Mae a courtesy notice, stating that there had been one or more complaints made about the Arlington property concerning possible code violations and that he would like to arrange a time to see the property.  Dkt. 78-7 at 2.

On February 15, 2019, defendant visited the Arlington property without the consent of either plaintiff or Fannie Mae.  According to defendant's declaration, defendant observed from the street new construction, and he heard sounds of construction activity.  Dkt. 78-1 at 2.  According to plaintiff, defendant entered the property through a gap in a wooden gate.  Dkt. 81-1 at 4–5.  According to Daniel St. Clair's declaration, defendant walked to the back of the garage where a door was open; he entered the garage through the door and found a worker there, St. Clair.  Dkt. 78-2 at 1–2.  St. Clair declared that he informed defendant that he was not the owner of the Arlington property but that he was doing remodeling work for the owner; namely, St. Clair was adding new flooring to the

2

United States District Court
Northern District of California

1   garage.  Id.  According to defendant, he proceeded to walk around the garage and the

2   adjacent carport and took several photographs of the property.  Dkt. 78-1 at 2–3.

3   Defendant testified that he left citations for plaintiff for construction without a permit.  Dkt.

4   78-10 at 10.

5          On February 20, 2019, plaintiff sent a letter to the County of Sonoma regarding the

6   February 15, 2019 inspection, stating the following: "I intend to file a claim against the

7   County of Sonoma if my rights are violated and will be contacting you again shortly in

8   regards to this intentional tort and damage if our constitutional protections are not

9   upheld."  Dkt. 78-16 at 3.  Plaintiff then filed his claim with the County on October 23,

10  2019.  Dkt. 78-18 at 3.  On November 6, 2019, the County of Sonoma informed plaintiff

11  his claim was untimely because it was not presented within six months of the event or

12  occurrence, as was required by sections 901 and 911.2 of the California Government

13  Code.  Id. at 7.

14  **II.     Procedural History**

15         On May 21, 2020, plaintiff filed this lawsuit.  Dkt. 1.  Plaintiff brought various claims

16  under 42 U.S.C. § 1983 in connection with defendant's allegedly unlawful search of the

17  Arlington property.  Id.  On September 9, 2020, this court dismissed with prejudice all

18  claims against all previously named defendants, except Smith and the County of

19  Sonoma.  Dkt. 36.  On October 7, 2020, plaintiff filed his amended complaint.  Dkt. 38.

20  On February 17, 2021, the court dismissed the County of Sonoma as a defendant.  Dkt.

21  57.  Currently, Smith is the only remaining defendant in this lawsuit, and plaintiff has two

22  remaining claims against him: (1) a § 1983 claim for an unlawful search in violation of the

23  Fourth Amendment, and (2) a California state law claim for trespass.  Dkt. 60.  On

24  December 9, 2021, defendant moved for summary judgment on plaintiff's remaining

25  claims.  Dkt. 78.

**DISCUSSION**

26

27  **A.     Legal Standard**

28         A party may move for summary judgment on a "claim or defense" or "part of . . . a

3

1   claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "there

2   is no genuine dispute as to any material fact and the movant is entitled to judgment as a

3   matter of law." Id.

4       A party seeking summary judgment bears the initial burden of informing the court

5   of the basis for its motion, and of identifying those portions of the pleadings and discovery

6   responses that demonstrate the absence of a genuine issue of material fact. See

7   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might

8   affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

9   (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a

10  reasonable jury to return a verdict for the nonmoving party. Id.

11      On an issue where the nonmoving party will bear the burden of proof at trial, the

12  moving party may carry its initial burden of production by submitting admissible "evidence

13  negating an essential element of the nonmoving party's case," or by showing, "after

14  suitable discovery," that the "nonmoving party does not have enough evidence of an

15  essential element of its claim or defense to carry its ultimate burden of persuasion at

16  trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir.

17  2000).

18      When the moving party has carried its burden, the nonmoving party must respond

19  with specific facts, supported by admissible evidence, showing a genuine issue for trial.

20  Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material—the existence of

21  only "*some* alleged factual dispute between the parties will not defeat an otherwise

22  properly supported motion for summary judgment." Anderson, 477 U.S. at 247–48.

23      When deciding a summary judgment motion, a court must view the evidence in the

24  light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

25  Id. at 255; see Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).

26  **B.    Analysis**

27      **1.    The Fourth Amendment**

28      Defendant moves for summary judgment on plaintiff's Fourth Amendment claim.

United States District Court
Northern District of California

4

1  The Fourth Amendment "protects two types of expectations, one involving searches, the

2  other seizures." Lavan v. City of Los Angeles, 693 F.3d 1022, 1027 (9th Cir. 2012)

3  (internal quotation marks omitted).  A "search occurs when the government intrudes upon

4  an expectation of privacy that society is prepared to consider reasonable." Id. (internal

5  quotation marks omitted).  Defendant argues his warrantless search of the Arlington

6  property was reasonable and legally permissible.

7  First, defendant argues that plaintiff had no reasonable expectation of privacy

8  because the garage is not within the curtilage of plaintiff's home.  The "extent of the

9  curtilage is determined by factors that bear upon whether an individual reasonably may

10  expect that the area in question should be treated as the home itself." United States v.

11  Duenas, 691 F.3d 1070, 1081 (9th Cir. 2012) (internal quotation marks omitted).  The

12  court considers four factors in determining whether an area is within the curtilage of a

13  home: (1) "the proximity of the area claimed to be curtilage to the home;" (2) "whether the

14  area is included within an enclosure surrounding the home;" (3) "the nature of the uses to

15  which the area is put;" and (4) "the steps taken by the resident to protect the area from

16  observation by people passing by." United States v. Dunn, 480 U.S. 294, 301 (1987).

17  "While combining these factors does not produce a finely tuned formula that, when

18  mechanically applied, yields a correct answer to all extent-of-curtilage questions, the

19  factors are useful in determining the centrally relevant consideration—whether the area in

20  question is so intimately tied to the home itself that it should be placed under the home's

21  umbrella of Fourth Amendment protection." Duenas, 691 F.3d at 1081 (internal quotation

22  marks omitted).  Notably, the Supreme Court "has long extended the Fourth

23  Amendment's protection to garages." United States v. Oaxaca, 233 F.3d 1154, 1157 (9th

24  Cir. 2000).

25  The Dunn factors do not support defendant's position.  First, plaintiff's garage is in

26  close proximity to the residence, only twenty-five feet away.  Dkt. 81-1 at 3; see, e.g.,

27  Dunn, 480 U.S. at 302 (finding a barn not within close proximity of the curtilage of the

28  home because it was sixty yards away from the house); United States v. Johnson, 58 F.

United States District Court
Northern District of California

App'x 287, 288 (9th Cir. 2003) (noting a shed that was forty-to-fifty yards from a residence "weigh[ed] against a finding that the shed is within his curtilage").  Second, plaintiff's garage and residence were enclosed together by a wooden fence that was ninety-three inches tall and running the length of the street (Dkt. 81-1 at 4).  See, e.g., Dunn, 480 U.S. at 302 (finding defendant's barn "did not lie within the area surrounding the house that was enclosed by a fence"); United States v. Davis, 530 F.3d 1069, 1078 (9th Cir. 2008) (finding a "workshop was set apart from the house and other areas of the [defendant's] property by a separate chain-link fence").  Although defendant asserts the garage here was separately fenced from the residence (Dkt. 78 at 16), plaintiff declares otherwise (Dkt. 81-1 at 4), creating a triable issue of fact.  Third, the parties also dispute the garage's use at the time of defendant's inspection.  Plaintiff asserts the garage was being used as a living space or "granny unit" (Dkt. 81-1 at 3), which would weigh in favor of finding the garage was within the curtilage of plaintiff's home.  But plaintiff's construction worker, upon whom defendant relies, declared he was "installing flooring in the garage" at the time of the inspection.  Dkt. 78-2 at 1.  If the garage was being used as a living space, it was not being used as a living space at the time of the inspection.  See United States v. Barajas-Avalos, 377 F.3d 1040, 1057 (9th Cir. 2004) (stating "occasional occupancy did not demonstrate that the travel trailer harbored those intimate activities associated with domestic life and the privacies of the home") (internal quotation marks and alterations omitted).  Photographs from the inspection appear to show that the garage was being used as a workshop for storing construction material.  Thus, a further triable issue of fact exists.  Fourth, plaintiff protected the garage from observation, even if he did not rely on "no trespassing" signs.  Plaintiff built a ninety-three inch tall wooden fence around the garage to shield it from observation and from the public.  Dkt. 81-1 at 4.  Taken together, the Dunn factors raise triable issues of fact as to whether the garage was within the curtilage of plaintiff's home.  Thus, the court cannot find that plaintiff had no reasonable expectation of privacy, and defendant has not met his burden to obtain summary judgment on this basis.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Second, defendant argues that his warrantless search was permissible under the "open fields" doctrine. Dkt. 78 at 14. This doctrine is inapplicable where an officer searches the curtilage of a home. See United States v. Jones, 565 U.S. 400, 411 (2012) ("Quite simply, an open field, unlike the curtilage of a home . . . is not one of those protected areas enumerated in the Fourth Amendment") (internal quotation marks and citation omitted). Accordingly, the doctrine cannot apply until and unless the garage is found not to be within the curtilage of plaintiff's home. Thus, summary judgment on this basis is not warranted. Additionally, defendant's reference to the "plain view" exception does not appear to apply here where no item in plain view was seized. See, e.g., Kentucky v. King, 563 U.S. 452, 463 (2011); United States v. Brinkerhoff, 404 F. App'x 147, 149 (9th Cir. 2010) ("Officers may seize an item in plain view if they have probable cause to believe that the item is incriminating").

Third, defendant argues his unwarranted search was permitted pursuant to the "knock and talk" exception. The knock and talk exception "permits law enforcement officers to encroach upon the curtilage of a home for the purpose of asking questions of the occupants." United States v. Lundin, 817 F.3d 1151, 1158 (9th Cir. 2016) (internal quotation marks omitted). To "qualify for the exception, the government must demonstrate that the officers conformed to the habits of the country by doing no more than any private citizen might do." Id. at 1159 (internal quotation marks, citations, and alterations omitted). For example, "a doorbell or knocker on the front door often signals a homeowner's consent allowing visitors to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Bovat v. Vermont, 141 S. Ct. 22 (2020) (internal quotation marks omitted).

Unlike a front door which customarily invites individuals to engage with a property's resident, defendant entered the garage through an eight-foot gap in a wooden fence that is not available to the public. Dkt. 81-1 at 4–5. Even if plaintiff did grant an implied license, defendant likely exceeded the scope of that license. The "customary license to approach a home and knock is generally limited to the purpose of asking

1    questions of the occupants." <u>Lundin</u>, 817 F.3d at 1159 (internal quotation marks

2    omitted).  Defendant approached the garage area, entered the garage door, spoke with

3    plaintiff's worker, walked through plaintiff's carport, and then took multiple photographs of

4    the garage and surrounding area.  <u>See</u> <u>Bovat</u>, 141 S. Ct. 22 ("A visitor cannot traipse

5    through the garden, meander into the backyard, or take other circuitous detours that veer

6    from the pathway that a visitor would customarily use") (internal quotation marks omitted).

7    Thus, summary judgment is not warranted on this basis.

8         The court has found that defendant has not shown that he is entitled to summary

9    judgment on the Fourth Amendment claim.  But that doesn't mean that the court has

10   found in plaintiff's favor; rather the court has found that the jury must first find the facts

11   before any defenses of defendant can be applied.  Defendant's motion for summary

12   judgment on plaintiff's Fourth Amendment claim is DENIED.

13        **2.    Qualified Immunity**

14        Defendant moves for summary judgment on plaintiff's Fourth Amendment claim on

15   the basis that he is entitled to qualified immunity.  The doctrine of "qualified immunity

16   shields individual officers from liability for civil damages insofar as their conduct did not

17   violate clearly established constitutional rights of which a reasonable person would have

18   known." <u>Kirkpatrick v. Cty. of Washoe</u>, 843 F.3d 784, 788 (9th Cir. 2016) (internal

19   quotation marks and alterations omitted).  "Summary judgment on qualified immunity is

20   not proper unless the evidence permits only one reasonable conclusion." <u>Munger v. City</u>

21   <u>of Glasgow Police Dep't</u>, 227 F.3d 1082, 1087 (9th Cir. 2000).  The court must determine

22   "(1) whether there has been a violation of a constitutional right; and (2) whether that right

23   was clearly established at the time of the officer's alleged misconduct." <u>Lopez v. City of</u>

24   <u>Glendora</u>, 811 F. App'x 1016, 1018 (9th Cir. 2020) (internal quotation marks omitted).  A

25   "constitutional right is clearly established at the time of the incident only if the right's

26   contours are sufficiently definite that any reasonable official in the defendant's shoes

27   would have understood that he was violating it." <u>Id.</u> (internal quotation marks omitted).

28        Reviewing the record in a light most favorable to plaintiff, the court finds that there

United States District Court
Northern District of California

1    are triable issues of fact as to whether defendant violated plaintiff's Fourth Amendment

2    rights.  Accordingly, the court DENIES defendant's alternative argument that he is entitled

3    to summary judgment on plaintiff's Fourth Amendment claim because he is qualifiedly

4    immune.

5              **3.    California Government Code § 910**

6              Defendant moves for summary judgment on plaintiff's California trespass claim,

7    arguing plaintiff failed to meet prelitigation requirements under California Government

8    Code § 910.  Section 910 requires a plaintiff to file a written claim with the government

9    within six months of an alleged violation "stating the date, place, and other circumstances

10   of the occurrence or transaction which gave rise to the claim asserted."  Mackovski v.

11   City of Garden Grove, 666 F. App'x 649, 654 (9th Cir. 2016) (internal quotation marks

12   omitted); see Cal. Gov't Code § 910.  Plaintiff did not comply with this requirement.

13   Plaintiff provided defendant with a letter on February 20, 2019 stating the following: "I

14   intend to file a claim against the County of Sonoma if my rights are violated, and will be

15   contacting you again shortly . . . ."  Dkt. 78-16 at 2 (emphasis added).  Plaintiff's letter

16   only states his conditional intent to file a claim, it does not provide actual notice of a valid

17   claim.  Indeed, plaintiff later presented his claim with the County of Sonoma on October

18   23, 2019, two months after the deadline had expired.  Dkt. 78-18 at 3.

19             Contrary to plaintiff's argument, defendant did not waive his right to assert this

20   defense.  Section 911 states that "[a]ny defense as to the sufficiency of the claim based

21   upon a defect or omission in the claim as presented is waived by failure to give notice of

22   insufficiency with respect to the defect or omission."  Cal. Gov't Code § 911.  Because

23   plaintiff's February 20, 2019 letter does not qualify as a presented claim under § 910, the

24   § 911 defense waiver does not apply to defendant.  Accordingly, the court GRANTS

25   summary judgment in favor of defendant on plaintiff's California trespass claim.

26             In view of this holding, the court does not reach defendant's other defenses to the

27   trespass claim based on California Government Code sections 820.4 and 821.8.  At the

28   hearing defendant conceded his argument that plaintiff was not the legal owner of the

1    Arlington property on February 15, 2019.

2         **4.      Punitive Damages**

3         Defendant moves for summary judgment on plaintiff's claim for punitive damages.

4    Dkt. 78 at 23.  A jury "may award punitive damages under section 1983 either when a

5    defendant's conduct was driven by evil motive or intent, or when it involved a reckless or

6    callous indifference to the constitutional rights of others."  Dang v. Cross, 422 F.3d 800,

7    807 (9th Cir. 2005) (internal quotation marks omitted).  Viewing all evidence in a light

8    most favorable to plaintiff, a reasonable juror may find defendant acted with callous

9    indifference by failing to apply for a warrant, searching the Arlington property without

10   plaintiff's consent, ignoring the fences on plaintiff's property, entering plaintiff's garage,

11   searching plaintiff's carport, and taking photographs of plaintiff's property.  Accordingly,

12   the court DENIES defendant's motion for summary judgment on plaintiff's claim for

13   punitive damages.

14                               **CONCLUSION**

15        The court GRANTS defendant's motion for summary judgment on plaintiff's state

16   law trespass claim.  The court DENIES defendant's motion for summary judgment on

17   plaintiff's Fourth Amendment claim.  The court SUSTAINS plaintiff's objection to paragraph

18   8 of defendant's declaration because it calls for a legal conclusion.

19        This matter is re-referred to Magistrate Judge Westmore for a settlement conference

20   to take place within the next 120 days, or as soon thereafter as her calendar permits.  If

21   the parties are unable to settle the case, a case management conference will be held to

22   schedule the trial.

23        **IT IS SO ORDERED.**

24   Dated: February 23, 2022

25                                    */s/ Phyllis J. Hamilton*

26                                    PHYLLIS J. HAMILTON
                                     United States District Judge

27

28

United States District Court
Northern District of California

EXHIBIT 7

1

2

3

4                      UNITED STATES DISTRICT COURT

5                      NORTHERN DISTRICT OF CALIFORNIA

6

7    RONALD CUPP,

8                  Plaintiff,                    Case No.  20-cv-03456-PJH

9         v.

10   ANDREW SMITH,                               **ORDER OF DISMISSAL WITH**
                                                 **PREJUDICE**
11                 Defendant.
                                                 Re: Dkt. No. 143
12

13

14        Before the court is the parties' stipulation to dismiss this lawsuit with prejudice

15   under Federal Rule of Civil Procedure 41(a)(1)(ii).  This case has been thoroughly

16   litigated, and trial is set to begin in less than one week, on April 3, 2023.  The sole

17   remaining claim is brought under Title 42 U.S.C. § 1983 for alleged breach of plaintiff's

18   Fourth Amendment rights based on defendant Andrew Smith's February 15, 2019,

19   inspection/search of the property at 4640 Arlington Avenue in Santa Rosa, California.

20   Plaintiff has made clear that the claim is against Smith in both his personal and official

21   capacity.  Dkt. 1, Dkt. 38 (SAC ¶ 8), Dkt. 129.  In light of the parties' agreement, the court

22   ORDERS that this case is hereby DISMISSED WITH PREJUDICE as to all claims,

23   causes of action, and parties, including against Smith in his personal and official capacity.

24        The parties' stipulation states, "Defendant reserves the right to request an award

25   of fees and/or costs as allowed by the Court; Plaintiff reserves the right to oppose such

26   request."  Dkt. 43 at 1.  Defendant, as the prevailing party, may submit a bill of costs in

27   accordance with Federal Rule of Civil Procedure 54 and Civil Local Rule 54.  Plaintiff may

28   object in accordance with those same Rules.

United States District Court
Northern District of California

1       On the other hand, attorneys' fees may be awarded against an unsuccessful

2  § 1983 plaintiff only "in exceptional circumstances" where the court finds "the plaintiff's

3  action was frivolous, unreasonable, or without foundation." <u>Harris v. Maricopa Cnty.</u>

4  <u>Superior Ct.</u>, 631 F.3d 963, 968 (9th Cir. 2011) (cleaned up); <u>see also</u> 42 U.S.C.

5  § 1988(b).  Defendant may certainly file a fee petition in light of this authority.  However,

6  given the survival of the plaintiff's § 1983 claim to this stage of litigation, the court would

7  be hard-pressed to find that an award of attorneys' fees would be appropriate under this

8  standard.

9       **IT IS SO ORDERED.**

10  Dated: March 30, 2023

11                       */s/ Phyllis J. Hamilton*

12                       PHYLLIS J. HAMILTON
                           United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

          Plaintiff,

    v.

ANDREW SMITH,

          Defendant.

Case No.  20-cv-03456-PJH

**JUDGMENT**

    The issues having been duly heard and the court having granted the parties' stipulation to dismiss the case with prejudice,

    it is Ordered and Adjudged

    that plaintiff take nothing, and that the action is dismissed with prejudice.

    **IT IS SO ORDERED.**

Dated: March 30, 2023

                             */s/ Phyllis J. Hamilton*

                             PHYLLIS J. HAMILTON
                             United States District Judge

EXHIBIT 8

1  Ronald Cupp
   150 Raley Town Center Ste 2512
2  Rohnert Park, California [94928]
   Telephone: (707) 318-9929
3  Plaintiff in Pro Se

4

5

6

**FILED**

JUL 26 2022

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

7

8                 **UNITED STATES DISTRICT COURT**

9               **NORTHERN DISTRICT OF CALIFORNIA**     **TSH**

10                                                        4307
                                          **CV 22**
11  Ronald Cupp                            ) CASE NO:
                                           )
12       Plaintiff,                        ) **VERIFIED COMPLAINT FOR**
                                           ) **DAMAGES**
13       vs.                               ) **FOR CIVIL RIGHTS VIOLATIONS**
                                           )
14  COUNTY OF SONOMA;                      )
    ANDREW SMITH, individually.            ) **COMPENSATORY DAMAGES**
15  TODD HOFFMAN, individually.            ) **DECLARATORY RELIEF**
                                           ) **INJUNCTIVE RELIEF**
16  TYRA HARRINGTON, individually.         ) **PUNITIVE DAMAGES**
    MARK FRANCESCHI, individually.         )
17  TENNIS WICK, individually.             )
    MICHAEL KING, individually.            ) **DEMAND FOR TRIAL BY JURY**
18  ANTHONY CINQUINI, individually.        )
    CINQUINI & PASSARINO, INC.             )
19                                         )
    DOES 1-20                              )
20                                         )
                                           )
21       Defendants.                       )
                                           )
22  ─────────────────────────────────────

23          **INTRODUCTION AND OPENING STATEMENT**

24       Plaintiff Ronald Cupp (hereinafter "CUPP"), complains as follows:

25       This is a civil rights action arising from unconstitutional and unlawful actions taken by

26  Sonoma County PRMD and its Code Enforcement Officers towards "CUPP" and landowners.

27

28

COMPLAINT FOR VIOLATIONS OF CIVIL RIGHTS, AND STATE LAW VIOLATIONS                    1

RECEIVED

2022 JUL 25 P 3: 37

CLERK, US DISTRICT COURT
NO. DIST. OF CA.

421

In May 2019 CUPP filed a complaint against same state actors, same property, same causes of action; that case CV 20-3456 PJH. During the continuing course of events, same state actors continued to violate CUPP's individual and property rights. CUPP had attempted to add these new damages as new counts and Does in the above case, but Honorable Judge Hamilton instructed CUPP he was limited to the events of 'that case' of February 15, 2019, in that case, and any of the new damages and actions by state actors would have to be a new complaint. This is that new complaint for continuing damages caused by unlawful actions by the same state actors.

## I.     **JURISDICTION AND VENUE**

1.     Plaintiff brings this action pursuant to, and jurisdiction of this Court arises under Title 42 USC sections §1983, §1985, §1986 and §1988, and the Civil Rights Act of 1870; Article VI, Section 10 of the California Constitution; Civil Code sections 51.7 & 52.1; Code of Civil Procedure section 88; and Government Code section 12960, and invokes the jurisdiction of this court pursuant to Title 28 USC Section §1343 (A)(3)(4), Section §1331 (Federal Question), and pursuant to the 4th and 14th Amendment, and supplemental jurisdiction exists for the state law claims pursuant to 28 USC  §1367 , Jurisdiction arises under Cal. Civ. Pro. §410.10.  At all times relevant, all of the causes of action were committed within the geographical jurisdiction of this court.

2.     Venue is proper pursuant to 28 U.S.C. §1391b and Cal. Civ. Pro. §395(a). Venue in this District is proper in that the Plaintiff resides here, the Defendants are employed and transact business here, and the conduct complained of occurred here.

## II.     **PARTIES**

3.      Plaintiff Ronald Cupp, herein after "CUPP" or "PLAINITFF", at all times relevant herein, lived at 4640 Arlington Avenue, Santa Rosa, Sonoma County, California; and has lived in Sonoma County since 1987. Mailing address is 150 Raley Town Center, Suite 2512, Rohnert Park, CA 94928.

4.      Defendant Todd Hoffman, hereinafter "HOFFMAN", Defendant Andrew Smith, hereinafter 'SMITH", Defendant Tyra Harrington, hereinafter "HARRINGTON",  Defendant Mark Franceschi, hereinafter "FRANCESCHI",  Defendant Tennis Wick, hereinafter 'WICK", at all times relevant to this complaint was the Code Enforcers and Inspectors employed by the County of Sonoma, California; and is being sued individually and in their official capacities. Be it known that "HOFFMAN", "SMITH", "HARRINGTON" and others comprise the "CODE ENFORCEMENT DIVISION" and are all ***ex-police officers or sheriff*** of many substantial years, indicating that their knowledge and actions are far more egregious knowing that they know the rules and laws that "CUPP" complains of here.

5.      Defendant Michael King, Deputy Sonoma County Counsel, herein after "KING", at all times relevant to this compliant was the Deputy Sonoma County Counsel employed by the County of Sonoma, California; and is being sued individually and in his official capacity.

6.      Defendant Anthony Cinquini, an individual Independent Subcontractor or hire, herein after "CINQUINI", at all times relevant to this compliant was Independent Subcontractor for hire by the Permit & Resource Management Director or his employees, employed by the County of Sonoma, California; and is being sued individually.

7.      Defendant CINQUINI & PASSARINO, INC, a Person hired by Sonoma County Permit & Resource Management Director, or his charges, herein after "CINQUINI & PASSARINO", at all times relevant to this compliant was the Permit & Resource Management

Subcontractor employed by the County of Sonoma, California; and is being sued in it official capacity.

8.     Defendant County of Sonoma California, herein after "COUNTY", is a quasi-judicial corporation within the State of California, located at 575 Administration Drive, Santa Rosa, CA 95403. At all times relevant to this complaint Defendant "COUNTY" either directly or indirectly trained, controlled, made policy for, employed, supervised, compensated, enriched, or rewarded and ratified some or all of the other defendants for their actions on AND AFTER February 15, 2019, and thereafter. The "COUNTY" is being sued as a person.

9.     At all times relevant hereto, defendants "DOES 1-20" are unknown persons who have either created policy or custom and managed, ordered, controlled, or neglected to restrain or correct the Defendants herein from committing said civil rights violations complained herein. These Defendants will be identified as their names and addresses become known to the CUPP.

10.     Each of the named defendants collectively known as Defendants caused and is responsible for the below-described unlawful conduct and resulting injuries by, among other things: personally participating in the unlawful conduct or acting jointly or conspiring with others who did so by authorizing, acquiescing or setting in motion policies, plans or actions that led to the unlawful conduct; by failing to take action to prevent the unlawful conduct; by failing and refusing with deliberate indifference to "CUPPS" rights; and by ratifying the unlawful conduct that occurred by agents and officers under their discretion and control, including failing to take remedial steps or disciplinary action.

11.     In doing the acts alleged herein, defendants and each of them were on duty as PRMD CODE ENFORCEMENT OFFICERS, in uniform, armed, with badges and bad attitudes, and, thus, were acting within the scope and course of their employment with the "COUNTY".

12.     In doing the acts alleged herein, defendants and each of them had a duty to protect the health and safety of "CUPP", his property, and they failed to exercise due care in the enforcement of that duty.

13.     In doing the acts alleged herein, defendants and each of them acted as the agent, servant, employee, partner, joint-venturer, co-conspirator and/or in concert with each of said other defendants; and in engaging in the conduct hereinafter alleged, were acting with the permission, knowledge, consent, and ratification of their co-defendants, and each of them.

### III.     PLAIN SIMPLE STATEMENT OF FACTS

14.     In May 2019 "CUPP" filed a complaint against same defendants, in this same court, CV 20-3456 PJH, regarding the same and similar causes of action.

15.     The first case it is already determined that the property is enclosed on all sides with fencing, buildings and trees, not visible from the street or outside of the property, clearly "CUPP" had established actual expectation of privacy that society recognizes as reasonable, both subjectively and objectively, and that Curtilage is established. "CUPPS" property can hardly be described as an 'open field' or be able to use 'plain view' by any lay understanding of the term and, most of it is not visible from the ground.

16.     In violation of both the warrant and due process requirements of the state and federal constitutions, as further described in the following detailed facts and attached declarations, defendants trespassed and performed unreasonable searches upon the property and residence of "CUPP", and others, as a pattern and practice.

17.     On 6-12-19 "SMITH" by "HARRINGTON" caused to be filed Notice of Abatement Proceedings (liens) on "CUPP"S property before and without giving "CUPP" due

process and a hearing as required by code, "COUNTY"s own citations, Administrative

Procedures Act, documents #'s 2019039697 and 2019039721, thereby slandering "CUPP"s title.

18.     On or about 3-27-20 "CINQUINI", "CINQUINI & PASSARINO", and on

information and belief directed by "HOFFMAN" or "HARRINGTON" trespassed and performed

an unreasonable search by operating a drone to fly over "CUPPS" curtilage, fences, house(s) and

property at 4640 Arlington Avenue (all references made to this property unless otherwise noted,

"CUPP" has owned the property since 1989) and took videos/pictures.

19.     This was done without "CUPPS" permission, or a warrant and in secret, and not

discovered by "CUPP" until these images were used and submitted by "HOFFMAN" as an

intentional misleading statement to a Sonoma County Superior Court Judge to obtain an

inspection warrant. "HOFFMAN" created his Affidavit of Probable Cause on or about 7-12-20,

Obtained an Inspection Warrant on or about 7-20-20, and served the "invalid inspection warrant"

with "HARRINGTON" and "SMITH" and others on July 30, 2020.  (CASE SCV266746

inspection warrant).

20.     As Defendants pattern and practice, CASE SCV266746 was IMMEDIATELY

closed out so there could be no challenges to the warrant nor affidavit of probable cause used to

obtain the inspection warrant.

21.     "CUPP" discovered through an unrelated criminal case that "WICK",

"HARRINGTON", "HOFFMAN" and "COUNTY" have made 'private' agreements and

contracts to use 'CINQUINI", "CINQUINI & PASSARINO" to secretly use their unmanned

aerial aircraft, hereinafter "DRONE", fly over people's property and houses to document for the

"COUNTY" what they want without landowners permission or knowledge or public

documentation.

22.     On information and belief, there has been no required public bidding for these services (REQUIRED BY LAW) and although they execute a contract for the unreasonable search and trespass, it is done in private and in secrecy.

23.     These 'DRONES" have thermal imagery, High-Definition Video and Telephoto Imagery capabilities. They are not like a flying over fixed wing aircraft nor a helicopter that is flying over an open field looking for what is in plain view. These hover, can spin in place while hovering, zoom in and out with video and camera capabilities, and scare or threaten occupants outside of houses and inside of houses, around your 'yards' and in essence, their 'protected private space'.

24.     Just because technology develops new and innovative ways in which a person's privacy can be violated should not dictate whether that person's legitimate expectation of privacy should or could be violated, and whether society should continue to recognize that expectation as reasonable.

25.     Low-altitude, unmanned, specifically targeted drone surveillance of "CUPPS" private individual's property is qualitatively different from the kinds of human-operated aircraft overflights permitted by Ciraolo of a fixed wing aircraft at 1000 ft and Riley's use of a helicopter at 400 ft. Drone surveillance of this nature intrudes into "CUPPS" reasonable expectations of privacy, so such surveillance implicates the Fourth Amendment and is illegal without a warrant or a traditional exception to the warrant requirement. A drone is therefore necessarily more intrusive into "CUPPS" private space than would be an airplane overflight.

26.     In other words, drones are intrinsically more targeted in nature than airplanes and much easier to deploy. Also, given their maneuverability, speed, and stealth, drones are—like thermal imaging devices—capable of drastically exceeding the kind of human limitations that

would have been expected by the Framers not just in degree, but in kind. Drones fly below what is usually considered public or navigable airspace. Consequently, flying them at legal altitudes over another person's property without permission or a warrant would reasonably be expected to constitute a trespass.

27.    In addition, upon discussion with several people who have experienced the "COUNTY'S" "DRONE" flyover experience, all have experienced low flying, intrusive, unwelcome threatening scaring experiences. (EXHIBIT A attached and incorporated by reference– A.1 STAVRINIDES, A.2 PETERSON, A.3 MUSGROVE, A.4 BUSENBARK, A.5 AVATAR, A.6 CRUZ).

28.    California legislature has already outlined that drones may not be used to violate a civilians reasonable expectation of privacy (Civil Code 1708.8). So, because they are government, is it right and damages do not apply?

29.    The" COUNTY" and all defendants, with the ***INTENT as government agents*** to' spy and look over peoples fences surrounding their houses, breach the house curtilage and private areas; these are performed routinely and as a pattern and practice of just 'lets see what so and so is doing at their house and property' and then we will decide if they have broken some rule or statute. Supreme Court ruled in Florida v. Jardines (2013) 569 U.S. 1  that this is not OK.

30.    There is no more an invasion of privacy and unreasonable search than this. If the court does not think so, please supply me with your address and I will have someone fly a "DRONE" over your house and see what you or your wife and your children are doing in the pool in your backyard, at my convenience, without telling you. And just because you did not see the DRONE" it is OK?

31.     In this instant action, Defendants did not even need this warrantless surveillance and it was totally unnecessary, as due to current case CV 20-3456 PJH all was needed was for "KING" or "COUNTY" Defendants to request an 'on site inspection' through available discovery. And the quantum of evidence necessary to establish probable cause to conduct an administrative inspection is more than "none," but less than what might be required to execute a criminal search warrant; Camara  387 U.S. at 528-539, 87 S.Ct. 1727. No "DRONE" was needed, but it is the Defendants pattern and practice that they do so.

32.     Short of outright 'fishing expeditions', if "COUNTY", "WICK", "KING", "SMITH", "HOFFMAN",  "HARRINGTON", or others has any kind of nontrivial and objective reason to believe there would be value in flying a drone over "CUPPS" property, as Defendants did here, then I trust the Defendants would probably be able to persuade a court to grant a warrant or equivalent permission to conduct a search without the violation of constitutional protections. (Camera). Inspection warrant 1822.56 is a very low bar to obtain.

33.     Only the work product (pictures and videos) are used in public as exhibits or attachments to documents and affidavits submitted to Judges and Courts, ***with deceptive intent.*** They use the deceptive practices to get past their probable cause.

34.     As a pattern and practice, Defendants mislead and hide their actions in the Affidavits and Courts. As an example, in my case, SCV266746 in the Affidavit of Probable cause, "HOFFMAN" states the Exhibits are from Google Earth, and then states, "upon further examination of satellite imagery" (***the mislead***), there are drone pictures taken without a warrant to prove the facts he wants to submit included as Exhibits. In my case "HOFFMAN" stated "USING AERIAL IMAGERY OBTAINED ON MARCH 27, 2020 – E1 & E2" which were

"DRONE" images taken of my property (misleading the Judge to think it was still Google Earth Images).

35.    This is a pattern and practice by defendants and "COUNTY", and other PRMD employees use the *EXACT TECHNIQUE, LANGUAGE, AFFIDAVIT OF PROBABLE CAUSE, AND PRESENTATION* in applying for Inspection Warrants, to Sonoma County Courts and Judges.

36.    As an additional pattern and practice Defendants do this so much, the misleading Affidavits of Probable Cause are form letter type they cut and paste, as mine had wrong information included and submitted. (CV 20-3456 PJH DOC 25 AND 25.1 MISQUOTE JUDGE DEMAYO)

37.    How is the Judge issuing an Inspection Warrant to know, as they were misled by defendants thinking it is Google Earth? The Judge is not told this was performed by a "DRONE", on a different date, in secrecy, without a warrant of any kind (4th amendment or Inspection Warrant CCP 1822.56) and submitted as an Exhibit with the Google Earth photos together.

38.    The Defendants feel the drone is 'legal' and they use it all the time with impunity, stating it is legal. Who is going to challenge them? If it is, why do they hide their use and their actions? Why don't they put in the Affidavit of Probable Cause, stating "we flew a "DRONE" over the property on this date, without a warrant, permission, exigent circumstances, or any other protections our society is reasonably ready to accept?" Defendants' actions 'in hiding' this information speaks for itself.

39.    Our society is not ready to accept this type of conduct or actions, and we even wrote Civil Code 1708.8 to discourage and punish civilians and the people who do so. Just

1   because they are Government agents, does that make it OK? I think not, and thing the Framers

2   would agree.

3        40.    As a matter of information "HARRINGTON" wrote a County Code for

4   "DRONES" , 7-0 Standard Operating Procedures on the Use of Unmanned Aircraft Systems

5   (UAS) 9-22-17 approved by "WICK", her boss and department head and  reviewed by Deputy

6   County Counsel, Holly Rickett.  "COUNTY" uses it when they want to 'back up' their 'secret

7   spying on people's houses'.

8

9        41.    "COUNTY" does not have the authority to promulgate Policies, Procedures or

10  Contracts authorizing Nonconsensual Inspections of Private Property Absent an Administrative

11  warrant. Article 11, Section 7 of the California Constitution and Government Code section

12  37100 prohibit the enactment of municipal laws that conflict with the general laws of the State.

13       42.    The Defendants have every right to get a warrant, and they know how, as they

14  know it is laid out in Camara v. Municipal Court (1967) 387 U.S. 523 that says if they want an

15  inspection warrant, all they have to do is request one if they have probable cause. They do not

16  get a warrant.  Why? *This is intentional and shows mens rea.*

17       43.    On 7-30-20 "CUPP" received a call from "HARRINGTON" at 9:30 a.m., stating

18  that they had an inspection warrant, and would be "coming in". I informed her I was at work and

19  was not available to let them in. She informed me that they did not have to give me notice and

20  were coming in anyway. Of course 'HOFFMAN" put into the Inspection Warrant request, how

21  dangerous I was, and that if they gave me notice as called for in 1822.50, I could remove or

22  destroy evidence. Yes, busted doors and lots of damage. And Yes again, based on "HOFFMAN"

23  affidavit of probable cause using the "DRONE" pictures, misleading the Superior Court Judge to

24  give him the Inspection Warrant.

44.    On 7-31-20 "CUPP" filed an EX PARTE APPLICATION FOR A TRO AND MOTION FOR PRELIM INJUNCTION. (20-03456 PJH DOC 20) "CUPP" was afraid that Defendants would cut off power to the property as they have done so many times before to others to control landowners.

45.    On 7-31-20 Judge Hamilton presiding Judge in 20-03456 PJH DOC 21, DENIED "CUPP" MOTION FOR TRO, stating "plaintiff fails to identify any specific fact that clearly shows that immediate and irreparable injury would result to him during the brief period that defendants would have to oppose his motion." And Judge Hamilton continues "That said, to the extent plaintiff relies upon the possibility that defendants might direct third-party PG&E to "shut off" his electricity, Dkt. 20 at 7, the court **ORDERS** defendants to refrain from issuing any such direction until it has resolved the instant motion."

46.    On 8-4-20 under Defendants email request, PGE came out and took the two electrical meters, and the gas meter. Not only for the purported dangerous barns (commercial meter), but took the house meter (residential meter) which was not a hazard or danger to any person or property and is 50 yards from the 'dangerous' barns. This was done intentionally. Same for removal of the gas meter for the house.

47.    Judge Hamilton has never been informed, to this day, that defendants did in fact have PGE remove not only the purported dangerous Commercial meter, but also the safe house Residential meter, and the gas meter.

48.    "CUPP" went to PGE 3 times, was told that PGE would turn power back on upon instructions and an order from "COUNTY". "CUPP" heard from defendants and "KING" that they did not violate the order and that a request to not shut off the power was sent (email) after Hamilton's order. But ooops, there was a mistake.

49.    "CUPP" emailed and talked to "KING", and talked to him on the phone, who said he would NOT AUHTORIZE PGE to restore power as the Judge denied the TRO and that my property was a safety hazard.

50.    On 9-17-20 "CUPP" through his attorney Eric Young filed a Public Records Act request directed to "WICK", department head. This was to understand data and facts from PRMD on their operations on Inspection Warrants, Citations written, Appeals lodged by Homeowners, Building Code Violations, Drone or surveillance technology. The PRA request has been ignored, not denied, but ignored. "COUNTY" and defendants don't want to account for their actions or be responsible for how they operate. What they don't show, you can't call them on it.

51.    In December 2020 and January 2021 "CUPP" was given an 'Administrative Hearing regarding the Citations issued by "SMITH" and "HOFFMAN", this hearing was run by "FRANCESCHI", who does not have an oath of office as required by Federal and California Constitutions and California Government Code. "CUPP" had objected to this, but the 'hearing officer' stated it was OK, he would allow it.  "CUPP" has complained to "COUNTY", hearing officers, and others, to no avail. "COUNTY" is aware that "FRANCESCHI" does not have the required oath of office.

52.    The hearing(s) were conducted with the data obtained from "HOFFMAN" based on his misleading Affidavit of Probable cause used to get the Inspection Warrant.

53.    On 4-15-21 "CUPP" and "KING" had settlement conference on CV 20-03456 PJH. At that hearing "KING" represented to the Court (Hamilton) that this was a "frivolous complaint and that "SMITH" had never entered the property, only went to the fence/gate, and

talked to a person through the gate, took pictures through the gate, and never entered the property once".

54.    "CUPP" knew this was not factual or true, and that the Court (Hamilton) based her rulings on this misrepresentation(s). "CUPP" tried to get a record of this as he knew "SMITH" had in fact trespassed and performed an unreasonable search by breaching the curtilage at least twice, once through the fence and again through a gate. "CUPP" applied to the court CV 20-03456 PJH DOC 65 to substantiate this, but the Court did not have written or audio of our hearing.  Through discovery, "KING" eventually submitted pictures "SMITH" took while ON THE PROPERTY and admitting that he was in fact on the property, and that he had entered thru the fence opening and the gate. Judge Hamilton has not been made aware of this.

55.    On 7-22-21, "SMITH" stated that at deposition "HARRINGTON" had changed PRMD procedure to remove any notices to landowners and instructed him to go straight to penalties and fines, write citations and file abatement liens. This is a pattern and practice from Management to violate due process.

56.    9-17-21 "CUPP" and Defendants "COUNTY" and "KING" were having discovery disputes, went to Judge Hamilton. 20-03456 PJH, DOC 68, 72, Hamilton ordered Defendants to submit to "CUPP" Discovery with meta data, and privilege log. "COUNTY" and "KING" never complied with this order. Again Judge Hamilton has not been made aware of this.

57.    On 1-19-22 Young ("CUPPS" attorney) wrote email to "KING" requesting power be restored. "CUPP" had learned from PRMD that the order from "COUNTY" to restore power would have to come from County Counsel Office, presumably "KING". On 1-28-22 Young again wrote to "KING" (because of no response) regarding PGE not being instructed to reinstate power to the property. "KING" thought request for assistance was a 'threat' from Young.

58.     On 2-23-22 Judge Hamilton in CV20-03456 PJH, DOC 87 issued her order from the Defendants Motion for Summary Judgement (DOC 78) stating "CUPP" in fact has 3 triable issues of fact, and also included in the order the possibility of award of "punitive damages". Immediately thereafter "KING" called PGE to have them reinstall the power Defendants had PGE remove on 8-4-20. PGE called "CUPP" to inform him that "KING" had called. *Again, mens rea?*

59.     PGE would not reinstate power now due to length of time and no direction in writing from Defendants. PGE representative Michael Norwitz stated to "CUPP" this sounds litigious (while reviewing history from 8-4-20) and PGE required "CUPP" get a permit from PRMD, *under now 'current building codes'*.  (Which was not a requirement before Defendants 'took' power from "CUPP" and is *a direct result of continuing damage*).

60.     "CUPP" went to PRMD and the permit tech said there was no permit application approved by PRMD for this. "CUPP" asked the permit tech to talk to "HARRINGTON", she was not available, but "FRANCESCHI" was. Permit tech went to his office and asked "FRANCESCHI" if OK to give permit to "CUPP" to reinstall power, "FRANCHECHI" stated "yes, give "CUPP" what he needs. "CUPP" was issued a permit BLD22-1409 on 2-28-22, went back to PGE who scheduled for power reinstall.

61.     Then PGE then required "CUPP" to get a second permit from PRMD for second meter, "CUPP" returned to PRMD and spoke to Permit tech again, who said again, no permit application approved on file. "CUPP" asked to have her talk to "HARRINGTON" who was in the next room talking to "KING" on the phone at that time regarding the PGE power again. The Permit tech stated to me that "HARRINGTON" talking with "KING" about my power, "KING" told "HARRINGTON" to have tech issue permit to reinstall power for second meter.

62.     On 3-3-22 Marc Bamatter of PRMD approved the meter for PGE reinstallation of permit BLD22-1501. PGE in short order came to reinstall the two meters.

63.     ***"CUPP" was without power at his property for 19 months***. The PGE gas is still not approved nor designed for installation. ***There is STILL NO GAS installed at Property***. This was done intentionally and as a pattern and practice defendants do this to punish anyone who opposes them. This is what "CUPP" stated in his application for TRO, and in fact did happen, even though ordered by Judge not to do so.

64.     On 6-1-22 again with witnesses, defendants trespassed and performed unreasonable search by again flying a "DRONE" over the property, hovering over Antonio Gonzalez Cruz, at approximately 20' away and the height of a telephone pole off the ground, while he was working on the house. Cruz took a video at the time he was accosted. This was not 'open field' or 'plain view', the "DRONE" focused on the house and Mr. Cruz while he was working on the house, at a height that the drone could look into the house bedroom and bathroom windows on the second floor.

65.     If not enjoined by the Court, defendants will continue to implement unreasonable searches and trespasses and the unlawful use of drones to violate people's expectation of privacy and the derogation of the rights of "CUPP" and other similarly situated residents. Such implementation will impose irreparable injury on "CUPP" and other persons. Plaintiff has no plain, speedy, and adequate remedy at law."

## IV.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violation of "CUPPS" Fourth Amendment Rights (42 U.S.C. § 1983)

### (Against All Defendants)

1   66.   "CUPP" realleges and incorporates by reference all preceding paragraphs of this

2   Complaint as though fully alleged herein.

3   67.   By entering the residences (or curtilage) of "CUPPS" property without a warrant,

4

5   or "CUPPS" consent, ,defendants violated the Fourth Amendment to the United States

6   Constitution, which is a violation of 42 U.S.C. § 1983.

7   68.   As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered

8   actual injuries and damages, and continues to incur, general and special damages in an amount to

9   be proven at trial.

10  69.   At all relevant times herein, Defendants actions, as complained of herein, were

11

12  committed maliciously, oppressively, and in reckless disregard of "CUPPS" constitutional rights;

13  were done willfully, in bad faith, wantonly, and with an evil motive or purpose designed to vex,

14  injure, or annoy; were done in concert with other Defendants, including Defendant "DOES".

15  70.   The acts and omissions alleged in this Complaint are indicative and representative

16

17  of a repeated course of conduct by Defendants in unconstitutionally performing unreasonable

18  searches and trespassing with "DRONES"; and using abuse of power and fraudulent conspiracy

19  to control or manipulate citizens and landowners by having the Courts to issue inspection

20  warrants, using deceitful Affidavits of Probable Cause and exhibits to have Judges (not knowing

21  all the facts) issue these warrants giving defendants the ability to violate citizens' rights.

22  71.   All of the defendants are sued in their official and individual capacities.

23

24  **SECOND CAUSE OF ACTION**

25  **Violation of "CUPPS" Fourteenth Amendment Rights (42 U.S.C. § 1983)**

26  **(Against All Defendants)**

27

28

72.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

73.    By entering the residences (or curtilage) of "CUPPS" property without a warrant, defendants violated the Fourteenth Amendment to the United States Constitution, which is a violation of 42 U.S.C. § 1983.

74.    As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered actual injuries and damages, and continues to incur, general and special damages in an amount to be proven at trial.

75.    At all relevant times herein, Defendants actions, as complained of herein, were committed maliciously, oppressively, and in reckless disregard of "CUPPS" constitutional rights; were done willfully, in bad faith, wantonly, and with an evil motive or purpose designed to vex, injure, or annoy; were done in concert with other Defendants, including Defendant "DOES".

76.    The acts and omissions alleged in this Complaint are indicative and representative of a repeated course of conduct by defendants in unconstitutionally performing unreasonable searches and trespassing with "DRONES"; and using abuse of power and fraudulent conspiracy to control or manipulate citizens and landowners by having the Courts to issue inspection warrants, using deceitful Affidavits of Probable Cause and exhibits to have Judges (not knowing all the facts) issue these warrants giving defendants the ability to violate citizens' rights.

77.    All of the defendants are sued in their official and individual capacities.

## THIRD CAUSE OF ACTION

**Conspiracy to Violate 'CUPPS" Fourth Amendment Rights (42 U.S.C. § 1983)**

**(Against All Defendants)**

78.     "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

79.     Defendants conspired with each other to violate the civil rights of "CUPP", in particular,the Fourth Amendment right to a warrant prior to a search and seizure.

80.     Defendants "WICK", "HARRINGTON", "HOFFMAN" designed the hidden procedure and had and continue to have "SMITH" and other PRMD Code Enforcement Officers and well as "CINQUINI" and "CINQUINI & PASSARINO" effectuate the unconstitutional search and seizures without any legal authority to do so. They stay 'hidden from the public'.

81.     Defendant "HARRINGTON" attempts to 'legalize it on its face' by her creation of County Code for "DRONES" , 7-0 Standard Operating Procedures on the Use of Unmanned Aircraft Systems (UAS) 9-22-17 approved by "WICK", her boss and department head and reviewed by County Counsel.

82.     "COUNTY" does not have the authority to promulgate Policies, Procedures or Contracts authorizing Nonconsensual Inspections of Private Property Absent an Administrative warrant.  Article 11, Section 7 of the California Constitution and Government Code section 37100 prohibit the enactment of municipal laws that conflict with the general laws of the State.

83.     By conspiring to unreasonably search, enter residences or curtilage of "CUPPS" property without a proper warrant, or advance notice or an opportunity for a hearing, defendants violated the Fourteenth Amendment to the United State Constitution, which is a violation of 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

**Conspiracy to Violate 'CUPPS" Fourteenth Amendment Rights (42 U.S.C. § 1983)**

**(Against All Defendants)**

84.     "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

85.     Defendants conspired with each other to violate the civil rights of "CUPP", in particular, the Fourteenth Amendment right to due process.

86.     Defendants "WICK", "HARRINGTON", "HOFFMAN" designed the hidden procedure and had and continue to have "SMITH" and other PRMD Code Enforcement Officers and well as "CINQUINI" and "CINQUINI & PASSARINO" effectuate the unconstitutional search and seizures without any legal authority to do so. They stay 'hidden from the public'.

87.     "COUNTY" does not have the authority to promulgate Policies, Procedures or Contracts authorizing Nonconsensual Inspections of Private Property Absent an Administrative warrant.  Article 11, Section 7 of the California Constitution and Government Code section 37100 prohibit the enactment of municipal laws that conflict with the general laws of the State.

88.     Defendant "HARRINGTON" designed this County 'Drone" plan, "WICK" approved it, and "COUNTY" by and through County Counsel ratified it.

89.     Defendants "HARRINGTON", "HOFFMAN", "SMITH" executed this unconstitutional plan in their capacity as the PRMD Code Enforcement Officers for "COUNTY".

90.     Defendants "HARRINGTON", "HOFFMAN", "SMITH", "CINQUINI" and "CINQUINI & PASSARINO" were personally present at these unconstitutional searches and raids.

91.     By conspiring to unreasonably search, enter residences or curtilage of "CUPPS" property without a proper warrant, or advance notice or an opportunity for a hearing, defendants

violated the Fourteenth Amendment to the United State Constitution, which is a violation of 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION

### Violation of California Constitution article 1, section 7

### (Against All Defendants)

92.     "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

93.     Article 1, section 7 of the California Constitution prohibits the deprivation of property without advance notice and the opportunity for a hearing.

94.     By entering the curtilage of "CUPPS" property, searching with "DRONES" and having PGE remove the electrical and gas meters without notice or a hearing violated article 1, section 7 of the California Constitution.

95.     As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered actual injuries, and continues to incur, general and special damages in an amount to be proven at trial.

96.     The acts and omissions alleged in this Complaint are indicative and representative of a repeated course of conduct by the defendants tantamount to a custom, policy or practice of the PRMD and Code Enforcement condoning and tacitly encouraging the disregard for the constitutional rights of "CUPP" and Sonoma County citizens, as described herein.

97.     Under California Government Code § 820(a), the individual officer defendants are liable for damages for their own misconduct.

1      98.    Under California Government Code § 815.2(a), the public entity employer is

2  vicariously liable for conduct performed within the scope and course of their employment.

3

4

5  <center>**SIXTH CAUSE OF ACTION**</center>

6

7  <center>**Violation of California Constitution article 1, section 13**</center>

8  <center>**(Against All Defendants)**</center>

9      99.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this

10 Complaint as though fully alleged herein.

11

12     100.    Article 1, section 13 of the California Constitution prohibits warrantless searches

13 and seizures on property, or against the property owned by "CUPP".

14     101.    By entering the residence or curtilage of "CUPPS" property without a warrant,

15 defendants violated California Constitution, article 1, section 13.

16

17     102.    As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered

18 actual injuries and damages, and continues to incur, general and special damages in an amount to

19 be proven at trial.

20     103.    The acts and omissions alleged in this Complaint are indicative and representative

21 of a repeated course of conduct by the defendants tantamount to a custom, policy or practice of

22

23 the agencies of condoning and tacitly encouraging the disregard for the constitutional rights of

24 "CUPP" and Sonoma County citizens, as described herein.

25     104.    Under California Government Code § 820(a), the individual officer defendants

26 are liable for damages for their own misconduct.

27

28

105.    Under California Government Code § 815.2(a), the public entity employer is vicariously liable for conduct performed within the scope and course of their employment.

## SEVENTH CAUSE OF ACTION

### Violation of California Civil Code § 52.1

### (Against All Defendants)

106.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

107.    Article 1, sections 7 and 13 of the California Constitution prohibit the warrantless searches and seizures of property without due process.  So, too, do the Fourth and Fourteenth Amendments to the Unites States Constitution.

108.    By performing warrantless "DRONE" searches of residences or breaching the curtilage of "CUPPS" property without a warrant or any advance notice or opportunity for a hearing, and damaging "CUPPS" property, under the threat of authority by law enforcement, in this case PRMD Code Enforcement, defendants interfered with, and attempted to interfere by threats, intimidation, and coercion, with "CUPPS" peaceable exercise of the rights secured to him by the federal and state constitutions, in violation of the Bane Civil Rights Act, Cal. Civil Code § 52.1.

109.    The same as when "HARRINGTON, "HOFFMAN", "SMITH" and others performed the raid (July 30, 2020 inspection warrant) where "COUNTY" got authority from the Superior Court by looking at "HOFFMANS" tainted or biased affidavit of probable cause and showing the Judge the Exhibits E-1 & E-2 which were "DRONE" pictures, but represented to the Judge they were Google Earth photos, and not from a warrantless search.

110.    As a direct and proximate result of defendant's illegal conduct, "CUPP" suffered actual injuries and damages, and continues to incur general and special damages in an amount to be proven at trial.

111.    The acts and omissions alleged in this Complaint are indicative and representative of a repeated course of conduct by the defendants tantamount to a custom, policy or practice of the agencies of condoning and tacitly encouraging the disregard for the constitutional rights of "CUPP" and Sonoma County citizens, as described herein.

112.    Under California Government Code § 820(a), the individual officer defendants are liable for damages for their own misconduct.

113.    Under California Government Code § 815.2(a), the public entity employer is vicariously liable for conduct performed within the scope and course of their employment.

## EIGHTH CAUSE OF ACTION

### Conspiracy to Violate California Civil Code § 52.1

### (Against All Defendants)

114.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

115.    Article 1, sections 7 and 13 of the California Constitution prohibit the warrantless searches and seizures of property without due process. So, too, do the Fourth and Fourteenth Amendments to the United States Constitution.

116.    By conspiring to enter the residence (or curtilage) of "CUPPS" property without a warrant or any advance notice or opportunity for a hearing, and damaging his property, under the threat of authority by law enforcement, in this case PRMD Code Enforcement, defendants interfered with, and attempted to interfere by threats, intimidation, and coercion, with "CUPPS"

peaceable exercise of the rights secured to him by the federal and state constitutions, in violation of the Bane Civil Rights Act, Cal. Civil Code § 52.1.

117.   As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered actual injuries and damages, and continues to incur general and special damages in an amount to be proven at trial.

118.   The acts and omissions alleged in this Complaint are indicative and representative of a repeated course of conduct by the defendants tantamount to a custom, policy or practice of the agencies of condoning and tacitly encouraging the disregard for the constitution rights of "CUPP" and Sonoma County citizens, as described herein.

119.   Under California Government Code § 820(a), the individual officer defendants are liable for damages for their own misconduct.

120.   Under California Government Code § 815.2(a), the public entity employer is vicariously liable for conduct performed within the scope and course of their employment.

### NINTH CAUSE OF ACTION

### Conversion under California Law

### (Against All Defendants)

121.   "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

122.   "CUPP" legally owned and possessed his property under California Law.

123.   On or about 7-30-20 defendants "HARRINGTON", "HOFFMAN", "SMITH" and others representing "COUNTY", entered "CUPPS" property with a 'bogus' inspection warrant based on "HOFFMANs" tainted Affidavit of Probable cause that included "DRONE" photos from another warrantless search of "CUPPS" property months before.  "HOFFMAN" represents

1   to the Superior Court Judge that the Images (photos) are from Google Earth, misleading her to

2   get the inspection warrant signed.

3       124.   "HARRINGTON" called "CUPP" on 7-30-20 on his cell and said she/they were

4   executing a Inspection Warrant. "CUPP" stated he was at work, "HARRINGTON" replied, it did

5   not matter, they were going in anyway. "CUPP" did not voluntarily consent to this.

6

7       125.   Previous to this (as noted above) the Honorable Hamilton in the existing case CV

8   20-03456 directed "COUNTY" not to terminate PGE service to "CUPP" or his property.

9       126.   On 8-4-20 PGE under direction from "COUNTY" came out to "CUPPS" property

10  and removed both electrical meters and gas meter. "CUPP" was without power for 19 months

11  and is still without gas service. "KING" would not authorize PGE to restore power, even though

12  he was aware of Judge Hamilton's ORDER. It was only when Judge Hamilton ruled on

13  defendants Motion for Summary Judgement and decided "CUPP" had 3 triable issues of fact and

14  could be awarded punitive damages that "KING" immediately called PGE to restore the power.

15      127.   Defendants' actions were without right or justification and constitutes the

16  conversion of "CUPPS" property under the common law of the State of California.

17

18      128.   Defendants acted maliciously and in bad faith in that they knew or should have

19  known that their actions were wrongful.

20      129.   As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered

21  actual injuries and damages.

22

23      130.   Under California Government Code § 820(a), the individual officer defendants

24  are liable for damages for their own misconduct.

25      131.   Under California Government Code § 815.2(a), the public entity employer is

26  vicariously liable for conduct performed within the scope and course of their employment.

27

28

## TENTH CAUSE OF ACTION

### A Taking under Federal Law

### (Against All Defendants)

132.   "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

133.   "CUPP" legally owned and possessed his property under California Law.

134.   On or about 7-30-20 defendants "HARRINGTON", "HOFFMAN", "SMITH" and others representing "COUNTY", entered "CUPPS" property with a 'bogus' inspection warrant based on "HOFFMANs" tainted Affidavit of Probable cause that included "DRONE" photos from another warrantless search of "CUPPS" property months before.  "HOFFMAN" represents to the Superior Court Judge that the Images (photos) are from Google Earth, misleading her to get the inspection warrant signed.

135.   "HARRINGTON" called "CUPP" on 7-30-20 on his cell and said she/they were executing a Inspection Warrant. "CUPP" stated he was at work, "HARRINGTON" replied, it did not matter, they were going in anyway. "CUPP" did not voluntarily consent to this.

136.   Previous to this (as noted above) the Honorable Hamilton in the existing case CV 20-03456 directed "COUNTY" not to terminate PGE service to "CUPP" or his property.

137.   On 8-4-20 PGE under direction from "COUNTY" came out to "CUPPS" property and removed both electrical meters and gas meter. "CUPP" was without power for 19 months and is still without gas service. "KING" would not authorize PGE to restore power, even though he was aware of Judge Hamilton's ORDER. It was only when Judge Hamilton ruled on defendants Motion for Summary Judgement and decided "CUPP" had 3 triable issues of fact and could be awarded punitive damages that "KING" immediately called PGE to restore the power.

138.    Defendants' actions were without right or justification and constitutes the taking of "CUPPS" property under the common law of the State of California.

139.    Defendants acted maliciously and in bad faith in that they knew or should have known that their actions were wrongful.

140.    As a direct and proximate result of defendants' illegal conduct, "CUPP" suffered actual injuries and damages, and continues to incur general and special damages in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION

### Trespass under California Law

### (Against All Defendants)

141.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

142.    "CUPP" legally possessed the property at the time of defendant's trespass(s).

143.    There are four times that " CUPP" knows about, (maybe more), the original trespass by "SMITH" in February 2019, the "DRONE" incident that produced the Exhibits in "HOFFMANS" Affidavit of Probable cause March 2020, the 'raid' when "COUNTY" and related defendants physically entered the property and broke doors with their 'inspection warrant' on 7-30-20, and the 6-1-22 that just occurred.

144.    Defendants entry upon the curtilage of "CUPPS" homes and airspace was not authorized, consented to, welcome, or lawful.

145.    Lets be clear, since the first trespass by "SMITH" 2-15-19, all defendants including "COUNTY" (except "CINQUINI and "CINQUINI & PASSARINO"), knew or should have known that "CUPP" would not allow any trespass or authorize any entry by "COUNTY".

Prior to that, for several years, "CUPP" has written and posted approximately 14 times of 'NO

TRESPASSING' to "COUNTY" through risk management or Board of Supervisors.

146.    As a direct and proximate result of defendants' illegal conduct, 'CUPP" suffered

actual injuries and damages, and continues to incur general and special damages in an amount to

be determined at trial.

147.    At all relevant times herein, Defendant's actions, as complained of herein, were

committed maliciously, oppressively, and in reckless disregard or "CUPPs" constitutional rights;

were done willfully, in bad faith, wantonly, and with an evil motive or purpose designed to vex,

injure, or annoy; were done in concert with other Defendants, including 'WICK" who is in

charge of the whole department, and DOES 1-20, demonstrating a deliberate indifference to

"CUPPS" constitutional and statutory rights, sufficient for an award of punitive/exemplary

damages against Defendants, in an amount to be proven at trial.

148.    Under California Government Code § 820(a), the individual officer defendants

are liable for damages for their own misconduct.

149.    Under California Government Code § 815.2(a), the public entity employer is

vicariously liable for conduct performed within the scope and course of their employment.

## TWELFTH CAUSE OF ACTION

### Agency Liability – Unconstitutional Official or De Facto Policy, Practice, or Custom in

### Violation of 42 U.S.C. § 1983 (MONELL)

### (Against Defendant COUNTY)

150.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this

Complaint as though fully alleged herein.

1

2

151.   "CUPP" is informed and believes that Defendant "COUNTY" exercises de facto policies that are contrary to its constitutional requirements. Defendant "COUNTY" is ultimately responsible due to customs, policies, and practices of its officers, agents, and employees; whom they employ, train, supervise, oversee, discipline, reward, or ratify.

3

4

5

6

152.   At all times relevant herein, "CUPP" had a reasonable expectation that Defendants would not violate his Fourth Amendment protections and search the subject land without a warrant or take his property without legal justification.

7

8

9

153.   "CUPP" is informed and believes and thereon alleges that, at all times mentioned herein, Defendant "COUNTY", with deliberate indifference, and in conscious disregard of the security and constitutional rights of "CUPP" and others, including the right to be free from warrantless searches under the Fourth Amendment, maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied, among other, the follow customs, policies and practices:

10

11

12

13

14

15

16

a.   Failing to adequately train, supervise, and discipline its Code Inspectors, especially the Code Enforcement Officers including Defendants "HARRINGTON", "HOFFMAN", "SMITH" (who are all ex-police officers) and others;

17

18

19

b.   Failing to discourage, or actively encouraging, the unlawful use of authority of the PRMD, and Code Enforcement Officers, or its officers, and its agents, including the named Defendants herein and DOES 1-20;

20

21

22

c.   Failing to admonish, reprimand, discipline, or even investigate constitutional or statutory rights violations by its Code Inspectors, and Code Enforcement Officers, including the named Defendants herein and DOES 1-20;

23

24

25

d.   Ratifying the violations of clearly established constitutional protections, including those conferred by the Fourth Amendment, by directing, encouraging, or rewarding Code Inspectors/Code Enforcement Officers and others, including the named Defendants herein and DOES 1-20, in conducting warrantless searches of private property, including but not limited to the subject land, and unlawfully taking property.

26

27

28

e.    Failing to implement proper procedures for obtaining inspection warrants, keeping track of when inspection warrants are sought, executing such warrants; and applying to judicial officers for orders regarding inspection warrants, including the falsification of court records and other documents to justify the otherwise unlawful and unconstitutional behavior of its Code Inspectors, Code Enforcement Officers, and other agents, including the named Defendants herein and DOES 1-20;

f.    Maintaining a custom, policy, or practice of routinely violating, or encouraging the violation of, the Fourth Amendment rights of landowners in Defendant "COUNTY" by searching their private property without warrants or other legal justification in a scheme to illicitly raise revenue for Defendant "COUNTY" and, thus, unfairly penalize landowners in Defendant "COUNTY".

154.    At all relevant times herein, all individual Defendants named herein as well as DOES 1-20 were acting pursuant to customs, policies, and practices of Defendant "COUNTY" and its agency, PRMD, especially the Code Enforcement Officers who, under "WICK", managed by "HARRINGTON" and "HOFFMAN" appear to have a custom and practice of:

a.    Performing unwarranted "DRONE" searches of citizens property 'because they want to for fishing expeditions, without public knowledge, by Code Enforcement Officers.

b.    These unwarranted "DRONE" searches are done in private and secrecy, by Defendant "CINQUINI", who to "CUPPS" information and belief was not hired by "COUNTY" with public competitive bidding.

c.    Using video/pictures from these unlawful searches as part of their Affidavit of Probable Cause presented to Judicial Officers in obtaining inspection warrants.

d.    Misleading Judicial Officers that the pictures from the unwarranted and unlawful "DRONE" searches are part of Google Earth images, without telling the Judicial Officers that these Code Enforcement Officers had the pictures taken (by a private contractor in secrecy) without any permission, authorization, or exigent circumstances of the citizens, and have

grouped the "DRONE" photos in with the Google Earth images, in order to obtain the inspection warrants from these Judicial Officers.

e.  Custom, policy, pattern, and practice and with knowledge of all the Defendants who are conspiring, that the Affidavit or Probable cause is a cut and paste job, say the same untrue facts while inserting the "DRONE" photos to intentionally mislead the Judicial Officer.

f.  Immediately closing out Sonoma County Superior Court cases opened for Inspection warrant purposes, closed out so they cannot be challenged for Defendants wrongdoings. +

g.  Knowing and allowing defendant "FRANCESCHI" to operate without an oath of office.

h.  Removing the availability of due process ("HARRINGTON" removed this step) of a possibility of a citation and having PRMD officers begin writing citations and/or filing Notice of Abatement Liens and recording them on landowners property to get them to comply with PRMD wishes.

155.    At all relevant times herein, all individual Defendants named herein as well as DOES 1-20 were acting pursuant to the customs, policies, and practices of Defendant "COUNTY" and its agency, PRMD, in this case Code Enforcement Division.

156.    As a direct ad proximate result of the acts and omissions complained of herein, "CUPP" has sustained, and continues to sustain, general and special damages in an amount to be proven at trial.

### THIRTEENTH  CAUSE OF ACTION

### Trespass and Invasion of Privacy § Civil Code 1708.8

### (Against Defendants "CINQUINI" AND "CINQUINI & PASSARINO")

157.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

1
2
3
4
5
6

158.    Defendants "CINQUINI" AND "CINQUINI & PASSARINO" intentionally violated "CUPPS" reasonable expectation of privacy, his private affairs,  and performed physical trespass and intentional invasion into "CUPPS" property by crossing his curtilage with electronic or optical intrusion equipment, using zoom lenses or highly sensitive microphones to photograph or record  "CUPP" and/or his property.

7

159.    "CUPP" has a reasonable expectation of privacy.

8
9
10
11
12
13

160.    These actions of intrusion upon seclusion are highly offensive to "CUPP" and would be to any reasonable person. And these actions were done for profit. "CUPP" has taken great lengths to protect his property by fencing on all four property sides with tall solid fencing at the street sides, to which the Federal Court has recognized "CUPP" has taken great lengths to be in private and the court has recognized his curtilage in current court case.

14
15
16
17
18
19
20

161.    Upon "CUPPS" learning defendants "CINQUINI" AND "CINQUINI & PASSARINO" were secretly flying over a "DRONE" for profit by selling images of "CUPPS" private property, without consent or permission and without "CUPPS" knowledge. The actions of these defendants has caused mental anguish and suffering to "CUPP" in the form of surprise, fright and anger at the loss of his privacy. "CUPP" did not immediately find out until such time as it was discovered as evidence in a court case.

21
22

## REQUEST FOR DECLARATORY RELIEF

23
24

162.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

25
26
27
28

163.    An actual case or controversy has arisen and now exists between "CUPP" and Defendants, and each of them, concerning their respective rights and duties in that "CUPP"

contends that his Fourth and Fourteenth Amendment rights under the U.S. Constitution, as well as statutory and common law rights, have been violated.

164.    Plaintiff desires a judicial determination of those rights and his duties with respect to Defendants, and each of them.

165.    A judicial declaration is necessary and proper at this time under the circumstances alleged herein in order that "CUPP" may know his rights and duties with respect to:

a.   Any information obtained by "HOFFMAN" from use of fraudulent or misleading Affidavits of Probable Cause to Judicial Officers to obtain Inspection Warrants against "CUPP" is tainted and suspect and will be suppressed.

b.   The abatement hearing re: "CUPPS" property Dec 2020 and Jan 2021, where it was run by "FRANCESCHI" without an Oath of Office (not in compliance with all constitutions and Government Codes), knowing so by "COUNTY" and all other Supervisors and Superiors, using tainted evidence obtained by "HOFFMAN" after unlawfully having a "DRONE" fly over his property and taking pictures "HOFFMAN" then used to fool a Judicial Officer misleading her that the images were part of Google Earth and not informing her that he obtained the pictures from unwarranted search fly over of "CUPPS" property.

c.   From this hearing the county has penalties assessed by Defendant "COUNTY", which now burden "CUPP" and the subject land.

166.    Monetary damages will not suffice to provide "CUPP" with an adequate remedy because Defendant "COUNTY" is assessing per diem penalties against "CUPP" and the subject land, which arose out of an unlawful search in violation of the Fourth and Fourteenth Amendment, trespass, and the subsequent actions by "COUNTY" as alleged herein.

## REQUEST FOR INJUNCTIVE RELIEF

167.    "CUPP" realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully alleged herein.

168.    **This is probably most important to "CUPP" as much as the damages** that Defendants have caused me. Yes, silly "CUPP" is a 'constitutionalist' who fully believes in property rights and being left alone. "CUPP" is not anti-police nor anti-government **BUT IS anti-corrupt police and anti-corrupt government.**

169.    "CUPP" is a firm believer, as stated above, that just because new technology is available, it should not be used to violate the rights of citizens, just because government can. This is the case with "DRONES" being used by government, *because it can*, to violate people's privacy and property rights.

170.    Our Supremes have ruled that people have no expectation of privacy from fixed wing aircraft at 1000 ft, same for helicopters at 400 ft.; and that if up there and they by chance happen to see something, it is OK. They cannot unsee what they may have witnessed with their own two eyes (camera's telephoto lenses etc.). I am OK with that.

171.    But "DRONES" are not that, as stated above it is new technology, it can hover, have telephoto lenses, camera, video capability, infra red capabilities, and so on.

172.    It is no mans land from the ground to 400 ft, which 400 ft and above is defined as navigable air space controlled by FAA.  There is no legal definition of this Wild West space, because it is not just used to see 'open space' or what is in 'plain view'. Read the Exhibit A of this complaint with the experiences from normal people. They flew the "DRONE" with impunity and not caring for citizens fears, rights or so on. Again, who is there to stop them? We are, here and now. We are not talking 'open field' or 'plain view' here.

173.    I am not asking the Court to define this 400 ft battlefield, that will come later by someone else. What I am asking THIS COURT TO DO is issue a temporary restraining order for this "COUNTY" not to fly any "DRONE" or similar technology over my or another citizens property without a valid warrant, whether it be search or inspection warrant.

174.    I am not talking about a kid buying a "DRONE" from Walmart and checking to see what the neighbor is doing, I am talking about Government actors with specific *INTENT*.

175.    If our Supremes can justify in Florida v. Jardines (2013) 569 U.S. 1 that the *INTENT* of government to bring a drug dog to a house curtilage and see if anything is up, *IS NOT OK*, and as simple as Taylor v. City of Saginaw (6th Cir. 2019) 922 F.3d 328 where the *INTENT* of government to chalk tires for a ticket are a 4th amendment violation and unreasonable search, how can this "COUNTY" government hire someone in private (no public bidding), trespass and perform an unwarranted unreasonable search of someone's house and land, take pictures/videos, without homeowners or landowners knowledge, and use these documents in an Affidavit of Probable Cause for a warrant, mislead the judge like they are part of Google Earth images and not let Judicial Officer  know they were obtained without a warrant.

176.    I think that is outrageous and as you say in legal terminology, 'fruit of the poisonous tree' from what they take, not counting 'someone should be tar and feathered'. And if you need to experience this, as I said above, give me your address . . . I will send you some pictures (or maybe not – as you don't have to know that I was there, even though you feel 'safe' in your backyard).

177.    Again, it is the *INTENT.* If it was or is OK, why doesn't government just tell the Judicial Officer that they 'flew a "DRONE" over someone's house or property, without a

warrant, and this is what they found. And can they obtain a warrant to "do it lawful this time?" Mens rea?

178.    As I have stated above, our Supremes have already told government what to do and how, in Camara v. Municipal Court (1967) 387 U.S. 523 (they have 55 years to get this down), which has such a low threshold for government to overcome that it is almost impossible NOT TO GET AN INSPECTION WARRANT, if they have any probable cause. Like when they say a grand jury can indict a ham sandwich.

179.    I am requesting a temporary restraining order and preliminary and permanent injunction, enjoining the defendants and their agents and employees from entering the private property or airspace from ground to 400 ft, by 'DRONE" or similar technology, without a meaningful hearing or valid warrant.

## JURY TRIAL

Jury trial by jury of my peers demanded.

## PRAYER FOR RELIEF

**WHEREFORE,** "CUPP" seeks the following relief:

1.  A declaration that defendants' actions are unlawful and unconstitutional as listed above;

2.  A declaration that information obtained by "HOFFMAN" by misleading Judicial Officers to obtain Inspection Warrants will be supressed.

3.  A declaration that "CUPPS" abatement hearing held with a "COUNTY" government employee without an Oath, and the evidence used and seized by unreasonable search and deceiving Judicial Officer to obtain an Inspection Warrant is invalid and unlawful;

1    4. A temporary restraining order and preliminary and permanent injunction, enjoining

2        the defendants and their agents and employees from flying a "DRONE" over any

3        "CUPPS" or citizens property, land, house, **without first obtaining a valid warrant**

4        from a Judicial Officer;

5    5. General and Special damages and Punitive damages, according to proof at trial;

6

7    6. Treble damages for each violation of the Bane Civil Rights Act;

8    7. Costs and attorneys' fees incurred in this action; and

9    8. Such other and further relief as this Court may be just and proper.

Dated: July 24, 2022,           Respectfully;

/s/ RONALD CUPP

Ronald Cupp,  Plaintiff Pro Se

## **VERIFICATION**

Declaration of Ronald Cupp

I, Ronald Cupp, a man aggrieved, "Declarant" one of the people of California, in this court of record, sound of mind and competent to testify, hereinafter "Cupp" declares on personal knowledge, information and belief, the following facts:

1. I have read the foregoing pleading and know the facts therein stated to be true and correct.

2. I declare, under penalty of perjury pursuant to the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date:   July 24, 2022

/s/ RONALD CUPP

Ronald Cupp, Plaintiff Pro Se

EXHIBIT 9

Ronald Cupp
150 Raley Town Center Ste 2512
Rohnert Park, California [94928]
Telephone: (707) 318-9929
Plaintiff in Pro Se

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ronald Cupp | )  CASE NO: 22-cv-4307 PJH |
| | ) |
|       Plaintiff, | )  NOTICE OF VOLUNARY DISMISSAL |
| | )  WITHOUT PREJUDICE |
|       vs. | ) |
| | ) |
| COUNTY OF SONOMA; | ) |
| ANDREW SMITH, Individually; | ) |
| TODD HOFFMAN, Individually; | ) |
| TYRA HARRINGTON, Individually; | ) |
| MARK FRANCESCHI, Individually; | ) |
| TENNIS WICK, Individually; | ) |
| MICHAEL KING, Individually; | ) |
| ANTHONY CINQUINI, Individually; | ) |
| CINQUINI & PASSARINO, INC.; | ) |
| DOES 1-20 | ) |
| | ) |
|       Defendants. | ) |

NOTICE IS HEREBY GIVEN that pursuant to Federal Rules of Civil Procedure 41(a), Plaintiff voluntarily dismisses without prejudice the above entitled action against Defendants.

This notice of dismissal is being filed with the Court before Defendants filed an answer or responsive pleading.

August 26, 2022

/s/ *Ronald Cupp*

_____

Ronald Cupp, Plaintiff
Pro Se

## **CERTIFICATE OF SERVICE**

The undersigned certified that, on August 26, 2022, the foregoing NOTICE OF

VOLUNTARY DISMISSAL WITHOUT PREJUDICE was filed electronically. Pursuant to Fed.

R. Civ. P.5(d), counsel of record will be served by electronic mail on this same date.


August 26, 2022


/s/ *Ronald Cupp*

_____

Ronald Cupp, Plaintiff
Pro Se

EXHIBIT 10

Michael Gogna
Tel: (707) 328-9565
mgogna@sonic.net

February 11, 2021

# Statement of Decision and Administrative Order

***Property Address***: **4640 Arlington Ave.** Santa Rosa, CA ("the Property")
***Responsible Parties***: Ronald Cupp, Property owner
***PRMD Case No.***: VCM20-0768, VCM19-0123
***Hearing Dates***: December 11, 2020, continued to January 22, 2021

## Alleged Violations:

1. Construction without required permits (remodel of single family dwelling and barn, garage conversion to dwelling unit), and unlawful use (a change of occupancy for garage)[1]
2. Numerous instances of construction without required permits (9-foot fence in front yard setback, improvements to barn, room addition and re-roof of single family dwelling with skylights, addition of "on demand" propane water heater to garage, two sheds and a carport)
3. Commercial cannabis cultivation without required County approvals or permits
4. "Dangerous building" – faulty construction, faulty/dangerous electrical and gas (sic)
5. Unpermitted use of Property for occupied travel trailer
6. Unpermitted use of Property for junkyard conditions and contractor's storage yard[2]

## Violation Determinations

1. The evidence supports a determination that there was unpermitted construction to the primary dwelling and the barn, and conversion of a garage to a dwelling unit, as alleged in the 2019 Notice and Orders.
2. The evidence supports a determination that there were numerous instances of unpermitted construction, as described in Item #2, above.
3. The evidence supports a determination that the Property was used for an unpermitted commercial cannabis cultivation operation.
4. The evidence supports a determination of unpermitted occupancy of a travel trailer.
5. The evidence supports a determination of unpermitted use of the Property for junkyard conditions.
6. The allegation of a "dangerous building", as described in Exhibit "Q" to the County's Appeal/Abatement Hearing Report, is not within the scope of these proceedings and no order or determination is made with respect thereto.
7. The evidence does not support a determination of a zoning violation for the unpermitted occupancy of a converted garage.
8. The evidence does not support a determination of unpermitted use of the Property for a contractor's storage yard.

---

[1] The violations listed in this item #1 were the subjects of two Notice and Orders issued in February of 2019 and are referred to as the "2019 Notice and Orders".
[2] The violations listed in Items #2 through #6 were the subjects of seven Notice and Orders issued in July of 2020 and are referred to as the "2020 Notice and Orders".

# Summary of Hearing

On December 11, 2020, a duly noticed administrative hearing ("the First Hearing") was conducted by the undersigned ("the Hearing Officer"), a hearing officer appointed by the Sonoma County Board of Supervisors, to consider a request by County enforcement officials ("County staff") for an abatement order and the appeal of the property owner, Ronald Cupp ("Cupp"). County staff sought an abatement order pertaining to unpermitted construction, as well as unpermitted uses and occupancy at the Property. County staff also issued a series of Notice and Orders describing numerous alleged violations of the Sonoma County Code. Based on a jurisdictional challenge raised by Cupp at the First Hearing, which asserted that the matters pertaining to unpermitted construction and various other building code violations were not properly before the Hearing Officer, the Hearing Officer requested briefings from the parties regarding Cupp's challenge and continued the First Hearing to January 22, 2021.

Both parties have submitted documents as part of the proceedings. Prior to the First Hearing, County staff submitted an "Appeal/Abatement Hearing Report". Prior to the continued hearing on January 22, 2021 ("Continued Hearing"), County staff submitted another "Appeal/Abatement Hearing Report".[3] The two Appeal/Abatement Hearing Reports are hereinafter collectively referred to as the "Staff Report." County staff also submitted a "Memorandum of Response", a "Memorandum of Reply", and two documents titled "Response to Interim Ruling and Order". Prior to the First Hearing, Cupp submitted an "Abatement Hearing Statement", which had 34 exhibits attached. Prior to the Continued Hearing, Cupp submitted a "Brief in Response", including five attached exhibits, and a "Conditional Acceptance of [PRMD] Jurisdiction". After receiving and considering the arguments of the parties on the issue of hearing officer jurisdiction, the Hearing Officer issued an "Interim Ruling and Order" ("Interim Order") on January 18, 2021, which included several exhibits as attachments.

At the Continued Hearing, witnesses were duly sworn and documents and testimony were received as evidence. At the time of the Continued Hearing, Mark Franceschi ("Franceschi") and Inspectors Todd Hoffman ("Hoffman") and Andrew Smith ("Smith") appeared and testified for the County. County staff presented a Power Point presentation depicting various conditions on the Property that were referenced in the Notice and Orders. Cupp appeared and testified on his own behalf. Franceschi, Hoffman and Smith presented testimony and documentary evidence tending to support most of the alleged violations. Cupp presented testimony that challenged the validity of the inspections of the Property and the authority of the inspectors. When offered the opportunity by the Hearing Officer to refute each of the factual allegations pertaining to code violations, Cupp declined the invitation.[4] Consequently, there are alleged code violations for which there is little, or no, contrary factual evidence.

After receiving evidence, the matter was deemed "submitted" by the parties and the Continued Hearing was closed. Following the close of the Continued Hearing, the Hearing Officer issued two rulings, one that addressed Cupp's continuing challenge to jurisdiction ("Final Ruling on Jurisdictional Issues") and a second ("Rulings on Objections and Evidence") which responded to objections and evidence offered by the parties, and which included "*sua sponte*" evidentiary rulings as to certain exhibits submitted by the parties. Those two Rulings, as well as the January 18 Interim Order, are incorporated into this Statement of Decision and Administrative Order by this reference.

---

[3] It appears to the Hearing Officer that the only difference between the two Abatement Hearing reports is the date reference. The text of the two reports, except for references to the date of the reports, appears to be identical.

[4] When asked about specific alleged violations, Cupp asserted his Fifth Amendment right to not testify. Although this is not a criminal proceeding, no adverse inference was drawn from his assertion of that right, as will be discussed in more detail.

# Factual and Procedural Background

In February of 2019, Smith conducted an inspection of the Property.[5] Based on that inspection, Smith issued the 2019 Notice and Orders. The first 2019 Notice and Order generally alleged "construction without permits" and pertained to a vacant single family dwelling and a barn that were being remodeled without required permits and a garage having been remodeled into a dwelling unit. (See **Exhibit "B"**)[6] The second 2019 Notice and Order alleged an "Unlawful Use" of the Subject Property referencing a "change of occupancy" as a result of the conversion of a garage to a dwelling unit. (See **Exhibit "C"**) In response to the 2019 Notice and Orders, Cupp sent a "Constructive Notice of Trespass & Deprivation of Rights" letter to County personnel." (See **Exhibit "D"**).

In April of 2019, the County issued two "Civil Penalties Due and Payable" notifications to Cupp. (See **Exhibits "E" and "F"**, hereinafter referred to as "Determination Notices"). The Determination Notice shown in Exhibit E was for "unpermitted land uses" as described in Exhibit C, and the Determination Notice in Exhibit F was for "unpermitted construction", as described in Exhibit B. Notably, and contrary to the Staff Report, neither of the Determination Notices provided Cupp with notice of appeal rights concerning civil penalties that were being assessed.

In July of 2020, County staff conducted another inspection of the Subject Property. This second inspection was pursuant to a Superior Court-issued Inspection Warrant. Based on that inspection, County staff issued the 2020 Notice and Orders, which consisted of seven separate Notice and Orders. Of those seven, four generally alleged "construction without permits", two were for "unlawful uses" and one was for "a dangerous building". (See **Exhibits "N"** through **"T"**) During the course of the Continued Hearing, Franceschi testified that the violations described in Exhibits "P" and "S" of the 2020 Notice and Orders were "duplicative" of the violations described in Exhibit "B" of the 2019 Notice and Orders. In response to the 2020 Notice and Orders, Cupp sent a letter to County staff titled "Constructive Notice of Trespass & Deprivation of Rights ", dated August 4, 2020. (See **Exhibit "U"**)

As mentioned above, the Hearing Officer requested briefings from the parties on a jurisdictional challenge raised by Cupp and issued an Interim Order on January 18, 2021. The Interim Order determined that the Hearing could proceed as to all but one of the alleged violations. The Hearing Officer ruled that the violations for "Dangerous Building", as described in Exhibit "Q", were more suited for a technical assessment and were aligned with issues raised in *Lippman v. City of Oakland* (2017) 19 Cal.App.5[th] 750 (substandard living conditions). An appeal of those violations should be considered, if at all, in accordance with §1.8.8 of the Building Standards Code.

# Summary of Decision

A. Three alleged violations of unpermitted construction described in the 2019 Notice and Orders are confirmed. However, these alleged violations for unpermitted remodel of the single family dwelling, the barn and the garage conversion are duplicative of similar violations contained in the 2020 Notice and Orders. (See Exhibits "P" and "S"). For that reason, the abatement order and assessment of civil penalties for these violations will be addressed in Paragraph "C" below.

---

[5] It is noted here that Cupp initiated litigation in Federal District Court claiming that the February 2019 inspection constituted a trespass and an unlawful search. That litigation is on-going and the lawfulness of that search is not at issue in this Hearing.

[6] Unless otherwise specified, all Exhibit references are references to exhibits that were included in the Staff Report.

B. The allegation of a zoning violation for conversion of a garage to a dwelling unit, as described in the 2019 Notice and Orders, is not confirmed. While the evidence presented confirms that improvements to the garage had been made to convert the garage into a dwelling unit, the Staff Report indicates that this work had not been completed, and there was no evidence presented that established an actual "use" of the garage as a dwelling unit.

C. Seven alleged violations of unpermitted construction described in the 2020 Notice and Orders are confirmed. The confirmed violations are for unpermitted construction of a 9-foot fence (Exhibit "N"), barn remodel (Exhibit "P"), the unpermitted additions and remodels to the single family residence and garage, described in Exhibit "S", and construction of two sheds and a carport (Exhibit "T"). Cupp must apply for all required permits to legalize or remove the unpermitted work, pay the applicable permit fees, and diligently pursue work authorized under such permits to completion, all in accordance with the terms of the Administrative Abatement Order, below. If Cupp fails to apply for all required permits to legalize or remove the remodel work that was performed without required permits within the specified timeframe, or fails to pay applicable permit fees, or fails to diligently pursue work authorized under such permits to completion, the following civil penalties shall be imposed: (1) a civil penalty in the amount of **$26,400.00**, based on a daily civil penalty of $75.00 per day for each of the two residential violations; and (2) a civil penalty in the amount of **$44,080.00**, based on a daily civil penalty of $50.00 per day for each of the five violations deemed to be non-commercial accessory structures. These civil penalty assessments begin on July 30, 2020 and shall continue to accrue at that rate until all required permits are obtained to either "legalize" or remove unpermitted the construction. This order also addresses the violations contained in Exhibit "B" that were part of the 2019 Notice and Orders.

D. The allegation of an unlawful commercial cannabis use is confirmed. A civil penalty in the amount of **$42,000.00** is assessed based on a daily civil penalty amount of $7,000.00 per day for a period of six days.

E. The allegation of the unpermitted occupancy of a travel trailer is confirmed. Cupp is ordered to terminate the occupancy of the travel trailer, in accordance with the terms of the Administrative Abatement Order, below. A civil penalty in the amount of **$8,800.00** is assessed based on a civil penalty in the amount of $50.00 per day beginning on July 30, 2020 and shall continue to accrue at that rate until the use of the Property for an occupied travel trailer is permitted, or that use is terminated and the termination of that use is confirmed by a County staff site inspection.

F. The allegation of the existence of junkyard conditions is confirmed. Cupp is ordered to terminate the use of the Property as a "junkyard" as defined in Sonoma County Code §26-02-140. A civil penalty in the amount of **$8,800.00** is assessed based on a civil penalty in the amount of $50.00 per day beginning on July 30, 2020 and shall continue to accrue at that rate until use of the Property as a "junkyard" ceases and is confirmed by a County staff site inspection.

G. The allegation of a "dangerous building" for faulty construction, construction without a permit, and "faulty/dangerous electrical and gas" (sic) is not within the scope of this proceeding for the reasons set forth in the Hearing Officer's Interim Order.

H. The allegation of unpermitted use of the Property for a contractor's storage yard is not confirmed. There was no evidence to support a finding that any equipment or described materials were used by Cupp in the conduct of building trades or building craft.

I. County staff is to issue a written authorization, as necessary or appropriate, to allow electrical service to the Property to be restored, as described in the Administrative Abatement Order.

# Findings of Fact

The following represent the Hearing Officer's findings of fact, based on the evidence presented:

1. Cupp is the current owner of the Property.

2. On, or about, January 29, 2019, PRMD received a complaint in which the complaining party asserted (1) that the Property was formerly bank owned, and (2) a belief that remodel work on a single family residence, as well as conversion of a garage to a dwelling unit, was being performed without permits.

3. Smith sent a "courtesy notice" on January 29, 2019, addressed to "Federal National Mortgage Association" in Jacksonville, FL, describing the complaint as "construction without a permit".[7]

4. Smith conducted a Property inspection on February 15, 2019.[8] He observed that a single family residence and a barn were being remodeled. He also observed "construction materials in and around the Single Family Dwelling". He also observed "a variety of construction materials, including lumber" inside the garage door, as well as "a large supply of lumber and cut tailings" outside of the garage. Smith also observed that a garage had been modified "into what was a dwelling space" but that "it had not been completed".

5. Smith spoke to someone who was operating power tools inside the converted garage.

6. Smith determined that no permits had been issued for the observed remodels and garage conversion.

7. Smith posted the 2019 Notice and Orders on the Property describing the alleged code violations.

8. Cupp responded to the 2019 Notice and Orders with a "Constructive Notice of Trespass and Deprivation of Rights", dated February 20, 2019 (or erroneously dated February 20, 2018).

9. Cupp testified that "I actually pulled a permit to build the barns through the County", but no permit or permits were offered as evidence prior to, or during, the Continued Hearing.

10. Cupp testified that the second-story remodel was done in 1979, before he purchased the Property.

11. Cupp testified that "the lower structure" was built over the well in 1979, prior to his ownership.

12. On July 20, 2020, County staff obtained an Inspection Warrant to conduct a Property Inspection.[9] Pursuant to the Inspection Warrant, County staff conducted a Property inspection on July 30, 2020. During the inspection, County staff observed the conditions described in the 2020 Notice and Orders.

13. A 9-foot fence was constructed within the front yard setback area without required permits.

14. Additions and remodels were made to a single family residence and a barn, and improvements were made to a garage, all without required permits. Violations referenced in the 2020 Notice and Orders that pertain to unpermitted improvements to the single family residence, barn and garage are duplicative of the same violations in the 2019 Notice and Orders.

15. Two sheds and a carport were constructed without required permits.

---

[7] No information was offered at the Hearing as to the actual Property owner on January 29, 2019, or why the "courtesy letter" was sent to Federal National Mortgage Association" in Jacksonville, FL.

[8] As mentioned previously, the validity of Smith's February 2019 Property inspection is the subject of litigation in federal court. Although Cupp has again challenged the validity of that inspection in this proceeding, the Hearing Officer has deferred to the pending federal court litigation for a determination of the validity of the February 2019 Property inspection.

[9] At the Hearing, Cupp challenged the validity of the Inspection Warrant, but that challenge is beyond the scope of this Hearing.

16. The Property was being used for an unpermitted commercial cannabis operation of approximately 500 mature cannabis plants. Cupp testified that the unpermitted commercial cannabis operation ceased on July 30, 2020. However, Cupp offered no photographic or documentary evidence to show that the commercial cannabis operation actually ceased on that date. Cupp also did not request a compliance inspection.

17. The Property was being used for the unpermitted occupancy of a travel trailer and as a "junkyard" as defined in Sonoma County Code §26-02-140.

18. Cupp has not requested a compliance inspection for any of the alleged violations on the Property since issuance of the 2020 Notice and Orders.

19. The Staff Report contained a "Penalties Due Calculation Sheet" for the 2019 Notice and Orders, but does not contain a "Penalty Schedule" that correlates to the Penalties Due Calculation Sheet. The Staff Report did not contain a "Penalties Due Calculation Sheet" or a "Penalty Schedule" for the 2020 Notice and Orders.

20. A "Response to Interim Ruling and Order" submitted by County staff during the Continued Hearing contained a "Cannabis Penalty Calculation Sheet" and a "Cannabis Violation Penalty Schedule", but did not contain a "Penalties Due Calculation Sheet" or a "Penalty Schedule" for the other 2020 Notice and Orders.

21. The Staff Report and the County's "Response to Interim Ruling and Order" include an analysis and calculation of civil penalties to be assessed. According to testimony from Franceschi, the 2019 violations "were incorporated into – or duplicated and included in the 2020 violations". He also testified that the penalty calculations for the 2020 violations "should be the same" as the penalty calculations shown in Exhibit Y to the Staff Report, which were for the 2019 violations because "it's the same violation, as we discussed they were duplicated."

22. Two "Determination of Civil Penalties" letters were sent to Cupp regarding the 2019 Notice and Orders, but not for the 2020 Notice and Orders. The two "Determination of Civil Penalties" that were sent to Cupp did not contain a statement advising Cupp that he could appeal the amount of civil penalties. However, because County Staff and Cupp have agreed that the Hearing would serve as an appeal of all issues relating to the 2019 Notice and Orders and the 2020 Notice and Orders, the omission of the right to appeal the amount of civil penalties is deemed harmless error.

23. There is no evidence in the record that any of the alleged violations in the 2019 Notice and Orders or the 2020 Notice and Orders had a significant effect on neighboring properties.

24. There is no evidence in the record that the any of the alleged violations in the 2019 Notice and Orders or the 2020 Notice and Orders actually caused human health or safety, or environmental, damage.

25. As to the unpermitted commercial cannabis cultivation operation, there is evidence in the record, including photographs, that tend to indicate that the operation required significant amounts of electricity to function (pictures of "grow lights", two "industrial warehouse sized" air conditioning units, nutrient mixing tank, and numerous "electrical lines".)

26. Cupp testified that electric service to the Property was terminated on August 4, 2021 and has not been restored.

27. As to the unpermitted commercial cannabis cultivation operation, there is no evidence in the record that Cupp had an economic incentive or benefit from the cannabis operation.

# Legal Analysis and Conclusions of Law

## Summary of applicable laws, regulations and policies

A. *Permit Requirement from County of Sonoma County Code (§§26-88-250 – 254)--* Commercial cannabis activities are subject to permit requirements as shown in 26-88-250, Table 1A-D. No other type of commercial cannabis activities are permitted except as specified in Table 1A-D.

B. *Unlawful Use/Zoning Violation from County of Sonoma County Code (§26-92-200(a)) --* Prohibits the use of land for any purpose or in any manner other than for "permitted uses" as listed in the County's Zoning Ordinance.

C. *Permit Requirement from Sonoma County Building Code (§7-5)--* No person is allowed to erect, construct, alter, repair, move, improve, convert or demolish any building or structure in the unincorporated area of this county, or cause the same to be done, without first obtaining a separate building permit for each such building or structure as required by the Building Code.

D. *Sonoma County Code 1-7.1(a) (Relevant Portions) --* Sets forth applicable penalty amounts for violations of various County Code sections, including Sections §§26-88-250, 7-5 and 26-92-200. Authorizes the enforcing officer to set the amount of civil penalties within prescribed ranges.

E. *Sonoma County Code §1-7(b)* (Relevant portion) – Authorizes the County to collect costs incurred by the County in abating nuisance conditions, which includes costs of administrative overhead, salaries and expenses incurred by PRMD and County counsel.

F. *Sonoma County Code §1-7(b)* (Relevant portion) -- A "responsible party" includes "[A] person with an ownership interest in real property upon which a violation is found".

G. *Sonoma County Code §1-7.1(f)(3)(a)--* A responsible party must pay the civil penalties imposed for an unpermitted use of property for commercial cannabis cultivation.

H. *Sonoma County Code §1-7(a)(4)(iii))* -- A responsible party must pay to the County a daily penalty in an amount determined by the enforcing officer.

## Analysis and Conclusions Regarding Construction without Required Permits

The 2019 Notice and Orders cited three instances of construction without required permits: remodel of the single family residence, remodel of a barn, and remodel/conversion of a garage to a dwelling unit. The 2020 Notice and Orders cited seven instances of construction without required permits; the same three that were described in the 2019 Notice and Orders, plus construction of a nine-foot fence, two sheds and a carport.[10] Franceschi testified that the 2020 Notice and Orders pertaining to unpermitted construction for the single family residence and the barn were duplicative of the 2019 Notice and Orders because "they [the violations] still existed" and "they were still included in violation notices that were sent following that 2020 inspection." The violations that were described in the 2019 Notice and Orders are included in the 2020 Notice and Orders and will not be separately considered for purposes of determining an appropriate abatement order or civil penalties. A preponderance of evidence supports the determination of a violation of Section 7-5 of the Sonoma County Code for unpermitted construction of a nine-foot fence in the front yard, the remodel of a single family dwelling, the remodel of a barn, the remodel/conversion of a garage, and the construction of two sheds and a carport.

---

[10] The 2020 Notice and Orders included an alleged violation for "dangerous building" based on "faulty construction". However, the Hearing Officer has determined that this alleged violation is beyond the scope of the Hearing.

Page | 7

The appropriate level of civil penalties to be assessed for the seven instances of unpermitted construction requires an analysis of "factors to be considered" in accordance with Sonoma County Code §1-7.1(c). Those factors align with the factors used by County staff in the "Penalties Due Calculation Sheet" (See **Exhibit "Y"**). While the penalty calculations contained in Exhibit Y pertain to the 2019 Notice and Orders, Franceschi testified that because the unpermitted construction violations cited in the 2020 Notice and Orders were the same as those cited in the 2019 Notice and Orders, the penalty calculations for the 2020 Notice and Orders should be the same as what is shown on Exhibit Y. However, the evidence presented does not support the penalty calculations shown in Exhibit Y. For example, the category of "Seriousness of Violation" uses a score of "10", which indicates that the violation "caused human health/safety or environmental damage". However, Franceschi testified that he had no knowledge of any damage from the unpermitted construction. Similarly, the category of "Effect on Other Properties" has an assigned score of "10" which requires a determination of "significant effect on other properties". However, Franceschi testified that "we have not received specific complaints from the neighborhood about any of the unpermitted construction." As for the category of "Sophistication of Owner", there is no evidence in the record that the requirement of permits was known to Cupp for the 2019 Notice and Orders. However, because the 2019 Notice and Orders are not separately considered for purposes of determining the appropriate level of civil penalties, Cupp's knowledge or awareness of the need for permits (with respect to the 2019 Notice and Orders) is of no significance. However, after having received the 2019 Notice and Orders, Cupp certainly had knowledge that County regulations required permits for the remodel/addition work that was being performed. Therefore, as to the 2020 Notice and Orders, a score of "10" is appropriate for this category as to the unpermitted construction violations.

The evidence presented regarding the seven instances of unpermitted construction supports a score of "5" for the category of "Seriousness of Violation" and a score of "1" "Effect on Other Properties", resulting in an overall score of 7.15 for the seven occurrences of unpermitted construction violations described in the 2020 Notice and Orders. The unpermitted remodel/additions to the single family dwelling and the converted garage are "residential" in nature, pursuant to *Sonoma County Code §1-7.1(a)(2)*. The five remaining violations for unpermitted construction (the 9-foot fence, barn, two sheds and a carport) fall into the category of "Other Violations", as they appear to be non-commercial accessory structures, per *Sonoma County Code §1-7.1(a)(7)*.

If Cupp applies for permits to "legalize" or remove the unpermitted construction, a civil penalty in the amount of 4.4 times the regular permit fee shall be imposed to obtain all permits. If Cupp does not apply for required permits, civil penalties for unpermitted construction shall be in the amount of $75.00 per day for each of the two residential violations and $50.00 per day for each of the violations deemed to be non-commercial accessory structures. These civil penalties shall be imposed in accordance with the terms of the Administrative Abatement Order, below.

## Analysis and Conclusions Regarding Non-Cannabis Zoning Violations/Unlawful Uses

The 2019 Notice and Orders cited one instance of a zoning violation, or "unlawful use", for the unpermitted conversion of a garage to a dwelling unit. The 2020 Notice and Orders did not include this zoning violation. However, the 2020 Notice and Orders contained three other non-cannabis related zoning, or "unlawful use", violations, namely; (1) an occupied travel trailer; (2) junkyard conditions; and (3) a contractor's storage yard. It is unclear as to why the garage conversion use violation was not included in the 2020 Notice and Orders, since Franceschi testified that the 2020 Notice and Orders were "duplicative of" the 2019 Notice and Orders. Nothing presented in the Staff Report, nor the testimony of County staff at the Hearing, provided evidence of actual "use" of the garage as a dwelling unit. The two

photographs of the garage, one taken on February 15, 2019, and a second, taken on July 30, 2020, did not show actual use of the garage as a dwelling unit. So while the violation for construction/remodel of the garage is established, the alleged violation for "use" of the garage as a dwelling unit is not confirmed.

There was also an allegation of an unlawful use included in the 2020 Notice and Orders for "a contractor's storage yard". The only evidence offered in support of this violation, other than the Notice and Order (Exhibit "R") was a statement in the Staff Report indicating that ". . . storage of construction materials was observed." While construction materials may have been observed during a site inspection, the presence of "construction materials", alone, is not sufficient to establish a zoning violation for a contractor's yard. County Code Section 26-02-140, defines a contractor's yard as "any land and/or building(s) used primarily for the storage of . . . building materials, paints, pipe or electrical components, any of which is used by the owner or occupant of the premises in the conduct of any building trades or building craft." (emphasis added) There was no evidence showing that the observed construction materials were used by Cupp in the conduct of any building trades or building craft. Therefore, the violation for unlawful use of the Property for a contractor's yard is not confirmed.

The evidence shows that a travel trailer on the Property was occupied and was being rented to a tenant. As for "junkyard conditions", Smith testified that he observed "multiple debris piles . . . as well as trash, junk and scrap" that exceeded an area of 500 square feet that was spread around various locations on the Property. This evidence was not refuted, so the violations for "use" of the Property for an occupied travel trailer and junkyard conditions are confirmed. Because the travel trailer was not "owner occupied", it is not considered a "residential violation", as described in *Sonoma County Code 1-7.1(a)(2)*. Similarly, *Sonoma County Code 26-02-140* excludes travel trailer from the definition of a "residential – dwelling unit". Therefore, for purposes of determining an appropriate level of civil penalty, the two confirmed unlawful uses, occupied travel trailer and "junkyard conditions" will be considered "Other Violations".

The only analysis provided to show how County staff determined a recommended daily civil penalty for these two "unlawful use/zoning violations" is found on the "Civil Penalties Due Calculation Sheet", which was attached as the second page of Exhibit Y. This sheet lists a "Violation #" of "VPL19-0130", which correlates to the 2019 allegation of "change of occupancy – convert garage to dwelling unit." The evidence presented did not support a determination of this alleged unlawful use. However, Franceschi testified that any penalties associated with the 2020 violations are the same as the penalty calculations for the 2019 violations. Based on that testimony, it appears to be the position of County staff that the civil daily penalties for the two non-cannabis related zoning, or "unlawful use", violations (i.e., an occupied travel trailer and "junkyard conditions") should be calculated applying the same scores and factors used on the second page of Exhibit Y.

Referring to those scores and factors, County staff has assigned a score of "10" to the category of "Seriousness of Violation", which requires a showing that the violation "has caused human health/safety or environmental damage". While it is possible, perhaps even likely, that the two uses of property found to be violations have the potential for causing such damage, there was no evidence of actual damage. The score for this category is changed to "5". Similarly, the category of "Effect on Other Properties" was assigned a score of "10" which requires a showing that the violations had a "significant effect on other properties". However, there was no evidence that any of the violations on the Property had any effect on other properties. The score for this category is changed to "1", and the overall score for these two violations is adjusted to 7.15. Based on the foregoing, it is the Hearing Officer's determination that the appropriate amount of a daily civil penalty relating to the travel trailer occupancy and for the "junkyard conditions" is $50 per day, beginning on July 30, 2020.

## Analysis and Conclusions Regarding Unlawful Commercial Cannabis Cultivation

The evidence presented clearly established a large-scale commercial cannabis use. The Staff Report indicates the cultivation operation consisted of "approximately 500 mature cannabis plants on the Property." There was no evidence to refute the use of the Property for a commercial cannabis use. In fact, Cupp testified that "all the cannabis [use] stopped that day", referring to the day of the second Property inspection (July 30, 2020), which can be taken as an admission that there was a "cannabis use" prior to that day. So the violation for unpermitted commercial cannabis use is confirmed.

Determining the length of that use is more complicated. The Staff Report suggests that the duration of that use should extend from the day of the Notice and Order (July 30, 2020) until the date of the First Hearing (December 11, 2010), or 134 days. Given the recommended amount of a recommended penalty of $8,500 per day, this would result in a civil penalty of $1,139,000.00, a sum that requires close scrutiny. (*United States v. Bajakajian (1997) 524 U.S. 321*)

The Notice and Order for this violation (Exhibit "O") indicated that Cupp was "required to notify this Department and schedule a re-inspection to verify the removal of the illegal use." It also advised Cupp that it was his responsibility "to arrange a site inspection to verify removal of the violation." Because Cupp did not arrange for a subsequent compliance inspection, Franceschi testified that County staff "is assuming that the cannabis we observed has probably been harvested by now, but their cultivation operations still continue unabated on the [P]roperty." No one from County staff offered any evidence as to how the determination was made that the "cultivation operations still continue unabated" into December of 2020. At the Hearing, Counsel argued that Cupp "had the ability to reduce his liability for civil penalties by simply, one, abating it, or two, calling for an inspection. He did neither." When pressed as to whether the County had any evidence that Cupp had not actually abated the violation, Counsel acknowledged that "I'm not making that representation at all". She relied on the fact that "because he did not call, that's how – why the penalties continue to accrue." So the County has offered no evidence as to the actual abatement of the violation other than Cupp's failure to call for an inspection. Rather, County staff relies on a presumption that the cannabis cultivation continued unabated because a compliance inspection was not requested nor conducted.

On the other hand, Cupp testified at the Hearing that all cannabis use stopped on July 30, 2020. However, Cupp offered no documentary or photographic evidence to support that statement. If that use had, in fact, stopped on July 30, it is reasonable to expect that Cupp would have notified County staff of that fact, since the Property was exposed to significant daily penalties for any continued unlawful use.[11]

A reasonable method of assessing the timing of the "abatement" of that use is to examine the infrastructure that was observed as part of the cannabis cultivation operation. Testimony and photographs show that this operation required a significant amount of electrical power to provide electricity for, among other things, two "industrial warehouse sized" air conditioning units, two separate "grow rooms" with "grow lights", and a nutrient mixing tank. Cupp testified that power to the Property was terminated on August 4, and that testimony was not refuted. A reasonable inference can be drawn that without electricity on the site, the cultivation operation was impaired, if not terminated, when electric service to the Property was terminated.

---

[11] The Notice and Order for this violation indicated a potential penalty "of up to $10,000" per day.

Page | 10

Franceschi testified that "the fact that there is no power does not mean that you . . . can't be cultivating cannabis currently in some kind of mixed light." This testimony invites the Hearing Officer to speculate as to potential growing opportunities, but it lacks any supporting evidence as to actual cultivation activity beyond August 4, 2020. Franceschi also testified that "we have not ever been invited back to the property to verify the cannabis has been abated", and because of this lack of an invitation "the inspection staff has not been able to perform a compliance inspection". However, the record indicates that inspection staff was able to perform two property inspections previously without "ever having been invited". With daily penalties accruing at a proposed rate of $8,500 per day, it seems reasonable to expect County staff to have made some outreach effort within the 134 days of presumed non-compliance to determine whether the cannabis cultivation violation had actually been abated.[12]

The Notice and Order for this violation (Exhibit "O") provided notice to Cupp that this particular violation would be assessed a daily penalty of "up to $10,000" until the violation was abated. But unlike the violations for the 2019 Notice and Orders, no "Civil Penalties Due and Payable" forms (such as shown in **Exhibits "E"** and **"F"**) were sent to Cupp regarding the 2020 Notice and Orders. So while County staff and Counsel contend that Cupp had the ability to avoid or mitigate the amount of civil penalties that were accruing (a contention that is not disputed), no evidence was presented to show that Cupp had actual knowledge of the amount of civil penalties that were accruing, on a daily basis, for the commercial cannabis cultivation violation for a period of 134 days, the proposed duration of the violation.

In determining the appropriate level of daily civil penalties for the cannabis operation, it is necessary to refer to the "Cannabis Penalty Schedule Sheet" that was submitted by County staff during the course of the Continued Hearing. Of note, the category of "Effect on Other Properties" was given a score of "10", which requires a showing that the violation "had a significant effect on other properties." However, Franceschi testified that staff had not received any complaints from the neighborhood about the cannabis cultivation activity on the Property. The required showing to support a score of "10" for this category has not been made and the score is changed to "1" for a "minor effect". Similarly, for "Culpability of Owner", a score of "10" was assigned. That score requires a showing that the "Owner created, added to, or allowed the violation", plus an additional showing that the owner had "economic incentive or benefit." There was no evidence tending to show that Cupp had an economic incentive or benefit relating to the cannabis cultivation operation. The score for this category is changed to "5".

Based on all of the foregoing, it is the Hearing Officer's determination that the appropriate amount of a daily civil penalty for the unpermitted commercial cannabis cultivation, using the revised scores from the "Cannabis Penalty Schedule Sheet" and the "Cannabis Violation Penalty Schedule" (which was also submitted during the course of the Continued Hearing), is $7,000 per day. It is the Hearing Officer's further determination that the duration for the accrual of daily civil penalties should be five days, extending from July 30, 2020 (the date of the 2020 Notice and Orders) to August 4, 2020, the date that electrical service to the Property was terminated.

---

[12] It is noted that Smith sent a letter to Cupp, dated December 30, 2019, in which Smith advised Cupp that he (Cupp) should notify Smith if the violations described in the 2019 Notice and Orders had been abated because daily penalties were accruing. (See Exhibit "L") However, since the violations described in the 2019 Notice and Orders are not being separately considered or assessed, that letter is of no significance to the determination of appropriate daily civil penalties. It is of note that no similar letter was sent for the 2020 Notice and Orders and the associated civil penalties that were accruing. Although not a specific "finding" or determination in this proceeding, the failure of County staff to undertake any follow up efforts to arrange for a site inspection pertaining to the 2020 violations, while penalties were accruing at a rate of several thousands of dollars per day, could raise questions or concerns about possible motives for not undertaking any follow up efforts.

## Analysis and Conclusions Regarding Amount of Civil Penalties

Both parties have raised an issue with respect to the amount of civil penalties to be assessed. Cupp argued (in his Abatement Hearing Statement) that the proposed fines are excessive, and violate the Eighth Amendment to the U.S. Constitution, which prohibits the imposition of excessive fines. When originally enacted, the Eighth Amendment applied only to federal actions, but more recently, the prohibition contained in the Eighth Amendment has been held to apply to states, by virtue of the 14th Amendment to the U.S. Constitution. (see *Timbs v. State of Indiana (2019) 586 U.S. ____, 139 S. Ct. 682*; see also, *McDonald v. Chicago, 561 U. S. 742, 767, 130 S. Ct. 3020*) The California Constitution also prohibits the imposition of excessive fines. (see *Cal. Constitution, Article I, Section 17).*

Cupp complains, among other things, that the County "has been charging fines and penalties every day, and it took 22 months to get this hearing, and I think they shouldn't even be allowed any of that until after the hearing." Cupp's complaint might have merit, except for the fact that County staff is not proposing to assess fines or penalties pertaining to the 2019 violations. Nor is County staff proposing to assess fines or penalties for a 22-month period. Pursuant to the Staff Report and testimony from Franceschi, County staff is recommending that daily fines and penalties only be assessed beginning on July 30, 2020, and continuing through December 11, 2020, the date of the First Hearing. (It is noted that County staff is also recommending that daily penalties continue to accrue after the Hearing date in the event that compliance with the Administrative Abatement Order is not achieved.)

During the Continued Hearing, the Hearing Officer noted that an earlier hearing date of October 23, 2020, had been scheduled but that the County "indefinitely continued" that hearing. The Hearing Officer questioned County staff as to whether daily penalties should continue to accrue during a period when the County is unable to schedule a hearing or unilaterally continues a scheduled hearing. Franceschi testified that, under different circumstances, it might be appropriate to stop the accrual of daily penalties. For example, if Cupp had requested a compliance inspection, but County staff was unable to respond to that request, a halt in the daily accruals might be warranted. But according to Franceschi, Cupp "never called, never offered an inspection on those issues" and so the daily penalties should continue to accrue because "nothing's changed" with respect to the violations. Counsel made the point that Cupp had not called for inspections, something that "is totally within his control . . . meaning he had the ability to reduce his liability for civil penalties."

Counsel also cited to two California cases for the proposition that the penalties were "clearly in control of the property owner to lessen and mitigate if he had just abated the violations." The cases cited by Counsel were *People v. Braum (2020) 49 Cal.App.5[th] 342*, and *City and County of San Francisco v. Sainez (2000) 77 Cal.App.4[th] 1302*. In *Braum*, the trial court imposed more than $6 million in civil fines for violations of the city's zoning ordinance. In upholding the trial court's civil fine assessment, the court stated the following: "Because, as the landlord, it was within his power to comply in a timely manner with the City's enforcement efforts, and thereby mitigate the amount of penalties imposed, his own conduct dictated that the amount of penalties . . . would be substantial." (*Braum*, supra, at p. 362). Similarly, in *Sainez*, San Francisco brought an action against owners of rental property for violations of local housing and building codes. The trial court imposed penalties amounting to $767,000, and the trial court's judgment was affirmed on appeal.[13] In explaining its decision, the Court of Appeal noted that "Defendants had it within their control first to prevent, and then to stop, the accumulation of penalties." (*Sainez*, at p. 1316.)

---

[13] The judgment of the trail court was modified to correct mathematical miscalculations that were made by the trial court judge

The authority cited by Counsel is persuasive. Cupp had it in his control to mitigate the amount of penalty accruals but opted not to do so. The Hearing Officer has determined that the appropriate amount of civil penalties to be assessed for the listed violations, if the abatement orders are not followed, is $130,080.[14] Considering all the factors discussed above, it is the Hearing Officer's determination that the amount of daily penalties being assessed is proportional to the violations, are not "excessive", and do not run afoul of either the U.S. or California Constitutions.

## Administrative Abatement Order

Having considered the evidence presented, and having reviewed applicable laws and regulations pertaining to the alleged code violations, **IT IS HEREBY ORDERED**:

1. **Within twenty (20) business days of the date of this Order,** Cupp must either initiate a process to "legalize" the improvements made to the single family residence and the garage by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or Cupp must submit a complete application for a demolition (or removal) permit to remove these improvements. To initiate the process to "legalize" or remove these improvements, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.4 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to "legalize" or remove the improvements made to the single family residence and the garage must be diligently pursued to completion and must be inspected by County staff for compliance with all applicable codes and permits. If Cupp fails to comply with this section of the Order, a civil penalty of $75 per day shall be assessed beginning on July 30, 2020 and continuing until these violations are abated and Cupp requests inspections by County staff to confirm the abatement.

2. **Within twenty (20) business days of the date of this Order,** Cupp must either initiate a process to "legalize" the nine-foot fence, the improvements made to the barn, the two sheds and the carport by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or Cupp must submit a complete application for a demolition (or removal) permit to remove these improvements. To initiate the process to "legalize" or remove these improvements, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.4 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to "legalize" or remove these improvements must be diligently pursued to completion and must be inspected by County staff for compliance with all applicable codes and permits. If Cupp fails to comply with this section of the Order, a civil penalty of $50 per day shall be assessed beginning on July 30, 2020 and continuing until all of these violations are abated and Cupp requests inspections by County staff to confirm the abatement.

---

[14] This amount is based on applying the daily civil penalties for each described violation for a period of 176 days, beginning on July 30, 2020 and continuing to January 22, 2021, the date of the Continued Hearing.

3. **Within ten (10) business days of the date of this Order**, Cupp must either initiate a process to "legalize" occupancy of the travel trailer by applying for required permit(s) from the County to allow the travel trailer to be occupied, or Cupp must cease the use of a travel trailer as an occupancy. To initiate the process to "legalize" the occupancy, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.1 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to allow for occupancy of the travel trailer must be completed within sixty (60) days of the issuance of such permit. Alternatively, Cupp is ordered to schedule a site inspection with PRMD code enforcement staff to verify the cessation of occupancy of the travel trailer within 10 business days from the date of this Order. If Cupp fails to comply with this section of the Order, a civil penalty of $50 per day, beginning on July 30, 2020 will be assessed and will continue until the violation is abated and Cupp requests inspections by County staff to confirm the abatement.

4. **Within thirty (30) business days of the date of this Order**, Cupp must abate the use of the Property as a "junkyard" by removing all debris piles, trash, junk and scrap, or reducing the accumulation of such materials to an area of less than 100 square feet. Cupp must also contact PRMD inspection staff within that same timeframe to request an inspection for compliance with this section of the Order. A civil penalty of $50 per day is assessed, beginning on July 30, 2020 and will continue until the violation is abated and Cupp requests inspections by County staff to confirm the abatement.

5. A civil penalty in the amount of **$42,000** is assessed for the unpermitted commercial cannabis use. Cupp is encouraged to work with PRMD staff to reach an agreement on how and by when this payment is to be made. Failing to reach an agreement within 10 business days of the date of this Order, payment is to be made within 20 business days of the date of this Order in the manner described in paragraph 8, below.

6. Cupp is liable to the County for costs of abatement, which includes County staff time in addressing the violations, and for Hearing Officer and court reporter services. Within 15 business days of the date of this Order, Cupp shall pay to the County the sum of **$18,493.25**, in accordance with the instructions in paragraph 8, below. The costs of abatement include (1) Code Enforcement Division investigative time and secretarial time in pursuing abatement ($12,021.40) , as detailed in the Staff Report and subsequent County invoice; (2) Hearing Officer fees ($5,670.00); and (3) fees for court reporter services ($801.85).

7. Any timeframes or deadlines described in this Order shall be extended if delays in pursuing compliance or abatement efforts are not due to the fault, or lack of diligence, on the part of Cupp. The length of any such extension shall be equal to the amount of time associated with the delay(s). Any timeframes or deadlines described in this Order may be extended upon written request of Cupp but are subject to the consent or approval of PRMD staff, which consent or approval shall not be unreasonably withheld or denied.

8. All payments required to be made herein shall be payable to "County of Sonoma" and sent or delivered to "County of Sonoma, Attn: PRMD, 2550 Ventura Ave., Santa Rosa, CA 95403".

//

This Statement of Decision and Administrative Order is final, subject to judicial review in accordance with the provisions of California Code of Civil Procedure §1094.6. Judicial review of this decision must be sought no later than ninety (90) days following the date shown on the Certificate of Mailing, attached hereto, pursuant to California Code of Civil Procedure §1094.6.

Date: February 11, 2021

Michael Gogna, Administrative Hearing Officer