ERIC G. YOUNG, ESQ. (SBN 190104)
**YOUNG LAW GROUP**
2544 Cleveland Avenue, Suite 210
Santa Rosa, California 95403
Tel.:  707.343.0556
Fax:  707.327.4360
Email: eyoung@younglawca.com
E-Service: service@younglawca.com

Attorneys for Plaintiff
RONALD CUPP

# UNITED STATES DISTRICT COURT

## NOTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| RONALD CUPP, an individual,<br><br>        Plaintiff,<br><br>        vs.<br><br>COUNTY OF SONOMA, a municipal corporation; TENNIS WICK, in his individual and official capacities; TYRA HARRINGTON, in her individual and official capacities; MARK FRANCESCHI, in his individual and official capacities; TODD HOFFMAN, in his individual and official capacities; JESSE CABLK, in his individual and official capacities; ANDREW SMITH, in his individual and official capacities; and DOES 1-50, inclusive.<br><br>        Defendants. | CASE NO.: 4:23-cv-01007 JST<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [PROPOSED] FIRST AMENDED COMPLAINT; DECLARATION OF ERIC G. YOUNG IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**(Submitted with Plaintiff's Request for Judicial Notice; [Proposed] Order on Motion to Dismiss First Amended Complaint)**<br><br>Date: July 18, 2024<br>Time: 2:00 p.m.<br>Courtroom: 6, 2nd Floor<br>Judge: Hon. Jon S. Tigar, Dist. Ct. Judge |

TO DEFENDANTS AND THEIR ATTORNEY OF RECORD:

Comes now Plaintiff RONALD CUPP (hereinafter "Plaintiff" or "Mr. Cupp") to submit this Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss [Proposed] First Amended Complaint (hereinafter "the Motion") [DOC 50]. The Motion represents the third such motion the defense has filed. The Motion targets Plaintiff's Proposed

First Amended Complaint (hereinafter "PROPOSED FAC") [DOC 49]. Except for any points of law conceded herein, Plaintiff respectfully requests that the Court deny the Motion. The time has come for this action to proceed to discovery, to undergo additional proceedings as needed, and to conduct a trial on the merits. If the Court is inclined to dismiss any part of the PROPOSED FAC not conceded herein, Plaintiff requests leave to cure any such deficiencies.

## I. <u>STATEMENT OF THE CASE</u>

Despite Defendants' characterization, this action is not only concerned about a single incident where Defendant COUNTY OF SONOMA (hereinafter "the County"), without a warrant, flew an unmanned aerial vehicle (UAV) (hereinafter "a drone") over private property owned by Mr. Cupp located at 4640 Arlington Avenue, Santa Rosa, California ("the Subject Property"). This warrantless intrusion and search of the Subject Property did, in fact, occur on or about July 1, 2022. On that date, acting in their official capacity as officers of Defendant COUNTY OF SONOMA (hereinafter "the County"), specifically the County's Code Enforcement Division (hereinafter "CED") of Permit Sonoma,[1] Defendants TODD HOFFMAN (hereinafter "Hoffman") and JESSE CABLK (hereinafter "Cablk"), two Code Enforcement Officers, flew a drone over the Subject Property and conducted an inspection search. They had no warrant, no consent, and no exigent circumstances.

The underlying facts are set forth in detail in the PROPOSED FAC and will not be reiterated in full here. (See, Young Declaration, **Exhibit A.**) However, the PROPOSED FAC makes it clear that this action raises far more serious constitutional issues, which Defendants

---

[1] Permit Sonoma is also known as "the Permit and Resource Management Department or "PRMD." The County describes the Department as its "consolidated land use planning and development agency." For brevity and clarity, Plaintiff refers to this Department as Permit Sonoma herein. See, https://permitsonoma.org/aboutus, accessed June 24, 2024.



either conveniently overlook in the Motion, or they argue these constitutional issues have already been fully and finally litigated. Defendants' arguments are legally and factually incorrect. Mr. Cupp also alleges under *Monell* that the County's promulgated an unconstitutional official policy, the Code Enforcement Enhancement Program (hereinafter "CEEP"). First enacted by the County Board of Supervisors in 2015,[2] this policy, which was augmented in 2017, represented a sea change in how CED conducted operations in the County. What had once been a public agency that primarily encouraged cooperation and compliance with local codes, after 2017, CED transformed under CEEP into an unlawfully aggressive pseudo-property policing agency that has harmed, and continues to harm, not only Mr. Cupp as alleged in the PROPOSED FAC, but also many other property owners in the County, through a systematic pattern and practice of unconstitutional misconduct.

As augmented in 2017, CEEP was written and submitted to the County by supervisory personnel, Defendants TENNIS WICK (hereinafter "Wick") and TYRA HARRINGTON ("Harrington"). Wick and Harrington are both high-level supervisors who direct and manage Permit Sonoma and the CED. Wick is the Director of Permit Sonoma whose rank within the County's hierarchy is equal to the County's Fire Chief as well as the Public Health Officer. (See, Plaintiff's Request for Judicial Notice (hereinafter "RFJN"), No. 1, **Exhibit 1**.) In addition to directing the activities of Permit Sonoma, Wick is deeply involved in policymaking for Permit Sonoma. Wick's policymaking role has been discussed in at least one newspaper article published by the local newspaper, the Press Democrat. (See, Young Declaration, **Exhibit A.**)

---

[2] The FAC indicates that CEEP was first enacted in 2017. Subsequent to the FAC, however, further information was discovered indicating CEEP originated in 2015. The Board's 2017 enactment augmented the original enactment.



Wick's significant personnel and operational role is reflected by the County's Local Ordinance, Chap. 7, Sec. 7-2,[3] which states:

> "There is Established the Office of Chief Building Official. The chief building official shall be the director of the permit and resource management department or his or her designee. The chief building official shall supervise and be responsible for all inspection work required for the proper enforcement of regulations imposed by this chapter except those duties specifically delegated herein to the county public health officer. ... The chief building official shall appoint such deputies and assistants as may be authorized by the board of supervisors. ..."

Harrington works directly under Wick as the Manager of CED. She is a former Deputy Sheriff who is now responsible for all aspects of CED's day-to-day enforcement activities. She establishes and implements policies and procedures for subordinate Code Enforcement officers. Nothing happens at CED in which Harrington is not involved. Harrington is also the liaison between CED and the Sonoma County Sheriff's Dept., often taking an active, law enforcement role with the Sheriff's Dept. when entering upon private property pursuant to CEEP, such as the July 30, 2020 entry upon the Subject Property where Harrington gave access to the Subject Property to the Sheriff's Dept. which did not, itself, have a warrant to enter the Subject Property. With virtually unfettered discretion, Harrington decides how zoning and building code violations cases are handled by CED, including how aggressively the cases are pursued.

Mr. Cupp alleges that Wick and Harrington either authored or have implemented the 2017 iteration of CEEP, and the policy purposefully instigated and incentivized an unconstitutional pattern and practice of misconduct by CED's officers against Mr. Cupp, which has damaged Mr. Cupp financially and emotionally, diminished the value of the Subject Property, and deprived Mr. Cupp of his civil rights. Mr. Cupp's allegation that the County authorized an unconstitutional policy as well as the implementation of a "pattern and practice"

---

[3] (Ord. No. 5754 § 1 (b), 2007: Ord. No. 5399 § 1, 2003: Ord. No. 4906 § 3, 1995.)



are actionable claims under 42 U.S.C. Section 1983, which may be pursued by Mr. Cupp under the *Monell* doctrine.

The extent of the harm to property owners in the County as a result of the enactment and implementation of CEEP is not fully known, but should be open to discovery. Based on internal CED documents obtained through an independent investigation including a request pursuant to the California Public Records Act (Cal. Govt. Code, § 7920.000, *et seq.*), the number of affected persons could be in the thousands. (See, Young Declaration, **Exhibit B** and **Exhibit C**.) Some affected individuals came forward to submit affidavits supporting the initial Complaint filed by Mr. Cupp, which are referenced in the PROPOSED FAC as well, and which were included as part of an extensive set of exhibits filed in support of the initial Complaint [DOC 01-1].[4] These documents are relevant to Mr. Cupp's *Monell* allegations against the County based on a pattern and practice.

Independent investigation has revealed additional facts not yet pleaded in the PROPOSED FAC, but which have bearing on this matter. Mr. Cupp has learned:

- As a result of the passage of Prop 64 on November 8, 2016, which legalized the use, sale, and cultivation of recreational cannabis in California for adults 21 and over, the County enacted Ordinance 6245 (hereinafter "the Ordinance") on or about October 16, 2018. While not expressly part of CEEP, the Ordinance arose from the same overly aggressive approach the County had begun to take against property owners using CED. (See, RFJN No. 2, **Exhibit 2.**);

---

[4] These exhibits were not attached to the proposed FAC due to its status as a "Proposed" FAC. To the extent that renders the FAC defective, Mr. Cupp requests leave to re-file a Second Amended Complaint that includes these exhibits as well as any additional facts or exhibits that will address any other deficiencies the Court finds when ruling upon the Motion.

- o The Ordinance set the cost of obtaining a permit to cultivate cannabis at $50,000, prohibitively expensive for small scale operations, and even this permit is only good for as long as five (5) years;

- o Enforcement of the Ordinance was turned over to CED in Section 26-88-252 of the Ordinance, beginning at page 9, entitled "Enforcement." The Ordinance provides that each day an unlicensed condition existed constituted a separate offense, and that the fine for such violations was up to $10,000 per day for a first violation, up to $25,000 per day for a second violation, and up to $50,000 per day for a third violation. Evidence that subjects a person to such extraordinary fines included, "Sheriff reports," but also "on-line searches, citations, _aerial photos_ or neighbor documentation." (Emphasis added);

- o Of particular importance to this case, the Ordinance further provides that where a code enforcement inspector, purportedly inspecting for cannabis, discovered any other non-cannabis violation of a building or zoning code, remediation of these other violations are subjected to punitive fines. "In the event that the use or structure in violation may be permitted with an appropriate permit, up to a maximum of fifty (50) times the amount of the standard fee for each approval, review and permit [may be charged]." This provision was designed to, and did, empower the County to block remediation by making it prohibitively expensive for most property owners. In turn, this allowed, and continues to allow, the County to accumulate enormous daily fines against property owners;

- In or about September 2020, on information and belief, the 50x multiplier was reduced to a 10x multiplier, but the County still attempts to collect the higher multiplier retroactively. In one instance, the County is now pursuing a Hispanic family in court for cannabis violations that allegedly occurred over twenty (20) years ago, seeking over $800,000 in penalties not including costs and fees, and further alleging the violations (which do not exist) continue to constitute a public nuisance without a shred of proof and without providing an administrative hearing; (See, RFJN No. 3, **Exhibit 3.**)[5]

- In or about the Spring of 2019, Harrington commenced an intensive enforcement program under the Ordinance, which dovetailed with the pursuit of CEEP around the same time as well as the acquisition and use of drones;

- Harrington gave an interview with the Sonoma West Times and News, which has since ceased publication, which resulted in an article published on October 19, 2019 (hereinafter "the Article");[6]

   o In the Article, Harrington admitted that her enforcement campaign was based, in part, on preventing growers from having an "unfair advantage" over large scale growers who had economic means to obtain a permit under the Ordinance;

   o During the Interview, Harrington admitted that very few cannabis cultivation permits had been processed or granted because the applicants

---

[5] Mr. Young represents the Alvarez family in this matter.

[6] Mr. Cupp does does not have a copy of the Article, and counsel was unable to find a copy using Google or Newspapers.com, which only archived Sonoma West Times and News through 2016. However, on information and belief, a copy of the Article is in the possession of an attorney defending a family against the County in a similar pending state case who will provide a copy of the Article to Mr. Young, which can be attached as an exhibit to corroborate these additional facts.



were forced to wait many months for permit processing, and the cost of application was "$50,000 or significantly more." Harrington speculated that many of the less affluent people were unable to afford to complete the application process;

    o As further proof of the County's unconstitutional approach to Code enforcement, Harrington also expressed her opinion that the County did not need evidence that cannabis existed on a targeted property to levy a fine, but only needed "probable cause." She maintained that, under the Ordinance, a property owner could be fined even where no cannabis was seen; and

    o Harrington defended the County's *modus operandi* in the Article, insisting that a $10,000 fine could be imposed simply for refusing to admit a code enforcement inspector onto a property;

- Throughout the spring, summer, and autumn of 2019, Harrington dispatched inspectors to numerous properties in the County. CED's routine procedure was, and continues to be, that an inspector may enter onto a suspect property without a search warrant, exigency, or permission of the owner. If the owner is present (Mr. Cupp was not in either 2019 or 2020) and refuses entry, inspectors are instructed to, or in fact do, threaten the owners with crippling fines unless they were permitted entry to the property and structures. This conduct violates the 4th Amendment, but CED engages in the conduct nonetheless; and

- When warrants are sought by CED, they are sought after the fact and are based on false and misleading Affidavits of Probable Cause that characterize property owners as "dangerous," "terrorists," and "sovereign citizens," and they characterize



every violation as a "health and safety violation" or a "public nuisance," in order to gain the broadest power to enter private property without notifying the property owner and at all hours of the day and night. This was the basis for CED's entry onto the Subject Property in 2020. In that case, and many others, CED is accompanied by the Sheriff's Dept., which has not itself obtained a search warrant relying instead on CED's inspection warrant.

The Fourth Amendment implications of the County's use of drones is but one part of a much larger constitutional problem at issue here. The County's use of CED amounts to a government-sponsored scheme to extort revenue from property owners or obtain the property itself. The scheme involves imposing crippling, per diem fines and penalties on property owners for relatively benign violations; meanwhile, CED frustrates and obstructs the property owners' efforts to remediate the violations, thereby causing the fines and penalties to increase exponentially. When the property owners cannot pay the fees and penalties, the County files civil suits against them, often without ever affording an administrative hearing.

Once suit is filed, many property owners, channeling the idiom that they "can't fight City Hall," capitulate and sign stipulated judgments containing onerous terms the County knows that most property owners cannot hope to meet (such as unreasonably short compliance deadlines) when CED's routine practice and procedure is to not issue any permits for remediation work until the fines and penalties are satisfied. When the property owner fails – as most inevitably do – the County returns to court, much aggrieved and maligns property owners, in order to obtain equity receiverships against property owners, regardless of any efforts the property owners have undertaken to comply with the County and without any regard to whether the underlying violations actually pose a health and safety hazard or constitute a public nuisance. This represents the "coup de grace" of the County's unconstitutional scheme to weaponize CED in



furtherance of corrupt goals. The scheme is a near-perfect "win-win" for the County. Property owners who have the means, pay the County off; the County wins. Those who cannot afford to pay lose their property to a receivership who ultimately sells the property, dispossessing the owner.

When a property owner like Mr. Cupp fights back, the County rolls its fees and costs onto the owners' property taxes, which often results in doubling or tripling the amount owed. Moreover, because the County treats every violation as a public nuisance, it records what purports to be nuisance abatement liens on the properties, which accelerates the timeline the County has to seize and sell the properties at a tax sale from five (5) years to three (3) years. Finally, on information and belief, the County treats properties seized in this manner as "surplus public land" and offers it to the highest bidding developer of affordable housing units, a public use that bypasses eminent domain and excuses the County from having to refund any surplus of such sales to the original owner.

Mr. Cupp now finds himself embroiled in this final chapter. As recently as today, June 24, 2024, Mr. Cupp had to seek a temporary restraining order against the County because it is now threatening to sell the Subject Property at a Defaulted Tax Sale to satisfy, in part, the County's fees and costs for its unconstitutional pursuit of Mr. Cupp through CED. Mr. Cupp obtained a TRO late this afternoon, but only until July 16, 2024.

Mr. Cupp has been caught up in the implementation of this policy, and continues to suffer harm and damages as a result of it, which has far greater implications than a single drone search. Mr. Cupp has spent tens of thousands of dollars hiring consultants and engineers in an effort to comply with the County's mandates. After five years, he has obtained finalization of remediation work, but the County continues to falsely accuse him of maintaining public nuisances on the Subject Property and accumulating fines and penalties and fees and costs. After all his efforts,



Mr. Cupp now faces the real possibility that he may lose the Subject Property altogether. Mr. Cupp should be permitted to include these factual allegations as part of the PROPOSED FAC. These issues have not been, *nor could they have been*, fully litigated in any prior proceeding relied on by Defendants. The County's efforts to compartmentalize and trivialize this action should be rejected.

## I. STATEMENT OF ISSUES & SUMMARY OF LEGAL ARGUMENT

In attacking the PROPOSED FAC, Defendants' Motion relies on erroneous presumptions about the facts and significant misapplications of the law. Defendants articulate seven points as their "Statement of Issues." [DOC 50; 2:8-21]. Defendants' legal arguments can actually be distilled into five topics:

1. Are Mr. Cupp's causes of action in the PROPOSED FAC are barred by the statute of limitations?
2. Are Mr. Cupp's factual allegations insufficient to state claims against the individual defendants pursuant to 42 U.S.C. Section 1983?
3. Does claim preclusion bar *most* of Mr. Cupp's claims (emphasis added)?
4. Did Mr. Cupp failed to adequately plead a cause of action under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978)? – and –
5. Should Mr. Cupp's request for injunctive relief be dismissed as unsupported by the allegations in the PROPOSED FAC or by reason of the *Younger* Abstention Doctrine. See, *Younger v. Harris,* 401 U.S. 37 (1971).

These questions should be answered in Mr. Cupp's favor. Mr. Cupp has pleaded adequate facts. This Court has already ruled that Mr. Cupp has a claim arising from the June 1, 2022 warrantless drone search of the subject property as well as a cognizable claim under *Monell* [DOC 42]. Likewise, the Court has previously rejected attempts to dismiss Mr. Cupp's common law claims for trespass and invasion of privacy arising from the June 1, 2022 incident [DOC 42]. The Court should not revisit its ruling now based on Defendants' flawed, repurposed arguments.



To the extent the Motion seeks to dismiss these claims, the Court should deny it. Defendants' remaining arguments are without merit and supply no legal bases for dismissal of Mr. Cupp's claims. The Motion should be denied.

### III. <u>LEGAL ARGUMENT</u>

### A. Legal Standard for Evaluating a 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Federal Rules of Civil Procedure (FRCP) Rule 12(b)(6), the plaintiff must provide enough factual information to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007). This is not an exceptionally heavy burden. A plausible claim need only include "enough details about the subject matter of the case to present a story that holds together." *Carlson v. CSX Transp., Inc.,* 758 F.3d 819, 827 (7th Cir. 2014) (citing *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404-05 (7th Cir. 2010). It must have "enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's allegations." *Brooks v. Ross,* 578 F.3d 574, 581 (7th Cir. 2009) (quoting *Twombly,* 550 U.S. at 556).

However, a plaintiff is not required to plead specific or detailed facts. *Erickson v. Pardus,* 551 U.S. 89, 93 (2007) (per curiam). The plausibility standard does not "impose a probability requirement on plaintiffs: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbably, and that recovery is very remote and unlikely." *Alam v. Miller Brewing Co.,* 709 F.3d 662, 666 (7th Cir. 2013) (quoting *Twombly,* 550 U.S. at 556.) "Determining whether a complaint states a plausible claim for relief will…be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009).

**B. As This Court Previously Ruled, Count One is Actionable to the Extent it is Based on Conduct Occurring After March 6, 2021**

### 1. Plaintiff Has a Valid Claim for a Fourth Amendment Violation Based on the Warrantless Use of a Drone to Search the Subject Property on July 1, 2022

The Fourth Amendment protects individuals' right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. In the context of warrantless searches—such as occurred on July 1, 2022—the Fourth Amendment has spawned two lines of cases. The first line, represented by *Katz* v. *United States*, 389 U.S. 347,  (1967), focuses on "people, not places[.]" *Id*. at 351. Under this doctrine, a warrantless search runs afoul the Fourth Amendment if it violates an individual's "reasonable expectation of privacy." *Id*. at 360, (Harlan, J., concurring).

However, a second line of cases—rooted in common law-coexist with *Katz*. *United States* v. *Jones*, 565 U.S. 400, 406-08, (2012). This doctrine grounds Fourth Amendment protections in "a particular concern for government trespass upon the areas [the Amendment] enumerates." *Id*. at 406. The Supreme Court has stressed that, while *Katz* supplemented the constitutional protections rooted in the common law, it has not replaced them. *Id*. at 409 ["[T]he Katz reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test."].

Under the *Katz* line of cases, the Supreme Court has held that certain warrantless aerial surveillance operations are constitutional, even if they observe the area immediately surrounding a home.  See, *California* v. *Ciraolo*, 476 U.S. 207,  (1986); *Florida* v. *Riley*, 488 U.S. 445, (1989). In *California* v. *Ciraolo*, the Court found no Fourth Amendment violation when officers, flying in an airplane 1,000 feet above ground, observed marijuana plants growing in a defendant's backyard with their naked eyes. *Ciraolo,* 476 U.S. at 215. The Court

---

determined not only that the defendant's ten-foot privacy fence failed to reflect a subjective belief that the conduct taking place there was private, but also that any such belief would be objectively unreasonable because anyone could legally fly an airplane in navigable airspace above the defendant's house and observe his marijuana plants. *Id.* at 212-14. Ciraolo's "expectation that his garden was protected from such observation . . . is not an expectation that society is prepared to honor." *Id.* at 214.

Similarly, in *Riley*, the Court held that police—hovering in a helicopter 400 feet above private property—did not violate the Fourth Amendment when they spied marijuana plants inside a partially covered greenhouse in a defendant's backyard. *Riley*, 488 U.S. at 450. Because helicopters are not bound by the same minimum-height restrictions as flying airplanes, "[a]ny member of the public could legally have been flying over [the defendant]'s property[.]" *Id.* at 451. The police officers did nothing that the public could not do; thus, their search did not require a warrant under *Katz. Id.*

*Riley* contains one important caveat: The Court cautioned against interpreting the case as holding "that an inspection of the curtilage of a house from an aircraft will always pass muster under the Fourth Amendment simply because the plane is within the navigable airspace specified by law." *Id.* at 451. The outcome may differ, the Court noted, if an aircraft violates the law or is rare enough that society would recognize a reasonable privacy interest in being free from its surveillance. *Id.* The Court also left open the possibility that an aerial intrusion that interferes with the use of someone's curtilage or reveals "intimate details connected with the use of the home or curtilage" may conflict with the Fourth Amendment. *Id.* at 452.

The County relies heavily on *Ciraolo* in arguing the Mr. Cupp's Count One lacks merit. However, a drone is quite different from a fixed wing aircraft. Although a drone may meet the technical definition of an "aircraft" as "any contrivance invented, used, or designed to navigate



_____
PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS [PROPOSED] FIRST AMENDED COMPLAINT, ETC. - 14

or fly in the air," 42 U.S.C. § 40102(a)(6), a drone is capable of flying at altitudes lower than navigable airspace into areas where there is a reasonable expectation of privacy under *Katz*. In addition, a drone is capable of maneuvering into private spaces where a fixed wing aircraft cannot, looking in windows and entering open air structures such as greenhouses and hoop houses, which the County routinely does despite the County's protestations to the contrary.

Finally, a drone is equipped with technology that enhances the senses beyond what an ordinary human being is capable of unlike a situation where a pilot flying a fixed wing aircraft observes cannabis grow with his own naked eyes or a simple camera.

The use of drones has been recognized as implicating the Fourth Amendment. See, *In re Application of the United States*, 637 F.Supp. 343, 349-356 (E.D.N.C. 2022) [detailed discussion of drones implicating Fourth Amendment and distinguishing *Ciraolo* and other authorities from drones]. In addition, the warrantless use of drones is much more akin to the circumstances found in *Kyllo v. United States,* 533 U.S. 27 (2001) [use of thermal imaging devices to detect marijuana grows implicates Fourth Amendment]. The warrantless use of drones is also analogous to other cases involving the use of technological devices where the Supreme Court has refined the contours of the Fourth Amendment. See, e.g., *U.S. v. Jones,* 565 U.S. 400 [warrantless use of tracking device on automobile violated Fourth Amendment] or *Carpenter v. United States*, — U.S. —, 138 S. Ct. 2206, 201 L.Ed.2d 507 (2018) [warrantless search and seizure of cell phone records violates Fourth Amendment]. Furthermore, because a drone has the ability to enhance the senses beyond what an ordinary officer would be capable of sensing, their warrantless use to detect illegality even resembles the purposeful use of drug sniffing dogs during a routine investigation. See, *Florida v. Jardines,* 569 U.S. 1 (2013).

Based on these authorities, Mr. Cupp has adequately alleged a valid claim for a Fourth Amendment violation. The Motion should be denied.



### 2. Count One is Not Time-Barred

Defendants assault Count One with the the statute of limitations. Defendants correctly point out that this issue was decided when the Court ruled on the prior 12(b)(6) motions. The Court concluded that to the extent Mr. Cupp's causes of action were based on conduct occurring prior to March 6, 2021, those claims were time-barred based on the date Mr. Cupp commenced this action, which was March 6, 2023 [DOC 42; 3:14-15]. The ruling left intact Mr. Cupp's 4th Amendment cause of action based on a warrantless drone search by Defendants TODD HOFFMAN (hereinafter "Hoffman") and JESSE CABLK (hereinafter "Cablk") at the Arlington Avenue property on or about July 1, 2022. Likewise, the ruling let Mr. Cupp's common law causes of action for trespass and invasion of privacy go forward, rejecting Defendants' argument that state statutory immunity shielded Hoffman, Cablk, and the County from liability. Mr. Cupp does not find fault with the Court's prior ruling.

To the extent the PROPOSED FAC includes allegations from the initial Complaint, such as the warrantless drone flyover of the Arlington Avenue property on March 27, 2020 [DOC 49; 42:1-4], these allegations while not supportive of an independent Fourth Amendment violation on their own, still form an integral part of the allegations supporting Mr. Cupp's *Monell* claim in Count Two. For this reason, they are proper and should not be dismissed.

### C. Count Two is not Time-Barred or Precluded Because it Involves Efforts by the County to Enforce the Collection of Excessive Fines and Penalties in Violation of the 8th Amendment and in Furtherance of the County's Unconstitutional Policies and Practices

In the Motion, aside from criticizing its specificity, Defendants barely address Count Two, which is Mr. Cupp's 8th Amendment, excessive fines and penalties" claim. Moreover, Defendants do not provide a single case or other legal authority, much less meaningful legal analysis, warranting a dismissal of Count Two.



Although the fines and penalties originated prior to March 6, 2021, the County has imposed additional fines and penalties against Mr. Cupp on top of the initial fines and penalties on a continuous *per diem* basis all the way to the present day. In addition, since March 6, 2021 the County has caused a significant portion of these excessive fines and penalties to be added to Mr. Cupp's property tax bill, providing neither notice or an opportunity to be heard before doing so. County Counsel did not notify Mr. Cupp's counsel either. This action by the County has caused Mr. Cupp's property tax bill to increase more than five-fold. Mr. Cupp did not discover the County had even taken this action until he was contacted by the Sonoma County Tax Collector, forcing him to seek a restraining order in state court. As a result, Mr. Cupp may be in danger of losing the Arlington Avenue property to the County.

Waiting until *after this lawsuit was filed*, the County commenced a state court action against Mr. Cupp for "abatement of a public nuisance" on June 23, 2023. In truth, the County's lawsuit will "abate" nothing, and the County knows it. Mr. Cupp has already remediated any alleged "nuisances" existing at the Arlington Avenue property, and he obtained the County's approval of the work, notwithstanding the County's attempts to suggest otherwise in the Motion. Therefore, in reality, the County has filed what amounts to a debtor-creditor collection action, and this Court should consider it as nothing more significant than that.

Ironically, in the Motion, Defendants find fault with the PROPOSED FAC on the grounds that it fails to provide what amounts to an accounting of what portion of the money Mr. Cupp owes is comprised of fines, penalties, fees, costs, etc. Because the County imposes *per diem* fines and penalties in different amounts for different violations, running from different dates, the County claims it cannot provide these details to Mr. Cupp, much less Mr. Cupp provide them in the PROPOSED FAC. This is an unreasonable and unnecessary pleading burden argued by Defendants.



Each of these events, in one way or another, are based on the same fines and penalties Mr. Cupp contends are excessive and violate the 8th Amendment. The excessiveness of the fines and penalties is also inextricably intertwined with *Monell* liability because the excessiveness of the fines and penalties results from an arbitrary and capricious method of imposing the fines and penalties in the first place, which arose from CEEP. Assuming arguendo that a two-year statute of limitations also applies to 8th Amendment claims, each of these events constitutes a new and expanded imposition of excessive fines and penalties well after March 1, 2021. Thus, Count Two is not time-barred. Defendants have provided no case law or other legal authority that supports dismissal of Count Two.

**D. The County's Unconstitutional Policies Promulgated in 2017 and 2019 Continues as the Underlying Basis for the County's Aggressive Tactics Against Plaintiff, and the County Has Continued to Implement the Policy Through an Unconstitutional Pattern and Practice**

### *1. Plaintiff Has Adequately Pleaded Monell Liability*

A plaintiff generally may use one of four methods to establish *Monell* liability. First, a plaintiff may point – as Plaintiff does here – to an officially adopted or promulgated policy. (*Monell v. Dept. of Social Services*, 436 U.S. 658, 690.) Plaintiff points to CEEP as well as the County's drone policy. Plaintiff also refers to Ordinance 6245, which Plaintiff also constitutes part of the County's unconstitutional policies.

Second, a plaintiff may point to a custom or practice that is not written or formally adopted, but that is pervasive enough to have the force of law. *Gregory v. City of Louisville*, 444 F.3d 725, 724 (6th Cir. 2006) [custom of using overly aggressive show ups]; *Sharp v. City of Houston*, 164 F.3d 923, 936 (5th Cir. 1999) [finding custom existed for transfers and demotion when officers reported misconduct]; *Watson v. City of Kansas City,* 857 F.2d 690,

_____

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS [PROPOSED] FIRST AMENDED COMPLAINT, ETC. - 18

696 (10th Cir. 1988) [finding a sufficient showing of the police department's custom for mishandling domestic violence cases].

Third, a plaintiff can establish *Monell* liability pursuant to *City of Canton v. Harris*, 489 U.S. 378 (1989). This method applies where a plaintiff can point to a failure to train, supervise, discipline, or adequately screen employees. *City of St. Louis v. Proprotnik,* 485 U.S. 112 123 (1988), citing *Pembaur v. City of Cincinatti,* 475 U.S. 469, 482-483 (1989).

Fourth and finally, a plaintiff may point to a particular decision or act made by someone who is asserted to be the final policymaker for an entity. The U.S. Supreme Court has held that in certain circumstances, the decisions or the acts of a final policymaker, even if only on a single occasion, may be attributed to a municipal defendant in a Section 1983 action. *Pembauer, supra,* 475 U.S. at pp. 484-485 [county prosecutor's decision to send deputy sheriffs into a premises to get a witness was county policy even though it only happened once].

At least for purposes of surviving Defendant's Motion, Plaintiff has already adequately pleaded *Monell* liability using the first, second and fourth methods. In addition, Plaintiff is aware of additional facts not yet pleaded, but which are set forth herein, which would establish *Monell* liability under any of the four methods as set forth herein. Therefore, even if the Court should conclude that Plaintiff has not adequately pleaded *Monell* liability in the PROPOSED FAC, Plaintiff should be granted leave to amend to provide both further allegations and documentary support in the form of exhibits.

### 2. Monell Liability is not Time-Barred Because it Continues Against Mr. Cupp to the Present Day, and it is Not Subject to Claims Preclusion

To be sure, the PROPOSED FAC describes activities and conduct by Defendants dating back as far as 2017, or even 2015. The PROPOSED FAC details the history of, and circumstances surrounding, the policies promulgated by the County's Board of Supervisors in

2017 and 2019. These allegations are proper and pertinent to allege the enactment of an official policy or policies that, among other things, "promoted, approved, created or established the County's 'Code Enforcement Enhancement Program'." (hereinafter "CEEP") [DOC 49: 2:17-20.] These allegations are necessary to allege *Monell* liability against the County and to "present a story that holds together." *Carlson, supra,* 758 F.3d at p. 827 (7th Cir. 2014) (internal citation ommitted).

Moreover, allegations of specific misconduct dating from the enactment of CEEP in 2017, the 2019 promulgation of the County's drone policy in 2019, Ordinance 6245 related to cannabis cultivation, and the instances of misconduct that have occurred continue in force to the present date, demonstrating the unconstitutional customs and practices Defendants have initiated or participated in to implement CEEP as well as showing how CEEP has been specifically weaponized against Mr. Cupp [DOC 49; 3:3-7:18]. These allegations adequately allege the separate and independent basis for *Monell* liability; namely, that the County continues to maintain illicit customs or practices that caused the constitutional violations complained of by Mr. Cupp.

Finally, Mr. Cupp's *Monell* allegations are not subject to claims preclusion. The County did not raise this issue in prior motions. Notwithstanding this omission, the County's *Monell* liability was not litigated in any prior litigation involving Mr. Cupp. While it is true Mr. Cupp's *Monell* allegations were dismissed in *Cupp v. Smith* several years ago for lack of sufficient factual allegations, Mr. Cupp did not allege then any of the facts he has learned since that time. He should be permitted to proceed on Count Three.

**E. This Court Has Already Allowed Counts Four and Five to Proceed to the Extent These Counts are not Predicated on Conduct Occurring Prior to March 6, 2021**

As noted above, the Court's prior ruling left Mr. Cupp's state law claims for trespass and



invasion of privacy intact to the extent they do not involve conduct occurring prior to March 6, 2021. The warrantless drone search of the Arlington Avenue property on July 1, 2022 is sufficient to constitute both a trespass and invasion of privacy because Defendants did not have Mr. Cupp's consent to enter upon the property, and no exigent circumstance justified the warrantless entry. Therefore, these common law claims are not time-barred.

### F. Plaintiff Does Not Dispute the Court's Prior Ruling on Qualified Immunity, but Believes He Has Valid Claims Against Wick and Harrington for Supervisory Liability and Requests Leave to Plead Them

Defendants correctly assert in the Motion that there is no respondeat superior liability against a municipality under Section 1983. This point formed a crucial part of the Court's holding in *Monell. Monell, supra,* 436 U.S. at p. 691. However, Defendants press the point too much and ignore two, interrelated arguments that mitigate against dismissing Wick and Harrington.

First, this action is not concerned solely with CED's use of drones to conduct aerial surveillance of private property. Instead, the PROPOSED FAC begins with allegations about the creation, promotion, or establishment of CEEP, which occurred in 2017 and possibly even as early as 2015. The County did not promulgate a policy or establish any custom or practice whereby CED began using drones to conduct aerial surveillance until 2019. If anything, the promulgation of the drone policy to conduct searches of private property, and the means, methods, and manners in which individuals within CED implemented that policy, must be viewed as merely one part of the much larger County-initiated policy scheme under CEEP, which incentivized and activated the conduct that caused the constitutional violations alleged in this case. Defendants' interpretation of the scope of this action is far too narrow.

Second, Defendants build a bridge too far when they argue that Wick and Harrington would automatically be immune from liability simply because subordinates like Hoffman and Cablk enjoy qualified immunity. The Court reached its conclusion about qualified immunity for



Hoffman and Cablk solely as to aerial surveillance of private property using drones, and may well be that Wick and Harrington also are qualifiedly immune from liability related to the use of drones. However, this case involves more than one issue.

Supervisory personnel are not automatically immune from liability for the conduct of subordinates, and they may still be held liable under theories that are not grounded on principles of respondeat superior. In general, an "affirmative link" must exist between the occurrence of a constitutional deprivation and the conduct of a supervisor. *Rizzo v. Goode,* 423 U.S. 362, 371. Aside from this causation standard and the prohibition of imposing respondeat superior liability under *Monell*, the circuit and district courts have received little guidance on what test to formulate to determine the existence of an "affirmative link." Not surprisingly, at least four, competing approaches, which are discussed in greater detail in the subsection that follow, can be realized by reviewing relevant case law.

Despite the lack of guidance from courts or the text or legislative history of Section 1983, however, courts are uniformly in agreement on two points. First, courts have squarely rejected the notion of strict supervisorial liability or that an "affirmative link" can be established under a simple negligence standard. See, e.g., *Jones v. Chicago*, 856 F.2d 985, 992 (7th Cir. 1988) [supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable; superiors must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they see" to be liable].

Second, courts have spoken with one voice and said that supervisors are clearly liable if constitutional violations take place in their presence, and they either direct or authorize the actions which led to the violations. See, e.g., *Specht v. Jensen,* 832 F.2d 1516 (10th Cir. 1987) [supervisor directly participated in unlawful search]; *Fundiller v. City of Cooper City,* 777 F.2d 1436 (11th Cir. 1985) [police misconduct case]. However, actual presence coupled with



participation is not a pre-requisite to liability. Supervisors may be held liable even though they did not directly participate in the violation, or order their subordinates to violate the Constitution. In *Rodney King v. the City of Los Angeles*, municipal liability was imposed based on the acquiescence of a supervisor, Sergeant Stacey Koon. Rodney King was beaten by officers of the Los Angeles Police Department, and the beating was famously captured on tape. Koon watched, but he did not strike King. Nevertheless, Koon was found guilty of violating King's civil rights despite being acquitted in state court of criminal charges. 2:91-CV-02497 (C.D. Cal. May 8, 1991). In *U.S. v. Koon*, 833 F. Supp. 769 (1993), the Court noted that Koon's conviction for violating King's civil rights was entirely based upon his willful refusal to prevent the illegal use of force in his presence. See also, *United States v. Reese,* 2 F.3d 870, 889-90 (9th Cir. 1993). Koon's action in failing to prevent his officers from using excessive force made him liable as a supervisor. See also, *McQuarter v. City of Atlanta,* 572 F.Supp. 1401 (N.D. Ga.), app dismissed, 724 F.2d 881 (11th Cir. 1983).

In between these parameters lies the four, different approaches courts have taken when analyzing supervisory liability. There are discrepancies even within certain circuits as to which standard is being adopted. Some courts apply different standards from case to case. Other jurisdictions combine the approaches together into a single standard.

This combined approach can be seen in *Larez v. City of Los Angeles,* 946 F.2d 630 (9th Cir. 1991), a case arising out of the police beating of Rodney King. There, the Court recognized that Chief of Police Gates could be liable in his individual capacity if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he kn[e]w or reasonably should [have] know[n], would cause others to inflict the constitutional injury." *Id*. at 646. The Court went on to state that "supervisory liability is imposed against a supervisory official in his individual capacity for his "own culpable action or inaction in the training,

supervision, or control of his subordinates; … for his "`acquiesce[nce] in the constitutional deprivations of which [the] complaint is made; …or for conduct that showed a "`reckless or callous indifference to the rights of others.'" *Id.*, internal citations omitted.

*Larez* also recognized supervisory liability in Chief Gates' official capacity equated to suit against the entity itself and was viable so long as a "policy or custom…played a part in the violation of federal law." *Id.*

Wick and Harrington are not co-equals with Hoffman and Cablk. Wick and Harrington can be held liable under Section 1983 under the theory of supervisory liability, either in their individual or official capacities. Wick's title is the Director of the Permit and Resources Management Department, what is now Permit Sonoma. Under Sonoma County Ordinance 7-2, Wick is the "chief building official." He is expressly made "responsible for all inspection work required for the proper enforcement of regulations imposed [by local ordinances]," except for duties specifically delegated to the county public health officer [DOC 49:10-11:5]. It cannot seriously be suggested that the Sonoma County Public Health Officer is not an supervisory official.

**G. No Abstention Doctrine Applies in This Case**

The issue of whether this Court should abstain from proceeding with this case should be guided by the recent 9th Circuit decision in *Peridot Tree, Inc. v. City of Sacramento*, (9th Cir., Mar. 4, 2024, No. 22-16783). In that case, the Court analyzed each of the federal abstention doctrines in a case involving a local ordinance requiring applicants for permits by individuals to operate storefront marijuana dispensaries to be residents of Sacramento. The Court found each of the abstention doctrines either inapplicable or lacking merit.

The outcome of these arguments should be no different in this case. The mere fact the County has initiated state court litigation against Mr. Cupp does not change the analysis even under *Younger* because this litigation was not pending at the time this case commenced.

**H. Conclusion**

For the foregoing reasons, Mr. Cupp respectfully requests that the County's Motion to Dismiss the PROPOSED FAC be denied.

Respectfully submitted,

Date:  March 24, 2024                    **YOUNG LAW GROUP**

By: _____
ERIC G. YOUNG, ESQ., Attorneys for Plaintiff RONALD CUPP

