1  JOSHUA A. MYERS #250988
   County Counsel
2  MICHAEL A. KING #77014
   Deputy County Counsel
3  County of Sonoma
   575 Administration Drive, Room 105A
4  Santa Rosa, California 95403
   Telephone: (707) 565-2421
5  E-mail: michael.king@sonomacounty.gov

6  Attorneys for Defendants
   COUNTY OF SONOMA, TODD HOFFMAN,
7  JESSE CABLK

8              UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA-OAKLAND COURTHOUSE

10

11                                    Case No. 4:23-cv-01007 JST
   RONALD CUPP,
12                                    DEFENDANTS' EXHIBIT LIST IN
         Plaintiff,                   SUPPORT OF MOTION FOR
13                                    SUMMARY JUDGMENT; REQUEST
   vs.                                FOR JUDICIAL NOTICE
14
   COUNTY OF SONOMA, et al;           Rule 56
15
         Defendants.                  Date:  May 21, 2026
16                                    Time:  2:00 p.m.
                                      Courtroom: 6, 2nd Floor
17  ─────────────────────────         Judge: John S. Tigar

18

19       Defendants COUNTY OF SONOMA, TODD HOFFMAN, and JESSE CABLK

20  ("County Defendants") Defendant COUNTY OF SONOMA ("COUNTY") hereby

21  submits the following as evidence in support of their Motion for Summary Judgment,

22  these documents identified in the Declarations of Jesse Cablk, Todd Hoffman, and

23  Michael King:

24       Exhibit 1:    Photographs of cannabis cultivation at 4656 Arlington Ave, Santa

25  Rosa, CA; taken on June 1, 2022.

26       Exhibit 2:    "Comments" note by Todd Hoffman for June 1, 2022 inspection of

27  4656 Arlington Ave., Santa Rosa,

28

Exhibit 3:    Google Earth image with notations for drone flight on June 1, 2022. Prepared by Jesse Cablk to illustrate the starting point for that flight, the route taken, and the location of the photographs of 4656 Arlington Ave.

Exhibit 4:    Deposition of Antonio Cruz  (12/9/25), pp. 29-30, 35-38, 50-51. 81-82, 89-90.

Exhibit 5:    Video taken by Antonio Cruz; Cruz deposition exhibit 5.

Exhibit 6:    Deposition of Gennaro Piccione (12/16/25), pp. 51, 54, 62-70

Exhibit 7:    Permit Sonoma UAS (drone) policy in effect in June 2022.

Exhibit 8    "Comments" note by Todd Hoffman for March through July 2022 including a consent status inspection of 4640 Arlington Ave., Santa Rosa on July 8, 2022.

Exhibit 9:    Statement of Decision and Administrative Order pertaining to 4640 Arlington Ave., dated 2/11/2021. Admitted into evidence at October trial in Sonoma County Superior Court, SCV-273578.

Exhibit 10:    Order Denying Application for TRO and Motion for Preliminary Injunction in Case No. 20-cv-03456, ECF 29.

Exhibit 11:    Order Granting Motion to Dismiss in part; Case No. 20-cv-03456, filed 2/17/2021, Dkt. No. 57.

Exhibit 12:    Order of Dismissal with Prejudice and Judgment in Case No. 20-cv-03456, filed 3/30/2023, Dkt. Nos. 145 and 146.

Exhibit 13:    Final Statement of Decision and Judgment; Sonoma Superior Court, Case No. SCV-273578; filed on 3/4/2026.

Exhibit 14:    Claim Against County of Sonoma; Rejection of Claim; Amended Claim; Attached as Exhibits A, B, and C to First Amended Complaint, Dkt. No. 49-1; filed 4/30/24.

Exhibit 15:    Deposition of Ronald Cupp (3/9/2026), pp. 55, 98-102, 105-106, 109-112, 113-114, 117.

# REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201 provides that a court, in its discretion, may take judicial notice of facts not subject to reasonable dispute that are either "(1) within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *See* Fed. R. Evid. 201(b).

Pursuant to Rule 201, a court may take judicial notice of public records, including the filing date and contents of the Claim against the County of Sonoma. See *Shaw v. City of Porterville*, 2015 U.S. Dist. LEXIS 78672 at *8-9 (E.D. Cal. June 17, 2015) (court may take judicial notice of tort claim and notice of insufficiency of claim, where authenticity undisputed, essential to plaintiff's claims, and no opposition); *Clarke v. Upton*, 703 F.Supp.2d 1037, 1042 (E.D. Cal. 2010) (taking judicial notice of tort claim and rejection of claim). See *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (court may consider document if authenticity not questioned). "Courts routinely take judicial notice of letters published by the government . . . as well as records and reports of administrative bodies." *Smith v. L.A. Unified Sch. Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016) (citations and internal quotation marks omitted).

Courts "may take judicial notice of undisputed matters of public record . . ., including documents on file in . . . state courts. Harris v. Cnty. of Orange, 682 F.3d 1126, 1132 (9th Cir. 2012); Banks v. Allison, 140 F.4th 1181, 1185 n.3 (9th Cir. 2025) (taking judicial notice of state court records). The records of the District Court for the Northern District of California are a "source whose accuracy cannot reasonably be questioned,", and review of them is easily had. Thompson v. Woodford, 2006 U.S. Dist. LEXIS 20155 *6-7, (N.D. Cal. 2006).

The exhibits "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Rule 201(b)(2). The exhibits are almost all Court records from this Court or the Sonoma County Superior Court, portions of depositions taken by a certified shorthand reporter; and/or are business records of the

County Permit Sonoma, Code Enforcement Division, maintained in the ordinary course of business.  The Court records include attachments to Plaintiff's First Amended Complaint. Jesse Cablk prepared Exhibit No. 3,  from a Google Earth for illustration only.

The documents are trustworthy and contemporaneous accounts of relevant events, or can easily be determined to be accurate.

Dated: March 11, 2026                    JOSHUA A. MYERS, County Counsel

By: _____
*Michael A. King*

Michael A. King
Attorneys for County Defendants

EXHIBIT 1









EXHIBIT 2

# Record ID: **VCM22-0517**

| User ID | Comment | Date | Time |
|---|---|---|---|
| ADELACR2 | 06/01/2022 0.25hrs N&O Processed VPL22-0332 AD. add apn 134-251-073 once available in accela | 06/01/2022 | 12:13 |
| GLOPEZ | .25 N&O VPL22-0232 Sent | 06/01/2022 | 13:32 |
| THOFFMA1 | 2.5hrs TSH | 06/01/2022 | 15:29 |

In 2021 I became aware that the property was in cultivation, but the cannabis was harvested prior to any enforcement actions. I subsequently became aware that the property owner was also in the application process with PRMD for a cannabis permit.

On 06-01-22 at approximately 0930hrs, I obtained aerial imagery of an unpermitted commercial cannabis grow at the subject property. The images depicted two greenhouse frames (uncovered), each containing approximately 250 mature cannabis plants.

I contacted property owner and applicant, Brandon Elias Wolcott Wright [CDL F1816300; DOB 06-27-94; 54 Drakewood Ln., Novato, CA 94947; (415) 609-8598], who I later identified by his valid California Driver's License, by cellular telephone to request a site inspection. Wright was initially hesitant, and contacted his "security consultant," Chris Eggers (former OPD & SFPD). After a delay of approximately 10 minutes, Wright consented to a site inspection. Inspector Cablk was present for the entire investigation.

In addition to the aforementioned cannabis in cultivation, I observed approximately 125 "mother" plants in a hard skinned greenhouse, and approximately 40 plants drying in a large warehouse/ workshop.

Wright provided his medical Cannabis card #792814 (Exp 06-25-22) issued by Compassionate Health Wellness Counseling, but indicated that while he occasionally stayed on the property, he did not reside there.His business partner Bo Sheffer (707) 510-5624, who was also present for the inspection, also provided his medical Cannabis card #793140 (Exp 07-13-22) issued by Compassionate Health Wellness Counseling. Sheffer indicated that he did reside on the property. Both Wright and Sheffer were told that they could keep a single 10'x10' area of cannabis.

I took several digital images of the violation and the property, which I later uploaded as attachments. I issued a Notice and Order for Unpermitted Commercial Cannabis. I thoroughly explained the cannabis enforcement process to Wright, Sheffer, and Eggers (on speaker phone), with particular attention to the Civil Penalties. All indicated that they understood my explanation, and would eradicate the cannabis to the legally permitted guidelines.

I later provided the assigned cannabis permit Planner with a copy of the Notice and Order and provided her with a brief explanation of the violation.

At approximately 1843hrs, I received multiple digital images that depicted the eradication of the cannabis to the legally permitted amount. I later uploaded those photos as attachments.

EXHIBIT 3



EXHIBIT 4

1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF CALIFORNIA

3    ---oOo---

4  RONALD CUPP, an individual,

5             Plaintiff,

6     vs.                    Case No. 4:23-cv-01007

7  COUNTY OF SONOMA, a municipal
   corporation; TODD HOFFMAN, in
8  his individual and official
   capacities; JESSE CABLK, in
9  his individual and official
   capacities; DOES 1-50,
10 inclusive,

11            Defendants.
   _____/

12

13

14

15

16 VIDEOCONFERENCE DEPOSITION OF ANTONIO GONZALEZ CRUZ

17       Tuesday, December 9, 2025

18

19

20

21

22

23       McMURTRIE STENOGRAPHY, INC.
         CA Certified Shorthand Reporters
              P.O. Box 5738
24       Santa Rosa, California 95402
             stefmc@sbcglobal.net
25            (707) 888-1130

1  weeks in preparation for this deposition, besides

2  Mr. Mounier?

3      A.  No.

4      Q.  You haven't spoken to Ron Cupp about this

5  deposition at all?

6      A.  No.

7      Q.  When was the last time you spoke with Mr. Cupp

8  about anything?

9      A.  Don't recall.

10     Q.  Well, did you happen to give him the flash

11  drive to take to our office, which had the movie on it,

12  the video?

13     A.  Yes, I did, actually.

14     Q.  Okay.  So that was just yesterday; correct?

15     A.  I think it was, yes.

16     Q.  Did you have any discussion with Mr. Cupp at

17  that time about what your testimony might be?

18     A.  No.

19     Q.  Have you reviewed any other documents at all

20  recently to prepare for the deposition, other than the

21  video itself and the picture?

22     A.  No.

23     Q.  What's your present residence where you live?

24     A.  116 Fernwood Court, Santa Rosa, California.

25     Q.  In the last five years, have you lived in any

1   Please go ahead and answer.

2           MR. MOUNIER:  Could we have the question

3   restated, please?

4           THE WITNESS:  Yes.

5           MR. KING:  I'll withdraw the question.  We're

6   going to withdraw it, and he can start again.  Okay?

7   BY MR. KING:

8       Q.  Mr. Cruz, do you have any recollection of

9   being at the property other than these two occasions,

10  one when you saw the two men arguing, or two, when you

11  took the video?

12      A.  No.

13      Q.  Okay.  Can you give me an estimate as to how

14  many other times you were at the property besides those

15  two times?

16      A.  I don't recall.

17      Q.  Do you remember anything about what you did at

18  the property -- that is, 4640 Arlington Avenue -- up to

19  the present time?

20      A.  Are you talking about the two times I was

21  there specifically?

22      Q.  We went through the first time, and I'll go

23  through the second time, when the video was taken.

24          Do you remember anything else that you did at

25  the property?

```
 1  maybe I can ask it a little bit differently to make it
 2  clearer.
 3         We know that you didn't really know who the
 4  two people were that were arguing, but let's just
 5  assume one of them works for the County of Sonoma.  All
 6  right?
 7     A.  Okay.
 8     Q.  And we know that on the property, when you
 9  took the video, there wasn't anybody actually
10  physically on the property besides you and anyone else
11  that was with Mr. Cupp, but there was a drone that was
12  taken in the video; correct?
13     A.  Correct.
14     Q.  All right.  So there wasn't anybody physically
15  on the property from the County of Sonoma, but there's
16  no question that the drone that you took the image of
17  was from the County of Sonoma.  I'll admit that fact
18  for purposes of the record.
19         Are there any other occasions when you were
20  there present at the property when anyone from the
21  County of Sonoma came onto the property?
22     A.  None.
23     Q.  So you weren't present when any inspections
24  were done for building purposes; correct?
25     A.  No, I don't recall.
```

CUPP vs. COUNTY OF SONOMA ~ 4:23-cv-01007

1      Q.   And you weren't there when any septic

2   inspections were done; correct?

3      A.   None.

4      Q.   So these are the only two occasions that

5   you're aware of when you were present when someone from

6   the County of Sonoma or a drone from the County of

7   Sonoma was near the property; correct?

8      A.   Correct.

9      Q.   And on the occasion which we're going to talk

10  about when the drone was there, did you have any

11  conversation with anyone that you believe was with the

12  County of Sonoma?

13     A.   No.

14     Q.   I mean, did you go talk to somebody that you

15  felt was operating that drone?

16     A.   No.

17     Q.   Well, we'll go through the whole thing.  In --

18  strike that.

19          Prior to the one that you took the video of,

20  did you ever know that there was a drone that took

21  pictures of this property?

22     A.   Not that I recall.

23     Q.   Okay.  No one ever told you that there was a

24  prior drone flight near the property that took pictures

25  of the property?

1    some other activity?

2        A.   No.

3        Q.   Okay.  Just trying to get to the day as best

4    we can.

5            When you arrived there at the property, you

6    don't remember exactly when it was, but do you know if

7    it was before noon or after noon?

8        A.   I don't.

9        Q.   Okay.  Was anyone present at the property when

10   you arrived?

11       A.   That I could see, nobody was there.

12       Q.   Okay.  What was the purpose that you went to

13   the property on the day that you took the video?

14       A.   I think it was to do some deck work, to look

15   at the deck for Ron.

16       Q.   What deck work were you planning to do?

17       A.   I said to look at it.  I didn't say I was

18   doing any work.

19       Q.   Oh, you didn't say you were doing any work?

20       A.   Huh-uh.

21       Q.   Well, what was the purpose of you looking at

22   it, then?

23       A.   Just a second thought, I don't know.  I don't

24   recall it.  It's been so long.

25       Q.   All right.  I'm going to use the date June 1,

1    2022, as the day that you took the video.  All right?

2        A.  Okay.

3        Q.  I think that we can all agree that that was

4    the day that you took the video.

5            How long had you been at the property before

6    you started the video?

7        A.  I can't recall that.

8        Q.  Can you give me an estimate?  Was it

9    one minute, ten minutes, an hour, two hours?

10       A.  I still can't recall that, any of that

11   information.

12       Q.  Sure.

13           At any time while you were at the property

14   before you started taking the video, did you talk to

15   anyone else?

16       A.  No.

17       Q.  Did you see anyone else at the property

18   besides yourself, on that day, before you started to

19   take the video?

20           MR. MOUNIER:  You already asked that question,

21   Mr. King.

22           MR. KING:  No, I didn't.  I asked him when he

23   arrived, was anyone present.  I'm trying to find out in

24   the interim between when he arrived and the video

25   started, whether anybody else was present that he saw.

1      MR. MOUNIER:  I believe you asked him, and he

2  said that he did not see anybody else on the Arlington

3  property.

4      MR. KING:  Correct.  When he arrived.  I'm

5  asking about during the interim, whatever time it was

6  before he started taking the video, whether he ever saw

7  anyone.

8      MR. MOUNIER:  You can answer that, if you have

9  a proper recollection, sir.

10      THE WITNESS:  Yeah, I don't recall.

11  BY MR. KING:

12      Q.  Did you talk to anyone at any time before you

13  started to take the video while you were at Arlington

14  Avenue?

15      A.  I don't recall.

16      Q.  At any time on that day when you were at the

17  property, after you started to take the video until you

18  left, did you see anyone at the property?

19      A.  I don't recall.

20      Q.  Did you talk to anybody while you were at the

21  property at any time on that day?

22      A.  I don't recall.

23      Q.  Did you ever see anyone that you believe was

24  operating the drone?

25      A.  I don't recall.

1    Q.   Okay.  Do you know where anyone was located

2   that was operating the drone?

3    A.   I don't recall at this point.

4    Q.   Okay.  Was there something that you believe

5   will be able to refresh your recollection so that

6   you'll be able to remember or not?

7    MR. MOUNIER:  That calls for speculation, that

8   question.

9    Could you please read --

10   MR. KING:  Is he going to be allowed to answer

11   the question if he doesn't know it or if he does know

12   it?

13   MR. MOUNIER:  Well, not that question, because

14   it calls for speculation.  Why don't you ask him --

15   MR. KING:  Are you going to instruct him not

16   to answer that question?

17   MR. MOUNIER:  Well, let's have the question

18   read back, and I'll give you my affirmative answer or

19   negative answer once I hear it back.

20   Ms. McMurtrie, could you possibly read that

21   back for us?

22   THE STENOGRAPHER:  Of course.

23   (The record was read as follows:

24   Q.   Was there something that you

25   believe will be able to refresh

ANTONIO GONZALEZ CRUZ ~ December 9, 2025

1          MR. MOUNIER:  Thank you.

2          THE WITNESS:  I don't recall.

3   BY MR. KING:

4      Q.  Okay.  So this is one of the ones I'm going to

5   ask you for an estimate.  Was it a matter of one or

6   five seconds, or was it longer than that?

7      A.  Probably longer.

8      Q.  Okay.  Was it as much as a minute later before

9   you started the video?

10     A.  We'll say a minute to ten minutes or so.  All

11  I heard was --

12     Q.  What was the drone doing during the time that

13  you were not videoing it?

14     A.  It was hovering above me and doing 360s -- or

15  not 360s.  You could tell it was moving 90 degrees

16  directions until it completed a circle.

17     Q.  Okay.  So what you believe it was doing while

18  you were not videoing it was completing a circle?

19     A.  Correct.  It was -- no.  It was hovering, yes.

20     Q.  Was it in the same general location where it

21  was when you videoed it?

22     A.  Yes.

23     Q.  When you saw this drone or you heard it, then

24  you were able to see it before you started to video it,

25  were you standing in the same location the entire time?

1      A.   Yes.

2      Q.   While you were not videoing it -- we've got

3  what you were doing when you were videoing it, but when

4  you were not videoing it, what were you doing?

5      A.   Looking at the deck.

6      Q.   Okay.  So were you on the deck when you were

7  not videoing the drone before you started to video it?

8      A.   This is before the video, you said; right?

9      Q.   Yeah, before you started to video after you

10  heard the drone.

11      A.   Yeah, I was on the deck.

12      Q.   Did you pretty much stay on the deck while you

13  were hearing and seeing the drone before you started to

14  video it?

15      A.   Yes.

16      Q.   And when you say "the deck," can you tell me

17  generally where that is on the property?

18      A.   Are you talking about north, south, east or

19  west, or what are you talking about?

20      Q.   Well, no, actually is it a deck on the

21  single-family dwelling?

22      A.   It's on the second story.

23      Q.   Okay, but it's on the single-family dwelling;

24  right?

25      A.   Yes.  Yes.

1    Q.   Was he present at the time?

2    A.   No.

3    Q.   So you didn't see him at all while you were at

4  the property?

5    A.   Nope.

6    Q.   Was his family present at the time?

7    A.   Nope.

8    Q.   Okay.  Do you know that they were living

9  there?

10    A.   I don't recall any of that.

11    Q.   Okay.  Was anyone living there, to your

12  knowledge, at the time of the drone image being taken?

13    A.   No, I don't recall anybody.

14    Q.   Did any repair people, contractors, laborers,

15  or anyone else related to construction or repair come

16  to the property while you were there looking at the

17  deck and taking the video image?

18    A.   No.

19    Q.   Did you ever at any time while you were at the

20  property, make any determination where the operators

21  were for the drone on June 1, 2022?

22    A.   Are you asking where you think I seen them or

23  where they were at, who were --

24    Q.   Yeah.  Yeah, I was actually trying to find out

25  if you saw them, first of all.  Did you see them?

1      A.   No.   The drone just flew westbound and just

2   disappeared.

3      Q.   Okay.  So when did that happen in relationship

4   to you being on the peak of the roof?

5      A.   That was the whole reason why I was on the

6   peak, to see where the drone was going, to see who was

7   filming me.

8      Q.   Okay.  So the drone flew to the west, you

9   think, and that's when you went to the peak of the

10  roof?

11     A.   The drone flew to the west.

12     Q.   Okay.  And that's when you went to the peak of

13  the roof?

14     A.   Yes.

15     Q.   Where did the drone go after you got to the

16  peak of the roof?

17     A.   I couldn't see it anymore.  It disappeared.

18     Q.   Okay.  Did you see anyone that was operating

19  it at that time?

20     A.   I did not.

21     Q.   Did you ever make any determination where the

22  people were that were operating the drone?

23     A.   No, because it went into different properties.

24     Q.   I'm sorry.  When you say it went to different

25  properties, what do you mean?

1        MR. MOUNIER:  He didn't refer you to anything.

2  You brought it up and showed him the picture, and at

3  some point in time he said that he thought the height

4  was the same as in the video, as in this photograph.

5        MR. KING:  Sure, he did say that, and that's

6  what I'm trying to talk about.

7  BY MR. KING:

8      Q.  You referred me to this picture, sir,

9  Exhibit 7, E1, as being something representative of the

10 distance the drone was from you at the time that you,

11 sir, saw it on June 1st.  Is that true or not?

12       MR. MOUNIER:  Objection.  You misstated his

13 testimony.  Mr. Cruz said that he believed this image

14 was taken from the same height as the height he

15 observed the drone, not distance.

16       THE WITNESS:  Correct.

17 BY MR. KING:

18     Q.  Well, okay, there's a distance that's involved

19 between the height of the drone and your location on

20 the deck.  Is the height of the drone shown in this

21 picture or depicted in this picture the same

22 approximate height of the drone on the day that you saw

23 it?

24     A.  I would guesstimate the height only, not the

25 distance.

1      Q.   Okay.  So what is the height of the drone,

2   from your estimate, in this picture?

3      A.   I'm not going to give you an answer to that.

4   I don't know.

5      Q.   Okay.  Fair enough.

6           And you believe that the picture that you

7   took, the video you took, the drone was somewhere over

8   your head; is that right?

9      A.   Yes.

10     Q.   And not to the east of the deck?

11     A.   No.

12          MR. KING:  Okay.  I'm going to ask the

13   reporter to go off the record for five minutes.  I'm

14   going to look through my notes.

15          I'm pretty sure I'm done, Mr. Mounier, but I

16   may not be done.  I may have a few other questions, but

17   I think we're pretty close to being done.  So I'm going

18   to take a five-minute break until, let's just say,

19   11:16.  Okay?

20          MR. MOUNIER:  Perfect.  Thank you.

21          (Recess taken at 11:09 a.m. until 11:17 a.m.)

22          MR. KING:  Let's go back on the record.

23          I don't have any other questions of the

24   witness at this time.  I am reserving my right to ask

25   further questions after I meet and confer with

ANTONIO GONZALEZ CRUZ ~ December 9, 2025

VIDEO PROVIDED ON FLASH DRIVE UNDER SEPARATE COVER

# EXHIBIT 5

EXHIBIT 6

CUPP vs. COUNTY OF SONOMA ~ 4:23-cv-01007

1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4   RONALD CUPP, an individual,

5                  Plaintiff,

6       vs.                          Case No. 4:23-cv-01007

7   COUNTY OF SONOMA, a municipal
    corporation; TODD HOFFMAN, in
8   his individual and official
    capacities; JESSE CABLK, in
9   his individual and official
    capacities; DOES 1-50,
10  inclusive,

11                 Defendants.
    _____/
12

13

14

15       VIDEOTAPED DEPOSITION OF GENNARO PICCIONE

16      Held at the Offices of Sonoma County Counsel

17        575 Administration Drive, Room 105-A

18             Santa Rosa, California

19          Tuesday, December 16, 2025

20                  - - - -

21

22

23           McMURTRIE STENOGRAPHY, INC
         CA Certified Shorthand Reporters
                P.O. Box 5738
24        Santa Rosa, California 95402
              stefmc@sbcglobal.net
25               (707) 888-1130

1    A.   I wasn't sure that it was the drone.

2    Q.   Okay.  Did you observe anyone near the

3  property or on the property that you believe was

4  operating the drone?

5    A.   No, sir.

6    Q.   Okay.  And do you know who was operating the

7  drone?

8    A.   No.

9    Q.   Okay.  Do you have any idea whether it was a

10  neighbor of the Cupp's -- Cupp property?                  02:34

11    A.   No, sir.

12    Q.   Do you have any idea whether it was a neighbor

13  of yours?

14    A.   No.

15    Q.   Okay.  Was that the only time that you

16  observed a drone near the 4640 Arlington Avenue

17  property?

18    A.   Yes, sir.

19    Q.   Okay.  When you talked to Mr. Cupp and

20  Mr. Cruz about the observation that you made, what was   02:34

21  their response?

22    A.   I don't recall.

23    Q.   Do you remember any conversations that you had

24  with Mr. Cupp about that observation?

25    A.   No.

1          A.    No, sir.

2          Q.    Did anyone -- any -- anyone at all tell you

3    that that drone was being flown by anyone from the

4    County of Sonoma?

5          A.    Did -- I'm sorry.  Did --

6          Q.    Did anyone tell you that --

7          A.    -- somebody from Sonoma contact me?  Is that

8    what you're asking me?

9          Q.    Pardon?

10         A.    Are you asking me if somebody from the County          02:37

11   contacted me?

12         Q.    Yeah, sure.

13         A.    No, sir.

14         Q.    Did anyone else tell you that that drone was

15   flown by someone with the County of Sonoma?

16         A.    No, sir.

17         Q.    Did anyone else tell you that they had seen a

18   drone flown at that property at any time before you?

19         A.    Not to my recollection.

20         Q.    Did anyone tell you they ever saw a drone          02:38

21   flown at that property after you saw it?

22         A.    No.

23         Q.    Okay.  How often was Mr. Cruz at the property

24   after you became the tenant there?

25         A.    A couple times a month maybe.

1  if I recall correctly, on the stairs.  It just didn't

2  appear to me like somebody had been living there.

3          Q.    Right.

4          A.    But I don't -- but it's possible.  It is

5  possible.

6          Q.    Okay.  All right.  Did anybody -- when you

7  went to view the property, you said that you saw paper

8  on the floor, painting, some railing work.  Did anybody

9  tell you how long that work had been going on?

10         A.    No, sir.                                        02:53

11         Q.    So turning to the incident that you talked

12  about with the drone activity in March of 2023, you

13  indicated you saw a drone from the -- and again, that's

14  what I wrote down.  If this is wrong, please let me

15  know.

16         A.    Sure.

17         Q.    You were out on the back porch on top --

18  that's on top of the utility?

19         A.    Correct.  Yes.

20         Q.    Okay.  All right.  Do you know approximately  02:53

21  how many feet it is from, say, the ground to that porch

22  that you were standing on?

23         A.    To the -- to the floor of it?

24         Q.    Yeah.

25         A.    I would estimate 13 feet.

1    Q.    And then you said that the drone was floating

2  about five feet above your head; right?

3    A.    I believe so.  Yes, sir.

4    Q.    And how tall are you, sir?

5    A.    I'm five foot ten, approximately.

6    Q.    Okay.  And you -- you didn't -- you indicated

7  you didn't really hear it until you realized it was

8  there kind of.  Did it catch you by surprise?

9    A.    Yeah, it snuck up on me.  Yes, sir.

10    Q.    Okay.  How did -- how did that -- how did that          02:54

11  affect you, if at all, when it, kind of, snuck up on

12  you?

13    A.    I felt a little bit shocked because, you know,

14  it seemed like it was a -- like a camera device and, you

15  know, that -- that -- that's where I was living.  So,

16  you know, it just felt like an invasion of privacy, like

17  -- like, what's going on, you know?

18    Q.    Okay.  All right.  And you indicated that you

19  watched it for a couple of minutes and then you went

20  inside the residence?          02:54

21    A.    Yes, yes.

22    Q.    You don't recall how long you were in the

23  residence, though.  Did I get that right?

24    A.    I don't recall how long I was there.

25    Q.    Do you recall what you did when you went back

1  inside?

2      A.   I went back inside, and I used the bathroom.

3      Q.   Okay.  And then, was it just curiosity that

4  led you to go back outside, or did you have a specific

5  need to go back outside?  What did you --

6      A.   No, I -- I went back outside to see if it was

7  still there.

8      Q.   Okay.

9      A.   Mm-hmm.

10     Q.   And that's when you saw it moving off to the          02:55

11  back of the property towards the pond?

12     A.   Yeah.  At that point, it was -- had progressed

13  towards the pond, and it had made kind of a substantial

14  movement towards that direction and I could faintly hear

15  the same buzz that I was hearing when -- when I

16  initially saw it.

17     Q.   Okay.  Now, you -- you testified earlier --

18  and this is pretty close to, I think, what you said, you

19  know a drone when you see it?

20     A.   Yes, sir.                                             02:56

21     Q.   Okay.  And you indicated you'd seen some

22  people flying drones, like, in a park or something like

23  that?

24     A.   Yeah.  Mm-hmm.

25     Q.   Okay.  In addition to that experience, had you

1  ever seen any drones advertised like in any magazines or

2  on TV or any shows about drones, that kind of thing?

3      A.   Yes, I believe I had.

4      Q.   Okay.  Can you describe the drone that you saw

5  in March of 2023?

6      A.   Of course.  So for reference, I would say it

7  was about as wide as a -- as a page of paper.

8      Q.   Okay.

9      A.   As thick as a -- a double double In-N-Out

10  hamburger.  So about -- about this.  It looked pretty

11  substantial as far as the drone is concerned.  I hadn't

12  really seen one up to that date that was that big in

13  person.

14      Q.   Okay.

15      A.   Yeah.

16      Q.   It was definitely different than your son's

17  toy drone; correct?

18      A.   Oh, yeah.  Absolutely.

19      Q.   What -- do you remember what color the drone

20  was?                                                    02:57

21      A.   I mean, it kind of reminds me a little bit of

22  this thing in the center here.  It was like a gray --

23  yeah, like a black-grayish color.

24      Q.   Okay.  And I'm -- I'm not there, so I don't

25  know what you indicated, but I'm assuming it was, like,

```
 1   maybe a conference call device or something like that?
 2        A.   Yeah, I don't know if I should touch it.  It's
 3   like a conference call device, correct.
 4        Q.   Okay.  All right.  And you recall how many
 5   propellers it had or if it had a head propeller?
 6        A.   So I didn't see any actual propellers, maybe
 7   because they were moving fast.  I kind of had a sense
 8   that they were contained within the unit.  I didn't see
 9   any, like, moving propellers.
10        Q.   Okay.  What -- what makes you think you got a
11   sense that they were contained within the unit?
12        A.   Just from what I've seen of drones, like, if
13   they're not spinning around the top or the bottom,
14   they're sort of, like, inside of the unit.  So I figured
15   that was how it was moving, but I -- I -- I did not have
16   confirmation of that.
17        Q.   Do you recall if the drone had any lights
18   flashing on it at all?
19        A.   I don't recall.
20        Q.   Could you see on the drone any sort of device
21   or anything that led you to believe that it was a camera
22   of some sort?
23        A.   It looked like it had a camera in the front.
24        Q.   All right.  And did the camera look like --
25   like the camera on the cell phone, or was it longer than
```

02:57

02:58

1  that?  How would you describe the camera?

2      A.   It was much larger than a cell phone.  It's

3  about the same size as the camera that's looking at me

4  right now as far as the lens is concerned.

5      Q.   Okay.

6      A.   I install security cameras, and I would say

7  it's a lot like what we install, that sort of size,

8  maybe like the size of my fist here (indicating).

9      Q.   Okay.  All right.  And how long have you been

10  installing security cameras?                              02:58

11      A.   It's about a year and a half now I've been

12  working for this company.

13      Q.   Okay.

14      A.   But I have -- I have done them in the past,

15  yes.

16      Q.   Okay.  So in -- in the scope of your

17  experience working with security cameras, can you give

18  me an estimate how many security cameras you've worked

19  with, installing them, working on them, whatever?

20      A.   Yeah, maybe a couple 100, maybe.                 02:59

21      Q.   Just for my notes, what's your present

22  residence address?

23      A.   19323 Natalina Court.  That's N-a-t-a-l-i-n-a,

24  Court, and that's in Sonoma, California.

25      Q.   Okay.  Do you have any plans to move from that

1   address anytime soon?

2       A.   No, sir.

3            MR. YOUNG:   I have nothing else for -- for the

4   witness.   Thank you.

5            MR. KING:   Thank you.   Just a few follow-up

6   based upon that.

7                          ---o0o---

8                    FURTHER EXAMINATION

9   BY MR. KING:

10      Q.   The entire time that you were observing this

11  object that you believe was a drone on -- in March of

12  2023, you have made no observation of anyone that you

13  believe was operating it; correct?

14      A.   No, I didn't see -- I was on top of that roof,

15  I could see all around.   I didn't see any people or

16  cars.

17      Q.   Okay.   And when you --

18      A.   In that direction.

19      Q.   In the direction that you were looking, which

20  would be to the west towards the pond?              03:01

21      A.   Is that the west?   Wouldn't that be the east?

22  I believe that's --

23      Q.   Oh, no, I'm sorry.   We've talked about it

24  earlier.

25      A.   Yes.

1      Q.    It is the east.

2      A.    Yes.

3      Q.    So towards the pond?

4      A.    Yes, sir.

5      Q.    So you -- when you were looking east towards

6   the pond, you didn't see anyone that you believe was

7   operating the drone?

8      A.    I did not.

9      Q.    All right.  And you didn't see anybody to the

10  north or the south of the property operating a drone?       03:01

11     A.    No, I did not.

12     Q.    And behind you was the building -- the roof of

13  the building, so you could not see towards the west; is

14  that true?

15     A.    That's correct.

16     Q.    And when you got -- when you came back out of

17  the house, you were on the ground level; is that right?

18     A.    No, sir.  I was still upstairs.

19     Q.    Okay.

20     A.    Yes.                                               03:01

21     Q.    My mistake.  I thought you had come back out

22  on the ground.

23     A.    No, that's okay.

24     Q.    So you're still upstairs --

25     A.    Right.

1    Q.    -- and you didn't see anyone operating the

2  drone at that time?

3    A.    No.

4    Q.    And you made no attempt yourself to go find

5  where the drone was operating from?

6    A.    No.

7    Q.    All right.  Now, you've described what you

8  believe was a camera device, but you don't know exactly

9  whether it was or not from what your original testimony

10  was; correct?                                              03:02

11    A.    That's -- that's correct.

12    Q.    I'm going to ask that the witness be allowed

13  to, if he can, or at least it'd be better if the camera

14  can point down to the device you've been talking about.

15    A.    Yeah.

16    Q.    And you could just point your finger towards

17  right next to it --

18    A.    Mm-hmm.

19    Q.    -- so that we can see that that's the color

20  that you are talking about.                                03:03

21          All right.  Thank you very much.  And when you

22  held the piece of paper up, was that supposed to depict

23  the entire dimensions of this object that you saw?

24    A.    No, sir.  That would depict the -- the width

25  of what I witnessed.

EXHIBIT 7



County of Sonoma
**Permit & Resource Management Department**

# 7-0-20 STANDARD OPERATING PROCEDURES ON THE USE OF UNMANNED AIRCRAFT SYSTEMS (UAS)

## PURPOSE

The purpose of this policy is to establish guidelines for the use of an unmanned aircraft system (UAS) and the retrieval, storage and dissemination of images and data captured by the UAS. These procedures shall apply to the use of the UAS used and/or owned by Permit Sonoma for the purpose of detection of Sonoma County Code violations on private property.

The Permit Sonoma UAS will be operated in accordance with 14 CFR Part 107 default operating rules (referred to as Part 107) for all UAS systems weighing under 55 pounds. While these federal Part 107 rules contain operational limits for all UAS drone use, Permit Sonoma is adopting this internal policy governing departmental UAS/ use for the narrowly defined purposes of investigating violations of the Sonoma County Code and as needed during disaster response. Any deviation from 14 CFR Part 107 will be in strict accordance with an FAA granted Certificate of Authorization (COA) or Expedited Special Governmental Interest (SCI) Waiver or Authorization for UAS operation.

## DEFINITIONS

**Approved Use:**  Approved Permit Sonoma uses of a UAS include investigations of complaints received about alleged violations of the Sonoma County Code.  These inspections of unpermitted and/or illegal land uses include, but are not limited to violations of zoning regulations, such as cannabis cultivation, non-operative motor vehicle storage yards, and junkyard conditions.  A UAS may also be employed for complaints and/or investigations alleging unpermitted and/or unpermitted construction, grading, and drainage improvements/obstructions.

Additional approved UAS uses include emergency response to disasters such as earthquake, fire, and flood events for visual access to conditions of roadways, structures and other hazards.

**Prohibited Use:**  The UAS video surveillance equipment shall not be used: to conduct surveillance or inspection activity without a reasonable suspicion of unpermitted or illegal actions; to target people; to harass, intimidate, or discriminate against any individual or group; or to conduct personal business of any type.

**Small Unmanned Aircraft System (UAS):**  An aircraft that is intended to navigate in the air without an on-board pilot, weighing under 55 lbs. and all of the supporting or attached systems designed for gathering information through imaging, recording or any other means.

**Unmanned Aircraft (UA):** An aircraft that is intended to navigate in the air without an on-board pilot.



## 7-0-20 STANDARD OPERATING PROCEDURES ON THE USE OF UNMANNED AIRCRAFT SYSTEMS (UAS)

**Unmanned Aircraft Pilot:** A person exercising control over unmanned aircraft during flight. The pilot will be ultimately responsible for the operation and the input of commands/piloting during flight. The pilot will be certified in the operation of the UAS by successful completion of an approved training course and holds a pilot certificate as approved by the FAA.

**Visual Observer:** The trained observer is responsible for the visual observation of the UAS while in flight. The observer will maintain a visual observation of the UAS while in flight and alert the pilot of any conditions (obstruction, terrain, structures, air traffic, weather, etc.) which will affect the safety of the flight. The observer to ensure instant relaying of timely information will be in close proximity to the Pilot. The observer will be responsible for all aviation related communications required by the FAA.

### GENERAL

Small unmanned aircraft systems (UAS) may be utilized for inspections of private property to detect violations of the Sonoma County Code when other means and resources are not available or are less effective. Permit Sonoma shall make every attempt to respect and observe existing privacy rights on private property. Permit Sonoma shall only conduct UAS take-offs and landings from public property or public right of way unless a private property owner has given Permit Sonoma their consent, orally or in writing, to use their property for the purpose of conducting surveillance with a UAS.

Permit Sonoma's use of UAS shall focus primarily on expanses of land (e.g. "open fields") in which private property owners have knowingly exposed unpermitted structures and uses to aerial vantage points. While a Permit Sonoma UAS pilot is operating a UAS they will take steps necessary to protect privacy and private property rights by (1) turning on photographic equipment only when the UAS is positioned close to the suspected violation or unpermitted use; (2) launch UAS as close to the suspected unpermitted property and/or property use as possible to limit potential exposure to other properties; (3) ensure all UAS recording devices are focused on the areas necessary to support the mission and to minimize the inadvertent collection of data about persons or uninvolved places. Any inadvertently collected data will be immediately destroyed upon review by the Code Enforcement Manager or Supervisor.

Permit Sonoma will conduct UAS aided inspections on properties where Permit Sonoma staff has reason to believe unpermitted building or illegal land use violations are occurring. Reasonable suspicion will be based on citizen complaints and/or staff observations coupled with any other facts that suggest violation of the Sonoma County Code.

The administration, safety policy, training requirements, general operation procedures and pre/post flight actions are contained in the Permit Sonoma UAS Operations Manual.

## 7-0-20 STANDARD OPERATING PROCEDURES ON THE USE OF UNMANNED AIRCRAFT SYSTEMS (UAS)

**Data Retention and Processing**

All UAS recorded data shall be reviewed and evaluated for evidentiary value by the Code Enforcement Manager or Supervisor.  Data of identifiable individuals not intended to be used as evidence shall not be retained.  All retained data shall be maintained or destroyed pursuant to County retention policies.

**Protection of Rights and Privacy Concerns**

Permit Sonoma staff, operator and observer will consider the protection of individual civil rights and the reasonable expectation of privacy as a key component in the use of Permit Sonoma's UAS.

All UAS flights must be pre-approved by the Code Enforcement Manager or Supervisor and will be reviewed by the Code Enforcement Manager or Supervisor to ensure that they are conducted in accordance with Permit Sonoma policy, FAA regulations, state and federal law, and with due regard for public privacy.

### AUTHORITY

14 CFR Part 107/Establishes the Minimum Necessary Requirements for Operating a UAS

### PROCEDURE

A. UAS operation shall only be performed only by a FAA licensed pilot.  The visual observer need not be licensed.

B. UAS operation shall have Code Enforcement Manager or Supervisor approval in advance of any flight.

C. UAS operation shall conform to all FAA, state, and local regulations relating to such use.  A flight log shall be maintained for every UAS flight and such log shall be made available to the Code Enforcement Manager or Supervisor upon request.

D. UAS launching and retrieval shall be conducted from the public way, publically owned land, or anywhere specific permission has been granted.  Such permission shall be documented.

E. Damage to private property and/or the UAS shall be reported immediately to the Code Enforcement Manager and/or Supervisor.

F. Any use or imagery from the UAS captured contrary to this policy shall be reported immediately to the Code Enforcement Manager and/or Supervisor.



## 7-0-20 STANDARD OPERATING PROCEDURES ON THE USE OF UNMANNED AIRCRAFT SYSTEMS (UAS)

**ATTACHMENTS**

None

**APPROVED BY:** /S/ Tennis Wick, Permit Sonoma Director
**Reviewed By Department Manager:** Tyra Harrington, Code Enforcement Manager
**Reviewed By County Counsel:** Holly Rickett, Deputy County Counsel
**Lead Author:** Tyra Harrington, Code Enforcement Manager

**VERSION: 08.29.2019**

☒ Intranet

☐ Internet



EXHIBIT 8

1.0hrs TSH

Discussion with Counsel regarding PG&E hookups.

Discussion with Building Inspector regarding inspection for residential re-hookup. Property Owner Cupp indicated that utilities were not requiring Building Permit for Commercial Hookup, only residential, which struck Inspector as "odd," and does not conform to PG&E policy or to code. Building Inspector will make detailed notes that inspection did not approve release of commercial hookup, only residential.

| THOFFMA1 | *******PLEASE REVIEW "JUDGEMENT" ON PAGE 4 OF DOCUMENTS TAB BEFORE ANY ACTIONS ARE TAKEN ON THIS PROPERTY, AS THERE ARE SPECIFIC PENALTY MULTIPLIERS FOR VIOLATIONS. ALTERNATIVELY, CONTACT INSPECTOR HOFFMAN. | 04/08/2022 | 13:39 |

THOFFMA1     0.5hrs TSH                                               05/13/2022   09:31

File review for Counsel.

| 40.75hrs for Inspectors | $6,153.25 |
| 4.7hrs for clerical | $418.30 |

| Total of | $6,571.55 |

| THOFFMA1 | 2.5hrs TSH [1.0hrs per investigator; 0.5hrs report writing] | 07/19/2022 | 11:34 |

On 07-08-22 at approximately 0830hrs, I met Sr. Inspector Carey and County Counsel King to discuss pending inspection. At approximately 0900hrs, I conducted an inspection of the property with the previously mentioned County personnel. Also in attendance were property Owner Cupp, Opposing Counsel, and Consultant Dave Harris.

Junkyard Conditions, Contractor storage yard, and occupied travel trailer can be cleared based on this inspection.

The remaining violations were still in existence as no permits had been issued. Of note was a family residing in the SFD, where no permits have been Issued for the remodel/ addition/re-roof.

| THOFFMA1 | 6.0hrs Total [3 inspectors each reviewed permits independently for 1.0hrs; 1.0hr group conference to discuss findings] | 07/22/2022 | 13:12 |

EXHIBIT 9

Michael Gogna
Tel: (707) 328-9565
mgogna@sonic.net

February 11, 2021

## Statement of Decision and Administrative Order

***Property Address***: <u>**4640 Arlington Ave.**</u> Santa Rosa, CA ("the Property")
***Responsible Parties***: Ronald Cupp, Property owner
***PRMD Case No.***: VCM20-0768, VCM19-0123
***Hearing Dates***: December 11, 2020, continued to January 22, 2021

### Alleged Violations:

1. Construction without required permits (remodel of single family dwelling and barn, garage conversion to dwelling unit), and unlawful use (a change of occupancy for garage)[1]
2. Numerous instances of construction without required permits (9-foot fence in front yard setback, improvements to barn, room addition and re-roof of single family dwelling with skylights, addition of "on demand" propane water heater to garage, two sheds and a carport)
3. Commercial cannabis cultivation without required County approvals or permits
4. "Dangerous building" – faulty construction, faulty/dangerous electrical and gas (sic)
5. Unpermitted use of Property for occupied travel trailer
6. Unpermitted use of Property for junkyard conditions and contractor's storage yard[2]

### Violation Determinations

1. The evidence supports a determination that there was unpermitted construction to the primary dwelling and the barn, and conversion of a garage to a dwelling unit, as alleged in the 2019 Notice and Orders.
2. The evidence supports a determination that there were numerous instances of unpermitted construction, as described in Item #2, above.
3. The evidence supports a determination that the Property was used for an unpermitted commercial cannabis cultivation operation.
4. The evidence supports a determination of unpermitted occupancy of a travel trailer.
5. The evidence supports a determination of unpermitted use of the Property for junkyard conditions.
6. The allegation of a "dangerous building", as described in Exhibit "Q" to the County's Appeal/Abatement Hearing Report, is not within the scope of these proceedings and no order or determination is made with respect thereto.
7. The evidence does not support a determination of a zoning violation for the unpermitted occupancy of a converted garage.
8. The evidence does not support a determination of unpermitted use of the Property for a contractor's storage yard.

---

[1] The violations listed in this item #1 were the subjects of two Notice and Orders issued in February of 2019 and are referred to as the "2019 Notice and Orders".
[2] The violations listed in Items #2 through #6 were the subjects of seven Notice and Orders issued in July of 2020 and are referred to as the "2020 Notice and Orders".

Page | 1

# Summary of Hearing

On December 11, 2020, a duly noticed administrative hearing ("the First Hearing") was conducted by the undersigned ("the Hearing Officer"), a hearing officer appointed by the Sonoma County Board of Supervisors, to consider a request by County enforcement officials ("County staff") for an abatement order and the appeal of the property owner, Ronald Cupp ("Cupp"). County staff sought an abatement order pertaining to unpermitted construction, as well as unpermitted uses and occupancy at the Property. County staff also issued a series of Notice and Orders describing numerous alleged violations of the Sonoma County Code. Based on a jurisdictional challenge raised by Cupp at the First Hearing, which asserted that the matters pertaining to unpermitted construction and various other building code violations were not properly before the Hearing Officer, the Hearing Officer requested briefings from the parties regarding Cupp's challenge and continued the First Hearing to January 22, 2021.

Both parties have submitted documents as part of the proceedings. Prior to the First Hearing, County staff submitted an "Appeal/Abatement Hearing Report". Prior to the continued hearing on January 22, 2021 ("Continued Hearing"), County staff submitted another "Appeal/Abatement Hearing Report".[3] The two Appeal/Abatement Hearing Reports are hereinafter collectively referred to as the "Staff Report." County staff also submitted a "Memorandum of Response", a "Memorandum of Reply", and two documents titled "Response to Interim Ruling and Order". Prior to the First Hearing, Cupp submitted an "Abatement Hearing Statement", which had 34 exhibits attached. Prior to the Continued Hearing, Cupp submitted a "Brief in Response", including five attached exhibits, and a "Conditional Acceptance of [PRMD] Jurisdiction". After receiving and considering the arguments of the parties on the issue of hearing officer jurisdiction, the Hearing Officer issued an "Interim Ruling and Order" ("Interim Order") on January 18, 2021, which included several exhibits as attachments.

At the Continued Hearing, witnesses were duly sworn and documents and testimony were received as evidence. At the time of the Continued Hearing, Mark Franceschi ("Franceschi") and Inspectors Todd Hoffman ("Hoffman") and Andrew Smith ("Smith") appeared and testified for the County. County staff presented a Power Point presentation depicting various conditions on the Property that were referenced in the Notice and Orders. Cupp appeared and testified on his own behalf. Franceschi, Hoffman and Smith presented testimony and documentary evidence tending to support most of the alleged violations. Cupp presented testimony that challenged the validity of the inspections of the Property and the authority of the inspectors. When offered the opportunity by the Hearing Officer to refute each of the factual allegations pertaining to code violations, Cupp declined the invitation.[4] Consequently, there are alleged code violations for which there is little, or no, contrary factual evidence.

After receiving evidence, the matter was deemed "submitted" by the parties and the Continued Hearing was closed. Following the close of the Continued Hearing, the Hearing Officer issued two rulings, one that addressed Cupp's continuing challenge to jurisdiction ("Final Ruling on Jurisdictional Issues") and a second ("Rulings on Objections and Evidence") which responded to objections and evidence offered by the parties, and which included "*sua sponte*" evidentiary rulings as to certain exhibits submitted by the parties. Those two Rulings, as well as the January 18 Interim Order, are incorporated into this Statement of Decision and Administrative Order by this reference.

---

[3] It appears to the Hearing Officer that the only difference between the two Abatement Hearing reports is the date reference. The text of the two reports, except for references to the date of the reports, appears to be identical.

[4] When asked about specific alleged violations, Cupp asserted his Fifth Amendment right to not testify. Although this is not a criminal proceeding, no adverse inference was drawn from his assertion of that right, as will be discussed in more detail.

## Factual and Procedural Background

In February of 2019, Smith conducted an inspection of the Property.[5]  Based on that inspection, Smith issued the 2019 Notice and Orders.  The first 2019 Notice and Order generally alleged "construction without permits" and pertained to a vacant single family dwelling and a barn that were being remodeled without required permits and a garage having been remodeled into a dwelling unit.  (See **Exhibit "B"**)[6]  The second 2019 Notice and Order alleged an "Unlawful Use" of the Subject Property referencing a "change of occupancy" as a result of the conversion of a garage to a dwelling unit.  (See **Exhibit "C"**)  In response to the 2019 Notice and Orders, Cupp sent a "Constructive Notice of Trespass & Deprivation of Rights" letter to County personnel."  (See **Exhibit "D"**).

In April of 2019, the County issued two "Civil Penalties Due and Payable" notifications to Cupp.  (See **Exhibits "E"** and **"F"**, hereinafter referred to as "Determination Notices").  The Determination Notice shown in Exhibit E was for "unpermitted land uses" as described in Exhibit C, and the Determination Notice in Exhibit F was for "unpermitted construction", as described in Exhibit B.  Notably, and contrary to the Staff Report, neither of the Determination Notices provided Cupp with notice of appeal rights concerning civil penalties that were being assessed.

In July of 2020, County staff conducted another inspection of the Subject Property. This second inspection was pursuant to a Superior Court-issued Inspection Warrant. Based on that inspection, County staff issued the 2020 Notice and Orders, which consisted of seven separate Notice and Orders.  Of those seven, four generally alleged "construction without permits", two were for "unlawful uses" and one was for "a dangerous building".  (See **Exhibits "N"** through **"T"**)  During the course of the Continued Hearing, Franceschi testified that the violations described in Exhibits "P" and "S" of the 2020 Notice and Orders were "duplicative" of the violations described in Exhibit "B" of the 2019 Notice and Orders.  In response to the 2020 Notice and Orders, Cupp sent a letter to County staff titled "Constructive Notice of Trespass & Deprivation of Rights ", dated August 4, 2020.  (See **Exhibit "U"**)

As mentioned above, the Hearing Officer requested briefings from the parties on a jurisdictional challenge raised by Cupp and issued an Interim Order on January 18, 2021.  The Interim Order determined that the Hearing could proceed as to all but one of the alleged violations.  The Hearing Officer ruled that the violations for "Dangerous Building", as described in Exhibit "Q", were more suited for a technical assessment and were aligned with issues raised in *Lippman v. City of Oakland* (2017) 19 Cal.App.5[th] 750  (substandard living conditions).  An appeal of those violations should be considered, if at all, in accordance with §1.8.8 of the Building Standards Code.

## Summary of Decision

A.  Three alleged violations of unpermitted construction described in the 2019 Notice and Orders are confirmed.  However, these alleged violations for unpermitted remodel of the single family dwelling, the barn and the garage conversion are duplicative of similar violations contained in the 2020 Notice and Orders.  (See Exhibits "P" and "S").  For that reason, the abatement order and assessment of civil penalties for these violations will be addressed in Paragraph "C" below.

---

[5] It is noted here that Cupp initiated litigation in Federal District Court claiming that the February 2019 inspection constituted a trespass and an unlawful search.  That litigation is on-going and the lawfulness of that search is not at issue in this Hearing.

[6] Unless otherwise specified, all Exhibit references are references to exhibits that were included in the Staff Report.

B.  The allegation of a zoning violation for conversion of a garage to a dwelling unit, as described in the 2019 Notice and Orders, is not confirmed.  While the evidence presented confirms that improvements to the garage had been made to convert the garage into a dwelling unit, the Staff Report indicates that this work had not been completed, and there was no evidence presented that established an actual "use" of the garage as a dwelling unit.

C.  Seven alleged violations of unpermitted construction described in the 2020 Notice and Orders are confirmed.  The confirmed violations are for unpermitted construction of a 9-foot fence (Exhibit "N"), barn remodel (Exhibit "P"), the unpermitted additions and remodels to the single family residence and garage, described in Exhibit "S", and construction of two sheds and a carport (Exhibit "T").  Cupp must apply for all required permits to legalize or remove the unpermitted work, pay the applicable permit fees, and diligently pursue work authorized under such permits to completion, all in accordance with the terms of the Administrative Abatement Order, below.  If Cupp fails to apply for all required permits to legalize or remove the remodel work that was performed without required permits within the specified timeframe, or fails to pay applicable permit fees, or fails to diligently pursue work authorized under such permits to completion, the following civil penalties shall be imposed:  (1) a civil penalty in the amount of **$26,400.00**, based on a daily civil penalty of $75.00 per day for each of the two residential violations; and (2) a civil penalty in the amount of **$44,080.00**, based on a daily civil penalty of $50.00 per day for each of the five violations deemed to be non-commercial accessory structures.  These civil penalty assessments begin on July 30, 2020 and shall continue to accrue at that rate until all required permits are obtained to either "legalize" or remove unpermitted the construction.  This order also addresses the violations contained in Exhibit "B" that were part of the 2019 Notice and Orders.

D.  The allegation of an unlawful commercial cannabis use is confirmed.   A civil penalty in the amount of **$42,000.00** is assessed based on a daily civil penalty amount of $7,000.00 per day for a period of six days.

E.  The allegation of the unpermitted occupancy of a travel trailer is confirmed.  Cupp is ordered to terminate the occupancy of the travel trailer, in accordance with the terms of the Administrative Abatement Order, below.  A civil penalty in the amount of **$8,800.00** is assessed based on a civil penalty in the amount of $50.00 per day beginning on July 30, 2020 and shall continue to accrue at that rate until the use of the Property for an occupied travel trailer is permitted, or that use is terminated and the termination of that use is confirmed by a County staff site inspection.

F.  The allegation of the existence of junkyard conditions is confirmed.  Cupp is ordered to terminate the use of the Property as a "junkyard" as defined in Sonoma County Code §26-02-140.  A civil penalty in the amount of **$8,800.00** is assessed based on a civil penalty in the amount of $50.00 per day beginning on July 30, 2020 and shall continue to accrue at that rate until use of the Property as a "junkyard" ceases and is confirmed by a County staff site inspection.

G.  The allegation of a "dangerous building" for faulty construction, construction without a permit, and "faulty/dangerous electrical and gas" (sic) is not within the scope of this proceeding for the reasons set forth in the Hearing Officer's Interim Order.

H.  The allegation of unpermitted use of the Property for a contractor's storage yard is <u>not</u> confirmed.  There was no evidence to support a finding that any equipment or described materials were used by Cupp in the conduct of building trades or building craft.

I.  County staff is to issue a written authorization, as necessary or appropriate, to allow electrical service to the Property to be restored, as described in the Administrative Abatement Order.

## Findings of Fact

The following represent the Hearing Officer's findings of fact, based on the evidence presented:

1. Cupp is the current owner of the Property.

2. On, or about, January 29, 2019, PRMD received a complaint in which the complaining party asserted (1) that the Property was formerly bank owned, and (2) a belief that remodel work on a single family residence, as well as conversion of a garage to a dwelling unit, was being performed without permits.

3. Smith sent a "courtesy notice" on January 29, 2019, addressed to "Federal National Mortgage Association" in Jacksonville, FL, describing the complaint as "construction without a permit".[7]

4. Smith conducted a Property inspection on February 15, 2019.[8] He observed that a single family residence and a barn were being remodeled. He also observed "construction materials in and around the Single Family Dwelling". He also observed "a variety of construction materials, including lumber" inside the garage door, as well as "a large supply of lumber and cut tailings" outside of the garage. Smith also observed that a garage had been modified "into what was a dwelling space" but that "it had not been completed".

5. Smith spoke to someone who was operating power tools inside the converted garage.

6. Smith determined that no permits had been issued for the observed remodels and garage conversion.

7. Smith posted the 2019 Notice and Orders on the Property describing the alleged code violations.

8. Cupp responded to the 2019 Notice and Orders with a "Constructive Notice of Trespass and Deprivation of Rights", dated February 20, 2019 (or erroneously dated February 20, 2018).

9. Cupp testified that "I actually pulled a permit to build the barns through the County", but no permit or permits were offered as evidence prior to, or during, the Continued Hearing.

10. Cupp testified that the second-story remodel was done in 1979, before he purchased the Property.

11. Cupp testified that "the lower structure" was built over the well in 1979, prior to his ownership.

12. On July 20, 2020, County staff obtained an Inspection Warrant to conduct a Property Inspection.[9] Pursuant to the Inspection Warrant, County staff conducted a Property inspection on July 30, 2020. During the inspection, County staff observed the conditions described in the 2020 Notice and Orders.

13. A 9-foot fence was constructed within the front yard setback area without required permits.

14. Additions and remodels were made to a single family residence and a barn, and improvements were made to a garage, all without required permits. Violations referenced in the 2020 Notice and Orders that pertain to unpermitted improvements to the single family residence, barn and garage are duplicative of the same violations in the 2019 Notice and Orders.

15. Two sheds and a carport were constructed without required permits.

---

[7] No information was offered at the Hearing as to the actual Property owner on January 29, 2019, or why the "courtesy letter" was sent to Federal National Mortgage Association" in Jacksonville, FL.

[8] As mentioned previously, the validity of Smith's February 2019 Property inspection is the subject of litigation in federal court. Although Cupp has again challenged the validity of that inspection in this proceeding, the Hearing Officer has deferred to the pending federal court litigation for a determination of the validity of the February 2019 Property inspection.

[9] At the Hearing, Cupp challenged the validity of the Inspection Warrant, but that challenge is beyond the scope of this Hearing.

16. The Property was being used for an unpermitted commercial cannabis operation of approximately 500 mature cannabis plants. Cupp testified that the unpermitted commercial cannabis operation ceased on July 30, 2020. However, Cupp offered no photographic or documentary evidence to show that the commercial cannabis operation actually ceased on that date. Cupp also did not request a compliance inspection.

17. The Property was being used for the unpermitted occupancy of a travel trailer and as a "junkyard" as defined in Sonoma County Code §26-02-140.

18. Cupp has not requested a compliance inspection for any of the alleged violations on the Property since issuance of the 2020 Notice and Orders.

19. The Staff Report contained a "Penalties Due Calculation Sheet" for the 2019 Notice and Orders, but does not contain a "Penalty Schedule" that correlates to the Penalties Due Calculation Sheet. The Staff Report did not contain a "Penalties Due Calculation Sheet" or a "Penalty Schedule" for the 2020 Notice and Orders.

20. A "Response to Interim Ruling and Order" submitted by County staff during the Continued Hearing contained a "Cannabis Penalty Calculation Sheet" and a "Cannabis Violation Penalty Schedule", but did not contain a "Penalties Due Calculation Sheet" or a "Penalty Schedule" for the other 2020 Notice and Orders.

21. The Staff Report and the County's "Response to Interim Ruling and Order" include an analysis and calculation of civil penalties to be assessed. According to testimony from Franceschi, the 2019 violations "were incorporated into – or duplicated and included in the 2020 violations". He also testified that the penalty calculations for the 2020 violations "should be the same" as the penalty calculations shown in Exhibit Y to the Staff Report, which were for the 2019 violations because "it's the same violation, as we discussed they were duplicated."

22. Two "Determination of Civil Penalties" letters were sent to Cupp regarding the 2019 Notice and Orders, but not for the 2020 Notice and Orders. The two "Determination of Civil Penalties" that were sent to Cupp did not contain a statement advising Cupp that he could appeal the amount of civil penalties. However, because County Staff and Cupp have agreed that the Hearing would serve as an appeal of all issues relating to the 2019 Notice and Orders and the 2020 Notice and Orders, the omission of the right to appeal the amount of civil penalties is deemed harmless error.

23. There is no evidence in the record that any of the alleged violations in the 2019 Notice and Orders or the 2020 Notice and Orders had a significant effect on neighboring properties.

24. There is no evidence in the record that the any of the alleged violations in the 2019 Notice and Orders or the 2020 Notice and Orders actually caused human health or safety, or environmental, damage.

25. As to the unpermitted commercial cannabis cultivation operation, there is evidence in the record, including photographs, that tend to indicate that the operation required significant amounts of electricity to function (pictures of "grow lights", two "industrial warehouse sized" air conditioning units, nutrient mixing tank, and numerous "electrical lines".)

26. Cupp testified that electric service to the Property was terminated on August 4, 2021 and has not been restored.

27. As to the unpermitted commercial cannabis cultivation operation, there is no evidence in the record that Cupp had an economic incentive or benefit from the cannabis operation.

# Legal Analysis and Conclusions of Law

## Summary of applicable laws, regulations and policies

A. *Permit Requirement from County of Sonoma County Code (§§26-88-250 – 254)--* Commercial cannabis activities are subject to permit requirements as shown in 26-88-250, Table 1A-D. No other type of commercial cannabis activities are permitted except as specified in Table 1A-D.

B. *Unlawful Use/Zoning Violation from County of Sonoma County Code  (§26-92-200(a)) --* Prohibits the use of land for any purpose or in any manner other than for "permitted uses" as listed in the County's Zoning Ordinance.

C. *Permit Requirement from Sonoma County Building Code (§7-5)--* No person is allowed to erect, construct, alter, repair, move, improve, convert or demolish any building or structure in the unincorporated area of this county, or cause the same to be done, without first obtaining a separate building permit for each such building or structure as required by the Building Code.

D. *Sonoma County Code 1-7.1(a) (Relevant Portions) --* Sets forth applicable penalty amounts for violations of various County Code sections, including Sections §§26-88-250, 7-5 and 26-92-200. Authorizes the enforcing officer to set the amount of civil penalties within prescribed ranges.

E. *Sonoma County Code §1-7(b)* (Relevant portion) – Authorizes the County to collect costs incurred by the County in abating nuisance conditions, which includes costs of administrative overhead, salaries and expenses incurred by PRMD and County counsel.

F. *Sonoma County Code §1-7(b)* (Relevant portion) -- A "responsible party" includes "[A] person with an ownership interest in real property upon which a violation is found".

G. *Sonoma County Code §1-7.1(f)(3)(a)--* A responsible party must pay the civil penalties imposed for an unpermitted use of property for commercial cannabis cultivation.

H. *Sonoma County Code §1-7(a)(4)(iii))* -- A responsible party must pay to the County a daily penalty in an amount determined by the enforcing officer.

## Analysis and Conclusions Regarding Construction without Required Permits

The 2019 Notice and Orders cited three instances of construction without required permits: remodel of the single family residence, remodel of a barn, and remodel/conversion of a garage to a dwelling unit. The 2020 Notice and Orders cited seven instances of construction without required permits; the same three that were described in the 2019 Notice and Orders, plus construction of a nine-foot fence, two sheds and a carport.[10] Franceschi testified that the 2020 Notice and Orders pertaining to unpermitted construction for the single family residence and the barn were duplicative of the 2019 Notice and Orders because "they [the violations] still existed" and "they were still included in violation notices that were sent following that 2020 inspection." The violations that were described in the 2019 Notice and Orders are included in the 2020 Notice and Orders and will not be separately considered for purposes of determining an appropriate abatement order or civil penalties. A preponderance of evidence supports the determination of a violation of Section 7-5 of the Sonoma County Code for unpermitted construction of a nine-foot fence in the front yard, the remodel of a single family dwelling, the remodel of a barn, the remodel/conversion of a garage, and the construction of two sheds and a carport.

---

[10] The 2020 Notice and Orders included an alleged violation for "dangerous building" based on "faulty construction". However, the Hearing Officer has determined that this alleged violation is beyond the scope of the Hearing.

Page | 7

The appropriate level of civil penalties to be assessed for the seven instances of unpermitted construction requires an analysis of "factors to be considered" in accordance with Sonoma County Code §1-7.1(c). Those factors align with the factors used by County staff in the "Penalties Due Calculation Sheet" (See **Exhibit "Y"**). While the penalty calculations contained in Exhibit Y pertain to the 2019 Notice and Orders, Franceschi testified that because the unpermitted construction violations cited in the 2020 Notice and Orders were the same as those cited in the 2019 Notice and Orders, the penalty calculations for the 2020 Notice and Orders should be the same as what is shown on Exhibit Y. However, the evidence presented does not support the penalty calculations shown in Exhibit Y. For example, the category of "Seriousness of Violation" uses a score of "10", which indicates that the violation "caused human health/safety or environmental damage". However, Franceschi testified that he had no knowledge of any damage from the unpermitted construction. Similarly, the category of "Effect on Other Properties" has an assigned score of "10" which requires a determination of "significant effect on other properties". However, Franceschi testified that "we have not received specific complaints from the neighborhood about any of the unpermitted construction." As for the category of "Sophistication of Owner", there is no evidence in the record that the requirement of permits was known to Cupp for the 2019 Notice and Orders. However, because the 2019 Notice and Orders are not separately considered for purposes of determining the appropriate level of civil penalties, Cupp's knowledge or awareness of the need for permits (with respect to the 2019 Notice and Orders) is of no significance. However, after having received the 2019 Notice and Orders, Cupp certainly had knowledge that County regulations required permits for the remodel/addition work that was being performed. Therefore, as to the 2020 Notice and Orders, a score of "10" is appropriate for this category as to the unpermitted construction violations.

The evidence presented regarding the seven instances of unpermitted construction supports a score of "5" for the category of "Seriousness of Violation" and a score of "1" "Effect on Other Properties", resulting in an overall score of 7.15 for the seven occurrences of unpermitted construction violations described in the 2020 Notice and Orders. The unpermitted remodel/additions to the single family dwelling and the converted garage are "residential" in nature, pursuant to *Sonoma County Code §1-7.1(a)(2)*. The five remaining violations for unpermitted construction (the 9-foot fence, barn, two sheds and a carport) fall into the category of "Other Violations", as they appear to be non-commercial accessory structures, per *Sonoma County Code §1-7.1(a)(7)*.

If Cupp applies for permits to "legalize" or remove the unpermitted construction, a civil penalty in the amount of 4.4 times the regular permit fee shall be imposed to obtain all permits. If Cupp does not apply for required permits, civil penalties for unpermitted construction shall be in the amount of $75.00 per day for each of the two residential violations and $50.00 per day for each of the violations deemed to be non-commercial accessory structures. These civil penalties shall be imposed in accordance with the terms of the Administrative Abatement Order, below.

## Analysis and Conclusions Regarding Non-Cannabis Zoning Violations/Unlawful Uses

The 2019 Notice and Orders cited one instance of a zoning violation, or "unlawful use", for the unpermitted conversion of a garage to a dwelling unit. The 2020 Notice and Orders did not include this zoning violation. However, the 2020 Notice and Orders contained three other non-cannabis related zoning, or "unlawful use", violations, namely; (1) an occupied travel trailer; (2) junkyard conditions; and (3) a contractor's storage yard. It is unclear as to why the garage conversion use violation was not included in the 2020 Notice and Orders, since Franceschi testified that the 2020 Notice and Orders were "duplicative of" the 2019 Notice and Orders. Nothing presented in the Staff Report, nor the testimony of County staff at the Hearing, provided evidence of actual "use" of the garage as a dwelling unit. The two

photographs of the garage, one taken on February 15, 2019, and a second, taken on July 30, 2020, did not show actual use of the garage as a dwelling unit. So while the violation for construction/remodel of the garage is established, the alleged violation for "use" of the garage as a dwelling unit is not confirmed.

There was also an allegation of an unlawful use included in the 2020 Notice and Orders for "a contractor's storage yard". The only evidence offered in support of this violation, other than the Notice and Order (Exhibit "R") was a statement in the Staff Report indicating that ". . . storage of construction materials was observed." While construction materials may have been observed during a site inspection, the presence of "construction materials", alone, is not sufficient to establish a zoning violation for a contractor's yard. County Code Section 26-02-140, defines a contractor's yard as "any land and/or building(s) used primarily for the storage of . . . building materials, paints, pipe or electrical components, any of which is <u>used by the owner or occupant of the premises in the conduct of any building trades or building craft</u>." (emphasis added) There was no evidence showing that the observed construction materials were used by Cupp in the conduct of any building trades or building craft. Therefore, the violation for unlawful use of the Property for a contractor's yard is not confirmed.

The evidence shows that a travel trailer on the Property was occupied and was being rented to a tenant. As for "junkyard conditions", Smith testified that he observed "multiple debris piles . . . as well as trash, junk and scrap" that exceeded an area of 500 square feet that was spread around various locations on the Property. This evidence was not refuted, so the violations for "use" of the Property for an occupied travel trailer and junkyard conditions are confirmed. Because the travel trailer was not "owner occupied", it is not considered a "residential violation", as described in *Sonoma County Code 1-7.1(a)(2)*. Similarly, *Sonoma County Code 26-02-140* excludes travel trailer from the definition of a "residential – dwelling unit". Therefore, for purposes of determining an appropriate level of civil penalty, the two confirmed unlawful uses, occupied travel trailer and "junkyard conditions" will be considered "Other Violations".

The only analysis provided to show how County staff determined a recommended daily civil penalty for these two "unlawful use/zoning violations" is found on the "Civil Penalties Due Calculation Sheet", which was attached as the second page of Exhibit Y. This sheet lists a "Violation #" of "VPL19-0130", which correlates to the 2019 allegation of "change of occupancy – convert garage to dwelling unit." The evidence presented did not support a determination of this alleged unlawful use. However, Franceschi testified that any penalties associated with the 2020 violations are the same as the penalty calculations for the 2019 violations. Based on that testimony, it appears to be the position of County staff that the civil daily penalties for the two non-cannabis related zoning, or "unlawful use", violations (i.e., an occupied travel trailer and "junkyard conditions") should be calculated applying the same scores and factors used on the second page of Exhibit Y.

Referring to those scores and factors, County staff has assigned a score of "10" to the category of "Seriousness of Violation", which requires a showing that the violation "has caused human health/safety or environmental damage". While it is possible, perhaps even likely, that the two uses of property found to be violations have the potential for causing such damage, there was no evidence of <u>actual</u> damage. The score for this category is changed to "5". Similarly, the category of "Effect on Other Properties" was assigned a score of "10" which requires a showing that the violations had a "significant effect on other properties". However, there was no evidence that any of the violations on the Property had any effect on other properties. The score for this category is changed to "1", and the overall score for these two violations is adjusted to 7.15. Based on the foregoing, it is the Hearing Officer's determination that the appropriate amount of a daily civil penalty relating to the travel trailer occupancy and for the "junkyard conditions" is $50 per day, beginning on July 30, 2020.

## Analysis and Conclusions Regarding Unlawful Commercial Cannabis Cultivation

The evidence presented clearly established a large-scale commercial cannabis use. The Staff Report indicates the cultivation operation consisted of "approximately 500 mature cannabis plants on the Property." There was no evidence to refute the use of the Property for a commercial cannabis use. In fact, Cupp testified that "all the cannabis [use] stopped that day", referring to the day of the second Property inspection (July 30, 2020), which can be taken as an admission that there was a "cannabis use" prior to that day. So the violation for unpermitted commercial cannabis use is confirmed.

Determining the length of that use is more complicated. The Staff Report suggests that the duration of that use should extend from the day of the Notice and Order (July 30, 2020) until the date of the First Hearing (December 11, 2010), or 134 days. Given the recommended amount of a recommended penalty of $8,500 per day, this would result in a civil penalty of $1,139,000.00, a sum that requires close scrutiny. (*United States v. Bajakajian* (1997) 524 U.S. 321)

The Notice and Order for this violation (Exhibit "O") indicated that Cupp was "required to notify this Department and schedule a re-inspection to verify the removal of the illegal use." It also advised Cupp that it was his responsibility "to arrange a site inspection to verify removal of the violation." Because Cupp did not arrange for a subsequent compliance inspection, Franceschi testified that County staff "is assuming that the cannabis we observed has probably been harvested by now, but their cultivation operations still continue unabated on the [P]roperty." No one from County staff offered any evidence as to how the determination was made that the "cultivation operations still continue unabated" into December of 2020. At the Hearing, Counsel argued that Cupp "had the ability to reduce his liability for civil penalties by simply, one, <u>abating it</u>, or two, <u>calling for an inspection</u>. He did neither." When pressed as to whether the County had any evidence that Cupp had not actually abated the violation, Counsel acknowledged that "I'm not making that representation at all". She relied on the fact that "because he did not call, that's how – why the penalties continue to accrue." So the County has offered no evidence as to the actual abatement of the violation other than Cupp's failure to call for an inspection. Rather, County staff relies on a <u>presumption</u> that the cannabis cultivation continued unabated because a compliance inspection was not requested nor conducted.

On the other hand, Cupp testified at the Hearing that all cannabis use stopped on July 30, 2020. However, Cupp offered no documentary or photographic evidence to support that statement. If that use had, in fact, stopped on July 30, it is reasonable to expect that Cupp would have notified County staff of that fact, since the Property was exposed to significant daily penalties for any continued unlawful use.[11]

A reasonable method of assessing the timing of the "abatement" of that use is to examine the infrastructure that was observed as part of the cannabis cultivation operation. Testimony and photographs show that this operation required a significant amount of electrical power to provide electricity for, among other things, two "industrial warehouse sized" air conditioning units, two separate "grow rooms" with "grow lights", and a nutrient mixing tank. Cupp testified that power to the Property was terminated on August 4, and that testimony was not refuted. A reasonable inference can be drawn that without electricity on the site, the cultivation operation was impaired, if not terminated, when electric service to the Property was terminated.

---

[11] The Notice and Order for this violation indicated a potential penalty "of up to $10,000" per day.

Page | 10

Franceschi testified that "the fact that there is no power does not mean that you . . . can't be cultivating cannabis currently in some kind of mixed light." This testimony invites the Hearing Officer to speculate as to potential growing opportunities, but it lacks any supporting evidence as to actual cultivation activity beyond August 4, 2020. Franceschi also testified that "we have not ever been invited back to the property to verify the cannabis has been abated", and because of this lack of an invitation "the inspection staff has not been able to perform a compliance inspection". However, the record indicates that inspection staff was able to perform two property inspections previously without "ever having been invited". With daily penalties accruing at a proposed rate of $8,500 per day, it seems reasonable to expect County staff to have made some outreach effort within the 134 days of presumed non-compliance to determine whether the cannabis cultivation violation had actually been abated.[12]

The Notice and Order for this violation (Exhibit "O") provided notice to Cupp that this particular violation would be assessed a daily penalty of "up to $10,000" until the violation was abated. But unlike the violations for the 2019 Notice and Orders, no "Civil Penalties Due and Payable" forms (such as shown in **Exhibits "E" and "F"**) were sent to Cupp regarding the 2020 Notice and Orders. So while County staff and Counsel contend that Cupp had the ability to avoid or mitigate the amount of civil penalties that were accruing (a contention that is not disputed), no evidence was presented to show that Cupp had actual knowledge of the amount of civil penalties that were accruing, <u>on a daily basis</u>, for the commercial cannabis cultivation violation for a period of 134 days, the proposed duration of the violation.

In determining the appropriate level of daily civil penalties for the cannabis operation, it is necessary to refer to the "Cannabis Penalty Schedule Sheet" that was submitted by County staff during the course of the Continued Hearing. Of note, the category of "Effect on Other Properties" was given a score of "10", which requires a showing that the violation "had a significant effect on other properties." However, Franceschi testified that staff had not received any complaints from the neighborhood about the cannabis cultivation activity on the Property. The required showing to support a score of "10" for this category has not been made and the score is changed to "1" for a "minor effect". Similarly, for "Culpability of Owner", a score of "10" was assigned. That score requires a showing that the "Owner created, added to, or allowed the violation", <u>plus an additional showing</u> that the owner had "economic incentive or benefit." There was no evidence tending to show that Cupp had an economic incentive or benefit relating to the cannabis cultivation operation. The score for this category is changed to "5".

Based on all of the foregoing, it is the Hearing Officer's determination that the appropriate amount of a daily civil penalty for the unpermitted commercial cannabis cultivation, using the revised scores from the "Cannabis Penalty Schedule Sheet" and the "Cannabis Violation Penalty Schedule" (which was also submitted during the course of the Continued Hearing), is $7,000 per day. It is the Hearing Officer's further determination that the duration for the accrual of daily civil penalties should be five days, extending from July 30, 2020 (the date of the 2020 Notice and Orders) to August 4, 2020, the date that electrical service to the Property was terminated.

---

[12] It is noted that Smith sent a letter to Cupp, dated December 30, 2019, in which Smith advised Cupp that he (Cupp) should notify Smith if the violations described in the 2019 Notice and Orders had been abated because daily penalties were accruing. (See Exhibit "L") However, since the violations described in the 2019 Notice and Orders are not being separately considered or assessed, that letter is of no significance to the determination of appropriate daily civil penalties. It is of note that no similar letter was sent for the 2020 Notice and Orders and the associated civil penalties that were accruing. Although not a specific "finding" or determination in this proceeding, the failure of County staff to undertake any follow up efforts to arrange for a site inspection pertaining to the 2020 violations, while penalties were accruing at a rate of several thousands of dollars per day, could raise questions or concerns about possible motives for not undertaking any follow up efforts.

## Analysis and Conclusions Regarding Amount of Civil Penalties

Both parties have raised an issue with respect to the amount of civil penalties to be assessed. Cupp argued (in his Abatement Hearing Statement) that the proposed fines are excessive, and violate the Eighth Amendment to the U.S. Constitution, which prohibits the imposition of excessive fines. When originally enacted, the Eighth Amendment applied only to federal actions, but more recently, the prohibition contained in the Eighth Amendment has been held to apply to states, by virtue of the 14th Amendment to the U.S. Constitution. (see *Timbs v. State of Indiana (2019) 586 U.S. ___ , 139 S. Ct. 682*; see also, *McDonald v. Chicago, 561 U. S. 742, 767, 130 S. Ct. 3020*) The California Constitution also prohibits the imposition of excessive fines. (see *Cal. Constitution, Article I, Section 17*).

Cupp complains, among other things, that the County "has been charging fines and penalties every day, and it took 22 months to get this hearing, and I think they shouldn't even be allowed any of that until after the hearing." Cupp's complaint might have merit, except for the fact that County staff is not proposing to assess fines or penalties pertaining to the 2019 violations. Nor is County staff proposing to assess fines or penalties for a 22-month period. Pursuant to the Staff Report and testimony from Franceschi, County staff is recommending that daily fines and penalties only be assessed beginning on July 30, 2020, and continuing through December 11, 2020, the date of the First Hearing. (It is noted that County staff is also recommending that daily penalties continue to accrue after the Hearing date in the event that compliance with the Administrative Abatement Order is not achieved.)

During the Continued Hearing, the Hearing Officer noted that an earlier hearing date of October 23, 2020, had been scheduled but that the County "indefinitely continued" that hearing. The Hearing Officer questioned County staff as to whether daily penalties should continue to accrue during a period when the County is unable to schedule a hearing or unilaterally continues a scheduled hearing. Franceschi testified that, under different circumstances, it might be appropriate to stop the accrual of daily penalties. For example, if Cupp had requested a compliance inspection, but County staff was unable to respond to that request, a halt in the daily accruals might be warranted. But according to Franceschi, Cupp "never called, never offered an inspection on those issues" and so the daily penalties should continue to accrue because "nothing's changed" with respect to the violations. Counsel made the point that Cupp had not called for inspections, something that "is totally within his control . . . meaning he had the ability to reduce his liability for civil penalties."

Counsel also cited to two California cases for the proposition that the penalties were "clearly in control of the property owner to lessen and mitigate if he had just abated the violations." The cases cited by Counsel were *People v. Braum (2020) 49 Cal.App.5th 342*, and *City and County of San Francisco v. Sainez (2000) 77 Cal.App.4th 1302*. In *Braum*, the trial court imposed more than $6 million in civil fines for violations of the city's zoning ordinance. In upholding the trial court's civil fine assessment, the court stated the following: "Because, as the landlord, it was within his power to comply in a timely manner with the City's enforcement efforts, and thereby mitigate the amount of penalties imposed, his own conduct dictated that the amount of penalties . . . would be substantial." (*Braum*, supra, at p. 362). Similarly, in *Sainez*, San Francisco brought an action against owners of rental property for violations of local housing and building codes. The trial court imposed penalties amounting to $767,000, and the trial court's judgment was affirmed on appeal.[13] In explaining its decision, the Court of Appeal noted that "Defendants had it within their control first to prevent, and then to stop, the accumulation of penalties." (*Sainez*, at p. 1316.)

---

[13] The judgment of the trail court was modified to correct mathematical miscalculations that were made by the trial court judge

Page | 12

The authority cited by Counsel is persuasive. Cupp had it in his control to mitigate the amount of penalty accruals but opted not to do so. The Hearing Officer has determined that the appropriate amount of civil penalties to be assessed for the listed violations, if the abatement orders are not followed, is $130,080.[14] Considering all the factors discussed above, it is the Hearing Officer's determination that the amount of daily penalties being assessed is proportional to the violations, are not "excessive", and do not run afoul of either the U.S. or California Constitutions.

## Administrative Abatement Order

Having considered the evidence presented, and having reviewed applicable laws and regulations pertaining to the alleged code violations, **IT IS HEREBY ORDERED**:

1. **Within twenty (20) business days of the date of this Order,** Cupp must either initiate a process to "legalize" the improvements made to the single family residence and the garage by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or Cupp must submit a complete application for a demolition (or removal) permit to remove these improvements. To initiate the process to "legalize" or remove these improvements, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.4 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to "legalize" or remove the improvements made to the single family residence and the garage must be diligently pursued to completion and must be inspected by County staff for compliance with all applicable codes and permits. If Cupp fails to comply with this section of the Order, a civil penalty of $75 per day shall be assessed beginning on July 30, 2020 and continuing until these violations are abated and Cupp requests inspections by County staff to confirm the abatement.

2. **Within twenty (20) business days of the date of this Order,** Cupp must either initiate a process to "legalize" the nine-foot fence, the improvements made to the barn, the two sheds and the carport by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or Cupp must submit a complete application for a demolition (or removal) permit to remove these improvements. To initiate the process to "legalize" or remove these improvements, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.4 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to "legalize" or remove these improvements must be diligently pursued to completion and must be inspected by County staff for compliance with all applicable codes and permits. If Cupp fails to comply with this section of the Order, a civil penalty of $50 per day shall be assessed beginning on July 30, 2020 and continuing until all of these violations are abated and Cupp requests inspections by County staff to confirm the abatement.

---

[14] This amount is based on applying the daily civil penalties for each described violation for a period of 176 days, beginning on July 30, 2020 and continuing to January 22, 2021, the date of the Continued Hearing.

3. **Within ten (10) business days of the date of this Order,** Cupp must either initiate a process to "legalize" occupancy of the travel trailer by applying for required permit(s) from the County to allow the travel trailer to be occupied, or Cupp must cease the use of a travel trailer as an occupancy. To initiate the process to "legalize" the occupancy, Cupp must contact PRMD staff to determine the procedures (and costs) required to obtain all required permits and then diligently pursue obtaining such a permits. The cost of obtaining required permits shall be **4.1 times the normal cost** of obtaining such permits. All work undertaken pursuant to any permit issued by the County to allow for occupancy of the travel trailer must be completed within sixty (60) days of the issuance of such permit. Alternatively, Cupp is ordered to schedule a site inspection with PRMD code enforcement staff to verify the cessation of occupancy of the travel trailer within 10 business days from the date of this Order. If Cupp fails to comply with this section of the Order, a civil penalty of $50 per day, beginning on July 30, 2020 will be assessed and will continue until the violation is abated and Cupp requests inspections by County staff to confirm the abatement.

4. **Within thirty (30) business days of the date of this Order,** Cupp must abate the use of the Property as a "junkyard" by removing all debris piles, trash, junk and scrap, or reducing the accumulation of such materials to an area of less than 100 square feet. Cupp must also contact PRMD inspection staff within that same timeframe to request an inspection for compliance with this section of the Order. A civil penalty of $50 per day is assessed, beginning on July 30, 2020 and will continue until the violation is abated and Cupp requests inspections by County staff to confirm the abatement.

5. A civil penalty in the amount of **$42,000** is assessed for the unpermitted commercial cannabis use. Cupp is encouraged to work with PRMD staff to reach an agreement on how and by when this payment is to be made. Failing to reach an agreement within 10 business days of the date of this Order, payment is to be made within 20 business days of the date of this Order in the manner described in paragraph 8, below.

6. Cupp is liable to the County for costs of abatement, which includes County staff time in addressing the violations, and for Hearing Officer and court reporter services. <u>Within 15 business days of the date of this Order</u>, Cupp shall pay to the County the sum of **$18,493.25**, in accordance with the instructions in paragraph 8, below. The costs of abatement include (1) Code Enforcement Division investigative time and secretarial time in pursuing abatement ($12,021.40) , as detailed in the Staff Report and subsequent County invoice; (2) Hearing Officer fees ($5,670.00); and (3) fees for court reporter services ($801.85).

7. Any timeframes or deadlines described in this Order <u>shall</u> be extended if delays in pursuing compliance or abatement efforts are not due to the fault, or lack of diligence, on the part of Cupp. The length of any such extension shall be equal to the amount of time associated with the delay(s). Any timeframes or deadlines described in this Order <u>may</u> be extended upon written request of Cupp but are subject to the consent or approval of PRMD staff, which consent or approval shall not be unreasonably withheld or denied.

8. All payments required to be made herein shall be payable to "County of Sonoma" and sent or delivered to "County of Sonoma, Attn: PRMD, 2550 Ventura Ave., Santa Rosa, CA 95403".

//

This Statement of Decision and Administrative Order is final, subject to judicial review in accordance with the provisions of California Code of Civil Procedure §1094.6. Judicial review of this decision must be sought no later than ninety (90) days following the date shown on the Certificate of Mailing, attached hereto, pursuant to California Code of Civil Procedure §1094.6.


Date:  February 11, 2021


Michael Gogna, Administrative Hearing Officer

EXHIBIT 10

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

              Plaintiff,

    v.

ANDREW SMITH, et al.,

              Defendants.

Case No.  20-cv-03456-PJH

**ORDER DENYING APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION**

Re: Dkt. No. 20

       Before the court is plaintiff Ronald Cupp's ("plaintiff") ex parte application for a temporary restraining order and motion for a preliminary injunction.  Dkt. 20.  Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **DENIES** plaintiff's requests.

**BACKGROUND**

**A.**     **The Underlying Claims**

       On May 21, 2020, plaintiff filed the instant civil rights action against defendant County of Sonoma ("Sonoma County"), Andrew Smith ("Smith"), Tyra Harrington ("Harrington") ("defendants"), as well as other individuals not relevant to the instant motion.  Dkt. 1 (Compl.).  In it, plaintiff alleges that defendants violated his Fourth Amendment, Fifth Amendment, and certain due process rights in connection with their alleged February 15, 2019 "trespass" and "search" of plaintiff's property at 4640 Arlington Avenue, Santa Rosa, California.  Compl. ¶¶ 20-22.  Plaintiff's property comprises 4.33 acres of land and is "completely fenced in" with a "solid wood" fence.  Dkt. 20-2 ¶¶ 3, 8.

       Plaintiff's due process deprivation claim stems from defendants maliciously denying plaintiff his request for an appeal of the citations issued by Sonoma County

1   following their February 15, 2019 visit.  Id. ¶¶ 65-72.  Plaintiff adds ancillary state law

2   claims for trespass, land patent infringement, slander of title, as well as excessive fines,

3   all of which arise from the February 15, 2019 visit.  Id. ¶¶ 89-106.

4   **B.      The July 30, 2020 Search**

5          On July 20, 2020, an unspecified judge of the Sonoma County Superior Court

6   signed and issued an inspection warrant of plaintiff's property pursuant to California Code

7   of Civil Procedure § 1822.50, *et. seq.*  Dkt. 20-1 at 8.  The warrant authorized Sonoma

8   County to search the "interior and exterior" of the premises and "all items on and

9   associated to" the property, including "the surrounding grounds . . . garages . . . [and] any

10  vehicles, trailers, or motor-homes present on the property."  Id. at 10.  The warrant added

11  various endorsements authorizing the use of reasonable force for entry, id. at 13, its

12  execution in the absence of the owner or occupant, id. at 14, and shortened notice to

13  Cupp and other occupants, id.[1]

14         Ten days later, Smith, Harrington, and Todd Hoffman (an inspector with Sonoma

15  County, Dkt. 25-1 at ¶ 7) arrived at plaintiff's property and "passed thru" [sic] his "solid

16  wood" fence.  Dkt. 20-2 ¶ 8.  Smith used "some sort of metal ram to bust in the doors and

17  bust the locks and door jambs."  Id. ¶ 9.  Following the entry, Smith posted on plaintiff's

18  property various citations concerning certain "construction(s) without permit," Dkt. 20-1 at

19  1-2, 4, 7, "unlawful use/zoning violation(s)," id. at 3, "unlawful commercial cannabis use,"

20  id. at 5, and "dangerous building(s)," id. at 6.  By a phone call from Harrington, plaintiff

21  learned about the search immediately before it occurred but was not present when Smith,

22  Hoffman, and Harrington conducted it.  Dkt. 20-2 at ¶ 8. During the search, Smith stated

23  to someone living in a trailer on the property that he or she needed to leave and that

24  defendants "were going to get the PG&E power shut off."  Dkt. 20 at 7.

25

26  ───────────────

27  [1] Shortly after filing their opposition, defendants filed an errata indicating that it is unclear
    whether the judge who signed the July 20, 2020 warrant was Assistant Presiding Judge
    Shelly Averill or the judge to whom defendants presented the inspection warrant,
28  Presiding Judge Bradford DeMeo.  Dkt. 28.  This court cannot tell from the signature
    which judge signed it.  To simplify, the court will not refer to the issuing judge by name.

On July 31, 2020, the day after the search, Hoffman filed a return of inspection with the Sonoma County Superior Court. Dkt. 25-5. In his supporting declaration, Hoffman details the various violations observed. Id. ¶ 4. Those violations include the cultivation of over 450 cannabis plants, id. ¶ 4(B)(6), hazardous electrical work to plaintiff's barn, id. ¶ 4(C)(2), and a water heater powered by propane added to plaintiff's garage, id. ¶ 4(C)(7). That same day, Smith returned outside plaintiff's property and posted another citation. Dkt. 26.[2] The court details other evidence proffered by the parties as necessary in its analysis below.

**C.      The Instant Motion**

On July 31, 2020, plaintiff filed the instant motion on an ex parte basis. In it, he seeks "protection and status quo" until the court can decide this action on the merits. Id. at 7-8. Plaintiff expressly asked this court to order defendants not to direct PG&E to terminate his power. Id. at 8.

Within hours, the court issued its order denying plaintiff's request to proceed on an ex parte basis and setting a briefing schedule. Dkt. 21. The court also ordered defendants to refrain from issuing any direction to third-party PG&E to terminate plaintiff's electricity until it resolves the instant motion. Id. at 3. They complied. Dkt. 25 ¶ 12.

**DISCUSSION**

**A.      Legal Standard**

Federal Rule of Civil Procedure 65 provides federal courts with the authority to issue temporary restraining orders and preliminary injunctions. Fed. R. Civ. P. 65(a)-(b). Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment on the merits can be rendered, U.S. Philips Corp. v. KBC Bank N.V., 590 F.3d 1091, 1094 (9th Cir. 2010), while the purpose of a temporary restraining order is to preserve the status quo before a preliminary injunction

_____

[2] The court did not allow plaintiff leave to file a reply and warns him against making such unauthorized filings in the future. In any event, the court has considered plaintiff's reply and will detail it as necessary.

1    hearing may be held, <u>Granny Goose Foods, Inc. v. Bhd. of Teamsters and Auto Truck</u>

2    <u>Drivers</u>, 415 U.S. 423, 439 (1974)). Requests for temporary restraining orders are

3    governed by the same legal standards that govern the issuance of a preliminary

4    injunction. <u>Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.</u>, 240 F.3d 832, 839

5    n.7 (9th Cir. 2001).

6        An injunction is a matter of equitable discretion and is "an extraordinary remedy

7    that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."

8    <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008); <u>Munaf v. Geren</u>, 553

9    U.S. 674, 689-90 (2008). A preliminary injunction "should not be granted unless the

10   movant, by a clear showing, carries the burden of persuasion." <u>Mazurek v. Armstrong</u>,

11   520 U.S. 968, 972 (1997) (per curiam).

12       "A plaintiff seeking a preliminary injunction must establish that [1] he is likely to

13   succeed on the merits, that [2] he is likely to suffer irreparable harm in the absence of

14   preliminary relief, that [3] the balance of equities tips in his favor, and that [4] an

15   injunction is in the public interest." <u>Winter</u>, 555 U.S. at 20. Alternatively, "'serious

16   questions going to the merits' and a hardship balance that tips sharply toward the plaintiff

17   can support issuance of an injunction, assuming the other two elements of the <u>Winter</u> test

18   are also met." <u>All. for the Wild Rockies v. Cottrell</u>, 632 F.3d 1127, 1132 (9th Cir. 2011).

19   Stated differently, "'serious questions going to the merits' and a balance of hardships that

20   tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long

21   as the plaintiff also shows that there is a likelihood of irreparable injury and that the

22   injunction is in the public interest." <u>Id.</u> at 1135; <u>Disney Enterprises, Inc. v. VidAngel, Inc.</u>,

23   869 F.3d 848, 856 (9th Cir. 2017).

24   **B.    Analysis**

25       The court concludes that plaintiff failed to show that he is entitled to preliminary

26   injunctive relief. As analyzed below, plaintiff's request fails under every <u>Winters</u> factor.

27       **1.    Plaintiff Failed to Show a Likelihood of Success on the Merits**

28       To substantiate this factor, plaintiff analyzes the likelihood that he will succeed on

4

only (1) his Fourth Amendment claim for unlawful search premised upon the alleged February 15, 2019 entry; and (2) his claim for deprivation of due process concerning his denied request to appeal the citations issued after that visit. Dkt. 20 at 4-5. Below, the court analyzes plaintiff's likelihood of success on each claim in turn.

### a. The Claim for Unlawful Entry

Plaintiff failed to show that he is likely to succeed on the merits of his claim for unlawful entry. As an initial matter, plaintiff did not present any evidence to support finding that Smith, in fact, entered his property on February 15, 2019. To the contrary, defendants proffered affirmative evidence showing that Smith did not do so. In his declaration in support of the July 30, 2020 warrant, Hoffman states that in January 2019, Smith "observed" from plaintiff's property's "right of way" numerous violations, including "unpermitted construction/remodel of the primary residence, a barn, and a garage. . . . [and] at least one of the structures [] being converted into an unpermitted dwelling unit." Dkt. 25-2 at 7-8. For context, Hoffman explains that Smith then ran a permit history search of the property and "posted the notices to the property in February 2019." Id. at 8.

The court finds Hoffman's statement credible. Based on an aerial photo of plaintiff's property attached to Hoffman's declaration in support of the July 20, 2020 warrant, Dkt. 25-2 at 26, it appears that Smith could have easily viewed the unauthorized structures behind plaintiff's wooden fence from alongside the road. Given the above, the court concludes that plaintiff failed to show that he is likely to succeed on the merits of his claim for unlawful entry.

### b. The Claim for Deprivation of Due Process

Plaintiff also failed to show that he is likely to succeed on the merits of his claim for deprivation of due process. In a prior request for judicial notice, defendant proffered evidence showing that plaintiff did receive the opportunity for a hearing for the notice of abatement proceedings initiated against him in connection with the February 15, 2019 visit. Dkt. 10-3 at 2-4. On September 4, 2019, plaintiff sent a letter to Sonoma County's Code Enforcement Supervisor, Mark Franceschi, expressly stating that "I am in receipt of

United States District Court
Northern District of California

1   your letter dated August 28, 2019 titled **Notice of Abatement Hearing**."  Dkt. 10-4 at 2.

2   In that letter, plaintiff goes on to explain that he is "not available at the end of this month

3   [September 2019] . . . Please reschedule for last part of October 2019."  Id.  This letter

4   directly undermines plaintiff's allegation that defendants "knew of [his] request for an

5   appeal . . . regarding the citations Smith caused and denied Cupp."  Compl. ¶ 67.

6       While ten months to reschedule an administrative hearing is a long time,

7   defendants cite the October 2019 Kincade fires in the county, this litigation, and the

8   ongoing pandemic as exceptional circumstances that have prevented rescheduling that

9   hearing.  Dkt. 26 at 5.  Counsel for defendants represents to this court that the subject

10  hearing is "in queue to be scheduled."  Id.  If that representation is true, such hearing

11  would provide plaintiff the process requested and, thus, moot this claim.  Given the

12  above, the court concludes that plaintiff failed to show that he is likely to succeed on the

13  merits of his claim for deprivation of due process.

14      **2.      Plaintiff Failed to Show Irreparable Injury in the Absence of the**

15          **Preliminary Relief Requested**

16      Plaintiff suggests that, in the absence of preliminary relief, he will suffer irreparable

17  injury in three ways.

18      First, plaintiff argues that defendants will retaliate against him by future

19  "unconstitutional search and harassment without warrants or prior notice."  Dkt. 20 at 7.

20  Plaintiff appears to base this argument on the July 30, 2020 search.  Id.  This reason is

21  undermined by the evidence proffered: a judge authorized such entry without 24-hour

22  notice by warrant.  Dkt. 20-1 at 9-14.

23      In his reply, plaintiff states that he "continues to claim there was no warrant" until

24  he "may challenge the affidavit of probable cause."  Dkt. 26 at 2.  Despite having that

25  affidavit, Dkt. 25-2, plaintiff failed to contest its sufficiency or accuracy.  In any event,

26  based on review of that affidavit, the court finds it implausible that he could overcome its

27  presumed validity.  Franks v. Delaware, 438 U.S. 154, 171 (1978).  Accordingly, the court

28  has no basis to conclude that defendants will unlawfully retaliate against plaintiff.

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, plaintiff suggests that the defendants' actions will harm the "forever benefits" of his property's "land patent." Dkt. 20 at 7. Plaintiff fails to explain how, absent preliminary relief, defendants would disrupt any such perpetual benefits of his real property. The court cannot discern one. Given that, it need not consider any such harm.

Third, while not neatly articulated, plaintiff argues that defendants will direct PG&E to terminate his power. This argument potentially carries more weight. Plainly, the absence of utilities may harm plaintiff. However, he fails to explain how or why any such harm would be irreparable. In any event, any cognizable harm that plaintiff could cite as a result of having his electricity terminated appears self-imposed. As defendants "hope" for in their opposition, plaintiff could "abate the public nuisance and . . . work with the County . . . to deal with the violations." Dkt. 25 at 7. Accordingly, the court concludes that plaintiff failed to clearly show that he will likely suffer irreparable harm in the absence of preliminary relief.

**3.     Defendants Showed that the Remaining <u>Winters</u> Factors Cut Against Ordering the Preliminary Relief Requested**

In his opening brief, plaintiff did not present any evidence or make any arguments establishing that the balance of equities tips in his favor or that the requested relief is in the public interest. On these omissions alone, plaintiff failed to satisfy the remaining <u>Winters</u> factors.

That failure aside, defendants proffered evidence showing that the public interest favors denying any preliminary relief that would prevent it from pursuing abatement proceedings against plaintiff or terminating his utilities. Significantly, in his declaration to this court, Hoffman states the following:

> "the unpermitted and illegal electrical wiring and gas piping systems in the cannabis barn, presented an immediate and serious danger to the public, as well as the residents on the property. The open electrical wiring ran through water and in a different room, wiring was present with the unpermitted gas piping. A major fire or explosion could occur at any time, thereby endangering the surrounding neighbors and community. It is imperative that the entire electrical system be shut down until the problems are abated and legally permitted."

United States District Court
Northern District of California

Dkt. 25-1 ¶ 10.

Attached to his return of warrant, Hoffman provides two pictures from inside plaintiff's barn that appear consistent with this determination. Dkt. 25-5 at 11-12. Both show rows of cannabis under exposed ceilings with hanging wires and lights as well as uncovered air vents. Id. Aside from his conclusory assertions that there are "no immediate dangers to person or property," Dkt. 26 at 4; Dkt. 27 at 2, plaintiff fails to proffer any evidence contradicting Hoffman's determination. Given the apparent fire risk that the conditions of the barn poses, the court concludes that the public interest cuts in favor of denying the preliminary relief requested.

Lastly, given the abundant evidence proffered by defendants that plaintiff has been engaged in unlawful activity, Dkt. 25-5 at ¶ 4 (B)-(C) (listing 16 different sorts of violations), the court further concludes that the balance of equities also favors denying that relief.

## CONCLUSION

For the above reasons, the court **DENIES** plaintiff's application for a temporary restraining order and motion for preliminary injunction. The court acknowledges that Sonoma County alternatively argues that the court should dismiss the claims against it under the Younger abstention doctrine. Sonoma County raises that issue in its pending motion to dismiss, which is the proper procedural vehicle for the court to address it.

**IT IS SO ORDERED.**

Dated: August 5, 2020

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

EXHIBIT 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

           Plaintiff,

    v.

ANDREW SMITH, et al.,

           Defendants.

Case No. 20-cv-03456-PJH

**ORDER GRANTING SONOMA COUNTY'S MOTION TO DISMISS, STRIKING REFERENCES TO WICK AS A DEFENDANT, AND GRANTING IN PART PLAINTIFF'S MOTION TO STRIKE SMITH'S AFFIRMATIVE DEFENSES**

Re: Dkt. Nos. 41, 47

      Before the court is County of Sonoma's ("Sonoma County") and Tennis Wick's ("Wick") motion to dismiss. Dkt. 41. Also before the court is plaintiff Ronald Cupp's ("plaintiff") motion to strike certain affirmative defenses in defendant Andrew Smith's ("Smith") answer. Dkt. 47. Having read the parties' papers and carefully considered their argument and the relevant legal authority, and good cause appearing, the court hereby **GRANTS** Sonoma County's motion to dismiss, **STRIKES** any references in the first amended complaint ("FAC") to Wick as a defendant, and **GRANTS IN PART** plaintiff's motion to strike Smith's affirmative defenses.

<strong>BACKGROUND</strong>

      On May 21, 2020, plaintiff filed the instant action against Sonoma County and various county employees. Dkt. 1. In his complaint, plaintiff brought various claims under Title 42 U.S.C. § 1983 in connection with Smith's purportedly unlawful search of plaintiff's property in Sonoma County on February 15, 2019. Id.

      In its September 9, 2020 order, the court dismissed with prejudice all claims against all previously named defendants, except Smith and Sonoma County. Dkt. 36 at

24-25.  The then-dismissed defendants included Wick, Margarett Willet ("Willett"), Tyra Harrington ("Harrington"), and Mark Franceschi ("Franceschi").  Compare Id. at 2-3 (listing claims alleged against every defendant) with Id. at 24-25 (listing orders dismissing each claim alleged).

The court permitted plaintiff leave to amend only his § 1983 claim against Smith for unconstitutional search as well as his parallel state law claim for trespass.  Id.  The court also observed that, although plaintiff did not formally allege a Monell claim against Sonoma County for maintaining a policy of conducting unconstitutional searches of real property, plaintiff suggested such a claim in his complaint and opposition brief.  Id. at 14.  Given those suggestions, the court permitted plaintiff "one opportunity to clarify such a claim in any amended pleading."  Id.

On October 7, 2020, plaintiff filed his operative FAC.  Dkt. 38.  In it, plaintiff adds allegations attempting to cure the factual deficiencies in his two remaining claims against Smith.  Id. ¶¶ 13-35.  In particular, plaintiff details the physical barriers surrounding his property and explains how Smith passed those barriers on February 15, 2019 when entering the property.  Id. ¶¶ 20-25.  Separately, plaintiff added allegations in support of his Monell claim against Sonoma County.  Id. ¶¶ 46-51.  Lastly, plaintiff also includes a trespass claim against one of the previously dismissed defendants, Wick.  Id. ¶¶ 41-45.

On October 21, 2020, Sonoma County and Wick filed the instant motion to dismiss the claims against them.  Dkt. 41; Dkt. 43 (errata correcting for defense counsel's mistaken designation of moving defendants).  Sonoma County asks that the court dismiss the single Monell claim against it.  Sonoma County and Wick ask that the court dismiss the trespass claims against Wick.  The court will detail the allegations underlying these claims below.

That same day, Smith filed an answer in response to the amended claims against him.  Dkt. 42 ("Ans.").  In response, on November 12, 2020, plaintiff filed the instant motion to strike 14 of Smith's 20 affirmative defenses.  Dkt. 47.  Only a handful of the originally challenged defenses remain at issue.  The court will detail the defenses below.

2

**DISCUSSION**

A.    **Legal Standards**

1.    **Motion to Dismiss**

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. Ileto v. Glock, 349 F.3d 1191, 1199-1200 (9th Cir. 2003). Rule 8 requires that a complaint include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), dismissal "is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." Somers v. Apple, Inc., 729 F.3d 953, 959 (9th Cir. 2013). While the court is to accept as true all the factual allegations in the complaint, legally conclusory statements, not supported by actual factual allegations, need not be accepted. Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009). The complaint must proffer sufficient facts to state a claim for relief that is plausible on its face. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 558-59 (2007).

As a general matter, the court should limit its Rule 12(b)(6) analysis to the contents of the complaint, although it may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." Knievel v. ESPN, 393 F.3d 1068, 1076 (9th Cir. 2005); Sanders v. Brown, 504 F.3d 903, 910 (9th Cir. 2007) ("a court can consider a document on which the complaint relies if the document is central to the plaintiff's claim, and no party questions the authenticity of the document"). The court may also consider matters that are properly the subject of judicial notice, Lee v. City of L.A., 250 F.3d 668, 688–89 (9th Cir. 2001), exhibits attached to the complaint, Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1555 n.19 (9th Cir. 1989), and documents referenced extensively in the complaint and documents that form the basis of the plaintiff's claims, No. 84 Emp'r-Teamster Jt. Counsel Pension Tr. Fund v. Am. W. Holding Corp., 320 F.3d 920, 925 n.2 (9th Cir. 2003).

Lastly, a district court "should grant the plaintiff leave to amend if the complaint

can possibly be cured by additional factual allegations," however, dismissal without such leave "is proper if it is clear that the complaint could not be saved by amendment." Somers, 729 F.3d at 960.

### 2. Motion to Strike

Federal Rule of Civil Procedure 12(f) provides that the court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The function of a [Rule] 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." Whittlestone, Inc. v. Handi-Craft Co., 618 F.3d 970, 973 (9th Cir. 2010).

Motions to strike are not favored and "should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation." Colaprico v. Sun Microsystem, Inc., 758 F. Supp. 1335, 1339 (N.D. Cal. 1991). When a court considers a motion to strike, it "must view the pleadings in light most favorable to the pleading party." Uniloc v. Apple, Inc., 2018 WL 1640267, at *1 (N.D. Cal. Apr. 5, 2018). A court must deny the motion to strike if there is any doubt whether the allegations in the pleadings might be at issue in the action. In re 2TheMart.com, Inc., Sec. Litig., 114 F. Supp. 2d 955, 965 (C.D. Cal. 2000). However, a motion to strike is proper when a defense is insufficient as a matter of law. Chiron Corp. v. Abbot Labs., 156 F.R.D. 219, 220 (N.D. Cal. 1994). Ultimately, the decision "to grant a motion to strike lies within the sound discretion of the district court." Rees v. PNC Bank, N.A., 308 F.R.D. 266, 271 (N.D. Cal. 2015).

### B. Motion to Dismiss Analysis

In its motion to dismiss, Sonoma County principally argues that plaintiff failed to allege sufficient facts to state a Monell claim against it. Before analyzing that argument, the court will first address plaintiff's renaming of Wick in this action.

### 1. Wick Is Not a Defendant in This Action

In its opening brief, Sonoma County takes the position that Wick "was not

United States District Court
Northern District of California

expressly dismissed in the [September 9 Order] but believes that he should have been."

Dkt. 41 at 9. In his opposition, plaintiff asserts that the court has not and should not

dismiss Wick from this action. Dkt. 48 at 13-14. Both Sonoma County and plaintiff

mistakenly assert that the Wick remains a defendant in this action. He does not.

In his complaint, plaintiff named Wick as a defendant on the following six claims:

(1) Title 42 U.S.C. § 1983 for violation of due process rights. Compl. ¶¶ 65-72.

(2) Title 42 U.S.C. § 1985 for conspiracy. Id. ¶¶ 73-79.

(3) Title 42 U.S.C. § 1986 for neglect. Id. ¶¶ 80-88.

(4) Land patent infringement. Id. ¶¶ 95-98.

(5) Slander of title. Id. ¶¶ 99-104.

(6) Excessive fines. Id. ¶¶ 105-106.

Plaintiff alleged these same claims against various other defendants. Id. At the

conclusion of its prior order, the court enumerated its decision on each of the claims

alleged in the complaint. Dkt. 36 at 24-25. The court dismissed all claims in the

complaint. Id. at 24. More specifically, the court dismissed all six of the above claims

**with prejudice**. Id. The court permitted plaintiff leave to amend only the following three

claims: (1) the Title 42 U.S.C. § 1983 against Smith premised on an unconstitutional

search; (2) a state law trespass claim against Smith; and (3) a Monell claim against

Sonoma County premised on Smith's search of the property. Id. at 24-25.

The court does not see any reason for either side to conclude that Wick remains a

party in this action. When the court dismissed all six claims alleged against Wick with

prejudice, it necessarily dismissed Wick from this action. Moreover, plaintiff did not name

Wick as a defendant to the trespass claim in the complaint. Compl. ¶¶ 89-94. Thus, it is

unclear how or why plaintiff may, in the first instance, justify alleging that claim against

Wick in the FAC. FAC ¶¶ 41-45. In any event, Wick is not a defendant in this action.

As the court directed in its September 9 order, plaintiff "may **not** add any new

claims or parties to this action" absent "leave of court or consent from both Smith and

Sonoma County." Id. (emphasis in the original). Plaintiff failed to satisfy either condition.

Accordingly, the court strikes the FAC's references to Wick as a defendant. Separate but relatedly, the court understands that Wick is not listed as a "terminated" defendant on the docket. That omission was a ministerial oversight by the court.

### 2. Plaintiff Failed to Allege a <u>Monell</u> Claim against Sonoma County

"To establish municipal liability under <u>Monell</u>, a plaintiff "must prove that (1) he was deprived of a constitutional right; (2) the municipality had a policy; (3) the policy amounted to deliberate indifference to [his or her] constitutional right; and (4) the policy was the moving force behind the constitutional violation." <u>Lockett v. Cty. of Los Angeles</u>, 977 F.3d 737, 741 (9th Cir. 2020). Local government liability under § 1983 may arise "for policies of inaction as well as policies of action." <u>Jackson v. Barnes</u>, 749 F.3d 755, 763 (9th Cir. 2014). "A policy of action is one in which the government body itself violates someone's constitutional rights[] or instructs its employees to do so." <u>Id.</u> On the other hand, "a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.'" <u>Id.</u>

Stated simply, Sonoma County and plaintiff dispute the sufficiency of the FAC's allegations as they pertain to the <u>Monell</u> claim's policy and causation elements. Dkt. 41 at 10-12; Dkt. 48 at 6-13. The court analyzes the allegations and argument underlying each element in turn below.

### a. Plaintiff Fails to Allege Sufficient Facts Showing that Sonoma County Maintains a Policy of Conducting Unlawful Searches

Plaintiff fails to allege the policy element of his <u>Monell</u> claim for at least two reasons. First, the bulk of plaintiff's allegations that Sonoma County maintains an actionable policy of conducting unlawful searches rests on FAC paragraphs 47 and 49. Both paragraphs contain numerous pleading deficiencies.

At paragraph 47, plaintiff alleges that Sonoma County "exercises de facto policies" that are contrary to the Constitution and, ultimately, is responsible for the acts of its employees. FAC ¶ 47. This allegation is a legal conclusion. It does not rest on predicate facts substantiating the unlawful nature of the policy alleged.

United States District Court
Northern District of California

At paragraph 49, plaintiff enumerates six theories to support his position that Sonoma County maintains a policy to conduct unlawful searches. In particular, plaintiff alleges that Sonoma County engages in the following:

    a.    Failing to adequately train, supervise, and discipline its Code Inspectors . . .

    b.    Failing to discourage, or actively encouraging, the unlawful use of authority . . .

    c.    Failing to admonish, reprimand, discipline, or even investigate constitutional or statutory rights violations by its Code Inspectors . . .

    d.    Ratifying the violations of clearly established constitutional protections, including those conferred by the Fourth Amendment, by directing, encouraging, or rewarding Code Inspectors and others . . . . in conducting warrantless searches of private property . . .

    e.    Failing to implement proper procedures for obtaining inspection warrants, keeping track of when inspection warrants are sought, executing such warrants; and applying to judicial officers for orders regarding inspection warrants, including the falsification of court records and other documents to justify the otherwise unlawful and unconstitutional behavior of its Code Inspectors . . .

    f.    Maintaining a custom, policy, or practice of routinely violating, or encouraging the violation of, the Fourth Amendment rights of landowners in [Sonoma County] by searching their private property without warrants or other legal justification in a scheme to illicitly raise revenue for [Sonoma County] and, thus, unfairly penalize landowners in [Sonoma County]. FAC ¶ 49(a)-(f).

None of the above purported failures, ratifications, customs, policies, or practices rest on any particular fact. Instead, plaintiff bases all six theories of Sonoma County's purported "customs, policies, and practices" on conclusory assertions. When viewing these allegations in the context of paragraphs 46-51, the court finds it clear that the above six theories serve as nothing more than a formulaic recitation of the elements necessary to substantiate a <u>Monell</u> claim.

Second, independent of the above, plaintiff does not rest his municipal policy-related allegations on any reasonable investigation. While plaintiff states in his FAC that he bases the above-referenced theories on his "information and belief," his signed

7

verification indicates that he actually bases these theories on what he "believes to be true." Dkt. 38 at 77 ("Those facts and allegations are true and correct to the best of my knowledge, *except* for those facts and allegations which are stated on information and belief. *As to those facts and allegations, I believe them to be true.*") (emphasis added). Plaintiff's mere "belief," without more, falls short of the reasonable inquiry required under Rule 11. Fed. R. Civ. Pro. 11(b)(3) ("By presenting to the court a pleading . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*: . . . (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.") (emphasis added).

The court acknowledges that "information and belief" allegations might be proper in very limited circumstances where the evidence necessary to allege a fact is in the exclusive possession of a defendant. However, as plaintiff himself asserts in his opposition, Sonoma County's purported policy of conducting unlawful searches is public knowledge. Dkt. 48 at 6-8. Thus, even if plaintiff had engaged in a reasonable inquiry into the alleged Sonoma County policies, his information and belief allegations are improper here. In light of the two pleading deficiencies identified above, plaintiff fails to allege that Sonoma County maintains a policy of conducting unlawful searches.

Plaintiff's attempt to introduce new facts in his opposition does not alter that conclusion. For the first time in his opposition, plaintiff asserts that Smith's entry is not an isolated incident by county employees. Dkt. 48 at 6-7. To substantiate that assertion, plaintiff relies on (1) defendants' unspecified violation of his "private land rights" on July 30, 2020 and (2) "at least six" other instances where county employees conducted unconstitutional searches of some unspecified third parties' private land. Id. at 7-8.

Plaintiff's first ground is a non-starter. The court is familiar with the events that occurred at the property on July 30, 2020. As detailed by the court in its August 5, 2020 order denying plaintiff's motion for a temporary restraining order, the county employees

United States District Court
Northern District of California

1    visited the property on July 30, 2020 pursuant to an inspection warrant.  Dkt. 29 at 2.

2    Given that warrant (which the court reviewed), plaintiff is hard-pressed to allege in this

3    forum that the July 30, 2020 visit constitutes an actionable search.

4        Plaintiff's second ground does not fare any better.  Contrary to his representation,

5    plaintiff details only four instances when Sonoma County conducted unlawful searches of

6    others' real property.  Dkt. 48 at 7-8.  Looking beyond the obvious procedural deficiency

7    that plaintiff merely argues these facts, the court finds that the four other incidents

8    identified by plaintiff (taken as true) would not support the inference that Sonoma County

9    maintains a policy of conducting unlawful searches.

10       The first instance is a legal conclusion.  Dkt. 48 at 7 ("On one occasion, a Code

11   Enforcement Inspector with County entered upon an individual's private land without a

12   warrant just because he happened to be in the area.  In fact, he had an appointment to

13   inspect an entirely different parcel of land down the road from the affected landowner[]

14   but conducted an illegal search of the affected landowners property.").

15       The second instance does not refer to any search by county employees.  Id. ("On

16   another occasion, a landowner was assured by County's Code Enforcement Inspectors

17   that if the landowner took certain steps to cure discovered violations, County would either

18   not pursue the matter or pursue lesser civil penalties. Yet, the same County officials then

19   took back such assurances at a subsequent hearing, fully penalizing the landowner.").

20       The third instance rests on the mistaken assumption that Sonoma County was

21   constitutionally required to obtain a warrant before using an aerial drone to view land not

22   visible from the street.  Id. ("On yet another occasion, County's Code Enforcement

23   Inspectors flew a drone over the private land of another County resident, again without

24   first securing a warrant, to determine if the landowner was a 'grow operation.'").

25       The Supreme Court has recognized that the Fourth Amendment does not

26   automatically protect space that authorities may view only from the air.  Fla. v. Riley, 488

27   U.S. 445, 450 (1989) (holding that a landowner had no reasonable expectation of privacy

28   from aerial surveillance of the open space in his residential backyard); California v.

United States District Court
Northern District of California

1    Ciraolo, 476 U.S. 207, 215 (1986) ("The Fourth Amendment simply does not require the

2    police traveling in the public airways at [1,000 feet] to obtain a warrant in order to observe

3    what is visible to the naked eye.").  In any event, even if Sonoma County's purported use

4    of a drone to search open backyard spaces were legally actionable, such use qualifies as

5    a distinct policy from that at issue in this case.

6         The fourth instance rests on facially implausible accusations that Sonoma County

7    employees are taking bribes.  Dkt. 48 at 8 ("In addition, [county employees] have on more

8    than one occasion, offered to take bribes from private landowners. In exchange for

9    'looking the other way' on code violations discovered as a result of illegal searches,

10   [county employees] have requested payment of large sums of money. On at least one

11   occasion, a partial payment was made by a landowner.").  Further, given that plaintiff's

12   description of the above-reference incidents of bribery sound in fraud, Rule 9(b) would

13   apply.  Plaintiff's description falls short of the specificity demanded by that rule.

14        The court concludes that the Monell claim fails because plaintiff did not allege

15   sufficient facts showing that Sonoma County maintains a policy of conducting unlawful

16   searches.

17           **b.    Plaintiff Fails to Allege Sufficient Facts Showing that Any**

18                 **Sonoma County Policy Caused the Purported Violation**

19        Independent of plaintiff's failure to allege that Sonoma County maintains an

20   actionable policy, plaintiff separately fails to show how or why such policy serves as the

21   proximate and legal cause of Smith's February 15, 2019 entry.  To substantiate the

22   Monell claim's causation element, plaintiff relies on only FAC paragraph 50 and 51.  In

23   those paragraphs, plaintiff summarily alleges that:

24                 At all relevant times herein, all individual Defendants named
                   herein . . . were acting pursuant to the customs, policies, and
25                 practices of [Sonoma County] . . .

26                 As a direct and proximate result of the acts and omissions
                   complained of herein, Plaintiff has sustained, and continues to
27                 sustain, general and special damages in an amount to be
                   proven at trial.  FAC ¶¶ 50-51.
28

                                          10

Neither of the above allegations purporting to link a Sonoma County policy to the February 15, 2019 entry rest on any particular fact. Again, when viewed in the context of paragraphs 46-51, the court finds that these two allegations serve as nothing more than a formulaic recitation of the causation element necessary to substantiate a <u>Monell</u> claim.

The court understands that plaintiff also attempts to raise new causation-related facts in his opposition. In particular, plaintiff argues that:

> At the same time, Wick is the decisionmaker that animates all the other Code Enforcement Inspectors for County, including Smith. Smith would not have committed the constitutional violations alleged in this matter without either the express approval of Wick or the knowledge that Wick would "have his back" after the fact. Smith would not have trespassed unless Wick told him to. Dkt. 48 at 14.

Again, putting aside the procedural deficiency that plaintiff fails to allege this fact in his FAC, the court finds that, even if taken as true, this fact would not support the inference that a Sonoma County policy caused the purported constitutional violation at issue. First, plaintiff argues this fact in the conditional. He does not actually state that Wick **did** tell Smith to enter plaintiff's property. Second, the contention that Smith would violate a constitutional right only if Wick supported that violation is conclusory. Plaintiff fails to identify any predicate facts about the relationship between Smith and Wick substantiating that summary assertion. Third, even if plaintiff had proffered such facts, he failed to proffer any authority, <u>see</u> Dkt. 48 at 11-14, showing that a single instance of a county official instructing an employee to take a certain course of action qualifies as "the actionable cause of [the] claimed injury." <u>Bearchild</u>, 947 F.3d at 1150. Indeed, plaintiff omits any reference (in his FAC, opposition, or otherwise) to whether Wick's supposed instruction qualifies as the legal cause or proximate cause (or both) of the entry.

The court concludes that the <u>Monell</u> claim separately fails because plaintiff did not allege sufficient facts showing that a Sonoma County policy caused his purported constitutional injury.

### 3.    The Court Denies Plaintiff Further Leave to Amend

In his opposition, plaintiff requests leave to amend in the event the court "is

United States District Court
Northern District of California

inclined to grant the defense motion." Dkt. 48 at 8. In support of that request, he states that he "can provide further factual allegations" to substantiate his claim that Sonoma County maintains a policy of conducting unlawful searches. Id. Plaintiff later adds that his opposition "alleges facts" not formally alleged in his FAC. Id. at 15. Plaintiff further requests leave to amend on that additional ground. Id.

The court denies plaintiff leave to amend for two reasons. First, the court has, in effect, already permitted plaintiff two opportunities to amend his complaint. Neither altered the viability of his Monell claim. On August 10, 2020, the court granted plaintiff's request to file a supplemental declaration (Dkt. 30-2) in support of his original complaint and in opposition to defendants' first motion to dismiss. Dkt. 34. Plaintiff filed that declaration after briefing closed on that motion. Compare Dkt. 18 (reply brief filed on July 20, 2020) with Dkt. 30 (request for notice of supplemental declaration filed on August 8, 2020). Thus, as part of his supplemental declaration, plaintiff had the opportunity to correct the deficiencies in the Monell claim that Sonoma County identified in its moving papers. Dkt. 9 at 14-15. Indeed, to justify his request that the court permit him leave to file the declaration, plaintiff explained that the additional facts proffered in it "go to the crux of [his] allegations in this matter." Dkt. 30 at 2. The court considered this declaration when ruling on the viability of the claims in the original complaint. Dkt. 36 at 3-4. Despite the opportunity to proffer additional facts, plaintiff failed to state a Monell claim against Sonoma County.

Separately, as noted above, the court formally permitted plaintiff another opportunity to allege a Monell claim against Sonoma County following its September 9 order. Id. at 14. Despite that subsequent opportunity, plaintiff failed.

Second, and in any event, the court finds that further leave to amend the Monell claim would be futile. As detailed above, the court considered the purported "facts" identified by plaintiff in his opposition that were not included in his FAC. Those facts (even if taken as true) would not compel the inference that Sonoma County maintains a policy of conducting unlawful searches. They also would not show a causal connection

1    between any Sonoma County policy (sufficiently alleged or not) and plaintiff's claimed

2    constitutional deprivation.

3        The court has expended significant resources on this matter. When accounting for

4    the present order, it has decided a motion for a temporary restraining (Dkt. 20), a motion

5    to disqualify (Dkt. 14), two motions to dismiss (Dkt. 9 and Dkt. 41), and a motion to strike

6    (Dkt. 47). This action is almost a year old. The parties must now enter discovery.

7    **C.      Motion to Strike Analysis**

8        In his opening brief, plaintiff challenges 14 of Smith's defenses on three distinct

9    grounds. Dkt. 47 at 2. As part of Smith's opposition, Michael King, counsel for Smith

10   ("counsel King"), filed a declaration indicating that he contacted plaintiff concerning the

11   motion to strike. Dkt. 53-1. In his declaration, counsel King states that he "agreed to

12   drop certain defenses" and "amend other defenses." Id. ¶ 3. As attachments to his

13   declaration, Counsel King filed three communications with plaintiff purportedly indicating

14   Smith's intent to modify his answer. Id. ¶ 5. Plaintiff did not formally accept Smith's

15   proposal. Id. ¶ 3.

16       In his opposition brief, Smith asserts that, after accounting for the defenses that

17   he agreed to withdraw or amend, only three affirmative defenses remain at issue. Dkt. 53

18   at 2. Those defenses include the following:

19       •    Assumption of risk by plaintiff. Ans. at 7 ¶ 7 (seventh defense).

20       •    Absolute immunity. Id. at 8 ¶ 14 (fourteenth defense).

21       •    Reservation of the right to allege additional, unstated affirmative defenses.

22            Id. at 9 ¶ 20 (twentieth defense).

23       Plaintiff failed to file a reply in support of his motion. Given that failure, the court

24   finds that plaintiff abandoned his motion's original challenges to Smith's second through

25   sixth defenses, eighth defense, ninth through twelfth defenses, fifteenth defense, and

26   nineteenth defense. The court will consider the remaining three defenses in turn below.

27            **a.      Assumption of Risk Defense**

28       As his seventh defense, Smith alleges that plaintiff had "full knowledge" of some

United States District Court
Northern District of California

1    unspecified "risks, dangers, and hazards" but nevertheless "voluntarily and with full

2    appreciation of the amount of danger involved in his action . . . assumed the risk of injury

3    and damages to himself."  Ans. at 7 ¶ 7.

4         In his opening brief, plaintiff challenges this defense on two grounds.  First, plaintiff

5    argues that Smith fails to allege a sufficient factual basis for this defense.  Dkt. 47 at 6.

6    Second, plaintiff argues that this defense fails as a matter of law because the Ninth

7    Circuit "has long recognized that contributory negligence is a defense only to actions

8    grounded on negligence."  Dkt. 47 at 6.  Plaintiff adds that the Supreme Court "has held

9    that comparative/contributory fault is no bar to intentional wrongdoing."  Id.  In his

10   opposition, Smith explains that, given the claims against him, "there is a possibility that

11   unintentional (negligent) conduct may be at issue in this case."  Dkt. 53 at 5.

12        As this court recently explained, "when analyzing the factual sufficiency of an

13   alleged affirmative defense, courts in this district apply the pleading standard set forth in

14   Twombly and Iqbal."  Cisco Systems, Inc., et. al., v. Chung, et. al., 2021 WL 427293, at

15   *8 (N.D. Cal. Feb. 8, 2021) (citing Perez v. Gordon & Wong Law Grp., P.C., 2012 WL

16   1029425, at *7-8 (N.D. Cal. Mar. 26, 2012) (collecting cases)).

17        Plaintiff is correct that Smith's assumption of risk defense fails that standard.

18   Smith provides only vague allegations about plaintiff's knowledge and appreciation of

19   risks in the events underlying this action.  Smith fails to tie such knowledge and

20   appreciation to any specific event at issue.  He also fails to explain how or why plaintiff, in

21   fact, assumed such risk.  Thus, on the basis of plaintiff's first argument, the court strikes

22   the assumption of risk defense.  Given that plaintiff failed to contest Smith's assertion that

23   this defense might be relevant to the claims against him, the court need not consider

24   plaintiff's second argument.

25              **b.     Absolute Immunity Defense**

26        As his fourteenth defense, Smith alleges that he "acted within the scope of his

27   discretion, in good faith, with due care, and pursuant to applicable rules, regulations and

28   practices, which were reasonably and in good faith believed to be in accordance within

*United States District Court*
*Northern District of California*

the Constitution and laws of the United States, and that Defendant is therefore immune from liability." Ans. at 8 ¶ 14.

In his opening brief, plaintiff argues that this defense is "insufficient and superfluous." Dkt. 47 at 2. Plaintiff explains that it is unclear which applicable law Smith references. Id. at 7. Plaintiff further asserts that, absent additional information, this defense is also "redundant of" Smith's thirteenth defense (qualified immunity) and eighteenth defense (statutory immunity under the California Government Torts Act)." Id.

In his opposition, Smith argues only that plaintiff "is well aware that the basis for [this defense, among others] is his conduct for failure to obtain permits and abate the nuisances that existed and still exist," which Sonoma County previously communicated to plaintiff. Dkt. 53 at 3-4.

The court finds that Smith fails to adequately allege the basis of this defense. First, Smith fails to identify any authority supporting his proffered "absolute immunity" defense. He also fails to describe how such defense differs from his qualified immunity or statutory immunity defenses. Second, even if he had proffered such authority or description, Smith fails to explain how or why **his** conduct falls within the scope of an absolute immunity defense. Lastly, Smith fails to specify the purported "rules, regulations, or practices" referenced in that defense. Accordingly, the court strikes the absolute immunity defense without prejudice.

### c. Reservation of Rights Defense

As his twentieth affirmative defense, Smith alleges that he "reserves the right to assert additional defenses in the event that discovery indicates it would be appropriate." Ans. at 9 ¶ 20.

As plaintiff correctly points out, Dkt. 47 at 7, "[a]n attempt to reserve affirmative defenses for a future date is not a proper affirmative defense in itself." Solis v. Zenith Capital, LLC, 2009 WL 1324051, at *7 (N.D. Cal. May 8, 2009). Smith effectively acknowledges the same. Dkt. 53 at 4 ("[The twentieth defense] is not technically a defense, and Defendant will need to move to amend in any event, if proof changes the

pleading."). Accordingly, the court strikes this defense with prejudice. To the extent Smith later seeks to add an affirmative defense, he must move for leave to do so.

### d. Smith Must File an Amended Answer

Rule 8's pleading requirements, as construed by Twombly, Iqbal, and their Ninth Circuit progeny, apply to a defendant's answer. These requirements are black letter law. Thus, the court need not describe them here.

The court permits Smith a single opportunity to amend his defenses for assumption of risk and absolute immunity to meet these requirements. Smith must correct all pleading deficiencies in each such defense, including without limitation those identified above. If Smith fails to do so, the court will strike both defenses with prejudice.

Separately, in his opposition, Smith represents to the court that he has "agreed to amend" his defenses for failure to exhaust administrative remedies, failure to mitigate damages, violation of law by plaintiff, unclean hands, contribution of risks by plaintiff, and proper exercise of police powers. Dkt. 53 at 5 ("Defense counsel agreed to amend affirmative defenses 2, 4, 6, 8, 9, and 15, to some degree; primarily to spell out what Mr. Cupp already knows from his Complaint and attachments."). Given that representation, the court orders Smith to file an amended answer correcting all factual deficiencies in each of the above defenses. Again, when doing so, Smith must comply with the pleading requirements set forth in Twombly and Iqbal.

Lastly, Smith also represents that he has agreed to strike his res judicata, consent, and privilege defenses. Dkt. 53 at 5 ("Nevertheless, defense counsel agreed to drop defenses numbers 3, 10, and 11, for the present, without prejudice to raising those defenses in the future."). Given that representation, the court orders Smith to remove these defenses from his amended pleading.

### CONCLUSION

For the above reasons, the court **GRANTS** Sonoma County's motion to dismiss the Monell claim against it **WITH PREJUDICE**. Dkt. 41. The court also **STRIKES** the FAC's references to Tennis Wick as a defendant. Such references include FAC

paragraphs 2, 10, 44, and 45. As of the date of this order, Sonoma County is also **no longer** a defendant in this action. Thus, the only remaining defendant is Andrew Smith.

The court **GRANTS** plaintiff's motion to strike Smith's defenses for assumption of risk and absolute immunity. **Within 21 days of this order**, Smith may file an amended answer accounting for all pleading deficiencies in these two defenses. In any event, Smith must timely file an amended answer accounting for all such deficiencies in the six defenses that he voluntarily agreed to amend. In that same answer, Smith must remove his defenses for res judicata, consent, privilege, and reservation of rights. Absent leave of court or plaintiff's consent, Smith may not otherwise amend his answer. When filing his amended answer, Smith must provide a redline clearly showing each amendment made to his original answer. The subject redline must be filed as a separate attachment.

The court will set this matter for a case management conference after the pleadings are settled.

**IT IS SO ORDERED.**

Dated: February 17, 2021

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge

EXHIBIT 12

United States District Court
Northern District of California

1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7    RONALD CUPP,
8                 Plaintiff,                    Case No. 20-cv-03456-PJH
9          v.
                                                **ORDER OF DISMISSAL WITH**
10   ANDREW SMITH,                              **PREJUDICE**
11                Defendant.                    Re: Dkt. No. 143
12
13

14       Before the court is the parties' stipulation to dismiss this lawsuit with prejudice

15   under Federal Rule of Civil Procedure 41(a)(1)(ii). This case has been thoroughly

16   litigated, and trial is set to begin in less than one week, on April 3, 2023. The sole

17   remaining claim is brought under Title 42 U.S.C. § 1983 for alleged breach of plaintiff's

18   Fourth Amendment rights based on defendant Andrew Smith's February 15, 2019,

19   inspection/search of the property at 4640 Arlington Avenue in Santa Rosa, California.

20   Plaintiff has made clear that the claim is against Smith in both his personal and official

21   capacity. Dkt. 1, Dkt. 38 (SAC ¶ 8), Dkt. 129. In light of the parties' agreement, the court

22   ORDERS that this case is hereby DISMISSED WITH PREJUDICE as to all claims,

23   causes of action, and parties, including against Smith in his personal and official capacity.

24       The parties' stipulation states, "Defendant reserves the right to request an award

25   of fees and/or costs as allowed by the Court; Plaintiff reserves the right to oppose such

26   request." Dkt. 43 at 1. Defendant, as the prevailing party, may submit a bill of costs in

27   accordance with Federal Rule of Civil Procedure 54 and Civil Local Rule 54. Plaintiff may

28   object in accordance with those same Rules.

On the other hand, attorneys' fees may be awarded against an unsuccessful § 1983 plaintiff only "in exceptional circumstances" where the court finds "the plaintiff's action was frivolous, unreasonable, or without foundation." Harris v. Maricopa Cnty. Superior Ct., 631 F.3d 963, 968 (9th Cir. 2011) (cleaned up); see also 42 U.S.C. § 1988(b). Defendant may certainly file a fee petition in light of this authority. However, given the survival of the plaintiff's § 1983 claim to this stage of litigation, the court would be hard-pressed to find that an award of attorneys' fees would be appropriate under this standard.

**IT IS SO ORDERED.**

Dated: March 30, 2023

_/s/ Phyllis J. Hamilton_____

PHYLLIS J. HAMILTON
United States District Judge

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

RONALD CUPP,

        Plaintiff,

    v.

ANDREW SMITH,

        Defendant.

Case No. 20-cv-03456-PJH

**JUDGMENT**

The issues having been duly heard and the court having granted the parties' stipulation to dismiss the case with prejudice,

    it is Ordered and Adjudged

    that plaintiff take nothing, and that the action is dismissed with prejudice.

    **IT IS SO ORDERED.**

Dated: March 30, 2023

                            */s/ Phyllis J. Hamilton*
                            PHYLLIS J. HAMILTON
                            United States District Judge

United States District Court
Northern District of California

EXHIBIT 13

FILED

MAR 04 2026

Clerk of Superior Court of California,
County of Sonoma
By_____
Deputy Clerk

1  HON. OSCAR A. PARDO
   JUDGE OF THE SUPERIOR COURT
2  Courtroom 19
   3055 Cleveland Avenue
3  Santa Rosa, CA 95403
   (707) 521-6602
4

5

6

7

8          SUPERIOR COURT OF CALIFORNIA, COUNTY OF SONOMA

9  COUNTY OF SONOMA,                Case No. SCV-273578

10        Plaintiff,                **FINAL STATEMENT OF DECISION
                                     AND JUDGMENT**
11     v.

12 RONALD CUPP, et al.,

13        Defendants.

14

15                    **I.    Introduction**

16        The matter of County of Sonoma v. Ronald Cupp, SCV-273578, hereinafter

17 referenced as the "Complaint," came before the Court on a bench trial which took place

18 from October 10th, and 14th – 15th, 2025. Mr. Michael A. King, Esq., appeared on behalf

19 of Plaintiff County of Sonoma, hereinafter referenced as "Plaintiff" or "County." Mr. Eric

20 G. Young, Esq., appeared on behalf of defendant Ronald Cupp, hereinafter referenced

21 to as "Defendant" or "Cupp."

22        Factually, this case involves the unpermitted cannabis cultivation, building code

23 violations, and zoning code violations that took place at 4640 Arlington Ave., Santa

24 Rosa, CA ("Property"), owned by Cupp. Prior to litigation, the County held an

25 administrative evidentiary hearing (i.e. appeal) on January 22, 2023, at which Cupp was

26 present and participated. On February 11, 2021, the assigned Administrative Officer

27 made specific findings of fact, found for the County, issued orders for abatement

28 ("Administrative Order"), and awarded civil penalties to the County payable by Cupp. On

1  June 23, 2023, County filed the present complaint, effectively an enforcement action,

2  seeking abatement of the violations identified in the Administrative Order, requesting

3  injunctive relief, payment of all civil penalties awarded by the administrative officer and

4  still accruing, and for cost of abatement, including staff costs and attorneys' fees.

5      Upon the close of all evidence, the Parties elected to present closing arguments

6  in written briefs, which the Court accepted. Initially, closing briefs were ordered to be

7  submitted by October 24, 2025. However, by stipulation of the parties, which the Court

8  approved, this deadline was extended to October 31, 2025. No further extensions were

9  requested nor granted by the Court. Defendant did not file his closing brief until

10 November 3, 2025. Defendant's brief is inexcusably late. Nonetheless, the Court

11 reviewed Defendant's brief and now considers the matter submitted for determination as

12 of November 3, 2025.

13      The Court issued its tentative ruling on December 24, 2025. The Court informed

14 the parties that they then had ten (10) days from its electronic issuance to make a

15 formal request for a statement of decision of controverted issued. If no formal request

16 was timely lodged, then the tentative ruling would automatically become the proposed

17 statement of decision. The deadline to make a formal request expired on close of

18 business on January 5, 2026. No timely request was received. However, on January 5,

19 2026, at 11:46 p.m., Defendant did file a request which the Court deems untimely,

20 identifying the principal uncontroverted issues at trial. All controverted issues raised

21 within Defendant's requests were previously addressed by the Tentative Ruling and

22 January 5th Proposed Statement of Decision. However, to provide the parties with

23 additional time to file objections, the Court then reissued its proposed Statement of

24 Decision and Judgment on January 14, 2026, which triggered a new deadline for the

25 filing of any objections. The Court has reviewed and considered all of Defendant's

26 objections (filed on January 5, 2026, and January 29, 2026) and Plaintiff's objections. At

27 its discretion, the Court did not hold an 'objections' hearing. Instead, the Court now

28 issues its final Statement of Decision and Judgement ("SODJ").

## II.    Procedural Chronology

### A. Plaintiff's Complaint

County filed its Complaint on June 23, 2023, against Cupp alleging causes of action of (1) Building Code violations, (2) Zoning Code Violations, (3) Public Nuisance, (4) Injunctive Relief, and (5) Monetary Judgment for failure to pay costs, fees and civil penalties. The allegations seek enforcement of the Administrative Order issued on February 11, 2021, later amended on February 12, 2021; abatement of building and zoning code violations (public nuisances); (4) issuance of a permanent injunction; and (5) a money judgment (the "Complaint"). The Complaint alleges Cupp is owner of the property commonly known as 4640 Arlington Avenue, Santa Rosa, California (APN 135-251-063, the "Property"), which is a 20+ acre property located in the County of Sonoma, and there for liable. (Complaint ¶2, ¶5). Cupp filed an answer asserting affirmative defenses on December 6, 2023.

### B. Cupp's Cross-Complaint

Defendant also filed a cross-complaint ("Cross-Complaint") against the County, Tyra Harrington, Todd Hoffman, and Andrew Smith (together "Cross-Defendants") on June 26, 2024. The Cross-Complaint contained claims for (1) just compensation; (2) declaratory relief; (3) injunctive relief; (4) quiet title; (5) slander of title; and (6) intentional infliction of emotional distress.

By the time of trial, the Cross-Complaint had been dismissed by Court Orders. The first Court Order was issued on November 6, 2024, on Cross-Defendants' demurrer to the Cross-Complaint. The Court Order sustained, without leave to amend, all but the 3rd cause of action. The Court found the 1st, 2nd, and 4th causes of action were all untimely challenges to the Administrative Order. The 2nd cause of action for declaratory relief also failed because it was not an appropriate cause of action for review of an administrative decision. *State v. Superior Court* (1974) 12 Cal.3d 237, 249. Cupp's 4th, 5th, and 6th causes of action were found to be precluded by the Government Claims Act, primarily but not exclusively, pursuant to Gov. Code §911.2.

1    The second Court Order was issued on December 30, 2024. In that Order the

2    Court dismissed the entire Cross-Complaint with prejudice as Cupp had by then failed

3    to file a timely amendment to the 3rd cause of action.

4    **C. Discovery Orders Affecting the Court's Decision**

5    On April 25, 2025, the Court heard three (3) discovery motions filed by County

6    against Cupp. County's motions sought (1) terminating sanctions in the form of striking

7    Cupp's Answer due to his repeated failure to respond to prior discovery in contravention

8    to Court orders issued on November 13, 2024, and December 11, 2024; (2) for issue

9    sanctions due to Cupp's non-compliance with the same Orders; and for (3) monetary

10   sanctions for having to bring additional discovery motions to seek compliance. After the

11   hearing the Court took the matter under submission and then issued an order after

12   hearing on April 28, 2025 ("Discovery Order I").

13   In Discovery Order I, the Court denied County's request for terminating

14   sanctions. However, the Court granted County's request for issue sanctions and

15   deemed Request for Admission of Fact, Set One, (Nos. 1-27) and Request to Admit

16   Genuineness of Documents, Set One (Nos. 1-16) admitted for the truth of any matters

17   specified in these requests. (CCP §2033.280(b)-(c)). Cupp was also given fifteen (15)

18   days from the date of Discovery Order I to provide substantive responses, without

19   objection, to the special interrogatories and form interrogatories identified in the

20   November 13, 2024, order. The Court noted that if Cupp failed to comply with the

21   above-referenced discovery by time of trial it may convert the issue sanctions into more

22   drastic sanctions including deeming the County as the "prevailing party" as to all issues

23   in the Complaint.

24   For trial, County filed Motion in Limine No. 2 – seeking again additional sanctions

25   against Cupp for failure to comply with Discovery Order I. The Court received briefings

26   and arguments from the parties and issued what it now identified as "Discovery Order

27   II," in its August 19, 2025, Minute Orders. In Discovery Order II, which was granted in

28   part, and denied in part, the Court made the following additional findings:

1.  Cupp was found to have violated Discovery Order I, but only as to Form Interrogatory, No. 15.1. The Court imposed evidentiary sanctions in the form of limiting his ability to use any information and/or documents which are or would have been identified in the amended response to Form Interrogatory No. 15.1 due to this violation.

2.  Cupp was found to have violated Discovery Order I by not providing amended responses to Special Interrogatories, Set One by the May 15, 2025, deadline. The Court imposed additional evidentiary sanctions and held that Cupp waived his ability to use any information and/or documents which were identified in the amended responses due to his violation of the Court's Order.

3.  Cupp was also found to have violated Discovery Order I by not providing further responses, without objections, to County's Request for Production, Set One, numbers 1-16, along with all responsive documents by the May 15, 2025, deadline. Though Cupp claimed he produced some documents the Court was not privy as to the scope of this production. From the Court's perspective, Cupp failed to establish compliance on the document production. The Court permitted County to object to the introduction of any document which should have been produced in discovery and the Court would then preclude the same as a sanction.

Of critical importance to the Court's SODJ are Plaintiff's Request for Admissions, Set One, Nos. 16-19 and 26-27. Per Court Orders, these requests are now deemed ADMITTED against Cupp.

1.  Request No. 16: Admit that YOU have not paid any civil penalty issued in the ADMINISTRATIVE ORDER.

2.  Request No. 17: Admit that YOU did not comply with any part of the ADMINISTRATIVE ORDER within 30 days of the issuance of the Administrative Order.

3.  Request No. 18: Admit that YOU did not comply with any part of the
    ADMINISTRATIVE ORDER within 90 days of the issuance of the
    ADMINISTRATIVE ORDER.

4.  Request No. 19: Admit that YOU still have not complied with any portions
    of the ADMINISTRATIVE ORDER.

5.  Request No. 26: Admit that YOU are legally responsible for any zoning
    violations located on the PROPERTY.

6.  Request No. 27: Admit that YOU are legally responsible for any building
    code violations located on the PROPERTY.

These admissions, along with the other discovery sanctions identified above,
now have conclusive and preclusive effects on most, if not all, of the defense arguments
raised at trial. Defendant now objects to the Court's discovery findings and their impact
at trial. However, Defendant simply fails to acknowledge its abject refusal to comply with
multiple discovery requests and subsequent court orders requiring discovery
compliance issued throughout this litigation. The Court provided ample time and
compliance opportunities which were effectively ignored. The Court even provided
additional time after Discovery 1 was issued to comply with all discovery orders prior to
the commencement of trial. In many respects, as outlined above, Defendant continued
to refuse compliance. The Court also warned Defendant that non-compliance would
lead to additional evidentiary, issue and terminating sanctions. Defendant now has no
basis to object to the severity of these sanctions or their evidentiary consequences
especially when it was directly related to his conduct.

## III.    **Positions of the Parties**

### A. County's Position

The County's position, vis-à-vis the Complaint allegations and its brief, concerns
the unpermitted cannabis cultivation, building and zoning code violations at the
Property, and Cupp's failure to abate the same. On January 29, 2019, the County's
Permit Resources and Management Department ("Permit Sonoma" or "PRMD"),

1   received a complaint about possible construction on the Property without permits. (Brief

2   at 1:19-21; Complaint ¶18.) Permit Sonoma then conducted inspections of the Property

3   on February 15, 2019, and July 30, 2020. (Brief at 1:22-23; 2:3-9.) These inspections

4   resulted in permit and ordinance violations for which an administrative hearing was then

5   scheduled and held. A "Statement of Decision and Administrative Order"

6   ("Administrative Order") was made by the Administrative Hearing Officer on February

7   11, 2021, which confirmed several of the violations issued by Permit Somona against

8   Cupp and the Property in 2019 and 2020. (Brief at 1:24; 2:16-17.) Cupp was then

9   ordered to contact Permit Sonoma to determine the process to "legalize" or demolish

10  the work found to be in violation. (Brief at 2:22-23.) Specific timelines for abatement

11  were also provided and Cupp was also ordered to pay the County for abatement,

12  hearing costs, and civil penalties. (Brief at 2:22-26.) No timely challenge to the

13  Administrative Order was ever filed by Cupp.

14         The County now seeks injunctive relief in the form of an Order against Cupp to

15  complete final abatement of all outstanding violations, to restrict any future activities on

16  the Property that would require the issuance of a permit from Permit Sonoma, an award

17  civil penalties per the Administrative Order, an award of civil penalties for outstanding

18  violations calculated to the reasonable compliance date, and all costs awarded in the

19  Administrative Order and deemed proper by the Court for this matter.

20         **B. Cupp's Position**

21         Cupp did not submit a trial brief. However, Cupp's position, as stated in the

22  closing brief, poses the following questions:

23      1. Whether Mr. Cupp initiated and diligently pursued abatement as required by the

24         2021 Administrative Order?

25      2. Whether the County proved a continuing public nuisance, entitlement to ongoing

26         civil penalties, and injunctive relief?

27      3. Whether delays in abatement were due to Mr. Cupp or County administrative

28         failures?

1   Cupp's position is that this matter is essentially about enforcing a monetary

2   judgment, not about an ongoing dangerous condition. Cupp contends that the County's

3   claims for public nuisance and injunctive relief are unsupported. That County failed to

4   establish a public nuisance existed on the Property pursuant to Civil Code §§ 3479–

5   3480; that injunctive relief is a remedy, not a standalone cause of action, and is

6   unwarranted under the present circumstances. Cupp further argues that the

7   Administrative Order is binding and precludes re-litigation of issues. Consequently, if the

8   Court finds Cupp liable, it should only impose damages in County's favor totaling

9   $60,439.25, which includes $42,000 for unpermitted cannabis cultivation and

10  $18,439.25 in abatement costs.

11   Cupp states that he timely initiated the legalization process by contacting Permit

12  Sonoma and hiring consultants. Contrary to County's position, the Administrative Order

13  required Cupp to "initiate the process" and "diligently pursue" legalization; not to

14  complete the process within 30 days ("safe harbor" argument). This claim is now fully

15  negated by RFA No. 17. Cupp also asserts that the County's interpretation of the

16  Administrative Order in that it required inspections for work performed and allowed

17  unlimited civil penalties is incorrect and inequitable. Finally, Cupp claims that any delays

18  in his compliance were caused by Permit PRMD backlogs caused by wildfires and

19  COVID; a PG&E power shutoff to the Property; and PRMD's miscommunication and

20  errors and refutes County's assertion that civil penalties continue to accrue due to lack

21  of formal compliance confirmation. These claims are in great part negated by RFA Nos.

22  18, 19, 26, and 27, wherein Defendant admits he did not comply with any portions of the

23  Administrative Order and is also legally responsible for all zoning and building code

24  violations existing on the Property.

25                    **IV.    Relevant Factual Chronology**

26   **A. February 11, 2021, Administrative Order (Ex. 1)**

27   In February 2019, the County conducted an inspection of the Property prompted

28  by a complaint made by an unidentified person. (Ex. 1, pg. 5.) The County's inspection

1  produced two Notices and Orders ("2019 Orders") which generally alleged construction

2  without permits pertaining to a vacant single-family dwelling, a barn, and a garage. (Ex.

3  1, pg. 3.) The second Notice and Order alleged "a change of occupancy" on the

4  property resulting from the conversion of the garage to a dwelling unit. (Ex. 1, pg. 3.) In

5  July 2020, County staff conducted another inspection of the Property. As a result of this

6  inspection the County issued the 2020 Notices and Orders ("2020 Orders") which

7  consisted of 7 separate violations. (Ex. 1, pg. 3.)

8         An administrative hearing was requested by Cupp, and one was eventually held

9  on January 22, 2021, before the assigned Administrative Hearing Officer, Michael

10  Gogna, Esq. ("Administrative Officer"). After receiving evidence and argument the

11  Administrative Officer issued a "Statement of Decision and Administrative Order on

12  February 11, 2021, ("Administrative Order," Ex. 1), in which the following findings were

13  made:

14         1.  The Administrative Officer confirmed 7 violations of unpermitted construction

15             identified in the 2019 and 2020 Orders (Ex. 1, pg. 5 at ¶4 - ¶15):

16                 a.  A remodel of the single-family dwelling (2 violations).

17                 b.  A remodel of a barn.

18                 c.  A garage conversion.

19                 d.  Construction of a 9 ft. fence.

20                 e.  Construction of 2 sheds.

21                 f.  Construction of a carport.

22         2.  The Administrative Officer also found the Property was used for an

23             unpermitted commercial cannabis operation of approximately 500 mature

24             cannabis plants. (Ex. 1, pg. 6 at ¶16).

25         The Administrative Order required Cupp to "apply for all required permits to

26  legalize the unpermitted work, pay the applicable permit fees, and diligently pursue work

27  authorized under such permit to completion, all in accordance with the terms of the

28  Administrative Order." (Ex. 1, pg. 4.) If Cupp failed to apply for permits to legalize or

remove the unpermitted work within the "specified timeframe," failed to pay the applicable permit fees, or failed to diligently pursue the authorized work until completion, the following civil penalties would be imposed:

1. A civil penalty in the amount of **$26,400.00,** was assessed based on a daily civil penalty of $75.00 per day for each of the two residential violations.

    a. The period for the civil penalty assessment begins on July 30, 2020, and shall continue to accrue until all required permits are obtained to either "legalize" or remove the unpermitted construction.

2. A civil penalty in the amount of **$44,080.00,** was assessed based on a daily civil penalty of $50.00 per day for each of the five violations deemed to be non-commercial accessory structures.

    a. The period for the civil penalty assessment begins on July 30, 2020, and shall continue to accrue until all required permits are obtained to either "legalize" or remove the unpermitted construction.

3. A civil penalty in the amount of **$42,000.00** was assessed for the unlawful commercial cannabis operation based on a daily civil penalty amount of $7,000.00 per day for a period of six days.

4. A civil penalty in the amount of **$8,800.00** was assessed based on a civil penalty in the amount of $50.00 per day for the unpermitted occupancy of the travel trailer.

    a. The period for the civil penalty assessment begins on July 30, 2020, and shall continue to accrue until the occupied travel trailer is permitted.

5. A civil penalty in the amount of **$8,800.00** was assessed based on a civil penalty in the amount of $50.00 per day for the existence of junkyard conditions as defined in Sonoma County Code §26-02-140.

/

//

a. The period for the civil penalty assessment begins on July 30, 2020, and shall continue to accrue until the "junkyard" ceases and is confirmed by a County staff site inspection.

A total of **$130,080.00** in penalties were assessed. Cupp was then ordered:

1. Within twenty (20) business days of the date of this Order, to either initiate a process to "legalize" the improvements made to the single-family residence and the garage by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or to submit a complete application for a demolition (or removal) permit to remove these improvements.

2. Within twenty (20) business days of the date of this Order, to either initiate a process to "legalize" the nine-foot fence, the improvements made to the barn, the two sheds and the carport by submitting complete building permit applications (with construction drawings, as required) to obtain required permit(s) from the County for these structures or to submit a complete application for a demolition (or removal) permit to remove these improvements.

3. Within ten (10) business days of the date of this Order, to either initiate a process to "legalize" occupancy of the travel trailer by applying for required permit(s) from the County to allow the travel trailer to be occupied, or to cease the use of a travel trailer as an occupancy.

4. Within thirty (30) business days of the date of this Order, to abate the use of the Property as a "junkyard" by removing all debris piles, trash, junk and scrap, or reducing the accumulation of such materials to an area of less than 100 square feet. Cupp was also ordered to contact PRMD inspection staff within that same timeframe to request an inspection for compliance with this section of the Order.

5.  To pay the County the sum of **$18,493.25**, for costs of abatement which include (1) Code Enforcement Division investigative time and secretarial time in pursuing abatement ($12,021.40); (2) Hearing Officer fees ($5,670.00); and (3) fees for court reporter services ($801.85). The amount became payable within 15 days of the Administrative Order.

In all, the Administrative order outlined **$148,573.25** in penalties and costs against Cupp.

### B. Administrative Order Addendum

On February 12, 2021, the Administrative Officer issued an Addendum to the Statement of Decision and Administrative Order ("Addendum") which simply corrected a few clerical and typographical errors but retained the substance of the summary provided above. (Ex. 2.).

## V.    Governing Law

### A. Public Nuisance

A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal. (CC §3480.) Under Sonoma County Code ("SCC") Ch. 1, §1.7, a "violation" is "an act, omission, or condition contrary to the provision of this code, or an ordinance, resolution, rule, proclamation, order, or regulation of the county." (SCC, Ch. 1, §1.7 (b).) A code violation constitutes a public nuisance. (SEC, Ch.1, §1.7 (e).)

A public nuisance may be abated in any manner provided by [the SCC] or by law, including filing a judicial action in lieu of following the administrative abatement procedures. (SCC, Ch. One, §1.7 (f) (1).) In such action, the county may seek any remedies available to it, including abatement, injunctive relief, costs, and civil penalties. (SCC, Ch. One, §1.7 (f) (1).) "Abatement" means the ending, legalization, or removing of a violation. (SCC, Ch. 1, §1.7 (b).) A responsible party is liable for all costs. "Costs" or "abatement costs" means all costs incurred by the county in pursuing abatement,

1  associated remedies, and civil penalties, including administrative overhead, salaries,

2  attorneys' fees, and expenses incurred by any county department or agency. (SCC, Ch.

3  1, §1.7 (b).) Costs will be a special assessment against the parcel where the public

4  nuisance is located. (SCC, Ch. One, §1.7 (f) (2).) If the county seeks recovery of its own

5  attorneys' fees in an individual judicial action or administrative proceeding, an award of

6  attorneys' fees may be made to the prevailing party. The award of attorneys' fees to the

7  prevailing party cannot exceed the amount of reasonable attorneys' fees incurred by the

8  county in the same judicial action or administrative proceeding. (SCC, Ch. One, §1.7 (f)

9  (3).)

10      **B. Injunctive Relief**

11      A party may bring an action not only to recover damages for a public nuisance,

12  but to enjoin or abate the nuisance. (CC §3491.) Injunction is a typical form of equitable

13  relief, and an action in which injunctive relief is sought is an action in equity. (*St. James*

14  *Church of Christ Holiness v. Superior Court* (1955) 135 C.A.2d 352, 361.) The plaintiff in

15  a nuisance case has the burden of proving the existence of the alleged nuisance.

16  (*Nueber v. Royal Realty Co.* (1948) 86 Cal.App.2d 596.) The plaintiff is generally held to

17  a preponderance of the evidence standard. (*Sturges v. Charles L. Harney, Inc.* (1958)

18  165 Cal.App.2d 306, 318.)

19      **VI.    Discussion & Analysis**

20      The County seeks to enforce the civil penalties, attorneys' fees, and costs that it

21  was awarded in the Administrative Order and Addendum, and which have been ongoing

22  into the present litigation. (Exhs. 1-2.) The County also seeks to recover post-

23  Administrative Order civil penalties, attorneys' fees, costs, and seeks a permanent

24  injunction, recorded against the Property, based on Cupps' repeated violations of the

25  Sonoma County Building and Zoning Codes and his refusal, and failure to timely comply

26  with the Administrative Order. (Complaint ¶ 13-¶ 14, Prayer for Relief #2.)

27  //

28  //

**A. The County is the Prevailing Party on the First, Second, Third, and Fifth Causes of Action**

On August 19, 2025, the Court held a hearing to decide the various motions in limine which were filed in anticipation of the October 10, 2025, trial date. (See Court Minutes 08/19/25.) During that hearing the Court made final rulings on all eight (8) of Plaintiff's motions in limine, Defendant had filed none. The Court issued its Order After Hearing on Motions In Limine on August 20, 2025. (See Docket - 08/20/25 Order on Motions In Limine.) Conclusive to this Complaint is the Court's determination in Motion in Limine No. 1. The Court's ruling established the evidentiary starting point of February 11, 2021, the date of the Administrative Order. "From that point, evidence may be presented that shows either Cupp's completion or failure to abate those code violations which were required to be address in the Administrative Order. The parties may present admissible evidence tending to show compliance, delays in compliance, and the calculation of damages and/or civil penalties associated with the abatement process." (See Docket - 08/20/25 Order on Motions In Limine.) Defendant did not, at any time, contest that the code violations, in and of themselves, constitute a public nuisance.

The Court explicitly and repeatedly informed the Parties that the Administrative Order was conclusive as to all its factual findings, legal determinations regarding code violations, its award of civil penalties, formulas for calculating future penalties, costs, and attorneys' fees orders made in the administrative process. Cupp concedes this point and further concedes that collateral estoppel applies to the Administrative Order. (Def. Closing Brief 3:3-4; 4:20-22; 5-1-2.) Cupp is also correct in arguing the Administrative Order provided an opportunity to cure the public nuisances and avoid or minimize the accrual of any future civil penalties if he engaged in a timely abatement process. (Def. Closing 5:9-16.) To that end, the Court informed the Parties that trial was effectively reduced to a damages determination in calculating the outstanding civil penalties, pursuant to the Administrative Order's formulas, as to the violations at issue here. Defendant argued that County had to prove, once again, that there were

1  nuisances on the subject property. However, the Court disagrees with this contention.

2  The Administrative Order's factual findings of code violations coupled with Sonoma

3  County Code ("SCC") Ch. 1, §1.7, definition a "violation" serve as conclusive prima facie

4  proof for County in establishing an ongoing public nuisance. County did not have to 're-

5  prove' the code violations, nor did Cupp ever challenge the contention that the violations

6  still existed on the subject property after issuance of the Administrative Order. What

7  Cupp contested was determining the 'end date' of the violation as a mitigation for

8  potential future penalties. Following the Administrative Order, it was Cupp's obligation to

9  cure the nuisance (code violation) through appropriate abatement procedures or

10 establish how his efforts to do so may have been delayed or frustrated by the County.

11        Again, the Administrative Order conclusively establishes that each of the seven

12 (7) violations which Cupp caused on the Property, individually and collectively,

13 constitute a public nuisance. (SCC, Ch. One, §1.7(b)&(e).) The County was not required

14 to make any further evidentiary showing of public nuisance after February 11, 2021, for

15 any of the violations. The nuisances were ongoing until such time as Cupp could

16 establish abatement. Therefore, Cupp's argument that County failed to meet its burden

17 of proof in establishing the existence of a public nuisance is in contradiction with the

18 Administrative Order, and therefore specious, unfounded, and without merit.

19        Additionally, even the damages element of this case was effectively established

20 by the Administrative Order. (Ex. 1.) The Administrative Officer made findings on initial

21 civil penalties, identified future penalty calculation formulas, and ordered Cupp liable for

22 the same. The exclusive focus of this trial was determining the final amount of penalties

23 owed and whether Cupp had any mitigating defenses that may reduce these amounts.

24 The only evidentiary showing that County was required to make was (1) the

25 establishment of final penalty amounts post-Administrative Order, and (2) rebuttal of

26 Cupp's mitigation evidence. Even if County had failed in establishing post-

27 Administrative Order civil penalty amounts, it is still the "prevailing party" because it had

28 already secured a net positive award through the Administrative Order. Effectively,

1   County has established all elements necessary to succeed under the 1st, 2nd, 3rd, and 5th

2   causes of action and is therefore the prevailing party on these claims.

3          **B. Cupp's Mitigation Efforts Were Untimely and Not Diligently Pursued**

4         Cupp immediately, and correctly, concedes liability for the civil penalty imposed

5   for the unpermitted cannabis cultivation for $42,000 and for abatement costs totaling

6   $18,439.25, for a total of $60,439.25. (Def. Closing at 5:21-26.) However, Cupp

7   contests further liability for the remaining civil penalties by arguing that he timely

8   initiated, and then diligently followed, the timelines for abatement outlined through the

9   Administrative Order. (Def. Closing at 6:3-7:5.) Cupp claims he did both, 'timely' initiate

10  and 'diligently pursued,' the abatement process but the evidence establishes the

11  contrary.

12        As to timeliness, the Administrative Order required Cupp to "either initiate a

13  process to "legalize" the improvements made to the single-family residence and the

14  garage" and "the nine-foot fence, the improvements made to the barn, the two sheds

15  and the carport" within 20 days from February 11, 2021. The legalization process would

16  be initiated by submitting complete building permit applications or by submitting

17  complete applications for a demolition (or removal) permit to remove these

18  improvements. (Ex. 1, pg. 13.) This compliance deadline expired on March 3, 2021.

19  Cupp was precluded from providing admissible evidence that he initiated the legalizing

20  process (permitting) with PRMD for any of the public nuisance violations by March 3,

21  2021. In fact, under Discovery Order I, the earliest which Cupp could have presented

22  evidence of this attempt would have been from May 3, 2021, onwards. (Discovery Order

23  1, RFA Nos. 16-17.) The first permit application submitted by Cupp to abate any of the

24  public nuisances was for the single-family residence, which was on June 28, 2021,

25  nearly four months after the deadline. (Ex. 16, COS000194.) Consequently, Cupp's

26  argument that he timely began the legalization process is patently untrue.

27        Cupp is partly correct that the Administrative Order offered what might be

28  classified as a "safe harbor" provision that could have prevented or reduced any future

-16-

1    accrual of civil penalties. The Administrative Order does state "if Cupp fails to comply

2    with this section of the order, a civil penalty [either $50/$75] shall be assessed

3    beginning on July 30, 2020, and continuing until these violations are abated and Cupp

4    requests inspections by County staff to confirm the abatement." (Ex. 1, pg. 13.)

5    However, Cupp did not trigger this 'safe harbor' provision due to his failure to timely pull

6    permits to cure the violations.

7        As to diligence, Cupp claims that once his permits were finally pulled, County

8    then frustrated his efforts to complete them for a myriad of reasons. The following is the

9    permitting schedule for the violations at issue in this case, (Ex. 16):

10   **Table #1**

| Permit No. | Date Open | Date Closed | Duration |
| --- | --- | --- | --- |
| BLD21-4961 (Single-family Residence) | July 3, 2021 | April 17, 2023 | 654 days |
| BLD21-4775 Sheds | July 15, 2021 | October 27, 2023 | 835 days |
| BLD21-5010 ADU conversion | August 10, 2021 | November 6, 2023 | 819 days |
| BLD22-1409 Electric Meter SFD | February 28, 2022 | December 18, 2023 | 659 days |
| BLD22-1501 Electric Meter 220 | March 2, 2022 | December 18, 2023 | 657 days |
| WSR22-0269 Groundwater test | April 4, 2022 | April 5, 2022 | 1 day |
| BLD22-2038 Barn use change | April 5, 2022 | December 21, 2023 | 626 days |
| BLD21-4961 Rev. SFD - revised | March 3, 2023 | April 17, 2023 | 46 days |

22   Cupp correctly cites to the Administrative Order's diligence requirement:

23   "All work undertaken pursuant to any permit issued by the County to "legalize" or

24   remove the improvements made to the [single-family residence, garage, 9-ft

25   fence, barn improvements, the two shed, and carport] *must be diligently pursued*

26   *to completion* and *must be inspected* by County staff *for compliance* with all

27   applicable codes and permits. If Cupp fails to comply with the section of the

28   Order, *a civil penalty* of [$75 for the residence/garage, and $50 for all other

violations] *shall be assess beginning on July 30, 2020 and continuing until these violations are abated* and Cupp request inspection by the County staff to confirm the abatement." (Ex. 1, pg. 13, ¶12-¶13 (edited and emphasis added)).

The Administrative Order also provides base penalties from the onset of its issuance, which include:

**Table #2**

| Violations | Initial Civil Penalty |
|---|---|
| Single- family residence and garage | $26,400.00 |
| 9-ft fence, barn improvements, the two sheds, and carport | $44,080.00 |
| Cannabis cultivation | $42,000.00 |
| Unpermitted occupancy of the travel trailer | $8,800.00 |
| Junkyard conditions | $8,800.00 |
| Total Due at time of Administrative Order (fn. 14, covered timeframe of 07/20/2020 through 01/22/2021 = 176 days) | $130,080.00 |

County correctly argues that civil penalties are authorized under Sonoma County Code §1-7(a) for the various County Code building/zoning violations and under SCC section 1-7.1(f)(3)(a) for the commercial cannabis violation. In this case, the Administrative Officer decided 1) civil penalties due at the time of the Order and 2) set formulas for any additional civil penalties. The decision for finding violations and imposing civil penalties cannot be altered by the trial court in a subsequent enforcement action. *County of Sonoma v. Gustely* (2019) 36 Cal.App.5th 704, 712. Additional penalties can accrue on a per-day basis at the hearing officer's discretion if the violation is not abated within the period of time specified in the hearing officer's decision. *Gustely, Ibid.*, 36 Cal.App.5th at 707. On this issue, Cupp presented only argument but absolutely no evidence as to why he is not liable for the initial civil penalties awarded in the Administrative Order. Post-trial, Cupp raised objections regarding the "constitutional or equitable limitations on enforcement of these penalties (including proportionality, excessive fines, and due process)." (Def Objections 01/29/26 at 12:22-25). However, any such possible defenses, arguments, or corroborating evidence were not presented

1   by Cupp at trial. The Court now considers these issues waived. Therefore, the Court

2   now finds Cupp is liable for **$130,080.00**, in initial civil penalties.

3          The Court's analysis now turns to whether Cupp provided any mitigating

4   evidence to either minimize or eliminate any ongoing civil penalties for the public

5   nuisance violations identified in the Administrative Order.

6          1.  Accrued Civil Penalties from January 22, 2021, through July 3, 2021

7          The County is requesting a second accrual of civil penalties triggered by the

8   Administrative Order. (Ex. 1, fn. 14.) Using the date of the actual application for the

9   single-family residence (July 3, 2021) and the last date in the Administrative Order's

10  calculation of civil penalties (January 22, 2021, Ex. 1, fn. 14), there are an additional

11  162 days minimum for the award of civil penalties. The Order includes 2 violations at

12  $75 per day (item 1), 5 violations at $50 per day (item 2), and 1 violation each at $50

13  per day for items 3 and 4. (Ex. 1, COS00013-COS000014.) Before the first application

14  was received, 162 days of additional civil penalties accumulated: Item 1 - $24,300 (2

15  violations x $75 x 162); Item 2 -$40,500 (5 violations x $50 x162); Item 3 - $8,100 ($50 x

16  162), Item 4 - $8,100 ($50 x 162). Total additional civil penalties over which Cupp had

17  complete control amount to **$81,000**. Cupp presented no evidence rebutting this portion

18  of the award.

19         2.  Travel Trailer, Junkyard, Fence, and Carport

20         No permits were ever sought for the occupied travel trailer or the junkyard

21  conditions, but these were effectively closed by the County on July 1, 2022. (Ex. No.

22  12.) Also, the County no longer seeks additional civil penalties after July 1, 2022, for the

23  fence and carport although it notes these violations remain open. Cupp presented no

24  evidence to refute the July 1, 2022, cut-off date proposed by County or provided any

25  credible mitigating evidence. Moreover, but for the County's concession, the applicable

26  timeframe for the Court's consideration would have run from July 30, 2020, through July

27  1, 2022 (702 days). (Ex. 1, pg. 13, ¶2.) Therefore, relying on the Administrative Order

28  formula and *Gustely*, the Court must now award ongoing civil penalties for these

1   violations. (*County of Sonoma v. Gustely, supra*, (2019) 36 Cal.App.5th at 707.) The

2   ongoing civil penalties for these four (4) violations at $50 ea./daily for 363 days amounts

3   to **$72,600**.

4        3.  The Single-Family Residence, ADU, and Barn

5        The Court could have awarded penalties for these major violations from July 30,

6   2020, through their application closing date. (Ex. 1; Ex.16.) For the residence that would

7   total 993 days; for the ADU it would total 1,158 days; and for the barn it would total 965

8   days[1]. The ongoing civil penalties for the residence and ADU violations were set at

9   $75/day each, and the barn was set for $50/daily.

10       Cupp did present some mitigating evidence, and the County also offered credible

11   counterevidence. Generally, Cupp presented evidence that County delayed in

12   responding to his and his contractor's (Oracle Consulting) inquiries, required additional

13   work not contemplated by the Administrative Order or initial permit (septic system in the

14   residence and sprinkler system in the barn), and provided inconsistent information

15   regarding the fence. For its part, County offered countervailing and credible evidence

16   showing delays causes by Oracle, the County's non-involvement in any PG&E shut-off

17   to the Property, and refuting Cupp's assertions that PRMD offered conflicting

18   information on permits. Cupp failed to provide the Court with any evidence of duration

19   for any of County's alleged delays. This evidence would have been key in determining

20   what offset in civil penalties, if any, Cupp may have been entitled too as to any violation.

21   Cupp took the position that any form of mitigating evidence effectively precluded County

22   from recovering any ongoing civil penalties. Cupp's position is in direct contradiction to

23   the Administrative Order, which allowed for the continued accrual of penalties for each

24   of violations until "abated" and until Cupp "requests inspections by County staff to

25   confirm the abatement." (Ex 1, pp. 13-14, at end of items 1, 2, 3, and 4.) The burden of

26   fully establishing mitigating evidence rested with Cupp.

27

28

---

[1] The totals take as a starting date of July 30, 2020 (Administrative Order) and their respective permit application completion date. (See Table #1.)

1   Based on the evidence, the Court finds that additional civil penalties are

2   warranted. The Court also acknowledges that Cupp did present evidence that some

3   delays were caused by lapses with PRMD and other County-related circumstances,

4   including staffing backlogs, wildfire and COVID-related delays in permit processing,

5   PG&E power shutoffs, County's requirement of additional work not initially contemplated

6   (septic system, sprinkler system), and communication issues between Defendant's

7   consultant and PRMD staff. The County offered countervailing evidence, but the record

8   does not permit precise quantification of specific periods of delay attributable solely to

9   each party. In these circumstances, the Court allocates one-half of the total penalties in

10  Table 3 to Defendant, as set forth below. (Ex. 22.) The Court, with guidance provided by

11  the Administrative Order's formulas, now provides the following final calculations for

12  these outstanding violations:

13  **Table #3**

| Violation | Violation Timeframe | Outstanding Days | Daily Rate | Amount of Civil Penalty Due |
|---|---|---|---|---|
| Single Family Residence | 07/03/21 – 04/17/23 | 653 | $75 | $48,975.00 |
| ADU | 07/03/21 – 11/06/23 | 856 | $75 | $64,200.00 |
| Barn | 07/03/21 – 12/21/23 | 901 | $50 | $45,050.00 |
| Totals | | | | $158,225.00 |

20  County's proposal, which the Court now adopts, includes an even split of these

21  civil penalties to account for the respective delays caused by each side. As a result,

22  Cupp is now liable for **$79,112.50**, in accrued civil penalties on those violations

23  identified in Table #3, above.

24  **C. Abatement Costs**

25  Per the Administrative Order, Cupp was required to pay the County the sum of

26  $18,493.25, for costs of abatement which include (1) Code Enforcement Division

27  investigative time and secretarial time in pursuing abatement ($12,021.40); (2) Hearing

28  Officer fees ($5,670.00); and (3) fees for court reporter services ($801.85). (Ex 1,

1    COS00014, ¶7.) Cupp presented no evidence contradicting this amount and in fact

2    conceded this outstanding balance in his closing arguments. (Def. Closing at 5:25-25.)

3        However, County now seeks additional costs incurred by Code Enforcement for

4    staff time on the continued abatement process. Jesse Cablk testified that from the date

5    of the Administrative Order to September 19, 2024, and additional amount of $1,656.00

6    had been incurred. In providing this testimony Cablk relied on his review of a declaration

7    of Todd Hoffman (Ex. 6), which was not admitted into evidence. In closing arguments,

8    County revised the request to "$1,853.35 from February 11, 2019, to September 19,

9    2024, and $1,516.00 between September 20, 2024, and October 13, 2024, the day

10    before the testimony of Jesse Cablk." County also requested additional time to compute

11    abatement costs and for these to then be included in a motion for attorneys' fees.

12        The County's request is DENIED. First, the Administrative Order is silent on any

13    future or accruing award of costs past February 11, 2021. Second, there is no evidence

14    in the record to support any increase from the amount awarded in the Administrative

15    Order. Cablk's testimony has no foundation and therefore cannot be considered here

16    and any request to present additional evidence of costs would be impermissible as

17    evidence has closed on this matter. For these reasons and request for additional

18    abatement costs will not be considered.

19        Nonetheless, the County is still entitled to recover those costs which were

20    awarded in the Administrative Order in the amount of **$18,493.25**. This amount is

21    payable within fifteen (15) of the Notice of Entry the final Statement of Decision and

22    Judgment.

23        **D. County's Request for a Permanent Injunction as to the Property is**

24    **GRANTED**

25        County's Complaint also requests the imposition of a permanent injunction

26    prospectively prohibiting unpermitted construction, cannabis cultivation, and zoning

27    violations on the Property. The Court starts first by making the following correction, an

28    injunction is an equitable remedy and not a separate and distinct cause of action. (*St.*

*James Church of Christ Holiness v. Superior Court* (1955) 135 C.A.2d 352, 361.)
Though Plaintiff's Complaint identifies the request for permanent injunction as the 4th
cause of action, it's effectively a prayer for a specific remedy.

A party may bring an action not only to recover damages for a public nuisance,
but to enjoin or abate the nuisance. (CC §3491.) Injunction is a typical form of equitable
relief, and an action in which injunctive relief is sought is an action in equity. The plaintiff
is generally held to a preponderance of the evidence standard. (*Sturges v. Charles L.
Harney, Inc.* (1958) 165 Cal.App.2d 306, 318.)

County argues that a permanent injunction against the Property is warranted
given Cupp's actions amounting to repeated Building and Zoning Code violations and
failed or inexcusable non-compliance with Administrative Orders. "[T]he fact that Mr.
Cupp continued with and expanded his unpermitted construction and uses of the
Property after the February 2019 inspection, is proof enough for the Court to issue such
an injunction regarding use of the Property. The unpermitted violations are the reason.
A permanent injunction prohibiting future unpermitted construction and unpermitted
uses of the Property by Ronald Cupp is a very appropriate remedy which is requested in
the Complaint." (Plf. Closing Brief at 10:1-6.) County also points to Cupp's continued
refusal to pay outstanding sums immediately due by the Administrative Order. (Ex. 1;
discussed above.) Finally, County also identifies Cupp's protracted history of delays in
abatement and in the present litigation (failure to timely respond to discovery, refusal to
comply with Court orders, an unmeritorious Writ, an unmeritorious corollary federal
action, and unmeritorious judicial challenge) also with the intended consequence of
causing further delays and non-compliance. Stated alternatively for purposes of this
permanent injunction, Cupp has repeatedly shown a refusal to comply at every step.

Unfortunately for Cupp, the Court has acquired first-hand knowledge throughout
this litigation, that compliance is a forced and distant secondary instinct, with the first
being delay or refusal. Even when compliance is evident and warranted, for example
the timely submittal of permit applications per the Administrative Order, Cupp

-23-

inexplicably refused to follow such direction. Another example would be the

Administrative Order's establishment of initial civil penalties, Cupp refused to accept

these even through trial. Cupp did so knowing he failed to timely appeal the

Administrative Order and the initial civil penalties were thereby irrefutable and

conclusive. His approach was instead to 'pick and choose' which civil penalties he was

willing to pay. It is clear to the Court that a permanent injunction on the Property is now

warranted because voluntary compliance with County's building and zoning codes are a

futile exercise. The Court simply has no confidence in Cupp's ability to prospectively

comply with building and zoning codes for the Property absent the imposition of a

permanent injunction on the Property. The legal authority to seek this injunctive relief is

clearly set out in Plaintiff's Complaint, CC § 731, and CC § 3494, which allow for an

action to abate a nuisance. As County points out, SCC § 1-7.1(f) & (l) also authorize the

commencement of a judicial action to enjoin violations of the Code. The injunction

requested is the outcome of the numerous and repeated violations listed in the causes

of action, because Cupp has shown little regard for voluntarily complying otherwise.

Therefore, the County's requests that this Court include in the Judgment an

injunction prohibiting growing of any form of unpermitted cannabis, unpermitted

construction and unpermitted use of the Property in violation of the Sonoma County

Code or state law is GRANTED.

## VII.    Conclusion

Upon consideration of all the evidence and arguments presented by the Parties

in this action during this trial, the Court now renders a verdict in favor of Plaintiff County

of Sonoma, and against Defendant Cupp, as to all causes of action asserted in its

Complaint. The Court further finds that Plaintiff is the "prevailing party." As a result, the

Court now issues the following awards to Plaintiff:

1. Civil Penalties in the amount of **$362,792.50**

2. Abatement Costs in the amount of **$18,493.25**

3. Reasonable Attorney's Fees (through a separate motion)

1      4. Permanent Injunction attached to the Property prohibiting: the growing of any

2          form of unpermitted cannabis; unpermitted construction; and unpermitted use

3          of the Property in violation of the Sonoma County Code or state law.

4      The Court Clerk will be instructed to enter this Verdict in the record. Plaintiff is to

5  submit a Judgment in conformity with this verdict.

6      IT IS SO ORDERED.

7

8  DATED: March **4** , 2026.

9

                                              OSCAR A. PARDO

10                                    Judge of the Superior Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCV-273578

PROOF OF SERVICE BY ELECTRONIC MAIL

I certify that I am an employee of the Superior Court of California, County of Sonoma, and that my business address is 3055 Cleveland Ave., Santa Rosa, CA 95403; my service address is donotreplyjudicialassistant@sonomacourt.org; that I am not a party to this cause; that I am over the age of 18 years; that I Emailed a true copy of the following document: **FINAL STATEMENT OF DECISION AND JUDGMENT** electronically by email to the person and electronic service email address listed below.

Date: March 4, 2026

Robert Oliver,
Clerk of the Court

By: *Luce Gonzalez*
Luce Gonzalez, Deputy Clerk

ELECTRONIC SERVICE ADDRESSES

- Michael A. King, michael.king@sonomacounty.gov

- Eric Young, eyoung@younglawca.com

EXHIBIT 14

# EXHIBIT "A"

## CUPP V COUNTY OF SONOMA

# CLAIM AGAINST THE COUNTY OF SONOMA

(Government Code Section 910 et seq.)

RECEIVED

JUL 1 5 2022

**Submit claim in person or mail to:**
Board of Supervisors
575 Administration Dr Ste 100A
Santa Rosa CA 95403

☐ New Claim
☐ Amended Claim

* = REQUIRED

BOARD OF SUPERVISORS
For Board of Supervisors Use Only

Rev. 8/25/17

| 1.* Claimant's Name and Home Address | 2.* Send Official Notices and Correspondence to |
|---|---|
| RONALD CUPP | Eric G. Young/Young Law Group |
| 150 RALEY TOWN CENTER, STE. 2512 | 411 Russell Avenue |
| City ROHNERT PARK   State CA   Zip 94928 | City Santa Rosa   State CA   Zip 95403 |
| Phone  Home    Cell 707-318-9929   Work | Phone  Home    Cell    Work 707-527-3637 |

| 3. Claimant's Date of Birth | 4. Are you a Medicare Beneficiary?   ■ Yes  ☐ No |
|---|---|
| 01/01/1955 | Medicare HICN/SSN |

**5. Claimant Vehicle License Plate #, VIN, Make, Model, Mileage, and Year**

| 6.* Date of Incident | 7. Time of Incident | 8.* Address and/or Description of Incident Location |
|---|---|---|
| 06/01/2022 | Approx. 10:50 | 4640 Arlington Avenue, Santa Rosa, CA 95407 |

**9.* Basis of Claim.** State in detail all facts and circumstances of the incident. Identify all persons, entities, property, and County departments involved. State why you believe the County is responsible for the alleged injury, property damage, or loss.

See attached letter dated July 15, 2022, which is incorporated as if set forth in full herein.

**Names of Involved County Employees and/or Departments, if known**

On information and belief, Public Resources Management Department and/or Office of County Counsel as well as other individuals acting on behalf of County whose identities are not presently known to Claimant.

| 10.* Description of Claimant's injury, property damage, or loss | 11.* Amount of Claimant's property damage or loss and method of computation. Attach supporting documentation. |
|---|---|
| Unreasonable/unlawful search, trespass, invasion of privacy, intentional and negligent infliction of emotional distress, abuse of process, conspiracy, violation of due process, Civil Code 1708.8 | ITEMS |
| | Not yet calculated   $ |
| | $ |
| | $ |
| | $ |
| | TOTAL AMOUNT   $ 0.00 |
| | Court Jurisdiction:  ☐ Limited (up to $25,000) |
| | ■ Unlimited (over $25,000) |

| 12. Witness Names (if any) | Address | Phone |
|---|---|---|
| Tony Cruz | 4640 Arlington Avenue, Santa Rosa, CA 95407 | |

*Section 72 of the Penal Code states: "Every person who, with intent to defraud, presents for allowance or for payment to any state board or officer, or to any county, city, or district board or officer, authorized to allow or pay the same if genuine, any false or fraudulent claim, bill, account, voucher, or writing, is punishable either by imprisonment in the county jail for a period of not more than one year, by a fine of not exceeding one thousand dollars ($1,000), or by both such imprisonment and fine, or by imprisonment in the state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine."*

**13.***

Signature of Claimant or Representative    Date  7-15-22

Print Name  RONALD CUPP    Relationship to Claimant



## YOUNG LAW
——— GROUP ———

July 15, 2022

Board of Supervisors
County of Sonoma
575 Administration Drive, Ste. 100A
Santa Rosa, CA 95403

     Re:    Govt. Claim Against County
             Claimant: Ron Cupp

To Whom It May Concern:

      This letter is provided as an attachment to the Claim Against the County of Sonoma form submitted herewith and is expressly incorporated as if set forth in full in the aforementioned form.

      **Basis of Claim:**

      On June 1, 2022 at approximately 10:50, Sonoma County ("County") officials and/or individuals acting on behalf of and the behest of the County flew or operated an aerial drone over real property located at 4640 Arlington Avenue, Santa Rosa, California ("the property"), which is owned by Claimant. County did not first obtain a warrant or consent of Claimant before flying or operating the drone over the property. In addition, no exigent circumstances existed which would justify flying or operating the drone over the property.

      On information and belief, the drone took photographs and/or video of the property and/or persons residing at the property for an unknown period of time. The drone fly over occurred shortly after Claimant and various officials employed by the County, including Michael King, Mark Franceschi, and one of more individuals with County's Risk Management entered into negotiations to settle federal litigation entitled *Cupp v. Smith*, 4:20-cv-03456 PJH, which involves allegations of a warrantless search of the property occurring on February 15, 2019.

      In addition, County also conducted a prior, warrantless drone fly over at the property in or about March 2020, and thereafter, conducted a physical intrusion onto the property on July 30, 2020 pursuant to an inspection warrant which County officials obtained under false pretenses. (See, Claimant's prior Govt Claim dated 8/2/2020.) Claimant alleges that such conduct evidences a pattern or practice by County officials acting in concert to violate Claimant's private property interests and civil rights.

---

411 Russell Avenue, Second Floor, Santa Rosa, CA 95403
Tel: 707-527-3637/Fax: 707-520-7272
Email: eyoung@younglawca.com

# EXHIBIT "B"

## CUPP V COUNTY OF SONOMA



Opportunity. Diversity. Service.

COUNTY OF SONOMA
**HUMAN RESOURCES DEPARTMENT**

Christina Cramer, HR Director

Employment • Classification • Employee Relations • EEO • Training • Risk Management

August 25, 2022

Ronald Cupp
c/o Young Law Group, Attn: Eric G Young
411 Russell Avenue
Santa Rosa, CA 95403

| | |
|---|---|
| **Subject:** | **Claim of Ronald Cupp** |
| **Date of Incident:** | **06/01/2022** |
| **Location:** | **4640 Arlington Avenue, Santa Rosa** |
| **Claim Number:** | **2022075** |

Dear Mr. Cupp,

We have completed our investigation of the claim you filed with the Sonoma County Board of Supervisors on July 15, 2022 regarding the above-referenced incident.

In regards to the references made in the claim of a tort claim previously filed by you, served on our Board of Supervisors on August 4, 2020, please be advised that a rejection notice was sent specific that claim on September 30, 2020.

Furthermore, as respects the remaining claims made in the claim you filed with the Sonoma County Board of Supervisors on July 15, 2022, I have enclosed with this letter a formal rejection notice advising you of the applicable statute should you wish to pursue this matter further.

If you have any questions, please do not hesitate to call me at (707) 565-3521.

Sincerely,

Christopher Meza
Liability Analyst
christopher.meza@sonoma-county.org

COUNTY OF
SONOMA



Opportunity. Diversity. Service.

**COUNTY OF SONOMA**
**HUMAN RESOURCES DEPARTMENT**

Christina Cramer, HR Director

Employment • Classification • Employee Relations • EEO • Training • Risk Management

August 25, 2022

Ronald Cupp
c/o Young Law Group, Attn: Eric G Young
411 Russell Avenue
Santa Rosa, CA 95403

| | |
|---|---|
| **Subject:** | **NOTICE OF REJECTION OF CLAIM** |
| **Claim of:** | **Ronald Cupp** |
| **Date of Incident:** | **06/01/2022** |
| **Claim Number:** | **2022075** |
| **Third Party Claim Number:** | |

Dear Mr. Cupp,

The claim you presented to the Sonoma County Board of Supervisors on July 15, 2022 has been referred to the Risk Manager pursuant to Board of Supervisors Resolution No. 66798 and California Government Code Section 935.4.

NOTICE IS HEREBY GIVEN that said claim was rejected on August 25, 2022.

### WARNING

Subject to certain exceptions, you have only six (6) months from the date this notice was personally delivered or deposited in the mail to file a court action on this claim. See California Government Code Section 945.6

You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.

This notice applies only to causes of action arising under California law for which a claim is mandated by the California Government Tort Claims Act, California Government Code Sections 900 et seq. Other causes of action, including those arising under federal law, may have shorter time limitations for filing.

If you would like to discuss your claim further, please call Christopher Meza in Risk Management at (707) 565-3521.

Sincerely,

Janell Crane

Janell Crane
Risk Manager

575 Administration Drive, Suite 116B • Santa Rosa, CA 95403 • Telephone (707) 565-8059 • Fax (707) 565-3770 • www.sonoma-county.org

COUNTY OF
SONOMA

(PROOF OF SERVICE BY MAIL-1013a, 2015.5 C.C.P.)

STATE OF CALIFORNIA

COUNTY OF SONOMA

I am employed in the County of Sonoma, California; I am over the age of 18 years and not a party to the within action; my business address is 575 Administration Drive Suite 116C, Santa Rosa, CA 95403. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

On August 25, 2022, following ordinary business practice, I served the NOTICE OF REJECTION OF CLAIM on the parties in said cause, by placing on that date at my place of business, a true copy thereof, enclosed in a sealed envelope, for collection and mailing with the United States Postal Service where it would be deposited with the United States Postal Service that same day in the ordinary course of business, addressed as follows:

>       **Ronald Cupp**
>       **c/o Young Law Group, Attn: Eric G Young**
>       **411 Russell Avenue**
>       **Santa Rosa, CA 95403**

I certify (or declare), under penalty of perjury*, that the foregoing is true and correct.

Date:        August 25, 2022

_____
                            (Signature)

*Proof of service by mail forms, being signed under penalty of perjury, do not require notarization.

# *EXHIBIT "C"*

## *CUPP V COUNTY OF SONOMA*

# CLAIM AGAINST THE COUNTY OF SONOMA

(Government Code Section 910 et seq.)

**RECEIVED**

AUG 2 9 2022

**BOARD OF SUPERVISORS**
For Board of Supervisors Date Stamp Only
COUNTY OF SONOMA

**Submit claim in person or mail to:**
Board of Supervisors
575 Administration Dr Ste 100A
Rev. 8/25/17    Santa Rosa CA 95403

☐ New Claim
■ Amended Claim

\* = REQUIRED

---

**1.\* Claimant's Name and Home Address**
Ronald Cupp

150 Raley Town Center, Suite 2512

City Rohnert Park    State CA    Zip 94928

Phone    Home    Cell 707-318-9929    Work

**2.\* Send Official Notices and Correspondence to**
Eric G. Young/Young Law Group

411 Russell AVENUE

City Santa Rosa    State CA    Zip 95403

Phone    Home    Cell    Work 707-527-3637

---

**3. Claimant's Date of Birth**
01/01/1955

**4. Are you a Medicare Beneficiary?** ■ Yes ☐ No

**Medicare HICN/SSN**

---

**5. Claimant Vehicle License Plate #, VIN, Make, Model, Mileage, and Year**

---

**6.\* Date of Incident**
06/01/2022

**7. Time of Incident**
Approx. 10:50 a.m.

**8.\* Address and/or Description of Incident Location**
4640 Arlington Avenue, Santa Rosa, CA 95407

---

**9.\* Basis of Claim.** State in detail all facts and circumstances of the incident. Identify all persons, entities, property, and County departments involved. State why you believe the County is responsible for the alleged injury, property damage, or loss.
See attached lettter dated 8/29/2022. See attached initial claim dated July 15, 2022. All documents are incorporated as if set forth in full herein.

Names of Involved County Employees and/or Departments, if known

Permit Resources Management Dept. (PRMD/Permit Sonoma); Tennis Wick, Tyra Harrington, Mark Franceschi, Todd Hoffman, Andrew Lee, Andrew Smith, Jesse Cablk

---

**10.\* Description of Claimant's injury, property damage, or loss**

Unreasonable/unlawful search, trespass, violation of Calif. Const. Art. I, Sections 7, 13, invasion of privacy, intentional and negligent infliction of emotional distress, abuse of process, conspiracy, violation of due process

**11.\* Amount of Claimant's property damage or loss and method of computation. Attach supporting documentation.**

ITEMS

Not yet calculated    $

    $

    $

    $

**TOTAL AMOUNT**    $ 0.00

Court Jurisdiction:    ☐ Limited (up to $25,000)

■ Unlimited (over $25,000)

---

**12. Witness Names (if any)**
Tony Cruz

**Address**
4640 Arlington Avenue, Santa Rosa, CA 95407

**Phone**

---

Section 72 of the Penal Code states: "Every person who, with intent to defraud, presents for allowance or payment to any state board or officer, or to any county, city, or district board or officer, authorized to allow or pay the same if genuine, any false or fraudulent claim, bill, account, voucher, or writing, is punishable either by imprisonment in the county jail for a period of not more than one year, by a fine of not exceeding one thousand dollars ($1,000), or by both such imprisonment and fine, or by imprisonment in the state prison, or by a fine not exceeding ten thousand dollars ($10,000), or by both such imprisonment and fine."

---

**13.\***

**Signature of Claimant or Representative**

Eric G. Young
**Print Name**

08/29/2022
**Date**

Attorney for Claimant
**Relationship to Claimant**



**YOUNG LAW**
—— GROUP ——

August 29, 2022

Board of Supervisors
County of Sonoma
575 Administration Drive, Ste. 100A
Santa Rosa, CA 95403

     Re:   Govt. Claim Against County
           Claimant: Ron Cupp

To Whom It May Concern:

This letter is provided as an attachment to the Claim Against the County of Sonoma form dated August 29, 2022 and submitted herewith and is expressly incorporated as if set forth in full in the aforementioned form.

**Basis of Claim:**

On June 1, 2022 at approximately 10:50 a.m., Sonoma County ("County") officials employed by Permit Resources Management Dept. (PRMD/Permit Sonoma); namely, Todd Hoffman and/or Andrew Lee, flew or operated an aerial drone over real property located at 4640 Arlington Avenue, Santa Rosa, California ("the property"), which is owned by Claimant. Neither County nor its officials first obtained a warrant or consent of Claimant before flying or operating the drone over the property. In addition, no exigent circumstances existed which would justify flying or operating the drone over the property.

On information and belief, the drone took photographs and/or video of the property and/or persons residing at the property for an unknown period of time. The drone fly over occurred shortly after Claimant and various officials employed by the County, including Michael King, Mark Franceschi, and one of more individuals with County's Risk Management entered into negotiations to settle federal litigation entitled *Cupp v. Smith*, 4:20-cv-03456 PJH, which involves allegations of a warrantless search of the property occurring on February 15, 2019. The warrantless search occurred after fact discovery had closed in that case.

In addition, County and its officials also conducted a prior, warrantless drone fly over at the property in or about March 2020, and thereafter, conducted a physical intrusion onto the property on July 30, 2020 pursuant to an inspection warrant which County officials obtained under false pretenses. (See, Claimant's prior Govt Claim dated 8/2/2020, which is also incorporated as if set forth in full herein.)

411 Russell Avenue, Santa Rosa, CA 95403
Tel: 707-527-3637/Fax: 707-520-7272
Email: cyoung@younglawca.com

Case 3:24-cv-01301-RFL Document 94 Filed 06/08/20 Page 136 of 153

Claimant alleges that such conduct evidences and is indicative and representative of a pattern, practice, or repeated course of conduct approved, authorized, or ratified by County and other named officials acting in concert in such a manner as to be tantamount to a custom, policy, or practice of the agencies involved and of condoning and tacitly encouraging the violation of Claimant's private property interests and state and federal constitutional rights.

EXHIBIT 15

Case 4:23-cv-01007-JST    Document 107-4    Filed 03/11/26    Page 138 of 153

CUPP vs. COUNTY OF SONOMA ~ 4:23-cv-01007

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                    ---oOo---

4   RONALD CUPP, an individual,

5            Plaintiff,

6      vs.                    Case No. 4:23-cv-01007

7   COUNTY OF SONOMA, a municipal
    corporation; TODD HOFFMAN, in
8   his individual and official
    capacities; JESSE CABLK, in
9   his individual and official
    capacities; DOES 1-50,
10  inclusive,

11           Defendants.
    _____/

12

13

14        VIDEOTAPED DEPOSITION OF RONALD CUPP

15            VOLUME 1 (Pages 1 - 133)

16        575 Administration Drive, Room 105A

17          Santa Rosa, California 95403

18         Monday, March 9, 2026, 9:01 a.m.

19                 - - - -

20

21

22

23        McMURTRIE STENOGRAPHY, INC.
        CA Certified Shorthand Reporters
                P.O. Box 5738
24        Santa Rosa, California 95402
              stefmc@sbcglobal.net
25              (707) 888-1130

1    June 1?

2        A.   Well, he definitely was there in the time

3    frame that you guys made the site visit.

4        Q.   Okay.  So that's one month after -- or one

5    month, approximately, after June 1, 2022.  Was he          10:04:10

6    renting the ADU from you in May and June of 2022?

7        A.   No.

8        Q.   Okay.  Was he renting it from you in May of

9    2022?

10       A.   I don't have specific dates.                        10:04:24

11       Q.   Was he renting it from you in June of 2022?

12       A.   I don't have specific dates.

13       Q.   Okay.  That's exactly what I'm asking for.

14   But you understand, from what we've done before in

15   deposition, that I get to ask you the question to          10:04:38

16   try and refresh your recollection.

17            Do you understand that?

18       A.   To a point, I do.

19       Q.   Okay.

20            MR. YOUNG:  Why are we talking about               10:04:47

21   July 8th of 2022?

22            MR. KING:  Because that's the date that we

23   came out there --

24            MR. YOUNG:  That's not the date of your

25   incident, in your request.  You've got June 1 of           10:04:54

1      A.  No.

2      Q.  Okay.

3          MR. KING:  I'm going to ask the reporter to

4   mark this as the next exhibit, Exhibit 8, and that's

5   the video that Mr. Cruz had.                                11:35:51

6          (Deposition Exhibit 8 was marked for

7          identification.)

8   BY MR. KING:

9      Q.  With regards to the property itself, when

10  did you last actually live in the property before           11:36:05

11  June -- before the date of this video, June 1, 2022?

12     A.  Within three months.  I don't remember the

13  exact date, but before that, 'cause then I went back

14  to his house at Fernwood Court, and he witnessed

15  that -- took that video while I was still living in          11:36:27

16  his house.

17     Q.  Right.  And what was the purpose that he

18  was out there for, to your recollection?

19     A.  He was working on the deck.

20     Q.  Okay.  He was doing some work himself?                11:36:36

21     A.  Yes.

22     Q.  Okay.  And did he do other work out at the

23  property?

24     A.  On and off forever, yes.

25     Q.  Okay.  At the time of this event, when he             11:36:49

1   was taking the video, was he one of the owners of

2   the property by an agreement with you?

3       A.   When I first -- so I lost the property to a

4   foreclosure, and then I got it back December of 2018

5   from Fannie Mae.  And the next month, I had          11:37:17

6   negotiated with Mr. Cruz to purchase it, and I was

7   going to live there for the rest of my life, or at

8   least five years.

9           Once the thing happened with the County,

10  the lawsuit, we had to cancel or hold off that sale.   11:37:38

11  So that's why I've been working arm and arm with

12  Mr. Cruz in that we still can't come to a resolution

13  until the lawsuits are finished.  So we've never --

14  not knowing what the end results of the lawsuits,

15  how I could sell the property and know what the      11:38:01

16  outcome is gonna be.

17      Q.   Okay.  So you did mention that there was

18  some type of written agreement originally, though;

19  is that correct?

20      A.   Correct.                                     11:38:10

21      Q.   All right.  And that hasn't been finalized;

22  is that what you're saying?

23      A.   We -- it was actually written up by Pat

24  Macias, an attorney whom you know.

25      Q.   I don't know him, but I --                   11:38:20

1   A.  Yes, you did, because he did the deposition

2   with Mr. Cruz on the state case, and you guys talked

3   about he knew you in San Rafael as a lawyer that

4   specialized in insurance.

5   Q.  I know who he is --

6   A.  He was with -- the firm's name was

7   Ragghianti Freitas.  He drew up a purchase sale

8   agreement for us, and we actually got to the point

9   that we executed it, but we could not continue -- we

10  both agreed not to continue with the sale until we

11  found out the outcome of this interaction with the

12  County.

13  Q.  Okay.  So at the present time, is it still

14  your intention to proceed with that sale at some

15  time?

16  A.  Yes.

17  Q.  Okay.  So after the June 1, 2022, event as

18  shown in the video, what was the next time you

19  resided at the property?

20  A.  That was June.  So it was probably

21  September/October; it was before Halloween.

22  Q.  Okay.

23      MR. KING:  I'm going to ask the reporter to

24  mark as the next exhibit, which will be 9, the lease

25  agreement that I got from Mr. Piccione.

11:38:32

11:38:53

11:39:08

11:39:30

11:40:09

1           (Deposition Exhibit 9 was marked for
2           identification.)
3    BY MR. KING:
4        Q.  Mr. Cupp, I'm going to show you the actual
5    exhibit so that we have it clear that you're looking          11:40:31
6    at the actual exhibit.  It's the same thing that you
7    were just shown.
8        A.  Okay.
9        Q.  And does that appear to be the written
10   agreement that you had with Mr. Piccione about               11:40:43
11   renting the single-family dwelling at the property?
12       A.  Can you say that one more time?
13       Q.  Oh, yeah.  I'm sorry.
14           Does that appear to be the written
15   agreement that you had with Mr. Piccione about               11:40:54
16   renting the property at 4640 Arlington Avenue?
17       A.  I did not rent the property to
18   Mr. Piccione.
19       Q.  Okay.
20       A.  It says right on the lease agreement             11:41:12
21   "Antonio Gonzalez Cruz."
22       Q.  I'm just trying to find out, is this the
23   agreement that you had, or someone had, with
24   Mr. Piccione?
25       A.  Well, it appears Mr. Antonio Gonzalez Cruz        11:41:21

1    had this with Gennaro.  And I -- from our

2    conversation earlier, the date of the flyover,

3    Mr. Piccione was living there at that time.

4        Q.  Okay.  Well, in any event, as far as this

5    particular written agreement, have you ever seen it          11:41:46

6    before?

7        A.  Yes.

8        Q.  Okay.  Did you see it about the time it was

9    executed?  In other words, signed by the

10   individuals?                                                 11:41:55

11       A.  No.

12       Q.  Okay.  When was it that you saw this

13   agreement at any time before today?

14       A.  I went to the law library and got a copy of

15   the CEB for real estate leases and made a copy of           11:42:08

16   it, took it back, and Mr. Cruz put this together off

17   of that information and executed.  I was not part or

18   party of the lease with Mr. Piccione.

19       Q.  Okay.  So you prepared this agreement for

20   signature by the two parties?                               11:42:29

21       A.  Negative.

22       Q.  Okay.  I'm sorry, I misunderstood.  Maybe

23   I'll rephrase it and see if I got it right.  Okay?

24           You obtained a document that was used as

25   the basis for this agreement.  You obtained a               11:42:42

1   an exception, or appears to, for the ADU or granny

2   unit, with or without a separate address.

3   BY MR. KING:

4       Q.  Okay.  Did you have any understanding that

5   Mr. Piccione was only renting the single-family                11:45:06

6   dwelling?

7       A.  Correct.

8       Q.  Okay.  And from your observation, based

9   upon what Mr. Young just said, is this lease only

10  for the single-family dwelling?                                11:45:19

11      A.  It's my understanding that's correct.

12      Q.  And, again, any attachments, exhibits,

13  anything like that, that has nothing -- that was

14  nothing prepared by you?

15      A.  That's right.  I am not part of any                    11:45:31

16  attachments or anything else that goes with this.

17      Q.  And I'm just trying to find out, did you

18  have any involvement with renting any portion of the

19  property from, say, 2021 January through 2024?

20      A.  No.                                                    11:45:56

21      Q.  Okay.

22          MR. YOUNG:  And you're asking renting it to

23  other people?

24          MR. KING:  Renting it.

25          MR. YOUNG:  Renting it to other people?              11:46:02

1   That's your question?

2          MR. KING:  Renting it out to someone else,

3   yes.

4          MR. YOUNG:  Okay, thank you.

5          THE WITNESS:  No.                              11:46:09

6   BY MR. KING:

7       Q.  Do you have any documentation yourself as

8   to what dates you stayed at the property as your

9   residence, either in the single-family dwelling or

10  the ADU?                                              11:46:25

11      A.  No.

12      Q.  I mean, you don't have calendars or

13  calendar notes or diary notes or anything like that

14  showing when you were living at the ADU or in the

15  single-family dwelling?                               11:46:38

16      A.  No.

17      Q.  Okay.

18         MR. KING:  I had mentioned to Mr. Young off

19  the record that we had received a -- two

20  spreadsheets, which I haven't looked at, other than   11:46:58

21  just -- I saw them.  I didn't look at them.  I

22  didn't examine them.  And a link to documents, which

23  I understand are being produced today in response to

24  the request to produce today, but I haven't reviewed

25  them.                                                 11:47:18

1    Q.  Okay.  Also, Exhibit E1 and E2, which are

2    the third and fourth pages of this exhibit, are

3    images of your property at 4640.

4        Does that make sense?

5    A.  These are known as the infamous drone                11:50:18

6    photographs from the previous case on Mr. Hoffman's

7    affidavit of probable cause, where he first

8    referenced the Google photographs when he was

9    applying for the inspection permit to the judge, and

10   then said "upon further review," making it appear         11:50:38

11   that these were a continuation of the Google.  So

12   I'm very well of these.

13        And this also relates back to when you

14   asked me the March date, the first time I had come

15   across -- this is the first time that I'd even known     11:50:53

16   that you'd flown a drone over my property or that

17   the County had flown a drone over my property.

18   Q.  Okay.  So when you saw these pictures was

19   the first time that you knew that there had been a

20   drone flown over the property in 2020?                    11:51:08

21   A.  Yes.

22   Q.  And these pictures have a filed date of

23   August 4, 2020, at the top right-hand side?

24   A.  Yes.

25   Q.  Okay.  So in conjunction with the             11:51:25

1  restraining order that you were requesting at that

2  time, you saw these pictures?

3      A.  Yes.

4      Q.  Okay.

5      A.  I believe it was in the return of the          11:51:34

6  inspection warrant that I discovered this through

7  the federal case, something like Document 40.  What

8  does that say?  This is Document 25?

9          In any event, it was the return of the

10  inspection warrant -- I thought, holy crap, look at   11:51:49

11  all this stuff -- that I discovered this.

12      Q.  Okay.  So I'm just trying to find out, with

13  regards to these two photographs, E1 and E2, they

14  were contained in a legal filing for the prior case

15  involving Mr. Smith?                                  11:52:10

16      A.  That's correct.

17      Q.  All right.  And until you saw these

18  pictures when they were filed, you didn't know that

19  they had been taken; is that correct?

20      A.  That is correct.                              11:52:21

21      Q.  Okay.

22      A.  Had no clue of any drone whatsoever.

23      Q.  Okay.  And --

24          MR. YOUNG:  Wait, wait.  I'm sorry.  So

25  your question is when these were filed, that was     11:52:32

1  when he first became aware they'd been taken?

2          MR. KING:  Yes.

3          MR. YOUNG:  I think it's when the

4  inspection warrant was -- we found out about the

5  inspection warrant.                                    11:52:41

6          THE WITNESS:  When it was returned --

7          MR. YOUNG:  Right.

8          THE WITNESS:  -- into the federal court

9  case with Cupp v Smith is when I looked at the

10 document, and that's the first time that I was aware   11:52:49

11 that these are even the entire declaration, which I

12 thought was fraudulent for Mr. Hoffman, to the

13 judge.

14 BY MR. KING:

15     Q.  Okay.  So the return of the warrant, just    11:52:58

16 for the record, was in the state court matter?

17     A.  No.

18     Q.  Okay.

19          MR. YOUNG:  Well --

20 BY MR. KING:                                            11:53:09

21     Q.  You're remembering that the return of the

22 inspection warrant was in the federal court matter;

23 is that what you're remembering?

24     A.  Cupp v Smith was --

25          MR. YOUNG:  Well...                            11:53:22

1  BY MR. KING:

2      Q.  Just to be clear, the exhibits, 25-1 and

3  all the other exhibits that were filed at about this

4  time, August 4th, 2020, included the inspection

5  warrant.  You remember seeing that at sometime                    11:53:39

6  before this date?

7      A.  Before which date?

8      Q.  Before August 4, 2020.

9      A.  No.  I saw it after it was filed.

10     Q.  Perfect.  That's all I wanted to find out.        11:53:52

11  August 4, 2020, is when we're referencing that you

12  saw the inspection warrant, the return of inspection

13  warrant and these photographs?

14     A.  That's when it was filed.  When I reviewed

15  the filings after that is when I discovered, when I       11:54:04

16  was going through all the filings.

17     Q.  Okay.  Thanks.

18         And did you make any contact with code

19  enforcement about these photographs at that time?

20     A.  My understanding, that when they had            11:54:22

21  applied for the inspection warrant, I got a call --

22  they put in to not give me a phone call 24 hours in

23  advance, that it was exigent circumstances; that

24  Hoffman had pulled the inspection warrant around

25  July 20th, but they came in for what I call the          11:54:52

1  raid; they came in with eight different agencies,

2  and I got a call from Tyra Harrington while I was at

3  work and said, "We're here.  We have an inspection

4  warrant."

5        And I said, "Well, I'm at work.  I can't                 11:55:09

6  get there for a little while."

7        And she said, "It doesn't matter.  We're

8  going in."

9        That's how I was awakened to the County on

10  July, like, 30th.  So it was ten or -- yeah, ten        11:55:20

11  more days after the exigent circumstances when they

12  pulled the warrant.

13     Q.  Okay.  So with reference back to the

14  Mr. Cruz video and the date of June 1, 2022, did you

15  make any contact with a healthcare professional with   11:55:47

16  regards to any concerns you had about the drone

17  being flown on that date?

18     A.  I'm not sure I understand your question.

19     Q.  Sure.  Did you claim that you were injured

20  in some way, either physically, emotionally or         11:56:09

21  mentally that led you to go to a healthcare

22  professional following learning about that drone

23  event?

24     A.  I did not go to a specific healthcare

25  professional.  I've had 20 years of interaction with   11:56:23

1    the County going back to 2000.  They wrote me up a

2    bunch of citations, then, for storage containers,

3    and the guy came out, and I said, "Well, you drove

4    past 50 of them to get here."

5             He goes, "We're complaint driven," so          11:56:42

6    someone must have filed a complaint.

7             Then I had a section of time where the

8    County came out, and I -- in the ADU that had always

9    been there was my office, my construction office; so

10   myself and a bookkeeper operated out of the ADU.       11:56:57

11            MR. YOUNG:  So hold on.  He's asking you if

12   you ever went to see a healthcare professional as a

13   result of learning they had droned your property.

14            THE WITNESS:  No.

15   BY MR. KING:                                            11:57:12

16       Q.  So with regards to drone activity at your

17   property, you haven't seen any healthcare

18   professional; is that correct?

19       A.  I believe that's correct.

20       Q.  Okay.  With regards to these other             11:57:26

21   complaints that started in 2019 with regards to

22   Mr. Smith to the present time, have you seen a

23   healthcare professional for any of your complaints

24   about code enforcement for Permit Sonoma?

25       A.  So isn't that the same question with the       11:57:46

1    are shown in the pictures in front of you?

2        A.  That's correct.

3        Q.  And you were not present at the property

4    when Mr. Cruz took the pictures; correct?

5        A.  That's correct.  And video.                    12:01:07

6        Q.  Yeah, I'm sorry, and the video.

7        A.  That's right.

8        Q.  That's what I meant.

9            You were present at the property in July

10   when we came to look at the property, July 2022?       12:01:25

11       A.  Where we had the site visit?

12       Q.  Yes.

13       A.  Correct.

14       Q.  Have you been present at the property when

15   any other visit or inspection by code enforcement      12:01:36

16   has taken place?

17       A.  Several.

18       Q.  Which ones?

19       A.  I couldn't tell you the dates.

20       Q.  Okay.  Which code enforcement?  I'm talking     12:01:46

21   about code enforcement, not building or...

22       A.  I misspoke.  It was building department.

23       Q.  Okay.  So building inspectors come out to

24   look and see that -- the work being done; correct?

25       A.  They come out to approve the work that's        12:01:59